No. 1:17-CV-11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

CORTNÉ MAREESE ROBINSON,

Petitioner,

v.

OFFICE OF THE ATTORNEY GENERAL,
LORIE DAVIS, DIRECTOR TDCJ-CID,

Respondent.

———————————

**REPLY BRIEF OF PETITIONER**

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

DONNA F. COLTHARP
Deputy Federal Public Defender

MARINA T. DOUENAT
Assistant Federal Public Defender

*Attorneys for Cortné Robinson*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iv

INTRODUCTION ............................................................................ 1

ARGUMENTS AND AUTHORITIES ............................................. 2

I.   General Statement on Procedural Default and Motion For
     Abeyance Pursuant to *Rhines v. Webber*, 544 U.S. 269
     (2005). ........................................................................................ 2

II.  Robinson Requests an Evidentiary Hearing. ........................... 3

III. Robinson Was Denied His Constitutional Right to
     Exculpatory Information When the Prosecution Withheld
     the Statement of Bradney Smith. (Pet's Claim I)..................... 8

     A.  Robinson seeks a stay to return to state court.
         Alternatively, this claim is not defaulted............................. 8

     B.  Robinson's *Brady* claim is meritorious................................ 10

IV.  Robinson Was Denied Due Process When the Prosecution
     Failed To Disclose the Benefits the State's Star
     Punishment Witness Was Promised by Attorney Hagan for
     His Cooperation. (Pet's Claim II)............................................ 12

     A.  The claim is not defaulted. .................................................. 12

     B.  The claim is meritorious. ..................................................... 14

V.   The State Courts' Rejection of Robinson's Claims
     Regarding Opinion Testimony Is Unreasonable. (Pet.
     Claim III) ................................................................................. 18

     A.  The State Courts' Finding That Trial Counsel Were Not
         Ineffective Was Unreasonable. ........................................... 18

     B.  Defense counsel were ineffective for failing to object to
         improper jury argument based on the lyrics....................... 23

C.  Trial counsel were ineffective for failing to offer expert
testimony rebutting the improper opinions and
arguments. .......................................................................... 25

VI. Trial counsel Were Ineffective for Failing to Challenge
Future-Dangerousness Evidence. (Pet's Claim. IV) ............... 29

A.  Trial counsel failed to challenge the reliability of future
dangerousness evidence...................................................... 29

B.  Trial counsel were ineffective for failing to present
adequate expert testimony on Robinson's behalf............... 33

1.  This claim is not defaulted. .......................................... 33

2.  The testimony would have made a difference. ............. 36

VII.    Trial Counsel Were Ineffective for Failing to
Investigate and Present Evidence About Robinson's
Serous Sleep Deprivation. (Pet. Claim V(B)(1)) ...................... 39

VIII.   Trial Counsel Was Ineffective for Failing to Investigate
Adolescent Brain Development. (Pet's Claim VI, VII) ............ 40

C.  Trial counsel were ineffective. ........................................... 45

IX. The State Courts' Rejection of Robinson's IAC Claims
Regarding Evidence of Mrs. Zabokrtsky's Sexual Assault
Is Unreasonable....................................................................... 48

A.  The state courts' findings that trial counsel were not
ineffective for failing to object to the assault evidence
were unreasonable. ............................................................. 49

1.  The evidence was inadmissible at trial or
sentencing..................................................................... 49

2.  The evidence was inadmissible at sentencing. ............. 51

3.  The extraneous-offense evidence at both trial and
sentencing violated Robinson's due process
guarantee of a fair sentencing proceeding.................... 53

X.  Robinson Was Denied Due Process and Equal Protection of
the Law When the Prosecutor Struck African-American
Venire Members Because of Their Race. (Pet's Claim IX) ...... 55

CONCLUSION.................................................................................. 59

CERTIFICATE OF SERVICE ....................................................... 60

## TABLE OF AUTHORITIES

### Cases

*Ake v. Oklahoma,*
   470 U.S. 68 (1985) ................................................................. 26, 47

*Balentine v. Stephens,*
   No. 2:03-cv-00039, 2016 WL 1322435
   (N.D. Tex. Apr. 1, 2016)...................................................... 4, 7, 11

*Banks v. Dretke,*
   540 U.S. 668 (2004) ............................................................. 10, 13

*Barefoot v. Estelle,*
   463 U.S. 880 (1983) ..................................................................... 31

*Barrientes v. Johnson,*
   221 F.3d 741 (5th Cir. 2000) ........................................................ 6

*Batson v. Kentucky,*
   476 U.S. 79 (1986) ................................................................. 55, 56

*Bekendam v. State,*
   441 S.W.3d 295 (Tex. Crim. App. 2014)...................................... 21

*Bouie v. City of Columbia,*
   378 U.S. 347 (1964) ..................................................................... 20

*Brady v. Maryland,*
   373 U.S. 83 (1963) ..............................................................*passim*

*Brown v. Thaler,*
   684 F. 3d 482 (5th Cir. 2012) ....................................................... 4

*Buck v. Davis,*
   137 S. Ct. 759 (2017) ..................................................... 25, 30, 36

*Charles v. Thaler,*
   629 F.3d 494 (5th Cir. 2011) ................................................ 18, 49

*Coker v. Georgia,*
 433 U.S. 584 (1977) .................................................................. 51

*Coleman v. Thompson,*
 501 U.S. 722 (1991) ....................................................... 6, 7, 42

*Cruz v. United States,*
 No. 3:11-cv-00787-JCH, 2018 WL 1541898
 (D. Conn. Mar. 29, 2018) ........................................................ 41

*Cullen v. Pinholster,*
 563 U.S. 170 (2011) ...................................................... 4, 9, 33

*Darden v. Wainwright,*
 477 U.S. 168 (1986) ................................................................ 54

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,*
 509 U.S. 579 (1993) .......................................................... 27, 30

*Detrich v. Ryan,*
 740 F.3d 1237 (9th Cir. 2013) (en banc) .................................... 8

*Escamilla v. Stephens,*
 749 F.3d 380 (5th Cir. 2014) ...................................................... 4

*Ex Parte Murphy,*
 495 S.W. 3d 282 (Tex. Crim. App. 2016) ................................... 42

*Ex Parte Robinson,*
 No. WR-81,583-01, 2016 WL 6610373
 (Tex. Crim. App. Nov. 9, 2016) ........................................*passim*

*Ex Parte Torres,*
 943 S.W.2d 469 (Tex. Crim. App. 1997) (en banc) .................... 42

*Fields v. State,*
 1 S.W.3d 687 (Tex. Crim. App. 1999) ........................................ 52

*Gholson v. Estelle,*
 675 F.2d 734 (5th Cir. 1982) .................................................... 30

*Giglio v. United States,*
    405 U.S. 150 (1972) ...................................................... 13, 14, 17

*Gray v. Netherland,*
    518 U.S. 152 (1996) ...................................................... 2

*Harris v. State,*
    827 S.W.2d 949 (Tex. Crim. App. 1992).................................... 52

*Hayes v. Thaler,*
    361 F. App'x 563 (5th Cir. 2010) ....................................... 56

*Hinton v. Alabama,*
    571 U.S. 263 (2014) .................................................... 39

*Jenkins v. Anderson,*
    447 U.S. 231 (1980) .................................................... 3

*Jones v. Bagley,*
    696 F.3d 475 (6th Cir. 2012) ........................................... 9

*Jones v. Basinger,*
    635 F.3d 1030 (7th Cir. 2011) .......................................... 43

*Joyner v. King,*
    786 F.2d 1317 (5th Cir. 1986) .......................................... 33

*Keeney v. Tamayo-Reyes,*
    504 U.S. 1 (1992) ...................................................... 6

*Kihega v. State,*
    392 S.W.3d 828 (Tex. App.—Texarkana 2013, no pet.)...................... 21

*King v. State,*
    125 S.W.3d 517 (Tex. Crim. App. 2003).................................. 52

*Kyles v. Whitely,*
    514 U.S. 419 (1995) .................................................... 12

*Lesko v. Lehman,*
    925 F.2d 1527 (3d Cir. 1991)............................................ 25

*Mack v. Bradshaw,*
  No. 1:04 CV 829, 2011 WL 5878395
  (N.D. Ohio Nov. 23, 2011) ......................................................... 9

*Martinez v. Ryan,*
  566 U.S. 1 (2012) .............................................................*passim*

*Mayes v. State,*
  816 S.W.2d 79 (Tex. Crim. App. 1991)..................................... 50

*McQuiggin v. Perkins,*
  569 U.S. 383 (2013) ................................................................... 5

*Miller-El v. Dretke,*
  545 U.S. 231 (2005) ................................................................. 58

*Moore v. State,*
  165 S.W.3d 118 (Tex. App.—Ft. Worth 2005, no pet.)......... 50, 52

*Napue v. Illinois,*
  360 U.S. 264 (1959) ..................................................... 12, 13, 17

*O'Dell v. Netherland,*
  521 U.S. 151 (1997) ................................................................. 43

*Osbourn v. State,*
  92 S.W.3d 531 (Tex. Crim. App. 2002)..................................... 22

*Payne v. Tennessee,*
  501 U.S. 808 (1991) ................................................................. 54

*Penry v. Lynaugh,*
  492 U.S. 302 (1989) ................................................................. 38

*Reid Road Mun. Utility Dist. No. 2 v. Speedy Stop Food Stores,*
  *Ltd.,* 337 S.W.3d 846 (Tex. 2011) ............................................. 21

*Rhines v. Webber,*
  544 U.S. 269 (2005) ............................................................. 2, 4

*Rhoades v. Davis,*
  852 F.3d 422 (5th Cir. 2017) ................................................... 42

*Riggins v. Nevada,*
   504 U.S. 127 (1992) .................................................................. 24

*Rodriguez v. State,*
   903 S.W.2d 405 (Tex. App.—Texarkana 1995, pet. ref'd) ......... 22

*Roper v. Simmons,*
   543 U.S. 551 (2005) ...........................................................*passim*

*Sample v. Colson,*
   958 F. Supp. 2d 2013, 889 (W.D. Tenn. 2013) ............................ 9

*Schlup v. Delo,*
   513 U.S. 298 (1995) ................................................................... 3

*Schriro v. Landrigan,*
   550 U.S. 465 (2007) ................................................................... 3

*Skaggs v. Parker,*
   235 F.3d 261 (6th Cir. 2000) ................................................... 47

*Smith v. Cain,*
   565 U.S. 73 (2012) ............................................................. 11, 12

*Spring Co. v. Edgar,*
   99 U.S. 645 (1878) ................................................................... 31

*Strickland v. Washington,*
   466 U.S. 668 (1984) ...........................................................*passim*

*Teague v. Lane,*
   489 U.S. 288 (1989) ................................................................. 43

*Townsend v. Sain,*
   372 U.S. 293 (1963),
   *overruled in part on other grounds, Keeney v. Tamayo-Reyes,*
   504 U.S. 1 (1992) ...................................................................... 3

*Trevino v. Thaler,*
   569 U.S. 413 (2013) ................................................................... 3

*United States v. Bagley,*
   473 U.S. 667 (1985) ............................................................. 14

*United States v. Fields,*
   483 F.3d 313 (2007) ............................................................ 30

*United States v. Frazier,*
   387 F.3d 1244 (11th Cir. 2004) ................................. 27

*United States v. Fulbright,*
   804 F.2d 847 (5th Cir. 1986) ..................................... 31

*Walker v. Martin,*
   562 U.S. 307 (2011) ................................................... 42

*Williams v. Taylor,*
   529 U.S. 362 (2000) ................................................... 38

*Williams v. Taylor,*
   529 U.S. 420 (2000) ........................................... 5, 6, 7

*Witherspoon v. Illinois,*
   391 U.S. 510 (1968) ................................................... 56

*Witty v. State,*
   203 S.W.2d 212 (1947).............................................. 22

*Woods v. State,*
   13 S.W.3d 100 (Tex. App.—Texarkana 2000, pet. ref'd) ........... 23

## Constitutional Provision

Eighth Amendment,
   United States Constitution ..................................... 40

## Statutes

28 U.S.C. § 2254(d) ........................................... 4, 7, 8, 9

28 U.S.C. § 2254(d)(1) ............................................. 4

28 U.S.C. § 2254(e)................................................... 9

28 U.S.C. § 2254(e)(2) ............................................................*passim*

TEX. CODE CRIM. PROC. ANN. Art. 37.07, § 3(a)............................ 52

TEX. CODE CRIM. PROC. Art. 37.071(b) .......................................... 40

TEX. CODE CRIM. PROC. art. 39.14(b) (2009) .................................. 20

**Rules**

Texas Rule of Evidence 701 ....................................................*passim*

Texas Rule of Evidence 702 ................................................... 20, 21

Texas Rule of Evidence 703 ......................................................... 21

Texas Rule of Evidence 705 (2009).............................................. 20

**Other Authorities**

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF
    COUNSEL IN DEATH PENALTY CASES 4.1 (2003) .......................... 26

Alan Jackson, *Prosecuting Gang Cases: What Local Prosecutors
    Need to Know*, 42-JUN PROSECUTOR 32 (2008) ........................ 28

American Bar Journal, Resolution 111, Report to the House of
    Delegates, *available at*
    https://www.americanbar.org/content/dam/aba/images/abanews/
    mym2018res/111.pdf .................................................................. 44

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL
    MANUAL OF MENTAL DISORDERS 645–50 (4th ed. 1994) ............. 32

Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art,
    Life, and Criminal Evidence*, 31 COLUM. J.L. & ARTS 1 (2007) . 26

Byron Hurt, *Hip Hop: Beyond Beats and Rhymes,*
    PBS/Independent Lens (2006) ................................................... 27

John H. Blume, Lindsey S. Vann, and Amelia Courtney Hritz,
    *Death by Numbers: Why Evolving Standards Compel Extending*

Roper's *Categorical Ban Against Executing Juveniles from 18 to 21*, TEX. L. REV. (forthcoming Spring 2019), *available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3341438 ##10–11* ..................................................................... 43, 44, 45

M. Eve Haman, *Remorse Bias*, 83 MO. L. REV. 301 (2018)............ 25

Robin Walker Sterling, *Children are Different: Implicit Bias, Rehabilitation, and the "New" Juvenile Jurisprudence,"* 46 LOY. L.A. L. REV. 1019 (2013) ........................................................... 46

Russell Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. Rev. 407 (2014)...... 48

Sheri Lynn Johnson, *Racial Imagery in Criminal Cases*, 67 TUL. L. REV. 1739 (1993) ........................................................... 24

*Speer v. Director*, No. 2:04-cv-00269-JRG-RSP, Magistrate's Report and Recommendation, Dkt. No. 102 at *22–23 (E.D. Tex. June 25, 2018) ........................................................... 34

Texas Crim. Jury Charges § 4:400, Extraneous Offenses (2009) . 53

United States Sentencing Commission, *Youthful Offenders in the Federal System*, *Fiscal Years 2010 to 2015,* at 15, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf ........................................................... 44

URBAN DICT., located at https://www.urbandictionary.com/define.php?term=doo-rag.... 28

## INTRODUCTION

Cortné Robinson was convicted of capital murder and sentenced to death. In this petition, he argues that conviction and sentence resulted from errors and missteps that violate the U.S. Constitution and must be corrected. They include the state's failure to disclose a co-defendant's exculpatory statement; a trial that was overwhelmed with evidence of the sexual assault that Robinson neither committed nor knew about; a conflict involving the special prosecutor appointed to represent Robinson at trial; an inadequate mitigation case that inexplicably did not address the 13 years of chronic sleep deprivation Robinson had suffered as a child; and testimony by a State psychiatrist who suggested Robinson had antisocial personality disorder and was a psychopath, even though Robinson did not meet the medical criteria for those diagnoses. The Director responds by contending either that Robinson's claims do not survive the "Scylla and Charybdis" of exhaustion and procedural error and that they lack merit. Robinson replies.[1]

_____

[1] Robinson's opening brief fully sets forth his arguments, and he replies only to the extent necessary to clarify his position or to address questions raised by the Director's arguments. His election not to reply to any of the Director's arguments should not be taken as a concession.

## ARGUMENTS AND AUTHORITIES

### I.    GENERAL STATEMENT ON PROCEDURAL DEFAULT AND MOTION FOR ABEYANCE PURSUANT TO *RHINES V. WEBBER*, 544 U.S. 269 (2005).

In its Answer, the Director asserts that many of Robinson's claims are procedurally defaulted. "[P]rocedural default is an affirmative defense." *Gray v. Netherland*, 518 U.S. 152, 165 (1996). The Director has not met her burden. As Robinson demonstrates below, many of his claims are based on the ineffectiveness of trial counsel and were not raised by state habeas counsel. Because Robinson can demonstrate both that state counsel were ineffective and that he was prejudiced by the ineffectiveness, there is no default. *See Martinez v. Ryan*, 566 U.S. 1, 17–18 (2012). Although some claims were heard by the state habeas court, Robinson has shown both cause and prejudice sufficient to overcome that bar. As for other claims this Court may decide are unexhausted or barred, contemporaneous with filing his reply, Robinson has filed a Motion to Stay and Abey the Federal Habeas Proceeding. For the reasons set forth in his Motion to Stay, Robinson believes that there is a reasonable likelihood that the state court would hear these claims on the merits.

Even if this Court were to treat Robinson's claims as procedurally defaulted as alleged by the State, Robinson invokes exceptions to the procedural default doctrine for each claim in his Original Petition, as well as in this Reply. Thus, while Robinson's motion to return to state court is filed at the same time

as this Response and is therefore still pending with this Court, Robinson specifically responds to the affirmative procedural defenses raised by the State for each claim below.

## II.   ROBINSON REQUESTS AN EVIDENTIARY HEARING.

Robinson requested an evidentiary hearing in his Original Petition and renews that request here. *See Pet. iii.* There are several disputes of material fact that must be resolved for this Court to adjudicate Robinson's constitutional claims. Many of the disputes turn on questions of trial and state habeas counsel's ineffectiveness. Accordingly, an evidentiary hearing is necessary. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Townsend v. Sain*, 372 U.S. 293, 312–19 (1963), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

To the extent this Court believes that any of Robinson's ineffective assistance of counsel claims may be procedurally defaulted, this Court should grant a hearing so that Robinson can show cause and prejudice and/or a fundamental miscarriage of justice to overcome any default. *See, e.g., Trevino v. Thaler*, 569 U.S. 413, 424–25 (2013) (ineffective assistance of state post-conviction counsel can establish cause for procedural default); *Schlup v. Delo*, 513 U.S. 298, 332 (1995) (remanding to district court to determine whether to hold hearing on fundamental miscarriage of justice); *Jenkins v. Anderson*, 447 U.S. 231, 234 n.1 (1980) (application of cause and prejudice may require district court fact

finding). If the Court were to deny Robinson's pending motion for a *Rhines* stay to permit factual development and exhaustion of claims in state court, a federal evidentiary hearing is particularly appropriate. *See, e.g., Balentine v. Stephens*, No. 2:03-cv-00039, 2016 WL 1322435, at *4 (N.D. Tex. Apr. 1, 2016).

The Director argues that, in reviewing claims that have been exhausted in state court, this Court may not consider any evidence that was not before the state court. Ans. 16–21 (citing 28 U.S.C. § 2254(d), *Cullen v. Pinholster*, 563 U.S. 170 (2011)). True enough. But, if a claim was defaulted and Robinson overcomes the default, then § 2254(d) does not apply. In addition, even when the state court adjudicated a claim on its merits, *Pinholster* limits habeas review to the state court record only on the question whether the state court reasonably applied Supreme Court precedent under 28 U.S.C. § 2254(d). *See Pinholster,* 563 U.S. at 181 ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

The Director argues Robinson is not entitled to a hearing, at least regarding claims that were raised in state court, including ineffective assistance of counsel claims. Ans. 19–22 *(*citing *Escamilla v. Stephens*, 749 F.3d 380 (5th Cir. 2014); *Brown v. Thaler,* 684 F. 3d 482, 489 n.4 (5th Cir. 2012)). Those cases do not apply here. In both cases, the state courts had considered the ineffectiveness claims. *See Escamilla*, 749 F.3d at 394–95; *Brown*, 684 F.3d at 489.

To the extent that Robinson raises ineffective assistance of counsel claims that were not developed in state court, these cases do not control Robinson's request for a hearing.

The Director cites 28 U.S.C. § 2254(e)(2), as a bar to new evidence on claims that may have been raised but were not fully developed in state court. Ans. 21–22. But Robinson is entitled to a hearing on those claims to the extent that the failure to develop them stems from the ineffective assistance of post-conviction counsel. Refusing to permit fact development in such cases would render *Martinez* meaningless. Because it is an equitable doctrine, *Martinez* should be understood as establishing an equitable exception to the operation of § 2254(e)(2). *See McQuiggin v. Perkins,* 569 U.S. 383, 392–93 (2013) (recognizing "fundamental miscarriage of justice" equitable exception to running of statute of limitations). Section 2254(e)(2) and procedural default are so closely related that it would be inconsistent with the purpose and holding of *Martinez* to fail to apply it in the context of § 2254(e)(2). Failure to develop facts under § 2254(e)(2) is a procedural error very similar to procedural default. *See Williams v. Taylor*, 529 U.S. 420, 437 (2000) (whether petitioner "failed to develop" evidence depends on whether he was "diligent in developing the record and presenting, if possible, all claims of constitutional error"). The rationale and purpose of the procedural default doctrine and § 2254(e)(2) are virtually identical.

As the Court pointed out in *Coleman v. Thompson*, 501 U.S. 722, 731 (1991), the procedural default rule prevents habeas petitioners from being given "an end run around the limits of this Court's [direct review certiorari] jurisdiction and a means to undermine the State's interest in enforcing its laws." *See also id.* at 750 (describing procedural default rule as furthering State interests in "channeling resolution of claims to the most appropriate forum, in finality, and in having an opportunity to correct its own errors"). In *Keeney v. Tamayo-Reyes,* 504 U.S. 1 (1992), the Supreme Court described its failure-to-develop doctrine (later codified and strengthened in § 2254(e)(2), *see Williams*, 529 U.S. at 434, in very similar terms, stating that the doctrine "will appropriately accommodate concerns of finality, comity, judicial economy, and channeling the resolution of claims into the most appropriate forum." *Id.* at 8; *see also id.* (it is "irrational to distinguish between failing to properly assert a federal claim in state court [i.e., procedural default] and failing in state court to properly develop such a claim"). Because the two doctrines serve similar purposes, cause for a procedural default and cause for failure to develop the factual basis for a claim are identical. *See Barrientes v. Johnson*, 221 F.3d 741, 771 (5th Cir. 2000) (when there is cause for procedural default, petitioner did not "fail to develop" the record under § 2254(e)(2)) (citing *Williams*, 529 U.S. at 444).

Section 2254(e)(2) states that the statute's preclusive effect applies only "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings …." As the Supreme Court explained in *Williams*, this language means that the preclusive effect applies only if the petitioner has been at fault in some way, and that "a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another …." *Williams*, 529 U.S. at 432.

In *Martinez*, the Court, reversing its holding in *Coleman*, explained that a petitioner may not be held to be at fault, under § 2254(d), for the failure of his habeas counsel to develop a claim. *Martinez*, 566 U.S. at 14. The same reasoning applies to a failure to develop under § 2254(e)(2). For  the same reasons that it is inequitable to attribute counsel's lack of diligence to the petitioner for purposes of procedural default, it is likewise inequitable to do so under § 2254(e)(2). Therefore, *Martinez* allows a petitioner to develop in a federal habeas court the factual basis for his ineffective assistance of trial counsel claim if the petitioner's failure to develop the facts in state court resulted from the inaction of counsel who was ineffective under the *Strickland* standard. *See Balentine*, No. 2:03-cv-00039, 2016 WL 1322435, at *4. *Martinez* would be a dead letter if a prisoner's only opportunity to develop the factual record of his state post-conviction counsel's ineffectiveness had been in state post-conviction

7

proceedings, where the same ineffective counsel represented him." *Detrich v. Ryan*, 740 F.3d 1237, 1247 (9th Cir. 2013) (en banc).

### III. ROBINSON WAS DENIED HIS CONSTITUTIONAL RIGHT TO EXCULPATORY INFORMATION WHEN THE PROSECUTION WITHHELD THE STATEMENT OF BRADNEY SMITH. (PET'S CLAIM I)

Robinson argues that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), when the prosecutor did not disclose to the defense team that it had learned from co-defendant Bradney Smith, who had been standing next to Robinson at the time of the shooting, that the shooting of Frank Zabokrtsky was accidental. Pet. 9–16. The Director responds that this argument is unexhausted and lacks merit.

### A. Robinson seeks a stay to return to state court. Alternatively, this claim is not defaulted.

The Director contends that this claim is unexhausted, and there is no excuse for the default. For the reasons set forth in his motion for a stay, Robinson believes that there is a reasonable likelihood that the state court would hear this claim on the merits. Robinson therefore seeks the opportunity to litigate this claim in state court.

Should this Court deny that motion, Robinson asserts that he can show cause and prejudice to overcome any default by showing that state habeas counsel was ineffective for failing to investigate and litigate this claim. *See Martinez,* 566 U.S. at 17–19. Title 28 U.S.C. § 2254(d) does not prohibit the

court from hearing evidence on these claims. As noted above, *Pinholster* limits habeas review to the state court record only on the question whether the state court reasonably applied Supreme Court precedent under 28 U.S.C. § 2254(d). *See* 563 U.S. at 181. These claims rely on a newly discovered and significant witness statement, which, if true, establishes that the prosecution knowingly elicited perjured testimony. That evidence was unknown to the state court. *Pinholster* recognizes the possibility that "withheld exculpatory witness statements" will give rise to a "new claim" in federal court. 563 U.S. at 186 n.10. Subsequent lower court decisions have allowed discovery, evidentiary hearings, and other factual development under circumstances like those present here—that is, when new and substantial *Brady* evidence emerges for the first time during federal habeas proceedings. *See, e.g., Sample v. Colson*, 958 F. Supp. 2d 2013, 889 (W.D. Tenn. 2013); *Jones v. Bagley*, 696 F.3d 475, 486 n.4 (6th Cir. 2012); *Mack v. Bradshaw*, No. 1:04 CV 829, 2011 WL 5878395, at *19 * n.3 (N.D. Ohio Nov. 23, 2011). If the law were otherwise, prosecutors could violate *Brady* and easily conceal the violation indefinitely.

Nor, contrary to the Director's argument, is habeas counsel's failure to develop the record a bar under under § 2254(e)(2). *See* Ans. 23. As Robinson has demonstrated, the bar under § 2254(e) should, under *Martinez*'s rationale, be lifted when habeas counsel has been ineffective.

The claim is not defaulted for another reason. The state's misconduct in not disclosing the favorable treatment to Smith constitutes cause for any default. *See Banks v. Dretke*, 540 U.S. 668, 692 (2004). In *Banks*, the prosecution had failed to disclose a deal it had made with a witness (in that case, a payment to an informant). The state argued that new evidence of the deal or the informant's status could not be presented for the first time in federal habeas proceedings. The Court disagreed. A petitioner shows cause when the reason for his failure to develop facts in the state court proceeding was the state's suppression of the evidence. *Id.* at 692. And the petitioner shows prejudice, when, as here, the witness at issue played a key role in the scenario, and was mentioned specifically in the prosecution's summation. *See id.* In Robinson's case, Smith, a co-defendant, not only would have cast doubts in a juror's mind about Robinson's "intent"—his eyewitness testimony would be the only evidence of mental state.

## B.  Robinson's *Brady* claim is meritorious.

The Director also attempts to refute Robinson's argument on the merits. Ans. 23–29. She argues that Smith's declaration changes nothing because if it had been admissible at trial, the prosecution would have rebutted Smith's statements with his prior inconsistent statement that he was not in the room when the shooting occurred. *See* Ans. 27. In so arguing, the State contends that Smith's declaration is not credible. *See* Ans. 24–27 The State insists that a

prisoner would not withhold information at one stage of litigation and then disclose it at the next stage. Of course, one reason Smith might have denied being in the room was that he faced a murder trial and was seeking to distance himself from the killing. But, leaving aside that the State presents no evidence from the trial prosecutors or otherwise, questions of credibility are properly assessed at an evidentiary hearing. *See Balentine*, No. 2:03-cv-00039, 2016 WL 1322435, at *4. The record does not compel the State's reading, and Robinson should be allowed to develop the evidence in this Court supporting his claim.

Additionally, the Director suggests that, in light of ballistics examiner Officer Beene's testimony, the withheld evidence would not have "affected the jury's verdict." *See* Ans. 20. The State errs. *Brady* materiality extends to all evidence "material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (citing *Brady*, 373 U.S. at 87 ("where the evidence is material either to guilt or to punishment") (emphasis added)). Beene testified that the shooting was not accidental. Of course, a jury might have credited Smith's testimony over Beene's. But, even if it did not, it could have nonetheless concluded that Robinson acted with a mental state less than intent. Smith's statements would have supported a lesser-mental-state finding, and it would also have countered the State's argument at punishment regarding Robinson's intent. *See* Pet. 13–15. The State's failure to disclose this information, and its contention that there was overwhelming evidence of Robinson's intent when there

really was not, undermines confidence in the outcome of the trial. *Id.*; *see Kyles v. Whitely*, 514 U.S. 419, 434 (1995).

**IV.  ROBINSON WAS DENIED DUE PROCESS WHEN THE PROSECUTION FAILED TO DISCLOSE THE BENEFITS THE STATE'S STAR PUNISHMENT WITNESS WAS PROMISED BY ATTORNEY HAGAN FOR HIS COOPERATION. (PET'S CLAIM II)**

Robinson contends that the State engaged in prosecutorial misconduct when prosecutor Rick Hagan promised his client, Renrick Taylor, favorable treatment in exchange for testimony against Robinson. Pet. 16–25. The State argues that this claim is procedurally barred and, alternatively, meritless. *See* Ans. 29.

### A. The claim is not defaulted.

The Director argues the claim is defaulted, because *Martinez* does not apply to *Brady* and *Napue v. Illinois*, 360 U.S. 264 (1959), claims, and Robinson has not alleged or established a sufficient basis to overcome the procedural default. Ans. 33. These claims should be rejected, because Robinson has overcome any default. Alternative, the claim should be remanded to state court.

Prosecutorial misconduct provides the cause for any default. The proper cause and prejudice analysis of the *Napue* portion of this claim is analogous to that of the *Brady* portion. The "cause" for Robinson's failure to raise the *Napue* claim is that the State presented false evidence—and allowed false evidence to stand uncorrected—based on its suppression of evidence regarding the owner

of the razor blade and Robinson's statements. *See, e.g., Banks*, 540 U.S. at 671. Robinson can also show prejudice. The "prejudice" portion is assessed identically to the materiality prong of *Napue*: that the false testimony "may have had an effect on the outcome of the trial." *Napue*, 360 U.S. at 272. Accordingly, as with the *Brady* claim, the cause and prejudice analysis regarding the default merges with the merits analysis, below.

The State then argues that Robinson "failed to develop" in state court the facts he now seeks to present in federal court, and that a hearing is therefore precluded by 28 U.S.C. § 2254(e)(2). *See* Ans. 34.The State's invocation of § 2254(e)(2) rests on the premise that Robinson, through one of his state habeas counsel's investigators, had spoken to Taylor and "gained information about his pretrial discussion with Hagan," which he then "failed to develop" in state court. *Id*. This argument fails for two independent reasons. First, *Martinez* provides a remedy because post-conviction counsel themselves failed to discover and present those facts on account of their own acknowledged ineffectiveness. Orig. Pet. Ex. 6. Second, the record establishes that Hagan and Black hid the information from trial counsel and state habeas counsel through their testimony at the state habeas hearing. Orig. Pet. Ex. 5. The State cannot have it both ways: either the information was known and counsel was ineffective for failing to uncover it, or it was suppressed, and the State violated *Brady, Giglio,* and *Napue*.

13

**B.  The claim is meritorious.**

As for the merits, the Director argues that Robinson failed to show (1) the State suppressed evidence; or (2) the State presented false testimony; and (3) that the evidence was material. *See* Ans. 34–38 The State is incorrect on all three points.

Rick Hagan, Robinson's lead prosecutor, learned right before Robinson's punishment hearing from his private client, Taylor, information that would exculpate Robinson in the allegations concerning the razor blade. Specifically, Hagan learned that "*the razor blade did not belong to Mr. Robinson, but instead belonged to Mr. Taylor* and that *Mr. Taylor never heard Mr. Robinson mention that he was planning on hurting a corrections officer*." Orig. Pet. Ex. 9 (emphasis added). What Hagan, and therefore the prosecution team, knew, was that at least three items of evidence might have been used to impeach Taylor: *First*, that the razor was Taylor's, not Robinson's. *Second*, that Taylor's version of the facts was inconsistent with Richard Benefield's statement that Robinson planned to harm a guard. And *third,* that Hagan had promised to testify on Taylor's behalf regarding Taylor's alleged "cooperation" in the Robinson trial. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence falls within the *Brady* rule.").

The Director argues that this evidence does not fall within *Brady* because the prosecution team in this case could not have offered Taylor leniency. Ans. 34. According to the Director, the prosecutors did not act as Harrison County district attorneys outside of the Robinson case. *Id*. The Director further suggests that because Hagan "stayed out of the loop" and turned over Taylor's examination at sentencing to Black, no *Brady* violation had occurred. *Id*. at 34–35. And the Director argues that there was no deal, and therefore no evidence was suppressed. Ans. 36.

The Director misses the point. By promising Taylor that he would testify on Taylor's behalf in his later criminal trial, Hagan conferred a valuable benefit in exchange for Taylor's cooperation in Robinson's trial. Orig. Pet. Ex. 10. Clearly, Hagan's testimony "benefitted" Taylor (and the prosecution). Hagan would have told Taylor's jury that he had cooperated with the State by testifying against a fellow inmate, thus bolstering a narrative that Taylor had reformed, or had at least been willing to assist in a criminal prosecution.

Hagan's explicit promise that he would testify at Taylor's capital murder trial would have provided valuable fodder for impeachment, for several reasons. First, the fact that Taylor could have been facing escape charges but was never charged after he testified in Robinson's case would have supported an inference that the prosecution did have an undisclosed deal with him; Taylor had a powerful motive to lie. Second, even in the absence of a formal "deal,"

Taylor had a reasonable expectation that he would receive favorable treatment with respect to his pending capital murder charge when Hagan testified at his sentencing.

As a prosecutor for the State of Texas, Hagan had an affirmative duty to provide the exculpatory information to Robinson's defense counsel, regardless whether he believed it to be true or not. *See Brady*, 373 U.S. at 87. Under *Brady*, the State, through Hagan, had a duty to disclose that Taylor had told him that the razor blade was Taylor's not Robinson's, and that Robinson never mentioned hurting a corrections officer. Hagan violated that duty. Instead, he improperly pressured Taylor to testify against Robinson by implying that Taylor was going to be charged with escape along with Robinson and suggested that Taylor should "help himself" by testifying against Robinson. *Id.*[2] None of this was disclosed to the defense.

The Director's argument that this evidence was not material should be rejected. Ans. 37–38. This information would have served as powerful impeachment of Taylor, because it would have raised substantial questions concerning Taylor's credibility and motivations. In addition, the truth about who the razor

---

[2] Also, at punishment, Mr. Black was careful in crafting the questions he asked Taylor on direct-examination, in order to avoid eliciting that fact or any testimony concerning ownership of the razor 32 RR 261.

blade belonged to would have rebutted the State's attempt at sentencing to characterize Robinson as a person who was ready to harm a correctional officer in an attempted escape. Therefore, under *Giglio*, the State had an obligation to provide this information to Robinson's defense team. *Giglio*, 405 U.S. at 154. The truth would have lent support to the theory that Robinson would not be a future danger, and that the jury should consider sparing his life.

As to Robinson's *Napue* claim, the Director argues that "nothing indicates that the testimony that Robinson had a blade was "actually false" and the prosecution knew it was false. Ans. 37. The Director does not address Hagen's apparent deception highlighted in his improper "testimony," excerpted in Robinson's Petition, Pet. 21, or the opinion of expert Charles Herring, Jr., that Hagen violated his duties to the State of Texas and under *Brady*, Orig. Pet. Ex. 5 at 8.[3] It merely concludes, without analysis, that "the State's questioning of the witnesses was entirely proper." *Id.*

---

[3] Robinson cites to the Exhibits as attached to his original petition. After the filing of that petition, Robinson filed two additional documents—an affidavit from rap expert Charis Kubrin and a report by sleep expert Candice Alfano. For the Court's convenience, those are attached to this Reply as A and B, respectively. In addition, in response to the Director's arguments that Robinson's expert affidavits are deficient because the experts did not swear they would have been available to testify at Robinson's trial, he attaches supplemental affidavits, collectively at C. Counsel was unable to secure a notarized version of Dr. Edens's supplement statement, and will supply it to the Court as soon as possible.

## V.   THE STATE COURTS' REJECTION OF ROBINSON'S CLAIMS REGARDING OPINION TESTIMONY IS UNREASONABLE. (PET. CLAIM III)

Robinson argues that his trial attorneys were ineffective for failing to object to improper opinion testimony about rap lyrics he sang in the hours after the killing. Pet. 25–34. He also contends that counsel were ineffective for failing to object to the prosecutor's inflammatory arguments about those lyrics. The Director responds that the first claim was reasonably resolved by the state courts and that the second is defaulted. The Director is wrong.

### A. The State Courts' finding that trial counsel were not ineffective was unreasonable.

Trial counsel did not object when Investigator Kyle Ready opined that Robinson's spontaneous squad-car rap lyrics meant that he regretted shooting Mrs. Zabokrtsky, that he shot Mr. Zabokrtsky intentionally, and that he was "trying to set up an excuse" for the shooting. 27 RR 188–90. Robinson's state habeas counsel argued that his trial attorneys were ineffective for failing to object. The Director contends the state courts' rejection of that claim is reasonable because the officers who testified had "extensive background in police work." Ans. 41. The Director also argues that the entire opinion-testimony question is unreviewable, because the state courts' rulings were based on state law. *See* Ans. 41–42 (citing *Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011)). The Director's arguments should be rejected, for several reasons.

First, neither the district court nor the court of criminal appeals gave serious consideration to the Texas evidentiary rules. At the state habeas hearing, trial counsel said they believed the opinion testimony was proper because Investigator Ready had experience taking statements. Orig. Pet. Ex. 2, pt. 1, at 129. The district court did not review the correctness of the attorneys' belief. It merely signed findings of facts and conclusions of law that had been drafted by the prosecutors. *See* Orig. Pet. Ex. 3 at 45. The findings noted trial counsels' testimony and then cited state evidentiary rules; the court did not state that the attorneys' interpretation of the rules was correct.[4] *Id*. In addition, the State did not even include Texas Rule of Evidence 701 in its unsupported findings. That rule was added—without explanation—by the court of criminal appeals. *See Ex Parte Robinson*, No. WR-81,583-01, 2016 WL 6610373, at *2 (Tex. Crim. App. Nov. 9, 2016). That court also did not question the correctness of trial counsel's views.

More important, the independent-state-grounds rule should be rejected because applying it would result in an unreasonable resolution of Robinson's federal ineffective-assistance-of-counsel (IAC) claim. To the extent the state

---

[4] In fact, Settle admitted that at least one of the statements "could have been" improper (without citing state or federal rules). Orig. Pet. Ex. 2, pt. 1, at 128, 129.

courts interpreted Texas law, their interpretation was novel and unforeseeable. *Cf. Bouie v. City of Columbia*, 378 U.S. 347, 353–54 (1964) (unforeseeable construction of state law applied retroactively violates due process). Counsel's ineffectiveness must be judged on their performance at the time of trial. *Strickland v. Washington,* 466 U.S. 668, 689 (1984). At that time, Investigator Ready's opinions were inadmissible under both Texas Rule of Evidence 702 and 701.

Investigator Ready was not a qualified expert under Texas Rule of Evidence 702—at least insofar as the meaning of rap lyrics. That is likely why, although the State disclosed the experts it intended to call at trial, it did not include Ready on its list. *See* 3 CR 3509–10; *see also* TEX. CODE CRIM. PROC. art. 39.14(b) (2009) (parties may request expert disclosure). Nor did defense counsel treat Ready as an expert; for example, they did not object that he was not disclosed as an expert or seek to inquire about the facts or data underlying his opinions. *See* TEX. R. EVID. 705 (2009).

Nor, as a substantive matter, did Texas Rule 702 authorize the opinion testimony. Investigator Ready's experience as an officer was not relevant. Under the Texas rule, experts must be "qualified . . . by knowledge, skill, experience, training, or education" on the subject about which they intend to opine. *See* TEX. R. EVID. 702. Here, that subject was the significance or interpretation of Robinson's rap lyrics. None of Ready's experience was related to that subject.

20

27 RR 146–48. In Texas, an expert's opinion is relevant only if the expert is knowledgeable about "the issues at hand." *See Bekendam v. State*, 441 S.W.3d 295, 304 (Tex. Crim. App. 2014) (principles must "fit" evidence "at hand"); *Kihega v. State*, 392 S.W.3d 828, 834 (Tex. App.—Texarkana 2013, no pet.) (expertise must be relevant to issues "at hand"). Thus, even if Ready based his opinions on his experience, *see* TEX. R. EVID. 703, he simply was not qualified to give them. The court of criminal appeals's conclusion to the contrary is a novel reading of state law.

It is for this reason that the court of criminal appeals likely added Rule 701 as a basis for denying the state habeas claim. But the court's decision was novel there, as well. In 2009, Rule 701 permitted lay witnesses, *who were not testifying as experts*, to render opinions, if those opinions were rationally based on the witness's perception and helpful to the jury in determining a fact in issue. The rule did not apply when opinion testimony was based on the witness's "specialized knowledge, experience, training, and expertise" under Rule 702. *Reid Road Mun. Utility Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852 (Tex. 2011). Both trial counsel and the State believed Investigator Ready was testifying as an expert under Rule 702. Indeed, the prosecutor elicited testimony from Ready that appears to be an attempt to qualify him as an

expert. 27 RR 146–48. Ready himself told the prosecutor that he believed Robinson's rap lyrics evinced an attempt to formulate a defense based on his "experience" as a police officer. 27 RR. 191–92.

To the extent the court of criminal appeals meant to isolate the rap testimony and treat it as lay testimony, its reading of Rule 701 was novel and unforeseeable. Texas precedent makes clear that the rule does not permit a lay witness to interpret the meaning of a person's statement. *See Rodriguez v. State*, 903 S.W.2d 405, 410 (Tex. App.—Texarkana 1995, pet. ref'd).[5] In *Rodriguez*, the defendant contended that a police officer was not permitted to give an opinion as to what a witness meant by an unclear assertion in her written statement. *Id*. at 410. Citing a decision from the court of criminal appeals, the Texarkana court agreed: "As a general rule, the opinion of a witness is not admissible to interpret the meaning of the acts, conduct, or language of another." *Id*. (citing *Witty v. State*, 203 S.W.2d 212 (1947)); *compare Osbourn v. State*, 92 S.W.3d 531, 535–36 (Tex. Crim. App. 2002) (testimony regarding

---

[5] The Director's assertion that Ready's opinion was not based on supposed expertise but was "primarily a summary of what had just been presented to the jury," Ans. 43, is patently wrong. Robinson does not object to Ready's testimony regarding the precise words spoken in the squad car. He objects to Ready's uninformed interpretation of those words.

identity of odor); *Woods v. State,* 13 S.W.3d 100, 103–04 (Tex. App.—Texarkana 2000, pet. ref'd) (testimony giving identity of man in videotape). To the extent the jury required assistance in knowing what Robinson actually said, Investigator Ready was qualified to offer an opinion under Rule 701. However, he was not permitted to go further and say what Robinson meant. In light of its precedent, the state court's interpretation of Texas law is novel. For that reason, the state courts unreasonably resolved Robinson's *Strickland* claim.

### B. Defense counsel were ineffective for failing to object to improper jury argument based on the lyrics.

Robinson argues that trial counsel were also ineffective for failing to object to the prosecutor's use of rap lyrics at trial and sentencing to portray Robinson as someone who would continue to be a danger and whose character provided no reason to reject a death sentencing. Pet. 31–32; *see generally* 26 RR 30–31; 41; 36 RR 22–23; 70–72. Contrary to the Director's response, this contention may be reviewed; neither trial counsel nor state habeas counsel raised it; accordingly, any default is excused by *Martinez v. Ryan*, if Robinson has demonstrated deficient performance and prejudice. 566 U.S. at 17–18. He has done so.

Counsel were deficient for not objecting when the prosecutor used the rap lyrics to suggest that Robinson was without "tenderness," "warmth," "kindness," and "compassion." *See* 36 RR 22–23. This statement was a misleading

and uninformed interpretation of any kind of artistic expression, but it was especially wrong and inflammatory in the case of rap lyrics. It invoked racist portrayals of defendants of color as remorseless and "animal-like or subhuman in some way." *See* Sheri Lynn Johnson, *Racial Imagery in Criminal Cases*, 67 TUL. L. REV. 1739, 1752 (1993).[6]

The prosecutor's argument reveals just how much water the rap lyrics carried for the State, both in proving guilt and in securing a death sentence. At trial, Investigator Ready was permitted to say (and, absurdly, to disavow the obvious speculative nature of his statement) that they "proved" the single contested element—intent. 27 RR 27. At sentencing, the lyrics were used to subtly invoke race, heading off important, potentially mitigating questions about youth, remorse, and redemption. In essence, the prosecutor relied on a misunderstood cultural artistic medium to tell the jury that Robinson had no feelings.

The use of the lyrics was prejudicial. "In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative." *Riggins v. Nevada*, 504 U.S. 127, 143 (1992) (Kennedy, J., concurring). Indeed, research suggests that "people in the position to punish others expect remorse and punish the remorseless more severely." M. Eve

---

[6] Elsewhere, the prosecutor was explicit, saying that, unlike Robinson, Mrs. Zabokrtsky "was not an animal." 30 RR 87.

Haman, *Remorse Bias*, 83 Mo. L. Rev. 301, 313–14 (2018). By invoking rap lyrics to suggest that Robinson was remorseless and poses a future danger, the prosecutor invoked troubling, but widely held, views that blacks are more likely to be violent in the future. *See id.* at 330 (summarizing cultural views that blacks are more likely to present a future danger); *cf. Buck v. Davis*, 137 S. Ct. 759 (2017) (vacating death sentence because expert testified that defendant was more likely to be violent in the future because of his race). Robinson's trial took place in a community whose troubled racial history is not fully behind it and centered around painful and problematic race-based questions. In that context, the prosecutor's arguments were "calculated to incite an unreasonable and retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence." *Lesko v. Lehman*, 925 F.2d 1527, 1545 (3d Cir. 1991). Defense counsel were ineffective for failing to stand up and call the jurors away from race and back to the task at hand.

### C. Trial counsel were ineffective for failing to offer expert testimony rebutting the improper opinions and arguments.

Trial counsel's failures to object to opinion testimony and improper argument were compounded by their failure to call an expert such as Dr. Charis E. Kubrin to testify about rap music. *See* Pet. 32–33; Att. A. Such testimony would have mitigated the effect of the prejudicial testimony and arguments. Robinson was entitled to more than just the presence of counsel at his capital trial and

sentencing; he was entitled to a meaningful defense, including meaningful support from experts. *See Ake v. Oklahoma*, 470 U.S. 68, 77 (1985); *see also* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 4.1 (2003) (right to adequate capital counsel includes right to "necessary expert witnesses"). Contrary to the Director's argument, this claim is not procedurally defaulted. *See Martinez*, 566 U.S. at 9. Robinson's state habeas counsel did not argue that trial counsel were ineffective for failing to call an expert knowledgeable about rap music. Under *Martinez*, habeas counsel's failure overcomes the procedural bar if Robinson can show the failure amounted to ineffective assistance and that he was prejudiced by the failure. *Id*. at 17–18.

Robinson has shown that counsel were ineffective. *See* Pet. 32–33. Because rap lyrics are artistic creations, traditional views about speech and language and their reliability must be questioned. Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 COLUM. J.L. & ARTS 1, 12–13 (2007). This is so because "the existence and use of methods governing the composition of lyrics are not part of the public's everyday learning and experience." *Id*. at 13. Jurors may not understand that, because lyrics are crafted (and sometimes re-crafted), they may not "bear reliably on the truth of any fact in issue." *Id*. at 14. It is wrong to treat them as necessarily autobiographical. *Id*. at 15–16.

In Dr. Kubrin's estimation, Robinson's lyrics are closely similar to the commonly misunderstood "commercially successful gangsta rap." Att. A at 2. Like gangsta rap, they "portray a violent persona" that is "not necessarily meant to be taken literally." *Id.* at 5. Kubrin quotes Conrad Tillard: "Every black man who goes into the studio, he's always got two people in his head; him, terms of who he really is, and the thug he feels he has to project." *Id.* at 5 (quoting Byron Hurt, *Hip Hop: Beyond Beats and Rhymes,* PBS/Independent Lens (2006). Rappers often "construct" violence "to gain respect among one's peers." *Id.* This insight would have been important for a jury considering how to view Robinson's views as he spoke with a younger black man in the back of a squad car after a terrible crime had been committed.

The Director suggests that non-experts such as Corey Robinson or Megan Gillament sufficiently explained all of this to the jury. Ans. 47–48 n.25. But the Director knows the power of labeling testimony "expert" at trial: that is why it "qualified" Investigator Ready. Indeed, expert testimony is evaluated under more stringent standards than other types of testimony precisely because of its "powerful," *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993), almost "talismanic," *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004), effect on jurors. In addition, of course, an expert who works on this subject matter with no knowledge of, and completely separate

from, Robinson, would be taken more seriously by jurors than family members and friends who did not want him to die.

Robinson was prejudiced by his attorneys' failure to provide context for the "expert" opinion testimony of the State's witnesses and for the prosecutor's inflammatory arguments. The rap opinion testimony and argument raised negative connotations about race, a fact that government attorneys are aware of. As former Los Angeles district attorney Alan Jackson wrote, in advocating for the use of rap lyrics at trial:

> Perhaps the most crucial element of a successful prosecution is introducing the jury to the real defendant. Invariably, by the time the jury sees the defendant at trial, his hair has grown out to a normal length, his clothes are nicely tailored, and he will have taken on the aura of an altar boy. But the real defendant is a criminal *wearing a do-rag and throwing a gang sign.*

Alan Jackson, *Prosecuting Gang Cases: What Local Prosecutors Need to Know*, 42-JUN PROSECUTOR 32, 36 (2008) (emphasis added).[7] Without an expert to explain that rap lyrics are not necessarily, or even frequently, autobiographical, Robinson's spontaneous and unreflected compositions became, with no opposition from his own attorneys, a confession—not just to acts allegedly committed, but to intent and character.

---

[7] A "doo-rag" is a "silk-like material worn around the head of black males as a fashion statement." URBAN DICT., located at https://www.urbandictionary.com/define.php?term=doo-rag (last visited Apr. 15, 2019).

28

In speculating that testimony from Dr. Kubrin would not have assisted Robinson, the Director attempts to presume away the proper function of an adversarial system of justice. *See* Ans. 48–49. The Director assures the Court that, on cross-examination, Dr. Kubrin "would have lost credibility with the jury . . . when at least one of Robinson's raps was decidedly literal." Ans. 48. But whether the lyric was "decidedly literal" was for an informed jury to decide, not the Director. There is a reason we conduct trials rather than inquisitions in this country: we trust juries to sort through *all* the evidence to reach their decisions. The Director's suggestion that Robinson was better off with a jury that heard only the State's narrative, the State's inferences, and the State's experts, should be rejected.

## VI. Trial counsel Were Ineffective for Failing to Challenge Future-Dangerousness Evidence. (Pet's Claim. IV)

Robinson argues that trial counsel were ineffective for failing to challenge evidence of future dangerousness. Pet. 34–50. Counsels' failures were prejudicial and require a new trial.

### A. Trial counsel failed to challenge the reliability of future dangerousness evidence.

Trial counsel failed to test the State's damning future-dangerousness evidence. Robinson argues that, in so failing, they were ineffective. His claim is

not procedurally barred because neither trial counsel nor habeas counsel pursued it. *See Martinez*, 566 U.S. at 17–19.[8]

The Director attempts several strikes at this claim; each misses its mark. First, the Director argues that "the introduction of expert testimony of future dangerousness does not violate the Constitution." Ans. 59. Robinson has not claimed that it does. Instead, Robinson claims that his attorneys were constitutionally defective, because the specific expert and the specific testimony the State relied upon at sentencing were highly prejudicial and subject to challenges and impeachment. No Supreme Court decision stands for the proposition that all future-dangerous testimony, by any expert, is admissible or unimpeachable. Indeed, decisions such as *Buck v. Davis* demonstrate otherwise. *See* 137 S. Ct. 759, 775 (expert may not testify that defendant is more likely a future danger because he is black).

Second, the Director contends that *Daubert* does not apply to capital sentencing—a contention Robinson concedes. *See* Ans. 59; *United States v. Fields*, 483 F.3d 313 (2007). Nonetheless, due process requires that sentencing evidence be reliable. *See Gholson v. Estelle*, 675 F.2d 734, 738 (5th Cir. 1982) (if a

---

[8] State habeas counsel contended that trial counsel was ineffective for objecting to Dr. Allen's testimony as improper rebuttal testimony. Orig. Pet. Ex. 1, pt. 1, at 124–27. They did not object to trial counsel's failure to challenge the substance of his testimony.

person is to be executed, it should be based on "reason and reliable evidence"). Indeed, without some modicum of reliability, the evidence cannot even be probative. *See United States v. Fulbright*, 804 F.2d 847, 853 (5th Cir. 1986) (due process requires that evidence at sentencing have some "minimal indicium of reliability").

Competent counsel would have objected to Dr. Allen's testimony on a number of bases. First, competent counsel would have objected that Allen did not interview Robinson. The Director argues that this claim has been "squarely rejected" by the Supreme Court. Ans. 60 (citing *Barefoot v. Estelle,* 463 U.S. 880, 903 (1983)). The Director is wrong. In *Barefoot*, psychologists who had not examined the defendant were allowed to opine that he would be a future danger, based on hypothetical questions. *Barefoot*, 463 U.S. at 884. The Supreme Court refused to find error, noting that it is the unique function of experts to respond to hypotheticals. *Id*. at 903. But, the Court noted, facts relied upon by experts should be facts that are "not disputed." *Id*. (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 657 (1878)). In this case, Allen made up the facts himself, answering questions that could not be answered without speaking to Robinson. And he then rendered an opinion based on his self-found facts. *Barefoot* does not approve such testimony.

In deciding that Robinson likely has Antisocial Personality Disorder (ASPD), Dr. Allen relied on Robinson's appearance and conduct on a grainy

video in the immediate aftermath of the offense and arrest, testifying that he could "clinically" determine that Robinson was without a conscience. 34 RR 152. In addition, Allen provided arbitrary scores on questions he could not have had definitive answers to. Pet. 44–46. And, with no objection from Robinson's trial attorneys, Allen was permitted to offer a "score" allegedly showing Robinson's psychopathy. No matter how lenient the evidentiary standard is in capital trials, that standard allowed for an objection that this expert testimony was baseless.

Competent counsel would have objected when Dr. Allen suggested Robinson was worse than other defendants because he committed an unlawful, rather than a lawful, killing. Pet. 45 n.19. The doctor's comparison detracted the jury from its proper focus: whether Robinson's offense was so egregious (compared to other *criminal* killings) that a sentence of death was warranted.

Competent counsel would have objected because Dr. Allen suggested Robinson has ASPD even though he did not meet the diagnostic requirements. Pet. 46–49. Robinson had not been diagnosed with a conduct disorder before the age of 15—a diagnostic criterion for ASPD. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 645–50 (4th ed. 1994) (Antisocial Personality Disorder) (DSM-IV). Indeed, neither Allen nor defense counsel appeared to know the age for the conduct disorder determination. 34 RR 165.

Competent counsel would have objected to Dr. Allen's unsupported psychopathy "score" of 33. Pet. 48–49. Defense counsels' expert came up with a lower score, but they did not offer it or even use their expert's score to impeach Allen's testimony about he scored Robinson's test.

## B. Trial counsel were ineffective for failing to present adequate expert testimony on Robinson's behalf.

Trial counsel were also ineffective for failing to present an expert of their own to counter Dr. Allen's unreliable testimony. Pet. 49.

### 1. This claim is not defaulted.

Contrary to the Director's argument, Ans. 49–50, 52, this claim is not defaulted. Nor is evidence in support of this claim barred by *Pinholster. See Pinholster,* 563 U.S. at 181–82. The relitigation bar discussed in *Pinholster* applies only if Robinson's IAC sentencing claim was *the same claim* presented to an adjudicated on the merits by the State. *See Pinholster*, 131 S. Ct. at 181–82. Although habeas counsel raised an IAC claim arising from Dr. Allen's testimony, Robinson's federal claim is "in a significantly different and stronger evidentiary posture." *Joyner v. King*, 786 F.2d 1317, 1320 (5th Cir. 1986).[9] State

---

[9] This argument applies equally to Robinson's claim regarding mitigation and his family. *See* Pet. 62–63; *see also* Ans. 62. Robinson's new evidence regarding his upbringing—including neglect, trauma, and sleep deprivation—is significantly stronger than the picture painted by state habeas counsel.

habeas counsel argued that trial counsel was ineffective for failing to put on an expert to rebut Allen's testimony. They contended that an expert such as Dr. Mark Vigen could have testified that Robinson would not be a danger while incarcerated. Orig. Pet. Ex. 1 at 21; *id*. at 128–33. Vigen did not address the fatal deficiencies and errors in Allen's testimony.

The claim in this petition is significantly different, and stronger. Here, Robinson points to specific and critical errors and lapses in Dr. Allen's testimony that could have been addressed had defense counsel called its own future dangerousness expert, such as Dr. Helena Huckabee, Dr. Daniel Murrie, Dr. Stephen Hart, or Dr. John Edens. *See Speer v. Director*, No. 2:04-cv-00269-JRG-RSP, Magistrate's Report and Recommendation, Dkt. No. 102 at *22–23 (E.D. Tex. June 25, 2018) (although claim of inadequate mitigation had been raised by state habeas counsel, federal petition, which included extensive supporting evidence, placed claim in "significantly different and stronger . . . posture and was therefore unexhausted), *accepted by district court*, Dkt. No. 115 at 2 (E.D. Tex. Sept. 14, 2018).

The new evidence shows that Dr. Huckabee would have disagreed with Dr. Allen's damaging suggestion of ASPD, both because, in her view, there was no evidence that Robinson had suffered from a conduct disorder before he was 15 and because Robinson's manifestations were more accurately explained by trauma and depression—treatable conditions. Orig. Pet. Ex. 19 at 28–30. In

addition, Huckabee, who interviewed Robinson, found him to be remorseful, *id*. at 26–27, and self-critical, *id*. at 14. These conclusions have nothing to do with classification at TDCJ and everything to do with the question the jury was required to deliberate: what sort of person Cortné Robinson was and what, if any, risk he posed in the future.

Similarly, Dr. Murrie's statement is significantly different from that presented by state habeas counsel. Murrie faulted Dr. Allen's testimony in significant ways: for linking ASPD to a risk of violence and for using the misleading PCL-R and unsupported HCR-20 for risk assessment. *See also* Orig. Pet. Ex. 25 at 5, Affidavit of John Edens. Dr. Hart faulted Allen for failing to interview Robinson personally, for not having sufficient information to score the PCL-R, and for basing his evaluation of Robinson on the offense rather than on his overall lifestyle and history.

Dr. Edens's testimony is also different from that presented by Dr. Vigen. Edens would have testified that the difference between the PCL-R score arrived at trial counsel's expert, Dr. David Self, and the one arrived at by Dr. Allen highlight the subjective nature of the instrument, a fact that, with other evidence of the unreliability of Allen's opinions, might have convinced the jury to question Allen's conclusions. Orig. Pet. Ex. 25 at 7.

### 2. The testimony would have made a difference.

The Director argues that the expert testimony offered by Robinson would not have made a difference. That argument should be rejected.

The Director contends that the affidavits offered by Drs. Murrie, Hart, and Edens were no more than "generalized criticisms" of the use of the HCR-20 and PCL-R. Ans. 58 n.32. Robinson has summarized the affidavits above. They do, in fact, question the overall validity of the instruments relied upon by Dr. Allen; regardless of the tests' admissibility, the jury deciding whether to execute Robinson should have been told that their reliability and validity are not universally accepted. But the affidavits did more: they pointed out serious defects in the way Allen used and extrapolated information from the tests. Based on the affidavits, a jury would likely have been persuaded that Allen's work did not provide a sufficient basis for imposing a sentence of death.

The Director suggests both that trial counsels' decision not to present an expert such as Dr. Huckabee should be deferred to and was not prejudicial because Huckabee's report is "double edged"—while some of it is helpful, some of it may not be. Ans. 55–58. This argument merely demonstrates why the law requires that criminal defendants be represented rather than left to the scant mercy of the State's narrative. *See Buck*, 137 S. Ct. at 775 (defense counsel is ineffective when he fails to "function[ ] as the 'counsel' guaranteed" by Constitution) (quoting *Strickland*, 486 U.S. at 687). The State painted Robinson,

36

through the words of an expert, as a remorseless, conscienceless animal. Undoubtedly, as the Director argues, had it been permitted to have an expert examine Robinson, that expert would have uncovered unfavorable facts. But certainly that does not mean that defense counsel may, consistent with their constitutional obligations, cede the field.

Dr. Huckabee offers a credible and trustworthy alternative to the State's narrative. Her acknowledgment that Robinson was angry and suspicious—which the Director finds damning, Ans. 56—coincides in a small way with the State's narrative. However, the coincidence lends credibility to her opinion that he was not a monster. Huckabee's report does not ignore facts. But, where Dr. Allen saw something that was barely human, Huckabee, a trained professional, saw remorse, depression, trauma, and fragility.

The subtext of the Director's argument appears to be that the State marshaled such a strong case against Robinson that any defense was futile.[10] The Director's premise must be rejected. Evidence offered in a capital trial inevitably has both aggravating and mitigating aspects; the defendant in such a trial is nearly always a broken individual. *See Penry v. Lynaugh*, 492 U.S. 302, 324

---

[10] For example, the Director suggests that, although Dr. Huckabee testified that, in her view, Robinson did not have a conduct disorder before the age of 15, all 12 jurors were "likely" to have concluded on their own that he did, based on his truancy. Ans. 57. The Director's confidence in the power of its largely untested dangerousness case should be resisted.

(1989). A juror may see that a fact such as anger makes it more likely that the defendant poses a continuing danger. But she may also look to the reasons for that anger—in Robinson's case, many of those reasons were beyond his control. *See Williams v. Taylor*, 529 U.S. 362, 398 (2000) (new evidence "may not have overcome a finding of future dangerousness," but it "might well have influenced the jury's appraisal of [defendant's] moral culpability"). And she may also consider testimony from experts, and arguments from defense counsel, that the anger is treatable. At base, the Director's argument suggests that, if evidence is subject to two interpretations, a defense attorney can be excused for leaving it only to consider harmful evidence. That suggestion has the role of defense counsel completely backward and should be rejected.

The Court should also reject the Director's suggestion that trial counsel's cross examination of Dr. Allen adequately addressed these issues. *See* Ans. 49 n.27; *see also id.* at 58 n.32 (experts Eden and Murrie could not have withstood cross examination). Trial counsel did not test Allen's score, which rested on answers to questions that the doctor could not have known without personally interviewing Robinson. Nor did trial counsel present evidence that its expert had come up with a much lower score. And, critically, cross-examination did not elicit testimony of alternative, treatable diagnoses, or produce a description of Robinson that a jury could have sympathized with—poorly parented, traumatized, depressed, anxious, and on a path that could have been reversed had

he been given a chance. Even the best cross-examination could not have elicited such testimony. Only a defense expert such as Dr. Huckabee would have provided it, and defense counsel did not produce one.

## VII.   TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE ABOUT ROBINSON'S SEROUS SLEEP DEPRIVATION. (PET. CLAIM V(B)(1))

Dr. Huckabee diagnosed Robinson with severe sleep deprivation. Orig. Pet. Ex. 19 at 28–30. Robinson claims that trial counsel should have hired a sleep expert to explain the effect lack of sleep had on him. Pet. 61–62. This claim is not procedurally barred. The claim was not raised by trial counsel, and habeas counsel's failure to make the claim excuses any default. *Martinez*, 566 U.S. at 17–19.

The Director argues that counsel were not ineffective because state habeas counsel did not identify the claim "after an extensive investigation and consultation with mental health experts." Ans. 72. Again, the Director has things backward. Neither trial nor habeas counsel investigated sleep deprivation. "'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (quoting *Strickland*, 466 U.S. at 690–91). Thus, that neither trial nor habeas counsel failed to identify sleep deprivation is not proof that it did not exist; it is evidence that counsel were ineffective. As Robinson has pointed out, his chronic

39

lack of sleep, throughout the formative years of his life, practically leaps from the record. *See* Pet. 51–53.

The Director also argues that Dr. Candice Alfano's testimony that Robinson suffered severe sleep deprivation is "double edged," because her finding that Robinson is still suffering sleep loss would have hurt his future-dangerousness argument. Ans. 74. The Texas capital sentencing scheme does not permit future dangerousness evidence to be weighed against mitigating evidence. TEX. CODE CRIM. PROC. Art. 37.071(b). A capital jury may determine there is sufficient mitigating evidence to warrant a sentence of life, notwithstanding evidence that the defendant poses a future danger. In this case, Robinson's chronic sleep loss, and the damage it caused, were not the result of choices he made; he was the victim of his mother's choices. Under such circumstances, a single juror might have found him less culpable and voted for a life sentence.

## VIII. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE ADOLESCENT BRAIN DEVELOPMENT. (PET'S CLAIM VI, VII)

The Eighth Amendment forbids executing persons who committed their crimes as juveniles—which the Supreme Court has defined as those below 18 years old. *Roper v. Simmons*, 543 U.S. 551, 568 (2005). Because juveniles are less culpable and more redeemable than adult offenders, "it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of

irretrievably depraved character." *Roper*, 543 U.S. at 564–68; Pet. 68–69. Robinson argues, as he did before the state habeas court, that *Roper*'s holding should be extended to young adults like Robinson, who committed his offense when he was 18 and who, in all ways, typifies the juvenile defendant described by the *Roper* Court. *See Cruz v. United States*, No. 3:11-cv-00787-JCH, 2018 WL 1541898, at *25 (D. Conn. Mar. 29, 2018) (based on national consensus and new scientific evidence, prohibition of life-without-parole sentence on juveniles applies to those who committed their offense at age 18). Robinson also argues that trial counsel were ineffective for failing to adequately raise Robinson's use and brain development.

### A.  Robinson's claim is unexhausted.

Although state habeas counsel presented this claim to the state court, that court did not fully resolve it. In dissenting from the majority opinion denying Robinson's habeas petition, Justice Alcala noted two deficiencies in the court's decision. First, the court had rejected the claim because it had been litigated on direct appeal, but the default principle relied upon "is inapplicable to situations where, as here, extra-record development is necessary to establish a claim." *Ex Parte Robinson*, No. WR-81,583-01, 2016 WL 6610373, at *6 (Alcala, J., dissenting). Second, the court "did not actually analyze the substance of [Robinson's] arguments," because it merely relied on precedent without accounting for evolving standards of decency. *Id.* (noting "an examination of the

41

constitutionality of the death penalty must look to "evolving standards of decency" to determine "which punishments are so disproportionate as to be cruel and unusual," "it is entirely possible that, in light of recent shifts in societal views about the death penalty, that punishment is no longer constitutionally permissible"). *See also Ex Parte Murphy*, 495 S.W. 3d 282, 286 (Tex. Crim. App. 2016) (Alcala, J., concurring and dissenting) (quoting *Roper*, 543 U.S. 551 at 561).

A state procedural bar is adequate to bar federal habeas review only if it "is firmly established and regularly followed at the time it is applied." *Walker v. Martin*, 562 U.S. 307, 316 (2011). Here, the court of criminal appeals held that Robinson's claim was procedurally barred because it had been addressed on direct appeal. *Ex Parte Robinson*, No. WR-81,583-01, 2016 WL 6610373, at *5. But, as Justice Acala pointed out, that bar is not regularly applied by Texas courts when, as in Robinson's case, extra-record development was required. Indeed, the Texas Court of Criminal Appeals, sitting en banc, expressly stated that it should not be applied in such cases. *Ex Parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (en banc).

In addition, it would be a fundamental miscarriage of justice to apply a bar in this case. *See Coleman*, 501 U.S. at 750. When, as here, "a state appellate court is divided on the merits of the constitutional question" it is entitled to federal review. *Cf. Rhoades v. Davis*, 852 F.3d 422, 429 (5th Cir. 2017); *Jones*

*v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011). As demonstrated below, science, practice, and societal norms suggest that executing defendants who committed their offense at age 18 is unconstitutional. Failing to acknowledge this fact means continuing to execute individuals whose brains were unformed and less able than the adult brain to resist impulses or peer pressure. In Robinson's case, these facts are compounded by inadequate parenting, trauma, and sleep deprivation. It is unjust to permit his sentence to stand.

Finally, the Director's claim that Robinson's arguments are barred by *Teague v. Lane*, 489 U.S. 288 (1989), must be rejected. *Teague's* retroactivity bar does not apply to new rules that prohibit "a certain category of punishment for a class of defendants because of their status or offense." *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997).

## B. The death penalty is unconstitutional as applied to Robinson.

The *Roper* Court recognized that the traits that distinguish juveniles from adults do not disappear at 18. *Id*. at 574. Robinson has set out in detail the consensus of medical experts that the cutoff for juvenile brain development should be greater than 18. Pet. 71; *see also* John H. Blume, Lindsey S. Vann, and Amelia Courtney Hritz, *Death by Numbers: Why Evolving Standards Compel Extending* Roper's *Categorical Ban Against Executing Juveniles from 18 to 21*, TEX. L. REV. (forthcoming Spring 2019), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3341438##10–11 (last accessed

43

Apr. 29, 2019). Developments in neuroscience since *Roper* demonstrate that "impulsivity, a tendency to engage in high-risk behavior, a strong susceptibility to peer pressure, and a high degree of personality plasticity characterize people up to the age of 21." *Id*. at 11–12. Indeed, at around age 21, brain volume begins to increase "dramatically," permitting different regions of the brain to communicate with one another, suggesting that brains before 21 are "poorly integrated." *Id*. at 12.

Evolving standards and national consensus support applying *Roper* to those who were 18 at the time of their offense. *See Roper*, 543 U.S. at 567 (one indicia of consensus is infrequency of punishment). A 2017 Report by the United States Sentencing Commission indicates that only one of 96 offenders who received life sentences was 18. United States Sentencing Commission, *Youthful Offenders in the Federal System*, *Fiscal Years 2010 to 2015,* at 15, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf (last accessed May 5, 2019). The ABA has recommended that the death penalty not be imposed on any person who was 21 or younger at the time of the offense. *See* American Bar Journal, Resolution 111, Report to the House of Delegates, *available at* https://www.americanbar.org/content/dam/aba/images/abanews/mym2018res/111.pdf (last accessed May 5, 2019). Most signifi-

cantly, the number of persons executed for offenses committed at age 18 is declining. Since *Roper*, only about four-and-a-half percent of all those sentenced to death were 18 at the time of their offense.  John H. Blume, Lindsey S. Vann, and Amelia Courtney Hritz, *Death by Numbers: Why Evolving Standards Compel Extending* Roper's *Categorical Ban Against Executing Juveniles from 18 to 21*, Tᴇx. L. Rᴇv.

### C.  Trial counsel were ineffective.

The state courts unreasonably found trial counsel had been effective, notwithstanding their failure to adequately litigate Robinson's youth and brain development. The Director contends the courts were correct, because trial counsel relied on strategy in failing to call an expert and that, in any event, their cross-examination of Dr. Allen was sufficient to educate the jury about Robinson's cognitive age at the time of the offense. These arguments should be rejected. Trial counsel became aware of the adolescent-brain issue late, and their ineffectiveness was due to inattentiveness, not strategy. *See* Orig. Pet. Ex. 2 at 158. And, their cross examination of Dr. Allen did not did make up for their professional lapses.

The Director again cites trial counsel's belief that their medical experts should not be called as evidence that they neglected juvenile brain development for strategic reasons. Ans. 75. The record shows some support for the argument that trial counsel were fearful of a personality-disorder diagnosis

and therefore did not pursue any affirmative mental-health evidence.[11] How-ever, to the extent that counsel acted based on strategy rather than expedience, that strategy was unreasonable. It is unreasonable to counter a devastating narrative with silence. And silence was not, contrary to the Director's argu-ment, required. To present evidence of juvenile brain development, trial coun-sel were not required to call an expert who had examined Robinson. *See* Ans. 75. Trial counsel could have called an expert, such as Dr. Kraus, to testify about adolescent brain development generally, without examining Robinson.

An expert on juvenile brain development may have been able to overcome implicit biases about black juvenile offenders. Black youth are overrepresented at every stage of the juvenile justice system. And, biases extend beyond the question of who should be arrested or who is guilty and who is innocent. They "distort findings of maturity, sophistication, future dangerousness, and sever-ity of punishment." Robin Walker Sterling, *Children are Different: Implicit Bias, Rehabilitation, and the "New" Juvenile Jurisprudence,"* 46 LOY. L.A. L. REV. 1019, 1066–68 (2013).

It was also ineffective to rely on cross-examination of the State's witness to educate the jury about important medical science. On cross-examination,

---

[11] In part, this strategy was unreasonable because the ASPD diagnosis was in-correct.

Dr. Allen conceded that the brain continues to develop until 25. 34 RR Trial 168. That development, Dr. Allen admitted, includes the ability to control impulses and make future plans. *Id.* at 168–69. But counsel did not elicit from Dr. Allen—nor is it clear that the doctor was qualified to testify about—evidence regarding the capacity for a juvenile to change or any evidence regarding why delayed development might make a juvenile less culpable. Nor did counsel elicit testimony regarding how trauma and sleep deprivation might further delay brain development. Nor, after the State elicited damaging "psychopathy" testimony from Dr. Allen, did trial counsel inquire whether questions about remorse and risk-taking behavior might be affected by a defendant's brain age. Cross-examination of the State's witness did nothing to link brain science to the development and circumstances of trial counsels' 19-year-old client who had suffered sleep deprivation since before he was ten years old.

The importance of an expert, especially on medical and psychological questions, cannot be underestimated. *See*, *e.g., Ake*, 470 U.S. at 80–81 (discussing importance of psychiatric testimony); *Skaggs v. Parker*, 235 F.3d 261, 272 (6th Cir. 2000) (citing *Ake*). In an adversarial system, it is especially important to have an expert who has been retained by the defense team, as opposed to the prosecutor's team. Even if the expert does not meet the defendant face-to-face, defense counsel can share both their impressions of him and what they have

learned in investigating mitigation. Thus, a team expert is able to tie her opinions to the facts and draw from the impressions counsel have gathered through face-to-face contact. *See* Russell Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. Rev. 407, 409 (2014) (in spite of skepticism about defense experts, "only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of his life and to offer an empathic framework for understanding the resultant disorders and disabilities").

## IX.  THE STATE COURTS' REJECTION OF ROBINSON'S IAC CLAIMS REGARDING EVIDENCE OF MRS. ZABOKRTSKY'S SEXUAL ASSAULT IS UNREASONABLE.

It is undisputed that Robinson did not commit, participate, or otherwise play a role in Travion Young's sexual assault of Mrs. Zabokrtsky. *See Ex Parte Robinson*, No. 81,582-01, 2016 WL 6610373, at *4; *see* also, *e.g.,* 26 RR 121–25 (Mrs. Zabokrtsky's testimony establishes that only one person sexually assaulted her); 29 RR 130–32 (testing confirmed that Young was the only DNA match). It is also undisputed that Robinson's trial was for "[i]ntentionally caus[ing] the death of an individual," not for sexual assault. 1 CR 2. Nevertheless, the State's case against Robinson at both stages of trial was nearly subsumed by its gratuitous evidence regarding the assault. Robinson argues that his trial attorneys were ineffective for failing to seek exclusion of extensive evidence about the assault, or to seek limiting instructions upon introduction

of that evidence. Pet. 92–95. The Director responds that the first claim was reasonably resolved by the state courts and that the second is defaulted. The Director is wrong.

### A. The state courts' findings that trial counsel were not ineffective for failing to object to the assault evidence were unreasonable.

The state habeas courts were wrong to find that trial counsels' failure to object to the evidence and arguments was based on reasonable interpretations of state law and not ineffective. The Director again relies on *Charles* to argue that, because these decisions were based on state law, they are unreviewable. Ans. 78–79. But, the state courts' interpretation of Texas law, especially insofar as admissibility at sentencing is concerned, was not in effect at the time of Robinson's trial. *See Strickland,* 466 U.S. at 689 (effectiveness is assessed in light of performance at time of trial). The state courts' application of novel and unforeseen law resulted in an unreasonable application of *Strickland*. Moreover, allowing this highly prejudicial testimony to consume Robinson's capital trial was so egregious that it violated Robinson's due process right to a fair trial—a federal protection.

### 1. The evidence was inadmissible at trial or sentencing.

As Robinson has argued, Young's sexual assault of Mrs. Zabokrtsky was not same-transaction contextual evidence; it was an extraneous offense and

therefore inadmissible at trial. *See* Pet. 93–94. This is so because the State failed to establish that Young's sexual assault of Mrs. Zabokrtsky—the extraneous offense in question—could be attributed to Robinson, either directly or indirectly. *See Ex Parte Robinson*, No. 81,582-01, 2016 WL 6610373, at *4. Further, a reading of the record in this case demonstrates how the intrinsic-evidence rule can be misused without careful attention to the rule's function. Texas courts permit contextual evidence as an exception to the extrinsic-act rule "where such testimony is necessary to a jury's understanding of the instant offense." *Moore v. State*, 165 S.W.3d 118, 122–23 (Tex. App.—Ft. Worth 2005, no pet.) The reason for its admissibility is that "in narrating the one [offense] it is impracticable to avoid describing the other, *and not because the other has any evidential purpose.*" *Id.* (quoting *Mayes v. State*, 816 S.W.2d 79, 86 n.4) (Tex. Crim. App. 1991)). The State should not be permitted to rely on the intrinsic-evidence exception when so much of its evidence was neither necessary for the jury to understand the charged murder nor so inextricably intertwined with the murder evidence that the murder narrative could not practicably have been told without it. Plainly, for example, Mrs. Zabokrtsky's examination was neither necessary nor inextricably intertwined with her husband's killing. In concluding that all of the assault evidence was intrinsic, the state courts applied novel and unforeseeable law, rendering the state habeas courts' application of *Strickland* unreasonable.

### 2.  The evidence was inadmissible at sentencing.

Even if the Director is correct about the evidence offered at the trial, the state courts were unambiguously incorrect in holding that the evidence was admissible, as a state-law matter, at the punishment phase. At punishment, the State presented evidence of the impact Young's sexual assault had on Mrs. Zabokrtsky and her family. *See* Pet. 94–95. And the State used this evidence, along with the trial evidence about the assault, to ask for a death sentence based on what happened to Mrs. Zabokrtsky rather than what happened to her husband. The prosecutor told the jurors that they should find Robinson a future danger because "not only was Cortné Robinson responsible for the capital murder of Frank Zabokrtsky . . . he's also responsible for . . . the aggravated sexual assault of Mrs. Zabokrtsky." *Id.* at 18; *see also id.* at 72. Nowhere was the improper plea for death more clear than when the prosecutor neatly flipped the tables, asking for a sentence of death because it was what Mr. Zabokrtsky would have wanted to vindicate his wife's assault: "[w]hat do you think [Mr. Zabokrtsky's] answer would have been [to the mitigation question] as he hear[d] [Young] raping his wife on the bathroom floor? Do you think his answer was yes?" 36 RR at 69–70.[12]

---

[12] A death sentence is disproportionate to, and may not be imposed to punish a defendant for, rape. *Coker v. Georgia*, 433 U.S. 584, 592 (1977).

Under Texas law, use of the evidence was improper at sentencing. It was inadmissible as extrinsic-act evidence. Texas Code of Criminal Procedure 37.07 permits extrinsic-offense evidence "if it is shown beyond a reasonable doubt . . . to have been committed by the defendant." TEX. CODE CRIM. PROC. ANN. Art. 37.07, § 3(a); *Harris v. State*, 827 S.W.2d 949, 961 (Tex. Crim. App. 1992) (internal citations omitted).

Same-transaction evidence may be admitted at sentencing, but there, a limiting instruction is required. *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999); *Moore*, 165 S.W.3d at 125 (citing *King v. State*, 125 S.W.3d 517, 519–20 (Tex. Crim. App. 2003) (Cochran, J., concurring in refusal of appellant's petition for discretionary review)). For the same reasons cited above, Robinson contends that the evidence at sentencing went well beyond same-transaction evidence. But, even if it did not, a limiting instruction was required, and defense counsel did not seek one.[13]

The Director suggests that trial counsel were not ineffective for failing to seek a limiting instruction, and the limiting instruction given to the jury regarding Robinson's criminal responsibility for Young's conduct was sufficient

---

[13] Robinson is not procedurally defaulted on this claim. *See Martinez*, 566 U.S. at 17. The claim was not raised at trial, and state habeas counsel failed to raise it as well.

Ans. 93. This is incorrect. Trial counsel should have sought the following limiting instruction:

> The State has introduced evidence of extraneous crimes or bad acts other than the one charged in the indictment in this case. This evidence was admitted only for the purpose of assisting you, if it does, in determining the proper punishment for the offense for which you have found the defendant guilty. You cannot consider the testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other acts, if any, were committed.[14]

This instruction makes clear that the jury could not consider the assault unless Robinson himself committed it. The instruction given to Robinson's jury was not only inadequate, it was misleading. It permitted the jury to hold Robinson responsible for the assault if he merely "encouraged, directed, aided, or attempted to aid" another in the offense. Thus, the jury was allowed to consider Young's sexual assault of Mrs. Zabokrtsky in determining whether Robinson was death-worthy even though Robinson did not perpetrate the assault.

### 3. The extraneous-offense evidence at both trial and sentencing violated Robinson's due process guarantee of a fair sentencing proceeding.

Finally, regardless of the correctness of the state courts' determination about Texas law, trial counsel were required to object because the admission

---

[14] Texas Crim. Jury Charges § 4:400, Extraneous Offenses (2009).

of this evidence—especially given its length and graphic detail—violated Robinson's federal due process right to a fair trial. Same-transaction contextual evidence certainly allows the jury to understand the context and complete circumstances surrounding the offense. But this justification is not without limit. "Evidence about the victim and survivors, and any jury argument predicated on it, can of course be so inflammatory as to risk a verdict impermissibly based on passion, not deliberation." *Payne v. Tennessee*, 501 U.S. 808, 836 (1991) (Souter, J., concurring) (internal citations omitted). And, "there is a traditional guard against the inflammatory risk, in the trial judge's authority and responsibility to control the proceedings consistently with due process, on which grounds defendants may object and, if necessary, appeal." *Id.* (citing *Darden v. Wainwright*, 477 U.S. 168, 178–83 (1986)).

This is such a case. Robinson's trial, as a whole, was replete with graphic evidence of Young's violent sexual assault of Mrs. Zabokrtsky, and the State was able to shift the jury's focus to that assault as the jury assessed whether Robinson was a future danger and whether mitigating facts required a sentence of life, not death. Due process required that Young's sexual assault of Mrs. Zabokrtsky be excluded from Robinson's trial. Trial counsel's failure to seek exclusion or any limitation was ineffective.

X.  **ROBINSON WAS DENIED DUE PROCESS AND EQUAL PROTECTION OF THE LAW WHEN THE PROSECUTOR STRUCK AFRICAN-AMERICAN VENIRE MEMBERS BECAUSE OF THEIR RACE. (PET'S CLAIM IX)**

Robinson argues that trial counsel were ineffective because they failed to object to two race-based peremptory strikes. Pet. 78–88. This claim was not pursued by state habeas counsel and, accordingly, any procedural bar is excused. *Martinez*, 566 U.S. at 17–19.

Contrary to the Director's arguments, had trial counsel objected under *Batson v. Kentucky*, 476 U.S. 79 (1986), and litigated the claim or had state habeas counsel raised the issue, there is a substantial likelihood that the challenge would have succeeded. As discussed in the Original Petition, the State used a disproportionate number of strikes against black prospective jurors. An analysis of the State's proffered reasons for its strikes, which were inaccurate and/or applied differently to accepted jurors, demonstrates that the State excluded individual panelists on the basis of race. *See* Pet. 82–88.

The Director asserts that Robinson has not shown that the state's strikes were racially motivated. *See* Ans. 83–94. She argues that, because Robinson has not provided all the juror questionnaires and information cards, Robinson cannot prove the State's admission at trial that it struck 50 percent (two of four) of the African-Americans on the panel. *See* Ans. 80 n.44. As an initial matter, because this was the *State's* admission, and not Robinson's allegation, any burden of proof on the question should belong to the State. Moreover, this

Court is not barred from considering the racial composition of the venire in evaluating Robinson's *Batson* claim simply because the race of each prospective juror was not expressly entered into the state-court record. *Hayes v. Thaler*, 361 F. App'x 563, 574 n.8 (5th Cir. 2010).

Robinson's *Batson* claim succeeds on the merits. As Robinson has demonstrated, there were (1) stark statistical differences in the State's  use of peremptory strikes; (2) repeated factual inaccuracies in the reasons proffered by the State; and (3) otherwise inexplicable differential treatment of similarly situated white and non-white panelists *See* Pet. 82–88.

The Director's argument that the State's first reason to strike Nancy Moore was her opposition to the death penalty is not supported by the record. 24 RR 26–28, 31. The Director asserts that "opposition to the death penalty" is a valid, race-neutral reason for a peremptory strike. Ans. 88. But Moore did not say she was opposed to the death penalty. She initially said she would have to be "100 percent" to impose a death sentence. 10 RR. 118. Then, upon further inquiry, she said total certainty was not required and that she could follow the law. The record is thus clear that Ms. Moore had mixed feelings about the death penalty, not that she opposed it. *Id*. Uncertainty about the death penalty does not make a person unwilling to impose it. Rather, it means the person does not have a predisposed view; the prospective juror is, in other words, unbiased. In *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968), the Supreme Court

stated that "a man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." As Moore told both defense counsel and the prosecutor, she could follow the law. 10 RR.123. Thus, she was no different from white jurors who expressed understandable caution about imposing the ultimate sentence. Those jurors said their answers on punishment would depend upon the facts. *See* Ans. 90. That is what the law requires, and Moore said she would follow the law.

As for the second reason for striking Moore, that she worked for a law firm, the Director's response proves too much. The Director states that "[a] prosecutor could reasonably want to strike a veniremember who might have preconceived notions about the law that might influence other jurors." Ans. 92. But that was not the reason the prosecutor gave.[15] And, more important, "preconceived notions about the law" could arise from any number of circumstances— from employment with a law firm, to, as with juror Leleko, employment with CASA, or to a recent binge-watching of *The Good Wife*. The prosecutor did not

---

[15] In fact, because her experience was in civil law, the State had actually made the opposite claim, stating that she would not be familiar with the "criminal aspect" and terms in the case. 10 RR 111.

make inquiries tailored to root out arm-chair lawyers. Its reason for striking Moore was pretextual.

The Director's argument that its reason for striking Debra Johnson was an "unquestionably credible race-neutral basis for a peremptory challenge" is not supported by the record. Ans. 93–94. The State's reason for striking Johnson was that she failed to report that her daughter had been a victim of sexual assault. 24 RR Trial 28–30. This reason was a pretext for discrimination. Like Juror Martin's parents, who were given hot checks, and Juror Burkhalter's wife, who was a victim of stalking, Juror Johnson's daughter was a victim of a crime. Yet, the prosecutors never questioned Johnson, Martin, or Burkhalter, about their experiences with, or opinions about, the sheriff's department or the district attorney's office, and they only struck Johnson, the African American juror. More importantly, the prosecutor's explanation regarding Johnson contradicted their trial strategy. *See Miller-El v. Dretke,* 545 U.S. 231, 247 (2005) (soundness of prosecutor's reasons depends, among other things, on "whether the proffered rationale has some basis in accepted trial strategy"). The prosecution heavily relied on Mrs. Zabokrtsky's sexual assault to convict Robinson of capital murder. Johnson was the outcry witness for her daughter's rape. As the outcry to her daughter's rape, Johnson "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence, and the prosecutor's expla-

58

nations for the strike cannot reasonably be accepted." *Id.* at 247. The prosecution's purported grounds for striking both Ms. Moore and Ms. Johnson were pre-textual.

## CONCLUSION

For these reasons, Robinson asks that his petition be granted. Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Donna F. Coltharp
DONNA F. COLTHARP
Deputy Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206-1205
State Bar No.: 24001909
(210) 472-6700
(210) 472-4454 (Fax)
Donna_Coltharp@fd.org

s/ Marina-Thais Douenat
MARINA-THAIS DOUENAT
Assistant Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206-1205
State Bar No.: 00798310
(210) 472-6700
(210) 472-4454 (Fax)
Marina_Douenat@fd.org

*Attorneys for Cortné Robinson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of May, 2019, I electronically filed the

Petitioner's Reply with the Clerk of Court using the CM/ECF system, which

will send notification of such filing to:


George A. d'Hemecourt
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548


s/ Donna F. Coltharp
DONNA F. COLTHARP


s/ Marina-Thais Douenat
MARINA-THAIS DOUENAT

*Attorneys for Cortné Robinson*

60