## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| CORTNÉ MAREESE ROBINSON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CAUSE NO. 1:17-cv-00011-RWS |
| | § | |
| BOBBY LUMPKIN, Director, Texas | § | |
| Department of Criminal Justice, Correctional | § | CASE INVOLVING THE DEATH |
| Institutions Division, | § | PENALTY |
| | § | |
| Respondent. | § | |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY
## PURSUANT TO 28 U.S.C. § 2254

MAUREEN FRANCO
Federal Public Defender
Western District of Texas
TIVON SCHARDL
Chief, Capital Habeas Unit
JOSHUA FREIMAN
Assistant Federal Public Defender
NY Bar No. 5353545
919 Congress, Suite 950
Austin, Texas 78701
737-207-3010 (tel.)
512-499-1584 (fax)
Joshua_Freiman@fd.org

Counsel for Petitioner

April 5, 2021

## TABLE OF CONTENTS

AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PRISONER IN
STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254                                    1

TABLE OF CONTENTS                                                            ii

EXHIBIT LIST                                                               viii

TABLE OF AUTHORITIES                          **Error! Bookmark not defined.**

PRELIMINARY STATEMENT REGARDING lOCAL RULE cv-3                               1

INTRODUCTION                                                                  1

PROCEDURAL HISTORY                                                            3

AUTHORITIES                                                                   7

I.        Standard of Care                                                    7

II.       Standard of Care for Post-Conviction Counsel   **Error! Bookmark not defined.**

CLAIMS FOR RELIEF                                                            10

I.        The State Violated *Napue v. Illinois* When It Knowingly Elicited False and Misleading
Testimony.
          10

A.   Relevant Facts.                                                         10

     1.   The Razor Blade Incident and Renrick Taylor's Trial Testimony ............................... 10

     2.   Attorney *Pro Tem* Rick Hagan's Relationship with Renrick Taylor. ........................... 14

     3.   Attorney *Pro Tem* Rick Hagan's Relationship with Richard Benefield. ..................... 16

B.  The State Violated Robinson's Right to Due Process By Knowingly Eliciting or Failing to Correct False And Misleading Material Testimony From Renrick Taylor.                    16

1.  The State knowingly elicited (or failed to correct) false and misleading testimony that (i) Taylor had not received any benefit in exchange for his cooperation, and (ii) the razor blade belonged to Robinson. ............................................................................ 17

2.  There is a reasonable likelihood that Taylor's false testimony affected the jury's judgment on punishment. ..................................................................................... 21

II.  The Sentence Violates Due Process Because The Prosecution Engaged In Misconduct When It Misattributed Possession Of The Razor Blade To Robinson.                    23

A.  The prosecutor repeatedly, deliberately, and falsely indicated that Robinson possessed the razor to use as a weapon in an alleged escape attempt.                    24

B.  The misattribution of possession of the razor to Robinson rendered the sentencing determination fundamentally unfair.                    24

III.  The State Withheld Favorable, Material Evidence in Violation Of *Brady v. Maryland*. 26

A.  The State Violated Due Process By Withholding Multiple Pieces of Exculpatory, Material Evidence.                    26

1.  The prosecution withheld information, favorable to Robinson, suggesting that the shooting of Zabokrtsky was accidental. ............................................................... 27

2.  The prosecution withheld information, favorable to Robinson, tending to undermine Renrick Taylor's credibility. .......................................................................... 31

3.  The prosecution withheld information, favorable to Robinson, that showed the razor blade belonged to Taylor, not Robinson. ............................................................. 33

B.  The Suppressed Evidence Was Material.                    34

C.  Alternatively, Prior Counsel Rendered Ineffective Assistance in Failing to Investigate the Razor Blade Incident and Taylor's Testimony.                    35

IV.  Robinson Was Denied His Rights to a Fair Trial, a Fair and Impartial Jury, and Due Process When the Court Failed to Change Venue, and Prior Counsel Was Ineffective in Failing to Request a Change in Venue.                    36

A.   Relevant Facts.                                                                      36

B.   The trial court erred in holding Robinson's trial in Harrison County, Texas.          38

C.   Counsel Were Ineffective for Failing to Move for a Change of Venue.                   39

D.   The State Court failed to fully address *Strickland*.                                 40

V.   Robinson Was Denied a Fair and Impartial Jury Because Harrison County's Jury
Selection Procedures Systematically Excluded Minorities; Prior Counsel Was Ineffective.    41

A.   Robinson Was Denied His Sixth Amendment Right to a Fair and Impartial Jury Because
     Harrison County's Jury Selection System Under-Represented African-Americans.          41

B.   Mr. Robinson's Trial and Post-Conviction Counsel Provided Ineffective Assistance by Failing to
     Adequately Raise and Litigate Robinson's Cross-Section Claims.                        45

     1.   Trial counsel was ineffective, and prejudice is presumed. ..........................................45

     2.   Post-conviction counsel was ineffective, and Robinson was prejudiced.................46

VI.  Trial Counsel Were Ineffective for Failing to Address Race or Attempt to Reduce the
Likelihood of Bias Among the Jurors.                                                       46

A.   Relevant background.                                                                  46

     1.   Marshall, Texas.............................................................................................47

     2.   The case. ......................................................................................................51

B.   Trial counsel unreasonably failed to address race during voir dire.                   54

C.   The failure to inquire about race prejudiced Robinson.                                56

VII. Trial counsel were ineffective for failing to challenge biased jurors for cause.     58

A.   Legal standard.                                                                       58

B.   Relevant facts and argument.                                                          59

C.   The State court unreasonably applied federal law in denying Robinson's bias claim.    62

VIII. Counsel was ineffective for failing to object to the State's *Batson* violations.   64

A.   Nancy Moore.                                                                    65

B.   Debra Johnson.                                                                  67

C.   Trial counsel was ineffective in not making a *Batson* challenge.              69

D.   Appellate and post-conviction counsel were ineffective.                        70

IX.     The Trial Court Erroneously Admitted Improper Opinion Testimony, and the State
Engaged in Inflammatory Commentary Based on That Testimony, Without Objection by Trial
Counsel. 70

A.   Relevant Facts.                                                                 70

B.   The State was permitted to elicit improper opinions, and they made improper arguments based
on those opinions.                                                                  74

    1.   The prosecutor elicited improper opinion testimony....................................................74

    2.   The prosecutors engaged in improper argument.........................................................75

C.   Counsel was ineffective.                                                        76

D.   The state court opinion failed to perform a complete *Strickland* analysis.    77

X.      Robinson Was Denied His Right to Counsel Because His Counsel Conceded He Was
Criminally Responsible for the Sexual Assault and Failed to Move to Exclude Evidence of It.78

A.   Relevant Facts.                                                                 79

    1.   The extensive evidence of rape at trial.........................................................................79

    2.   State's Legal Theory Regarding Robinson's Responsibility for the Rape. .................81

B.   Trial Counsel Were Ineffective for Failing to Object to Extensive Evidence of Sexual Assault.83

C.   The state court decision does not bar relief on this failure-to-exclude claim.  84

D.   The Court should presume prejudice. Alternatively, prejudice is clear from the record.   88

XI.     Trial Counsel Were Ineffective for Failing to Investigate and Present Powerful
Mitigating Evidence During Robinson's Punishment Phase.                             89

A.  Robinson's life history contained highly compelling mitigation that counsel never investigated or presented.                                                                            90

    1.  Donnetta and Moses Robinson: The Early Years..............................................91

    2.  A Violent Beginning (1985-2003) ...................................................................93

    3.  Repeating the Cycle: A Violent Step-Father (1995-2003)..........................97

    4.  Early School: A Promising Beginning (1995-2000).....................................98

    5.  Late Elementary School and Junior High: A Gradual Decline (2000-2005).............98

    6.  Cortné's High School Years: A Child Abandoned (2005-2009) ..............................100

B.  Trial Counsels' Failure to Investigate and Present Evidence of the Extreme Physical and Emotional Abuse Robinson Suffered Throughout His Childhood Constitutes Deficient Performance                                                                             105

    1.  Failure to Investigate Childhood Abuse.....................................................106

    2.  Failure to Develop and Present Expert Testimony Regarding Brain Development and Mental Health......................................................................................111

C.  Trial Counsels' Failures Prejudiced Robinson                                       113

    1.  Robinson was Prejudiced by Counsel's Failure to Investigate Childhood Abuse..114

    2.  Robinson was Prejudiced by Counsels' Failure to Develop and Present Expert Testimony Regarding Brain Development and Mental Health........................................118

    3.  Trial Counsel's Failures Individually and Cumulatively Prejudiced Robinson........120

D.  Any procedural default of this claim is excused.                                    121

XII.    Trial Counsel Was Ineffective for Failing to Investigate the State's Expert Evidence of Future Dangerousness and Exclude, Impeach, or Rebut that Expert's Testimony.           121

A.   Relevant Facts.                                                                                    122

B.   Counsel failed to investigate Dr. Allen's methodology and training.        126

C.   Counsel failed to insist upon a hearing to test the reliability of Dr. Allen's testimony on the subject of long-term future dangerousness.                                126

D.   Counsel failed to adequately counter Dr. Allen's testimony.                    134

E.   Counsel failed to develop and present mental health evidence that would rebut or mitigate Dr. Allen's future dangerousness testimony.                              135

F.   Counsel failed to object to the State's improper introduction of expert future dangerousness evidence on rebuttal.                                                          137

G.   Counsel's ineffectiveness was prejudicial.                                            138

H.   These Claims May Be Reviewed on the Merits, Because Post-Conviction Counsel's Ineffectiveness Excuses Any Failure to Raise Them.                        140

XIII.     Because he was 18 at the time of the offense, Robinson's execution would violate the Eighth Amendment prohibition on cruel and unusual punishment.        140

A.   Evolving standards of decency no longer allow for the imposition of death sentences on people 18 years of age.                                                                    143

    1.   National consensus...........................................................................143

    2.   Scientific Evidence ..........................................................................146

    3.   Other judicial considerations ..........................................................150

B.   Because of the trauma he suffered in childhood, the concerns raised in *Roper* apply especially to Robinson and executing him would violate the Eighth Amendment.        153

C.   The state court's ruling does not bar relief.                                          155

D.   Conclusion                                                                                            155

CONCLUSION                                                            **Error! Bookmark not defined.**

REQUEST FOR RELIEF                                                                          155

**EXHIBIT LIST**

| Exhibit | Description |
|:---:|:---|
|  |  |
| 1 | Declaration of Ms. Elizabeth Aguirre, Capital Mitigation Specialist |
| 2 | TDCJ Inmate Lookup and Docket Sheet - Larison |
| 3 | Robinson Inmate Incident History |
| 4 | Affidavit of Andrew Jakereon "A.J." Walker |
| 5 | Declaration of Andrew Clough |
| 6 | Harrison County Jail Inmate Movement Summary |
| 7 | Declaration of Stephen Kramer, Oct. 28, 2019 |
| 8 | Affidavit of Stephen Kramer, Dec. 18, 2012 |
| 9 | Affidavit of Roy Martin |
| 10 | Affidavit of Renrick Taylor |
| 11 | Richard Benefield's Statement, March 7, 2011 |
| 12 | Appointment Order - Rick Hagan; State of Texas v. Renrick Taylor; June 12, 2009 |
| 13 | Motion to Pay Appointed Attorney Rich Hagan and Fee Voucher State of Texas v. Renrick Taylor; July 18, 2011 |
| 14 | Rick Hagan's Punishment Testimony; State of Texas v. Renrick Taylor; October 27, 2011 |
| 15 | Robinson Conflict Timeline of Events |
| 16 | Motion to Withdraw and Substitute Counsel; State of Texas v. Renrick Taylor; March 8, 2011 |
| 17 | Affidavit of Post-Conviction Counsel – Ms. Kate Pumarejo |
| 18 | Rick Hagan Fee Voucher – State of Texas v. Richard Benefield, Case No. 13-0114X |
| 19 | Docket Sheet – State of Texas v. Richard Benefield, Case No. 13-0114X |
| 20 | Affidavit of Bradney Smith |
| 21 | Affidavit of Juror Clark |
| 22 | Affidavit of Juror Staten |
| 23 | Affidavit of Charles Herring Jr. |
| 24 | Defendant's Motion to Excuse for Cause all Prospective Jurors Who have Heard or Read About This Case – Jan. 12, 2010 |
| 25 | Defendant's Motion to Sequester Jury – Jan. 12, 2010 |
| 26 | Affidavit of Corey Robinson, Dec. 11, 2012 |
| 27 | Affidavit of Claude Andrews |
| 28 | Affidavit of Donnetta Gray, Dec. 9, 2012 |
| 29 | Affidavit of Helen Dawson, Dec. 9, 2012 |
| 30 | Media Coverage Exhibit |
| 31 | 2011 American Community Survey, 5-year estimate, Race/Ethnicity Background, Harrison County, Texas |
| 32 | Declaration of Dr. Stephen Ansolabehere, *Veasey v. Abbott*, No. 2:13-cv-193 (S.D. Tex. Sept. 16, 2014), ECF No. 600-1. |
| 33 | Affidavit of Dr. Celeste Henery, Jan. 2, 2013 |
| 34 | *The Marshall News Messenger* articles on the KKK |

| 35 | Affidavit of Corey Robinson, Oct. 25, 2017 |
| 36 | Affidavit of Ralph Hendrix, Oct. 18, 2017 |
| 37 | Affidavit of Coretta Robinson, Oct. 24, 2017 |
| 38 | Affidavit of Lula Waskom |
| 39 | Affidavit of Donnetta Gray, Oct. 24, 2017 |
| 40 | Special Issues Chart |
| 41 | Motion for Questionnaires |
| 42 | Juror Cynthia Leleko Questionnaire - SEALED |
| 43 | *The Marshall News Messenger*, Oct. 21, 2010 |
| 44 | Juror Nancy Keohane Questionnaire SEALED |
| 45 | Juror Martin Questionnaire - SEALED |
| 46 | Juror Lloyd Burkhalter Questionnaire - SEALED |
| 47 | Seated Juror Clifton Gillilands Questionnaire - SEALED |
| 48 | Seated Juror Joseph Saur Questionnaire - SEALED |
| 49 | Seated Juror Michael Anderson Questionnaire SEALED |
| 50 | Seated Juror Kenneth Clark Questionnaire - SEALED |
| 51 | Seated Juror Kevin Crutchfield Questionnaire SEALED |
| 52 | Transcript of Squad Car Video |
| 53 | Dr. Charis Kubrin's *Rap on Trial, The Threatening Nature of "Rap" Music* |
| 54 | Report of Helena Huckabee, Ph.D. |
| 55 | Affidavit of Ms. Kelley Lane |
| 56 | *Marshall News Messenger* May 10, 1984 |
| 57 | Affidavit of Sanford Robinson |
| 58 | *Marshall News Messenger* June 1, 1986 |
| 59 | Moses Robinson TDCJ Presentence Investigation Report |
| 60 | Moses Robinson Aggravated Robbery Indictment |
| 61 | Moses Robinson Judgment Guilty Plea |
| 62 | Moses Robinson TDCJ Certificate of Parole |
| 63 | Marshall ISD Records for Corey Robinson - SEALED |
| 64 | Marshall ISD Records for Corté Robinson - SEALED |
| 65 | Report of Dr. Barry Rath |
| 66 | Marshall PD Family Violence Report 9-26-2003 |
| 67 | Dr. Alfano Sleep Evaluation |
| 68 | Affidavit of Charles Jernigan |
| 69 | Declaration of Michael Gottlieb, Ph.D. |
| 70 | Affidavit of Stephen Hart, Ph.D. |
| 71 | Dr. David Self's HCR-20 and PCL-R Scoring Sheets |
| 72 | Curriculum Vitae of Dr. Thomas G. Allen, Ph.D. |
| 73 | List of Forensic Psychological Experience for Dr. Thomas G. Allen |
| 74 | Affidavit of Daniel Murrie, Ph.D. |
| 75 | Affidavit of Dr. John Edens, Ph.D. |
| 76 | Report of Charis Kubrin, Dec. 16, 2017 |
| 77 | Suppl. Affidavit of Stephen Hart, Ph.D. |
| 78 | Suppl. Affidavit of Dr. Daniel Murrie |
| 79 | Suppl. Affidavit of Dr. John Edens |
| 80 | Testimony of Dr. Thomas Allen, *State of Texas v. Robert Roberson*, Feb. 13, 2003 |

| 81 | Affidavit of Megan Robinson |
| 82 | Declaration of Am. Acad. Of Pediatric Neuropsychology, *Guzek v. Kelly*, No. 17CV08248 (Circuit Court for the State of Oregon, Marion County) |
| 83 | Robert J. McCaffrey and Cecil R. Reynolds, *On Neuroscience and the Teen-aged Death Penalty* |
| 84 | Declaration of Laurence Steinberg, *Guzek v. Kelly*, No. 17CV08248 (Circuit Court for the State of Oregon, Marion County) |
| 85 | 2017 Letter & CV of Candace Alfano |
| 86 | Brief of Amici Curiae In The Fields Of Neuroscience, Neuropsychology, and Related Fields, Wardlow v. Texas, No. 19-8712 (June 19, 2020) |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcorta v. Texas,*
    355 U.S. 28 (1957) ........................................................................................ 16

*Alston v. Manson,*
    791 F.2d 255 (2d Cir. 1986) ........................................................................ 43

*Andrus v. Texas,*
    140 S. Ct. 1875 (2020) ............................................... 8, 105, 106, 118

*Atkins v. Virginia,*
    536 U.S. 304 (2002) ........................................................................ 140, 143

*Banks v. Dretke,*
    540 U.S. 668 (2004) ........................................................................ 10

*Batson v. Kentucky,*
    476 U.S. 79 (1986) ........................................................................ 64, 69, 70

*Battenfield v. Gibson,*
    236 F.3d 1215 (10th Cir. 2001) ........................................................ 113

*Bemore v. Chappell,*
    788 F.3d 1151 (9th Cir. 2015) ............................................... 111, 113

*Berguis v. Smith,*
    559 U.S. 314 (2010) ........................................................................ 42

*Blankenship v. Estelle,*
    545 F.2d 510 (5th Cir. 1977) ........................................................ 20

*Bobby v. Van Hook,*
    558 U.S. 4 (2009) ........................................................................ 8

*Boyde v. California,*
    494 US. 370 (1990) ........................................................................ 108

*Brady v. Maryland,*
    373 U.S. 83 (1963) ........................................................................*passim*

*Brooks v. Dretke,*
    444 F.3d 328 (5th Cir. 2006) ........................................................ 63

*Buck v. Davis,*
    137 S. Ct. 759 (2017)...................................................................................121, 139

*Caldwell v. Mississippi,*
    472 U.S. 320 (1985)........................................................................................24, 75

*Chandler v. Florida,*
    449 U.S. 560 (1981).............................................................................................70

*Coble v. State,*
    330 S.W.3d 253 (Tex. Crim. App. 2010)....................................................*passim*

*Commonwealth v. Bredhold,*
    599 S.W.3d 409, 412 (Ky. 2020).................................................................144, 145

*Cullen v. Pinholster,*
    563 U.S. 170 (2011)...........................................................................................7, 84

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993)......................................................................................*passim*

*Duren v. Missouri,*
    439 U.S. 357 (1979)................................................................................42, 44, 45

*Eddings v. Oklahoma,*
    455 U.S. 104 (1982)......................................................................105, 108, 109

*Enmund v. Florida,*
    458 U.S. 782 (1982).........................................................................................140

*Escamilla v. Stephens,*
    602 F. App'x 939 (5th Cir. 2015) ....................................................................114

*Estes v. Texas,*
    381 U.S. 532 (1965)............................................................................................36

*Eze v. Senkowski,*
    321 F.3d 110 (2d Cir. 2003).............................................................................88

*Felde v. Blackburn,*
    795 F.2d 400 (5th Cir. 1986)............................................................................24

*Fields v. State,*
    1 S.W.3d 687 (Tex. Crim. App. 1999)..............................................................87

*Giglio v. United States,*
    405 U.S. 150 (1972)................................................................................20, 21, 32

*Ex parte Gonzales,*
    204 S.W.3d 391 (Tex. Crim. App. 2006)......................................................8, 9

*Graham v. Florida,*
    560 U.S. 48 (2011).....................................................................................*passim*

*Gregg v. Georgia,*
    428 U.S. 153 (1976)..........................................................................141, 143, 151

*Haley v. State,*
    173 S.W.3d 510 (Tex. Crim. App. 2005)......................................................83

*Hall v. Florida,*
    572 U.S. 701 (2014)...................................................................................147

*Harrington v. Richter,*
    562 U.S. 86 (2011).................................................................................8, 9, 86

*Hinton v. Alabama,*
    571 U.S. 263 (2014)....................................................................................88

*Irvin v. Dowd,*
    366 U.S. 717 (1961)...................................................................................*passim*

*J.E.B. v. Alabama ex rel. T.B.,*
    511 U.S. 127 (1994)....................................................................................64

*Johnson v. Mississippi,*
    486 U.S. 578 (1988)...................................................................................150

*Johnson v. Williams,*
    568 U.S. 289 (2013)................................................................................25, 86

*Jones v. Georgia,*
    389 U.S. 24 (1967).....................................................................................43

*Kelly v. Stone,*
    514 F.2d 18 (9th Cir. 1975)........................................................................52

*Kennedy v. Louisiana,*
    554 U.S. 407 (2008)................................................................140, 141, 143, 151

*Kirk v. Raymark Indus.,*
    61 F.3d 147 (3d Cir. 1995)......................................................................59, 60

*Kirkpatrick v. Blackburn,*
    777 F.2d 272 (5th Cir. 1985)...................................................................24, 25

*Kyles v. Whitley,*
    514 U.S. 419 (1995)............................................................................26, 29, 30, 34

*Ex parte Lalonde,*
    570 S.W.3d 716 (Tex. Crim. App. 2019).............................................................21

*Lambright v. Schriro,*
    490 F.3d 1103 (9th Cir. 2007) ..........................................................................107

*Lesko v. Lehman,*
    925 F.2d 1527 (3d Cir. 1991)........................................................................ 75, 76

*Lockett v. Ohio,*
    438 U.S. 586 (1978)................................................................................. 142, 154

*Martinez v. Ryan,*
    566 U.S. 1 (2012) .................................................................................................9

*Mayola v. Alabama,*
    623 F.2d 992 (5th Cir. 1980)..............................................................................39

*McCoy v. Louisiana,*
    138 S. Ct. 1500 (2018) ................................................................................ 87, 89

*Miller v. Alabama,*
    567 U.S. 460 (2012) ...................................................... 112, 141, 142, 153

*Miller v. Dretke,*
    420 F.3d 356 (5th Cir. 2005)......................................................................*passim*

*Miller v. North Carolina,*
    583 F.2d 701 (4th Cir.1978)...............................................................................53

*Miller v. Webb,*
    385 F.3d 666 (6th Cir. 2004)..............................................................................56

*Miller-El v. Dretke,*
    545 U.S. 231 (2005)...................................................................................*passim*

*Montgomery v. Louisiana,*
    136 S. Ct. 718 (2016).............................................. 141, 142, 144, 155

*Moore v. Morton,*
    255 F.3d 95 (3d Cir. 2001) ................................................................................75

*Moore v. Texas,*
    137 S. Ct. 1039 (2017) .....................................................................................147

*Morgan v. Illinois,*
    504 U.S. 719 (1992) ................................................................................................58

*Napue v. Illinois,*
    360 U.S. 264 (1959) ...........................................................................................*passim*

*Padilla v. Kentucky,*
    559 U.S. 356 (2010) ...........................................................................................7, 88

*Panetti v. Quarterman,*
    551 U.S. 930 (2007) ................................................................................................41

*Patton v. Yount,*
    467 U.S. 1025 (1984) ..............................................................................................59

*Pena-Rodriguez v. Colorado,*
    137 S. Ct. 855 (2017) ..............................................................................................85

*Penry v. Lynaugh,*
    492 U.S. 302 (1989) ..............................................................................................108

*Porter v. McCollum,*
    558 U.S. 30 (2009) ............................................................................................*passim*

*Powell v. Alabama,*
    287 U.S. 45 (1932) ..................................................................................................88

*Powers v. Ohio,*
    499 U.S. 400 (1991) ................................................................................................69

*Pruett v. Thigpen,*
    665 F. Supp. 1254 (N.D. Miss. 1986) ....................................................................25

*Richards v. Quarterman,*
    566 F.3d 553 (5th Cir. 2009) ................................................................................120

*Richardson v. Griffin,*
    866 F.3d 836 (7th Cir. 2017) ..................................................................................85

*Rideau v. Louisiana,*
    373 U.S. 723 (1963) ................................................................................................36

*Rideau v. Whitely,*
    237 F.3d 472 (5th Cir. 2000) ..................................................................................43

*Ristaino v. Ross,*
    424 U.S. 589 (1976) ....................................................................................46, 54, 89

*Ex Parte Robinson*,
No. WR-81,583-01, 2016 WL 6610373 (Tex. Crim. App. Nov. 9, 2016)...................................*passim*

*Ex parte Robinson*,
No. WR-81,583-02, 2020 WL 5649451 (Tex. Crim. App. Sept. 23, 2020) .......................................6

*Rodriguez v. State*,
903 S.W.2d 405 (Tex. App.—Texarkana 1995) ............................................................ 74, 75

*Ex parte Rogers*,
369 S.W.3d 858 (Tex. Crim. App. 2012)..............................................................................84

*Rompilla v. Beard*,
545 U.S. 374 (2005)...................................................................................................7, 35

*Roper v. Simmons*,
543 U.S. 551 (2005).................................................................................................*passim*

*Rose v. Mitchell*,
443 U.S. 545 (1979)............................................................................................................42

*Ross v. Oklahoma*,
487 U.S. 81 (1988)..............................................................................................................58

*Sears v. Upton*,
561 U.S. 945 (2010)..........................................................................................111, 113, 114

*Sheppard v. Maxwell*,
384 U.S. 333 (1966)..................................................................................................... 36, 41

*Skilling v. United States*,
561 U.S. 358 (2010)............................................................................................................38

*Smith v. Phillips*,
455 U.S. 209 (1981) .........................................................................................59, 60, 62, 63

*Smith v. Texas*,
311 U.S. 128 (1940)............................................................................................................41

*Snyder v. Louisiana*,
552 U.S. 472 (2008)............................................................................................................64

*Soria v. State*,
933 S.W.2d 46 (Tex. Crim. App. 1996)...........................................................................138

*State v. Norris*,
No. A-3008-15T4, 2017 WL 2062145 (N.J. Super. Ct. App. Div. May 15, 2017).......................145

*Stitt v. United States,*
  369 F. Supp. 2d 679 (E.D. Va. 2005) ........................................................................138

*Strickland v. Washington,*
  466 U.S. 668 (1984) ...................................................................................... *passim*

*Strickler v. Greene,*
  527 U.S. 263 (1999) ..........................................................................................21

*Taylor v. Louisiana,*
  419 U.S. 522 (1975) .................................................................................. 41, 46

*Taylor v. State,*
  No. 06-11-00249-CR, 2012 WL 2308278 (Tex. App.—Texarkana June 19, 2012) ......................13

*Thompson v. Oklahoma,*
  487 U.S. 815 (1988) ........................................................................................142

*Thompson v. Sheppard,*
  490 F.2d 830 (5th Cir. 1974) ............................................................................43

*Trop v. Dulles,*
  356 U.S. 86 (1958) ........................................................................................141

*Trottie v. Stephens,*
  720 F.3d 231 (5th Cir. 2013) ............................................................................24

*Turner v. Murray,*
  476 U.S. 28 (1986) ................................................................................36, 51, 52, 54

*United States v. Bagley,*
  473 U.S 667 (1985) ..............................................................................27, 29, 32

*United States v. Barham,*
  595 F.2d 231 (5th Cir. 1979) ........................................................................20, 21

*United States v. Barnette,*
  211 F.3d 803 (4th Cir. 2000) ............................................................................138

*United States v. Colombo,*
  909 F.2d 711 (2d Cir. 1990) ..............................................................................86

*United States v. Dvorin,*
  817 F.3d 438 (5th Cir. 2016) ..............................................................................16

*United States v. Garza,*
  608 F.2d 659 (5th Cir. 1979) ..............................................................................25

*United States v. Gaudin,*
   515 U.S. 506 (1995) ................................................................................................70

*United States v. Iredia,*
   866 F.2d 114 (5th Cir. 1989) ..................................................................................25

*United States v. Johnston,*
   127 F.3d 380 (5th Cir. 1997) ....................................................................23, 24, 25

*United States v. Mendoza,*
   522 F.3d 482 (5th Cir. 2008) ..................................................................................76

*United States v. Quiroz,*
   137 F. App'x 667 (5th Cir. 2005) ...........................................................................42

*United States v. Rodriguez-Lara,*
   421 F.3d 932 (9th Cir. 2005) ..................................................................................46

*United States v. Sampson,*
   335 F. Supp. 2d 217 (D. Mass. 2004) ...................................................................138

*United States v. Taylor,*
   320 F. Supp. 2d 790 (N.D. Ind. 2004) ..................................................................129

*United States v. Wood,*
   299 U.S. 123 (1936) ..........................................................................................59, 63

*Vasquez v. Hillery,*
   474 U.S. 254 (1986) ................................................................................................46

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) ............................................................................43, 44

*Virgil v. Dretke,*
   446 F.3d 598 (5th Cir. 2006) ........................................................................7, 56, 64

*Wainwright v. Witt,*
   469 U.S. 412 (1983) ..........................................................................................59, 63

*Walbey v. Quarterman,*
   309 F. App'x 795 (5th Cir. 2009) ...........................................105, 115, 116, 118

*Walker v. Caldwell,*
   476 F.2d 213 (5th Cir. 1973) ..................................................................................88

*Ward v. Stephens,*
   777 F.3d 250 (5th Cir. 2015) ................................................................................121

*Wearry v. Cain*,
    136 S. Ct. 1002 (2016) ................................................................................20

*Weaver v. Massachusetts*,
    137 S. Ct. 1899 (2017) ................................................................................46

*White v. Thaler*,
    610 F.3d 890 (5th Cir. 2010) .....................................................................120

*Wiggins v. Smith*,
    539 U.S. 510 (2003) ...........................................................................*passim*

*Williams v. Allen*,
    542 F.3d 1326 (11th Cir. 2008) .......................................... 106, 107, 108, 112

*Williams v. Taylor*,
    529 U.S. 362 (2000) ..................................................................... 9, 85, 106

*Wilson v. Sellers*,
    138 S. Ct. 1188 (2018) ................................................................................85

## Statutes and Rules

28 U.S.C. § 2254(d) ..........................................................................................85

28 U.S.C. § 2254(d)(1) ............................................................................... 41, 85

Fed. R. Civ. P. 26(b)(4) ..................................................................................126

Tex. Code Crim. Proc. art. 37.071, § 2(b)(1) .......................................... 121, 150

Tex. Code Crim. Proc. art. 37.071, § 3(a) ........................................................11

Tex. Penal Code § 7.01 ....................................................................................82

Tex. Penal Code § 7.02 ....................................................................................82

Tex. Penal Code §7.02(b) .................................................................................57

Tex. Penal Code §15.02(a) ...............................................................................57

Tex. R of Evid. 701 ..........................................................................................74

Tex. R. Evid. 702 ......................................................................................*passim*

Tex. R. Evid. 703 ..................................................................... 78, 122, 127, 138

Tex. R. Evid. 705 ................................................................................... 127, 138

Tex. R. Evid. 705(b) .......................................................................................122

Tex. Rules of Evid. 704................................................................................................78

Texas Rule of Evidence 401 and 402........................................................................84

Texas Rule of Evidence 403................................................................................84, 85

Texas Rule of Evidence 404(b)....................................................................................84

**Other Authorities**

ABA Guidelines for the Appointment and Performance of Defense Counsel in
  Death Penalty Cases 31 Hofstra L. Rev. 913 (2003)..........................................8

B.J. Casey, *Beyond Simple Models of Self-Control to Circuit-Based Accounts of Adolescent
  Behavior*, 66 Ann. Rev. Pscyhol. (2015)........................................................149

Barbara Holden-Smith, *Lynching, Federalism, and the Intersection of Race and Gender in the
  Progressive Era*, 8 YALE J. L & FEM. (1995)...................................................52

Brain Health, *Starting Age of Marijuana Use May Have Long-Term Effects on Brain
  Development*, Science Daily (Feb. 10, 2016) ...................................................154

Brandon Jett, *"Let Us Be Law Abiding Citizens" Mob Violence and the Local Response in
  Harrison County, Texas, 1890-1925*, 54 E. Tex. Hist. J. 22 (2016) .....................48

C. Robert Showalter & Richard J. Bonnie, *Psychiatrists and Capital Sentencing: Risks and
  Responsibilities in a Unique Legal Setting*, 12 Bull. Am. Acad. Psych. & L. (1984) ............139

Darrell Steffensmeier, Jeffery Ulmer, and John Kramer, *The Interaction of Race, Gender,
  and Age in Criminal Sentencing: The Punishment Cost of Being Young, Black, and Male*, 36
  Criminology (1998) ........................................................................................153

David DeMatteo, et al., *Statement of Concerned Experts on the Use of the Hare Psychopathy
  Checklist—Revised in Capital Sentencing to Assess Risk for Institutional Violence*, 26
  Psychol., Pub. Pol'y, & L. 133 (2020) ..............................................................130

*Death Penalty Due Process Review Project: Section of the Civil Rights and Social Justice*, A.B.A.
  Res. 111 (2018), ............................................................................................146

Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a
  Transitional Legal Authority: Science, Social Change, and Justice Policy*, 85 Fordham L.
  Rev. (2016). ...................................................................................................146

Equal Justice Initiative, *Lynching in America: Confronting the Legacy of Racial Terror* (3d ed.
  2017).............................................................................................................48

George Dawson and Richard Glaubman, *Life Is So Good* (2000) ................................48

Jay N. Giedd, *The Amazing Teen Brain*, 312 Scientific American 33 (June 2015)...................149

Jeff Greenberg & April Wursten, *The Psychologist and the Psychiatrist as Expert Witnesses: Perceived Credibility and Influence* ........................................................................139

Jeffrey J. Pokorak, *Rape as a Badge of Slavery* ...............................................................51

Joel Cooper et al., *Complex Scientific Testimony: How Do Jurors Make Decisions?,* 20 Law & Hum. Behav. (1996) ........................................................................................139

John H. Blume, et al., *Death By Numbers: Why Evolving Standards Compel Extending Roper's Categorical Ban Against Executing Juveniles from Eighteen to Twenty-One,* 98 Tex. L. Rev. (2020) ......................................................................................................144

Laurie MacKinnon, *The Neurosequential Model of Therapeutics: An Interview with Bruce Perry,* 33 The Australian & New Zealand J. of Family Therapy 210 (2012) .................110

Lee Rawles*, Ban Death Penalty for Those 21 or Younger, ABA House Says,* ABA Journal (Feb. 5, 2018) ...............................................................................................................145

Legal History Of, And Remedies For, Prosecutorial Race-Of-Victim Charging Disparities, 7 Nev. L.J. 1 (2006) .....................................................................................51

Peter S. Lehmann, Ted Chiricos, and William D. Bales, *Sentencing Transferred Juveniles in the Adult Criminal Court: The Direct and Interactive Effects of Race and Ethnicity,* 15 Youth Violence and Juvenile Justice (2017) ......................................................................153

Phil Latham*, Opinion: Asking Questions So a Community Thinks About Race,* Neiman Reports (Fall 2003) ...........................................................................................................48

R.L. Schalock, R. Luckassan, & M.J. Tassse*, Twenty Questions and Answers Regarding the 12*[th] *Edition of the AAIDD Manual: Intellectual Disability: Definitions, Diagnosis, Classification, and Systems of Supports,* Am. Ass'n intellectual and developmental disabilities 1, 3 (2018). ..................................................................................................146

Ralph Ellison, *Invisible Man* (1952) ......................................................................................4

Randolph B. Scott, *Population Persistence and Social Change in Nineteenth-Century Texas: Harrison County, 1850-1880,* 48 J. Southern Hist. (1982) .................................................47

Rhiana Kohl, *The Influence of Brain Development Research on the Response to Young Adult Males 18-24 Years of Age in the Criminal Justice System,* Mass. Dep't of Correction (Nov. 2018) ...................................................................................................................148

Richard L. Gaskill & Bruce D. Perry, *Child Sexual Abuse, Traumatic Experiences, and Their Impact on the Developing Brain, in Handbook of Child Sexual Abuse: Identification, Assessment, and Treatment* .........................................................................................110

Robert Hare, *Psychopathy, the PCL-R, and Criminal Justice: Some New Findings and Current Issues,* 57 Can. Psychol (2016) .....................................................................................133

Sheri Lynn Johnson, *Racial Imagery in Criminal Cases*, 67 Tul. L. Rev. 1739 (1993) ...............................139

Texas Fair Defense Project & Texas Appleseed, *Driven by Debt: How Driver's License Suspensions for Unpaid Fines and Fees Hurt Texas Families* (Mar. 2019) ....................................................44

Francesca M. Filbey, *et al.*, *Preliminary Findings Demonstrating Latent Effects of Early Adolescent Marijuana Use Onset on Cortical Architecture*, 16 Dev. Cognitive Neuroscience (2015) ..............................................................................................................................154

## PRELIMINARY STATEMENT REGARDING LOCAL RULE CV-3

On March 23, 2021, Petitioner filed an opposed motion requesting leave to file this amended petition in excess of the page limitations required by Local Rule CV-3. The motion remains pending. For the reasons stated in the motion, Petitioner believes this request is reasonable. The following petition is 155 pages. If this Court denies the motion, petitioner requests leave to refile in accordance with this Court's order.

## INTRODUCTION

Cortné Robinson was 18 years old when he was charged with the capital murder of Frank Zabokrtsky, an elderly white man. Robinson, who is Black, was tried in Marshall, Harrison County, Texas. He was convicted and sentenced to death. Robinson's trial was shadowed by the specter of racial prejudice. Every step in the trial process heightened the risk that Robinson would be sentenced to death not for who he was, but because of how he was perceived through a biased lens.

News of the crime immediately captivated the attention of the tight-knit and racially divided Marshall community. Despite widespread, prejudicial publicity, counsel insisted the case remain in town. Counsel would later say he wanted the trial in Harrison County because it had "one of the largest percentages of Black individuals in the area" and selecting a jury from it might improve Robinson's chances of a life sentence.

But if trial counsel's plan was to select a jury that was free from possible racial bias and that included members of Marshall's Black community, every action counsel took during jury selection betrayed that plan. In a county in which nearly one in four residents was Black, only one-twelfth (4/48) of members of the venire were Black. Yet trial counsel took no action to ensure the jury would remotely resemble a fair cross-section of the community. Just as damaging, trial counsel failed to test members of the venire for potential racial bias, ignoring the Supreme Court's decree that such questioning was essential in interracial capital crimes. And when potential jurors admitted their

exposure to pretrial publicity and confessed personal acquaintance with the prosecutors, counsel took no action to challenge these jurors for cause either. Finally, counsel failed to challenge the prosecution's use of peremptory strikes to remove two of the remaining four Black members of the venire. The strikes were so questionable—and counsel's performance so sub-par—that the State felt compelled to make a record of its pretextual reasons for striking the Black venire members of its own accord.

In both the guilt-innocence and penalty phases of the trial, counsel's passive performance allowed the State to convert Robinson's murder trial into a racially inflammatory sideshow focused on the horrific sexual assault of Mrs. Arnola Zabokrtsky. Robinson had nothing to do with Mrs. Zabokrtsky's rape, as even the prosecution tacitly conceded when it chose not to charge Robinson for the crime. The sole assailant was Robinson's juvenile co-defendant, Travion Young. Yet counsel did nothing to check the onslaught of highly prejudicial (and not particularly probative) information about the rape that flowed from the State's witnesses. In a past generation, such provocative facts had stirred white citizens of Marshall to lynching. In Robinson's capital sentencing—with his life hanging in the balance—his own counsel invited the jury to hold him responsible for his co-defendant's crime, a concession that was not only contrary to Robinson's wishes but also contrary to Texas law.

The rape was the anchoring event in the State's narrative. But the State returned time and again to several other racially tinged pieces of evidence. The State sponsored improper opinion testimony (again without counsel's objection) about rap lyrics Robinson freestyled in the back of a police squad car as he reflected on what he had done, portraying Robinson as a remorseless gangster—instead of a lost teen. The State exaggerated Robinson's supposed "gang" membership and lingered on Robinson's facial tattoos, which professed his allegiance to the "westside," the highly segregated Black neighborhood in which he grew up, and provided, they said, an admission of guilt in the form of a teardrop.

In sentencing, counsel adopted its own straight-from-casting stereotypes to tell Robinson's life story, rather than conducting a reasonable investigation of the facts regarding their client's traumatic childhood. Counsel called witnesses to tell the distorted story of a talented, quiet latchkey child who went off track because his struggling single mother was working too hard to make ends meet and missed the stabilizing influence of his stepfather. This narrative ticked off many boxes: a struggling, impoverished child; a hero in the form of a stepfather who brought structure and discipline, and tragedy when Robinson lost that father figure. But counsel were made aware from their initial investigation that these facts of Robinson's background were far more tragic. Because of their inadequate investigation, however, counsel overlooked the harrowing abuse and violence Robinson had suffered, including at the hands of that very stepfather. His stepfather got into physical fights with his mother, punching her in the stomach and, on one occasion, knocking her out. On another occasion, a gun was fired. And the abuse extended to Cortné, who was beaten daily with belts and switches.

The State, by contrast, provided the jury with a purportedly scientific opinion that Robinson was a dangerous "psychopath," a "predator" who would "hurt someone again." They bolstered this narrative with a hastily assembled story of a young man taking on armed jailors with a blade from a disposable razor—a story they obtained with a promise they did not disclose to defense counsel. Then, the state's unreliable "expert" opinion (again unchallenged by counsel) could have provided convenient cover for those inclined to see Black men as inherently more dangerous.

Robinson's experience was like the Black narrator of Ralph Ellison's *Invisible Man*:

I am invisible, understand, simply because people refuse to see me. Like the bodiless heads you see sometimes in a circus sideshow, it is as though I have been surrounded by mirrors of hard, distorting glass. When they approach me they see only my surroundings, themselves, or figments of their imagination—indeed, everything and anything except me.

Ralph Ellison, *Invisible Man* at 1 (1952). Robinson's story was more complicated, and, because it is true, more compelling than anything at his sentencing trial. A sensitive and private person, Robinson got up every day, into middle school, tried hard at school, loved his mom, and looked up to his brother. He was failed and betrayed at every turn. He was often hungry. He was frequently abused. From a young age, he was sleep deprived. For these reasons, an expert would have testified that his brain development and maturity were likely delayed. Robinson did not, as the prosecutor accused, squander his gifts--he survived in spite of his enormous deficits. Robinson succeeded until he no longer could.

Counsel's failures at sentencing prevented the jury from seeing him. Forced to choose between a child who could not survive losing his stepfather and a kid who was ungrateful, animalistic, and remorseless, the jury were denied the opportunity to truly provide an assessment of Robinson as an individual.

Individually, each of the constitutional violations at Robinson's trial set out in detail below warrants relief from the conviction or sentence. But the overall picture leaves the unmistakable impression that Robinson's trial was fundamentally unfair.

## PROCEDURAL HISTORY

Petitioner Cortné Robinson is in the custody of the Texas Department of Criminal Justice, pursuant to the 2011 verdict and judgment of a Harrison County, Texas jury.

In 2009, Robinson, an 18-year-old man, broke into a home in Marshall, Texas, intending to commit a burglary. Robinson had a gun with him, and, in the course of trying to restrain the elderly homeowner, Frank Zabokrtsky, he shot Zabokrtsky, who later died from his injuries.

Robinson was with two other young men: Bradney Smith, a friend of his, and Travion Young, an acquaintance, who was only 16 years old. During the break-in, Young took Mr. Zabokrtsky's wife, Arnola, into a bathroom and raped her. The three men tied Mrs. Zabokrtsky up, put her in the trunk of her car, and drove her to a secluded area, where they left her.

Robinson gave a statement to police shortly after the crime. He admitted that he shot Mr. Zabokrtsky. He vehemently denied participating in, or knowing about, the sexual assault. He was charged with capital murder. A jury convicted him and, after a trial on punishment, sentenced him to death.[1]

Robinson appealed his conviction and sentence to the Texas Court of Criminal Appeals, arguing that an outburst during trial by a Zabokrtsky family member required a mistrial and that Robinson's age at the time of the crime precluded the imposition of the death penalty. Robinson's appellate attorney waived oral argument, and the court rejected the appeal. *See Robinson v. State*, No. AP-76535, 2013 WL 2424133 (Tex. Crim. App. 2013) (unpublished).

An application for a writ of habeas corpus was filed in the state trial court. *See* 1 SHCR 16-237. The trial court held a two-day evidentiary hearing limited to issues of trial counsel's ineffectiveness, *see* 1 & 2 WRR, and adopted *verbatim* the State's proposed facts and conclusions of law recommending that relief be denied, *see* 4 SHCR 1661 (order adopting State's proposed findings and conclusions); Supp. SHCR 4-66 ("FFCL"). The Texas Court of Criminal Appeals adopted most of the findings and conclusions and accepted the recommendation. *Ex Parte Robinson*, No. WR-81,583-01, 2016 WL 6610373 (Tex. Crim. App. Nov. 9, 2016).

After Robinson filed his initial petition for writ of habeas corpus, ECF No. 14, this Court stayed federal habeas proceedings to allow Robinson to exhaust several claims in state court, including Claims I, II, III, and XII (IAC-Future Dangerousness) below . ECF No. 67. On September 23, 2020, the CCA dismissed the application in its entirety "without considering the merits of the claims," finding the application "failed to satisfy the requirements of [Texas Code of Criminal

---

[1] The initial state writ application presents a full discussion of the facts of this case and the evidence presented at trial, *see* 1 SHCR 34-53, and Robinson incorporates that recitation into this petition.

Procedure] Article 11.071, § 5(a)." *Ex parte Robinson*, No. WR-81,583-02, 2020 WL 5649451, at *1 (Tex. Crim. App. Sept. 23, 2020).

On November 24, 2020, after reopening the case, this Court granted Robinson's motion for a briefing schedule, including leave to file an amended petition.

Since the conclusion of state court proceedings, counsel have diligently worked to resume or begin several avenues of investigation that were not completed by prior counsel. These efforts have been severely hampered, however, by the ongoing effects of the global COVID-19 pandemic. Counsel have been unable to work from their office, visit Robinson, send experts to speak with their client, or travel to interview witnesses or gather records. Exhibit 1 (Declaration of Capital Mitigation Specialist Elizabeth Aguirre) (describing the impediments to investigation).

For these reasons and for other reasons outside counsel's control, several critical witnesses have been unavailable and several key documents have not yet been produced. One of Robinson's trial counsel, Lance Larison, is serving a prison sentence in the custody of TDCJ[2] and had been unavailable for visitation from March 2020 until March 2021. Prosecution witness Renrick Taylor has authorized access to his own trial files as they relate to Robinson's case, but attorney *pro tem* at trial Rick Hagan has refused to comply with his client's instruction to produce those records. Robinson's counsel are still attempting to collect all remaining records on the State's expert witness Dr. Thomas Allen. Counsel for Respondent are undertaking review of the prosecution file to determine whether they have any documents related to Dr. Allen or whether all files regarding Dr. Allen have been destroyed. Finally, Robinson's state-court counsel for his subsequent writ application has a pending motion in the state court for access to juror questionnaires, which may prove crucial to substantiating Robinson's claim regarding the prosecution's racially discriminatory use of peremptory strikes in jury

---

[2] *See* Ex. 2 (TDCJ Inmate Lookup and Docket Sheet - Larison).

selection. Under these unique circumstances, Robinson will soon move for comprehensive discovery and will supplement his petition as this Court permits.

For the court's convenience, additional facts relevant to each of the claims in this petition are recited in opening sections accompanying those claims.

## AUTHORITIES

### I.    Standard of Care

An ineffective assistance of counsel claim has two components: Robinson must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009); *Wiggins v. Smith,* 539 U.S. 510, 521 (2003); *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006). To establish deficiency, Robinson must show his counsel's representation fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38-39 (quoting *Strickland*, 466 U.S. at 688).

The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393-94 (2005) (O'Connor, J., concurring) (citing *Strickland*, 466 U.S. 668). Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (noting ABA Standards "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA Standards for Criminal Justice] as guides to determining what is reasonable.'") (quoting *Wiggins*, 539 U.S. at 524)). Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then

in effect. *See Bobby v. Van Hook*, 558 U.S. 4, 8-9 (2009). At the time of Robinson's trial, his attorneys' obligations were governed by the "prevailing professional norms," even if those norms did not align with less rigorous "most common customs." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). These include the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines) *printed in* 31 Hofstra L. Rev. 913 (2003); ABA Standards for Criminal Justice (3d ed. 1993) (ABA Standards); Guidelines and Standards for Texas Capital Counsel (April 21, 2006) (Texas Guidelines); Supplementary ABA Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (2008).

Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. Under the Guidelines, counsel was required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guidelines, Guideline 10.7. A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Miller v. Dretke,* 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521; *Andrus v. Texas,* 140 S. Ct. 1875, 1883 (2020) (finding counsel deficient where "counsel disregarded, rather than explored, the multiple red flags"). When defense counsel is not aware of the relevant evidence, "the issue is not whether he was ineffective for failing to present [the] evidence … , but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence*." Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA Guidelines, Guideline 10.10.1. "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions.

Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Gonzales*, 204 S.W.3d at 401 (Cochran, J., concurring).

Where prejudice is required, Robinson "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 558 U.S. at 44 (quoting *Strickland*, 466 U.S. at 694). Robinson need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693, only that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 562 U.S. at 112.

State post-conviction courts must analyze a capital penalty phase ineffectiveness claim by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. It is not necessary for the petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000). The Constitution requires that state post-conviction courts "engage with what [a defendant] actually went through" as expressed in mitigating evidence. *Porter*, 558 U.S. at 44. It is not only incorrect but "[i]t is unreasonable to discount to irrelevance [mitigating] evidence … [or] to conclude that [certain mitigating evidence] would be reduced to inconsequential proportions simply because the jury would also have learned [of related aggravating evidence.]" *Id.* at 43.

## II.   Statement Regarding Procedural Default

Procedural default is an affirmative defense that the State may raise against claims in its responsive pleading. Should the State argue that Texas law provides an independent and adequate state procedural bar to federal habeas review of any of Robinson's claims of ineffective assistance of trial counsel, *Martinez v. Ryan*, 566 U.S. 1, 17 (2012), permits Robinson to argue that state post-conviction counsel's ineffectiveness in failing to raise the claims excuses any default. Wherever

Robinson's failure to raise a claim in state court is due to the State's suppression of evidence, Robinson may argue that the suppression provides cause to overcome the default. *Banks v. Dretke*, 540 U.S. 668, 692 (2004).

## CLAIMS FOR RELIEF

### I.   The State Violated *Napue v. Illinois* When It Knowingly Elicited False and Misleading Testimony.

The Fourteenth Amendment prohibits a prosecutor from knowingly eliciting false or misleading testimony at trial or knowingly allowing it to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citing *Alcorta v. Texas*, 355 U.S. 28 (1957)).

Here, the prosecution knowingly elicited false and misleading testimony from Renrick Taylor during Robinson's penalty proceedings on two separate occasions. First, the State elicited testimony that Taylor—a key State's witness—had not been promised anything in exchange for his cooperation in Robinson's prosecution when, in fact, he had. Second, the State elicited misleading testimony that Robinson had possessed a razor blade in jail while awaiting the jury's verdict—which the State relied on in closing to prove that Robinson would be a future danger—all while knowing that the razor blade belonged to their key witness, Taylor, not Robinson. Because there is a reasonable likelihood that the false testimony could have affected the judgment of the jury, Robinson's death sentence should be vacated and his case remanded for further proceedings.

### A.   Relevant Facts.

#### 1.   The Razor Blade Incident and Renrick Taylor's Trial Testimony

Following his arrest on September 20, 2009, Robinson was housed at the Harrison County Jail.[3]  He spent the nearly 17 months leading up to his trial for capital murder without any serious incident. Robinson was never cited for fighting with fellow inmates and was described by guards and

---

[3] Though Mr. Robinson spent most of his time at the Harrison County Jail, he was briefly transferred to Gregg County Jail in October 2009 for approximately 1 month. Ex. 3 (Harrison Co. Jail Inmate Movement Summary).

cellmates as "calm," "quiet," and "reserved."  *See generally* Ex. 4 (Robinson Inmate Incident History);

*see also* 32 RR 252 (Officer Fugler indicating he was not aware of Robinson having been in any fights

during his incarceration). For instance, former jailer and Private First Class Andrew "AJ" Walker, who

oversaw Robinson for approximately eight months of his incarceration at the Harrison County Jail,

described Robinson as "different from other inmates. Mainly, he was calmer than most. Cortné

Robinson was very quiet. He was not a troublemaker and he was not violent. He was very reserved."

Ex. 5 (Andrew Jakereon "A.J." Walker Aff.) ¶ 10; *see also* Ex. 6 (Andrew Clough Aff.) ¶ 3 ("Cortné

was always quiet and kept to himself."); *id.* ¶ 8 (noting that Robinson "did not try to fight or respond

aggressively" when Mrs. Zabokrtsky's son-in-law tried to attack him during his trial). One of his

cellmates, Stephen Kramer, likewise referred to Robinson as "one of the calmest individuals" in the

cell. *See generally* Ex. 7 (Stephen Kramer 2019 Decl.) ¶ 3; *see also* Ex. 8 (Stephen Kramer 2012 Aff.) ¶ 4

("During the time that I knew Cortné, between Oct[ober], 2010 and March, 2011 he was quiet,

reserved, always well composed and never malicious to any of the other inmates or guards."); Ex. 9

(Roy Martin Aff.) ¶ 8 ("[Cortné] was real quiet and stayed to himself."); Ex. 10 (Renrick Taylor Aff.)

¶ 5 ("Cortné has always been quiet. He was not the type to start a fight or participate in one.").

Thus, heading into trial, defense counsel "felt comfortable" with their punishment case. 1

SHCR 82. Robinson had been only eighteen at the time of the offense; he had no prior convictions;

the unadjudicated offenses the State planned to raise at punishment were largely non-violent;[4] and his

---

[4] Counsel refers to the unadjudicated offenses alleged against Robinson by the State as largely non-violent because they consisted primarily of property offenses. Counsel acknowledges that the alleged assaults on two pizza delivery men do not fall within this category, but understand that this is not the forum to contest the merits of those unadjudicated offenses at length. That said, the State introduced scant evidence to support finding that Robinson, himself, committed an act of physical violence, and certainly far less than needed to prove his participation beyond a reasonable doubt as required under Tex. Code Crim. Proc. art. 37.071, § 3(a) for the introduction of extraneous-act evidence during the penalty phase. For instance, one of the victims, James Slayton, "saw nothing of the attack" and could not identify which individual was hitting him. 31 RR 197, 199. The other victim, Glen Spencer, failed to identify Robinson in a six-person photo lineup approximately one-month prior to his testimony; it was only two days before the start of Robinson's punishment phase, and as Spencer readied himself for parole, that he did an about-face, positively identifying Robinson as one of his assailants based on a solo picture. 31 RR 148, 158-59. The State's third witness, Justin Davis, offered no firsthand knowledge of the events, asserting only that Robinson once told him about an incident with a pizza delivery man. 31 RR 101.

conduct during incarceration reflected that of a quiet, reserved individual, not that of a future danger to society. On Sunday, March 6, 2011, however, the day before counsel were to present closing arguments in the guilt-innocence phase of Robinson's trial, an incident altered defense counsel's assessment of the strength of Robinson's punishment case. 1 SHCR 82, 140, 145-46.

That Sunday, around 5 o'clock in the afternoon, one of Robinson's cellmates,[5] Richard Benefield, called his girlfriend and asked her to inform the Harrison County jail authorities that Robinson possessed a razor blade and was planning to escape from the jail. Ex. 4 at 4. According to Benefield, on March 1, 2011—nearly one week before he chose to disclose this information to jail authorities—"Renrick Taylor told [him] that Cortney [sic] was going to grab jailer [Larry] Copeland when he came back to U tank to get the ice chests and cut his throat and grab the jail keys from him."[6] Ex. 11 (Statement of Richard Benefield). During a subsequent search of the U tank, Jailer Copeland found a razor blade wedged in the metal part of Robinson's bunk. 32 RR 285-87.

Not surprisingly, at the punishment phase, the State relied on evidence of Robinson's alleged desire to escape to show he would be a future danger. In its opening statement, the State proffered: "[Y]ou're going to hear that while he was here during this trial and in the Harrison County Jail, he was found in possession of a razor blade, and the ramifications that brings with it. So when he talks about and you hear what a good inmate he is, think about what that razor blade can do." 31 RR 21.

The State then presented three key witnesses related to the incident, none of whom was Benefield. First, jailer Copeland testified that, on that Sunday, he had received information from an inmate that Robinson was planning to escape from Harrison County Jail. 32 RR 285. Copeland explained that, following a search of Robinson's cell, he found a razor blade in Robinson's bunk. 32

---

[5] During the course of his trial, Robinson was housed in a twelve-man cell, the "U-Tank," at the Harrison County Jail. 32 RR 257; Kramer 2019 Decl. ¶ 2.
[6] The trial court excluded evidence of the alleged kidnapping because the State's key witness, Mr. Taylor, did not mention a hostage. 32 RR 280-81, 284. The State did not call Mr. Benefield.

RR 285-87. Copeland then acknowledged, in response to questions posed by the State, that such a razor could be used as a deadly weapon and "by someone attempting to escape that does not want to go down before he gets caught."  32 RR 288-89.

Second, the State offered the testimony of Renrick Taylor, another of Robinson's cellmates, who was charged with capital murder. 32 RR 255-91.[7]  Taylor testified that he had told Benefield about Robinson's plan to escape. 32 RR 264. Though he stated that he did not believe that Robinson was serious about the escape, Taylor admitted that he thought it was serious enough to mention to Benefield. 32 RR 264.

Third, the State offered the testimony of psychologist Dr. Thomas Allen, who opined— without ever having met Robinson—that he would represent a continuing threat to society. 34 RR 145. He then stated that, hypothetically speaking, he considered it significant to the future danger assessment that someone accused of capital murder secreted a razor blade in their cell during trial. 34 RR 174. Allen explained: "It's a highly risky behavior. It's a post-conduct behavior. And it becomes more important if they've ever used weapons before."  34 RR 174.

The State then focused the jury's attention on this incident in closing. Hagan reminded the jury: "Ladies and Gentleman, while waiting for your verdict in this case and during the trial of this case, [Robinson] unlawfully concealed a razor blade in preparation for his escape." 36 RR 19. And Black, in imploring the jury to find Robinson to be a future danger, stated:

> You talk about things they have in prison, such as a razor blade and how they say this is not that big a deal; it was used for cutting hair. The World Trade Centers were brought down by a razor blade. If that's not significant to do a major purpose, I don't know what is. If you don't think you can't do damage to cause an escape with that razor blade, you're sadly mistaken. They say, well, they're joking around talking. Who, in the middle of his capital murder trial, where he's on trial for his life, discusses

---

[7] The Sixth District Court of Appeals in Texarkana described Mr. Taylor's crime as "heinous": "The evidence led the jury to conclude that Taylor killed Jenkins in a heinous manner over her failure to return a twenty-dollar payment that was given in exchange for oral sex."  *Taylor v. State*, No. 06-11-00249-CR, 2012 WL 2308278, at *3 (Tex. App.—Texarkana June 19, 2012).

escaping? Cortné Robinson. Who hides a razor blade in his cell there knowing what it could do?  Cortné Robinson.

36 RR 71.

The defense offered no witnesses to rebut the prosecution's case. In fact, the defense chose not to call their custody classification expert, Larry Fitzgerald, in light of the allegations of an alleged escape and the discovery of a razor blade in Robinson's cell. As Settle explained, "The problem that I have, Your Honor, [Fitzgerald] will also talk about the availability of weapons in the penitentiary, and I don't want to get into that, seeing as how my client now has just been—there's evidence offered that he had a razor blade with him."  35 RR 5.

## 2.    Attorney *Pro Tem* Rick Hagan's Relationship with Renrick Taylor.[8]

The State knew information the defense did not, information that would have enabled Robinson to undercut Taylor's credibility and the State's future dangerousness case. Attorney *pro tem* Rick Hagan was Renrick Taylor's attorney. He had been appointed to represent Taylor approximately six months before he became *pro tem* prosecutor in Robinson's case. *See* Ex. 12 (Appointment Order). And, while Hagan was both Taylor's attorney and Robinson's prosecutor, he visited Taylor's cell.

Hagan met with Taylor on Sunday, March 6, 2011, to discuss the accusations about the razor blade. *See* Ex. 13 (Attorney Fee Voucher); Taylor Aff. ¶ 12; Ex. 14 (Hagan's Punishment Testimony) at 14; *see also* Ex. 15 (Timeline of Events) at 4. At that meeting, Taylor told Hagan that he had hidden the razor blade in Robinson's bunk. *See* Taylor Aff. ¶ 12. Hagan advised his client to testify against the man he was prosecuting, Robinson, to help himself avoid charges of attempted escape. *See id.* ¶ 13. Hagan also promised Taylor that, if he testified against Robinson, Hagan would testify on his behalf at his murder trial. *See* Ex. 14 at 17. Hagan then informed Taylor that he was going to file a motion to

---

[8] Counsel have received authorization from Renrick Taylor to inspect his trial file, still in the possession of his former counsel, Rick Hagan and John W. Moore. Against his client's express wishes, Hagan has refused to turn over relevant portions of  Taylor's file. Robinson intends to make a request for this Court to use its authority to compel the release of these files in a separately filed motion for discovery.

withdraw as counsel and that new counsel would be appointed for him so that the State could use him as a witness at the punishment phase of Robinson's trial. *See* Taylor Aff. ¶ 14.

Events moved swiftly. The Sheriff's Department had begun interviews of Taylor and Benefield on the evening of March 6,[9] but they stopped interviewing Taylor when they learned Hagan was Taylor's attorney. *See* Ex. 14 at 8. The same day, Hagan drafted a motion to withdraw from Taylor's case. *See* Ex. 13; Ex. 16 (Motion to Withdraw and Substitute Counsel). The Sheriff's Department resumed their interviews, and Hagan filed his motion to withdraw, the next day. *See id.*; *see also* Ex. 11. Hagan's motion was denied that same day. *See* Ex. 16. However, later in the day, the court granted the motion to withdraw, and John Moore was appointed to represent Taylor.[10] Ex. 16 at 4.

On March 9, 2011, Taylor testified for the State. Prosecutor Black elicited testimony from Taylor suggesting that the razor blade belonged to Robinson. For instance, when asked if he had "ever known if Robinson has any kind of object or weapon in his bunk," Taylor responded: "No, sir, not until we got shook down." 32 RR 261. Prosecutor Black also elicited testimony from Taylor that he had not been promised anything in exchange for his testimony: "You haven't been promised anything; you understand that I'm not the district attorney anymore, I can't give you anything, don't you?" 32 RR 264. Taylor agreed that he was not promised any benefits. 32 RR 264.

Robinson's trial attorneys were unaware that Taylor had informed prosecutor—and his then-attorney—Hagan that the razor blade belonged to him, not Robinson. Defense counsel was also unaware that Taylor avoided attempted escape charges and that Hagan had promised to testify on his behalf at his murder trial in exchange for his cooperation. In fact, defense counsel assumed the State

---

[9] Counsel reviewed the District Attorney's file for Robinson on September 30, 2019. The file contained no records suggesting that Benefield had been interviewed March 6. Robinson's fellow cellmate, however, confirmed that on the day of the shake down, most of the individuals in the U tank were questioned, including Benefield. Kramer Aff. ¶ 13.
[10] The motion was initially denied. *See* Ex. 16 at 2 (Motion to Withdraw and Substitute Counsel). Hagan billed for a hearing that day. *See* Ex. 13 at 2. The motion was granted later in the day. *See* Ex. 16 at 4.

would have been required to turn over such exculpatory and impeaching information under *Brady*. 1 SHCR 153.

When state habeas counsel investigated this incident and interviewed Taylor, neither Taylor nor Hagan provided the new information contained herein. *See* Ex. 17 (Pumarejo Aff.) at ¶ 6.

### 3.     Attorney *Pro Tem* Rick Hagan's Relationship with Richard Benefield.

Hagan also had an attorney-client relationship with another key witness to the razor blade incident—Benefield.

Benefield was in Robinson's cell at the time of the incident because, on January 5, 2011, he had been arrested for theft. *See* Taylor Aff. ¶ 8. He was released from custody shortly after Robinson's sentencing without ever having been charged with the theft. *See* Taylor Aff. ¶ 18. On April 23, 2012, Hagan started billing Harrison County for representing Benefield. *See* Ex. 18 (Rick Hagan Fee Voucher on Benefield's Case) at 2.

Benefield was not indicted for theft until April 25, 2013—two years after the arrest that placed him in Robinson's cell. *See* Ex. 19 (Benefield's Docket Sheet) at 2. Hagan represented him on those charges.

### B.     The State Violated Robinson's Right to Due Process By Knowingly Eliciting or Failing to Correct False And Misleading Material Testimony From Renrick Taylor.

The State must avoid presenting evidence that might be considered misleading, and evidence presented to the jury that is false or gives it a "false impression" must be corrected by the prosecution. *See Napue*, 360 U.S. at 269; *Alcorta*, 355 U.S. at 31. A *Napue* claimant must prove three elements: (1) the falsity of a witness statement; (2) the State's knowing elicitation or failure to correct it; and (3) materiality. *See United States v. Dvorin*, 817 F.3d 438, 451-52 (5th Cir. 2016). The State knowingly elicited false testimony from Taylor on two separate occasions. First, it elicited false testimony when it asked Taylor to confirm that he had received no benefit in exchange for his cooperation in the prosecution

of Robinson, when in fact he had avoided an escape charge of his own and was promised the benefit of Hagan's testimony at his murder trial. Second, it elicited false and misleading testimony as to Robinson's possession of the razor blade, when it knew—by virtue of Hagan's attorney-client relationship with Taylor—that the razor belonged to Taylor. Given the centrality of the razor blade incident and alleged escape attempt to the State's theory of future dangerousness, that false and misleading testimony had a reasonable likelihood of affecting the verdict.

        **1.**    **The State knowingly elicited (or failed to correct) false and misleading testimony that (i) Taylor had not received any benefit in exchange for his cooperation, and (ii) the razor blade belonged to Robinson.**

For ease of discussion, this Petition combines falsity and knowledge thereof into a single subsection.

*The State knowingly elicited false testimony that Taylor had not received any benefit in exchange for his cooperation.* As discussed above, the State called Taylor to testify on its behalf during the punishment phase of Robinson's trial. During his testimony, the State asked Taylor if he had been "promised anything" in exchange for his cooperation, to which he responded that he had not. 32 RR 264.

But the State knew this to be false. First, as Hagan later revealed when he testified on Taylor's behalf during the punishment phase of his trial, Hagan had promised Taylor "that if he was ever brought to court and he had a punishment phase, that [he] would certainly come in and testify and say what [Taylor] did" to assist the State in Robinson's prosecution. Ex. 14 at 17.

Second, Hagan—serving as a *pro tem* prosecutor in Robinson's case—applied pressure to Taylor, his then-client, to "help [him]self" by assisting the prosecution, because he "was going to be charged with escape." Taylor Aff. ¶ 12. Following his cooperation in Robinson's case, Taylor appears to have avoided any disciplinary action or prosecution of his own for his involvement in the incident.[11]

---

[11] Robinson's federal habeas counsel reviewed the District Attorney's file for Robinson. The file contained scant evidence related to the razor blade incident—and nothing suggesting Taylor planned to participate in the alleged escape—and was

Such evidence supports an inference that the prosecution did have an undisclosed deal with Taylor, even absent a formal "deal." A prosecutor's promise to forego charges and to testify on one's behalf is a benefit.

Taylor was clearly motivated to assist prosecutors when he testified against Robinson, a fact the State knew well. He was awaiting trial for capital murder. He faced potential escape charges on top of that, and he did not face those charges after he testified. *See generally* Taylor Aff. As even Hagan indicated in his testimony at Taylor's sentencing, he understood that it was the promises he made to Taylor that prompted his cooperation:

> **Coke Solomon**:  Okay. Now, when you ultimately called him to testify, he was very reluctant to do that, wasn't he?
>
> **Rick Hagan**:  I would say that's true.
>
> **Coke Solomon**:   Okay. So this cooperation that we're hearing about and this cooperation that we've been talking about wasn't exactly him running up and waving the flag saying, "I want to help you," is it?
>
> **Rick Hagan**:  I don't believe I would characterize it like that, no.
>
> **Coke Solomon**:  The answer is no, correct?
>
> **Rick Hagan**:  Correct.

*See* Ex. 14 at 22-23. Yet the State nevertheless knowingly elicited false testimony from Taylor to negate any attempts by defense counsel to impeach its star witness.

The State also knowingly elicited false and misleading testimony that the razor blade belonged to Robinson, when it knew that it instead belonged to Taylor. On March 6, 2011, before Robinson's punishment phase began, Hagan met with his then-client, Taylor, to discuss the razor blade incident and alleged escape attempt. According to Taylor, during that discussion, he told "[his] attorney Rick Hagan that the razor blades that were found in the cell were [his.]"  Taylor Aff. ¶ 12; *see also id.* ("I told

---

almost entirely devoid of handwritten notes. Further, no Harrison County Jail records related to Taylor obtained to date mention the incident on March 6, 2011.

[Hagan] I would like to testify on Cortné's behalf because I knew he was not seriously considering escaping and that the razor blades were not his."); *id.* ("I remember when District Attorney Joe Black and Rick Hagan were preparing me to testify, they asked me if Cortné said anything about hurting an officer and I told them, "No.").[12]  Despite Taylor's admission, Prosecutor Black elicited testimony from Taylor at Robinson's trial that gave the misimpression that the razor blade belonged to Robinson. Specifically, when asked if he had "ever known if Robinson has any kind of object or weapon in his bunk," Taylor responded: "No, sir, not until we got shook down."  32 RR 261. Taylor's statement necessarily implied that the razor blade found during the shake down belonged to Robinson.

The State did nothing to correct or clarify Taylor's statement. Nor did the State stop at simply eliciting the misleading testimony. Rather, the State chose to exploit its knowing use of false and misleading testimony in its later examination of Dr. Thomas Allen, the State's psychologist, and in both its opening statement and closing arguments, to place the razor blade firmly in Robinson's hands. First, operating under the guise of a "hypothetical," the State elicited testimony from Dr. Allen that the concealment of a razor blade in one's cell during a capital murder trial was "highly risky behavior" that "becomes more important" to the assessment of future danger "if [the individual has] ever used weapons before."  34 RR 174.

Second, the State made clear the central role Robinson's alleged possession of the razor blade was to have in its theory of future dangerousness from the outset of its punishment case. During opening statements, Black informed the jury: "[Y]ou're going to hear that while [Robinson] was here during this trial and in the Harrison County Jail, he was found in possession of a razor blade, and the

---

[12] Interestingly, despite knowing that their star witness would not corroborate their theory that Robinson planned to take a hostage in the alleged escape, *see* Taylor Aff., the State pushed hard to introduce that very evidence through jailer Larry Copeland. *See* 32 RR 274-284. But Copeland had only heard second-hand, based on a report from his Sergeant relaying information from Benefield (neither of whom the State called as witnesses), that Robinson intended to kidnap him during the alleged escape. 32 RR 275-76. The Court—outside the hearing of the jury—ultimately excluded the evidence, finding that nowhere in the report from Taylor "was anything mentioned about taking a hostage."  32 RR 280-81. But the State's insistence in seeking the admission of false information through hearsay testimony is indicative of bad faith.

ramifications that brings with it. So when he talks about and you hear what a good inmate he is, think about what that razor blade can do." 31 RR 21. The State then continued this line of attack in closing. Hagan first reminded the jury that, "while waiting for [their] verdict in this case and during the trial of this case, [Robinson] unlawfully concealed a razor blade in preparation for his escape." 36 RR 19. Black then highlighted the dangerousness of the "weapon," equating it to the blade used during the World Trade Center attack:

> You talk about things they have in prison, such as a razor blade and how they say this is not that big a deal; it was used for cutting hair. The World Trade Centers were brought down by a razor blade. If that's not significant to do a major purpose, I don't know what is. If you don't think you can't do damage to cause an escape with that razor blade, you're sadly mistaken. They say, well, they're joking around talking. Who, in the middle of his capital murder trial, where he's on trial for his life, discusses escaping?  Cortné Robinson. Who hides a razor blade in his cell there knowing what it could do?  Cortné Robinson.

36 RR 71. The closing argument is relevant both to whether the prosecutor knowingly misled the jury (this Subsection), as well as to whether there is a reasonable likelihood that the knowingly elicited falsehood affected the verdict. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Barham*, 595 F.2d 231, 242-43 (5th Cir. 1979); *see also Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (considering prosecution's closing in context of assessing materiality in *Brady* claim and citing *Napue*). And as reflected in Taylor's affidavit, the State knew that razor blade belonged to Taylor, not to Robinson.

Hagan's testimony from the punishment phase of Taylor's trial, combined with Taylor's affidavit, satisfy the falsity and knowledge requirements of *Napue. See Blankenship v. Estelle*, 545 F.2d 510, 513-14 (5th Cir. 1977). Whether the State intended to elicit the false statements or merely failed to correct them is immaterial; a State meets *Napue*'s knowledge criterion merely by allowing false evidence to go uncorrected. *See Napue*, 360 U.S. at 269.  But the State's behavior here was particularly appalling; not only did it elicit false and misleading testimony from Taylor indicating that he (i) received no benefit in exchange for his testimony, and (ii) that the razor blade belonged to Robinson, the State

also relied on the false and misleading testimony related to the razor blade to argue aggressively in closing that Robinson would present a future danger.

### 2. There is a reasonable likelihood that Taylor's false testimony affected the jury's judgment on punishment.

The standard for *Napue* materiality is whether, taking all the false testimony together, "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271). *Napue*'s "reasonable likelihood" standard is lower than the *Brady* materiality standard, and is akin to a harmless-error rule: "It is a brother, if not a twin, of the standard ('harmless beyond a reasonable doubt') for determining whether constitutional error can be held harmless. A strict standard is appropriate because, as the Supreme Court has explained, false testimony cases involve not only 'prosecutorial misconduct,' but also 'a corruption of the truth-seeking function of the trial process.'" *Barham*, 595 F.2d at 242 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976) (other internal citations omitted); *see also Strickler v. Greene*, 527 U.S. 263, 299 (1999) (Souter, J., concurring in part and dissenting in part) (explaining that reasonable-likelihood standard is a harmless-error rule).[13]

Because the State's future-dangerousness case was weak, Taylor's false testimony and the State's aggressive use of it during closing remarks were especially consequential, and likely affected the jury. Before trial, the defense "felt comfortable" with their punishment case. 1 SHCR 82. Robinson was only eighteen years old at the time of the offense, he had no prior convictions—his previous arrests were for largely non-violent offenses—and his jail record showed no indication of any violent misconduct while in custody.[14]  Ex. 3; *see also* 32 RR 252 (Officer Alton Fugler testifying that he was

---

[13] Because Robinson "could not have raised the matter at trial or on appeal, in [this] habeas proceeding he must show materiality but need not show the error was not harmless." *Ex parte Lalonde*, 570 S.W.3d 716, 723 (Tex. Crim. App. 2019).

[14] In fact, Mr. Robinson's most serious incident allegedly occurred the day before the razor blade incident, and appears to have been investigated around the time of the shake down:  "On 3/6/11 at approx 1800 hrs I Sgt Wright asked Inmate Robinson, Cortne about some cups being thrown at Officer Walker on 3/5/11 while Officer Walker was picking up trays

"not aware" of any fights involving Robinson). Defense counsel's assessment, however, changed entirely with the introduction of Taylor's false testimony regarding the razor blade. 1 SHCR 140 ("I can't tell you enough that the razor blade incident changed a lot to us.").

Specifically, Taylor offered the only first-hand account as to Robinson's supposed attempted escape.[15] And the false and misleading testimony elicited by the State from Taylor as to Robinson's possession of a razor blade provided the first, and only, indication of post-offense conduct suggesting that Robinson could pose a future danger in an institutional setting. That the State then undercut defense counsel's ability to impeach Taylor when it elicited the false testimony that Taylor had received no benefit in exchange for his cooperation only magnified the impact Taylor's testimony likely had on the jury.

The introduction of false testimony related to Robinson's possession of a razor blade also fundamentally altered defense counsel's strategy. For instance, instead of presenting a classification expert to help assuage any juror concerns about whether a person convicted of capital murder could be managed in a prison environment, defense counsel chose to forego altogether calling classification expert, Larry Fitzgerald. 35 RR 5. As counsel explained to the court during an ex parte hearing:  "The problem that I have, Your Honor, [Fitzgerald] will also talk about the availability of weapons in the penitentiary, and I don't want to get into that, seeing as how my client has just been—there's evidence offered that he had a razor blade with him[.]"  35 RR 5; *see also id.* at 9 (statement of Settle to Robinson explaining on the record his decision not to call Fitzgerald "because there's evidence that they found a razor blade on your person"). Settle reiterated this point during the state writ hearing when he

---

and cups. Inmate Robinson, Cortne told me he did it, but said it was an accident. A disciplinary report will be done." Ex. 3 at 4.

[15] The State did not call Mr. Benefield, whose girlfriend reported the alleged escape to Harrison County Jail authorities, and Jailer Larry Copeland's testimony focused primarily on the search of the U tank and the razor blade that was found, as his knowledge of an alleged escape attempt was only hearsay. *See generally*, 32 RR 272-73, 285-91.

suggested that the introduction of "some evidence of some kind of weapon" would only serve to undercut the defense expert's testimony. 1 SHCR 146.

Perhaps most prejudicially, however, and as detailed above, the State made a dramatic return to Robinson's possession of the razor blade in closing, invoking the incident as evidence that Robinson would pose a continuing threat to prison society. Black even went so far as to connect Robinson's alleged possession of the razor blade and the harm he could cause with the harm caused by a blade during the World Trade Center attacks: "The World Trade Centers were brought down by a razor blade. . . . If you don't think you can't do damage to cause an escape with that razor blade, you're sadly mistaken." 36 RR 71. The fruits of prosecutor misconduct are especially prejudicial when used during the State's closing, because those comments are presented to the jury moments before it begins deliberations. *See United States v. Johnston*, 127 F.3d 380, 399 (5th Cir. 1997).

## II.    The Sentence Violates Due Process Because The Prosecution Engaged In Misconduct When It Misattributed Possession Of The Razor Blade To Robinson.

Faced with weak evidence to support finding Robinson—a young, eighteen-year-old with no prior convictions and a non-violent incarceration record—a future danger, the State knowingly misattributed possession of the razor blade to Robinson. Specifically, and as explained in Claim I, Section A, *supra*, the State repeatedly used the razor blade and alleged escape attempt to paint Robinson as a man who was so dangerous that, even in the middle of his capital trial, he would hide a deadly weapon and resort to violence for a shot at escape. Yet, as the State painted the picture of a desperate, violent man, it knew that the razor blade belonged to another desperate man--its star witness, Taylor, not Robinson.[16]

When prosecutors ask questions that are "clearly improper and highly prejudicial," they potentially commit "serious prosecutorial misconduct" and can transgress an obligation "to refrain

---

[16] The facts supporting this claim are set forth above and in the other claims in this Application, which are incorporated by this specific reference as if fully set forth herein. This claim differs from the *Napue* claim in that it does not require false

from improper methods calculated to produce a wrongful conviction[.]" *Johnston*, 127 F.3d at 395-96 (internal citations and quotation marks omitted). To show prosecutorial misconduct, a petitioner must show impropriety and prejudice. *See Trottie v. Stephens*, 720 F.3d 231, 253 (5th Cir. 2013). For a misconduct claim based on improper prosecutor comments, the improprieties are sufficiently prejudicial if they render the trial fundamentally unfair within the meaning of the Fourteenth Amendment's Due Process Clause. *See Kirkpatrick v. Blackburn*, 777 F.2d 272, 280-81 (5th Cir. 1985). Robinson satisfies both criteria.

**A.**   **The prosecutor repeatedly, deliberately, and falsely indicated that Robinson possessed the razor to use as a weapon in an alleged escape attempt.**

As set forth in Claim I, Section A, *supra*, the State deliberately crafted and dispensed to the jury the misimpression that Robinson secreted a razor blade in his bunk to use in an alleged escape attempt—knowing that the razor blade belonged to its star witness, Taylor.

**B.**   **The misattribution of possession of the razor to Robinson rendered the sentencing determination fundamentally unfair.**

To establish fundamental unfairness, a claimant must show either: (1) "persistent and pronounced misconduct" or (2) "that the evidence [against him] was so insubstantial that [in probability] but for the remarks no conviction would have occurred." *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986); *see also Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (inaccurate prosecutorial arguments in capital sentencing phase may warrant reversal when "fundamentally incompatible with the Eighth Amendment's" heightened reliability standard). Here, Robinson satisfies *both alternatives* of the unfairness inquiry—in fact, Robinson's possession of the razor became such an important part of the State's future dangerousness theory precisely because the case against him was so weak.

---

testimony, and centers on the prosecution's questions and use of testimony, whatever the truth status of any testimony formally elicited.

In making a determination of fundamental unfairness, this Court must consider: (1) the magnitude of the prejudicial effect of the comment, (2) the effect of any curative instructions, and (3) the strength of other evidence indicating guilt.[17]  *See United States v. Iredia*, 866 F.2d 114, 117-18 (5th Cir. 1989). There was no curative instruction given—because the State failed even to disclose the exculpatory information—so the inquiry focuses on the prejudice of the improper comments, in light of the other evidence demonstrating future dangerousness. In appropriate situations, the effects of multiple improprieties can be cumulated in order to evaluate the fairness of the proceeding. *See, e.g.*, *Johnston*, 127 F.3d at 402 ("Weighing the evidence of Hill's guilt against the extreme prejudice he suffered due to the prosecutors' misconduct, we conclude that the cumulative effect of the errors substantially affected Hill's right to a fair trial."); *United States v. Garza*, 608 F.2d 659, 665 (5th Cir. 1979) ("While any single statement among those we have isolated might not be enough to require reversal of the conviction and, indeed, some clearly would not we think it beyond question that the prosecutor's improper comments, taken as a whole, affected substantial rights of the defendant."). The effects should be cumulated here, because all of the pertinent improprieties are deliberate misstatements of the same thing, and are therefore mutually reinforcing. *See Johnson*, 127 F.3d at 403 (cumulating improprieties that relate to the same conduct).

The effect of the misattribution of the razor blade to Robinson during the punishment phase cannot be overstated. The State repeatedly, deliberately, and falsely indicated that the razor blade belonged to Robinson—knowing full well that it did not—and even sought to compare, in closing, the dangerousness of Robinson's alleged razor to that of the blade used to bring down the World Trade Center towers. *See* 36 RR 71. Because the prosecution's misconduct violated Robinson's right to due process, his case should be remanded to the trial court for further proceedings.

---

[17] Courts have considered similar factors when addressing whether the sentencing phase of a capital trial was fundamentally unfair. *See, e.g.*, *Kirkpatrick*, 777 F.2d at 283-84; *Pruett v. Thigpen*, 665 F. Supp. 1254, 1280 (N.D. Miss. 1986).

III.     **The State Withheld Favorable, Material Evidence in Violation Of** *Brady v. Maryland.*

By withholding evidence that was favorable and material to the defense, the State violated *Brady v. Maryland*, 373 U.S. 83 (1963). Before trial, Robinson's defense counsel requested that the prosecution turn over all favorable evidence. 1 CR 45. Notwithstanding the request, the prosecution withheld evidence that would have allowed Robinson to (i) bolster his defense during the guilt-innocence phase that the shooting was unintentional, (ii) discredit the State's star witness, Renrick Taylor, during the penalty phase, and (iii) disprove the State's claim that the razor blade—a key piece of evidence used by the State to show future danger—belonged to him.

This claim is based on the following facts and law, and on the allegations in Claim I in this petition, which are incorporated by this specific reference.

A.     **The State Violated Due Process By Withholding Multiple Pieces of Exculpatory, Material Evidence.**

"[T]he suppression . . . of evidence favorable to the accused upon request violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The prosecutor's duty to disclose includes an affirmative duty to learn of any favorable evidence known to other law enforcement entities acting on the government's behalf. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

In this case, the State suppressed three categories of evidence favorable to Robinson: (1) information suggesting that the shooting of Mr. Zabokrtsky was unintentional; (2) evidence undermining the credibility of the testimony of Taylor, who, as detailed *supra*, indicated that Robinson possessed a razor blade in his jail cell during his capital trial; and (3) information showing that the razor blade belonged to the State's key witness, Taylor, and not to Robinson.

The suppressed evidence was material because, evaluated cumulatively, there is a reasonable probability that had the evidence been disclosed to the defense, the result of the trial and sentencing proceeding would have been different. *See Kyles*, 514 U.S. at 434 (internal citations omitted) (requiring

cumulative analysis); *United States v. Bagley*, 473 U.S 667, 682 (1985) (stating reasonable probability standard).

1.      **The prosecution withheld information, favorable to Robinson, suggesting that the shooting of Zabokrtsky was accidental.**

During opening statements at the guilt-innocence phase of Robinson's trial, defense counsel placed Robinson's intent directly at issue, suggesting to the jury that during trial, they would hear evidence that the gun used to shoot Frank Zabokrtsky went off accidentally, "surpris[ing]" Robinson, and that that was why Robinson was pleading "not guilty."  26 RR 36-37, 42.

But defense counsel did not call any witnesses on Robinson's behalf during the guilt phase to support its theory of the case. The State, on the other hand, elicited testimony from several of its witnesses to attempt to rebut the defense's suggestion of an accident. For instance, Investigator Kyle Ready opined, based on his interpretation of rap lyrics Robinson freestyled after the incident, that the crime was not an accident. Investigator Ready stated, Robinson "inten[ded] to do what he needed to do."  27 RR 189-90.

The State also elicited opinion testimony from John Beene, a firearms examiner at the Tyler Police Department, that the shooting could not have been accidental. 29 RR 176, 201. Officer Beene conducted several tests on the firearm admitted into evidence against Robinson at trial. 29 RR 179-86. He concluded that the gun was operable and that it had a trigger pull weight of 4.28 pounds of pressure for single action and 11.22 pounds of pressure for double action. *Id.* When the State suggested that such a weapon could only be fired intentionally, Officer Beene agreed. 29 RR 201-02.

Defense counsel was able to elicit some testimony in support of its accident theory during its cross examination of Investigator Ready. For instance, defense counsel elicited Officer Ready's admission that "[if] you don't know much about weapons and you're not good with them, [a gun]

27

could go off when someone jerks." 27 RR 199. Officer Ready also admitted that the firing of a weapon could be accidental if a shooter reacted to a situation by "pull[ing] back." 27 RR 199.

This was, however, the sum total of the evidence defense counsel offered the jury to find the shooting accidental. Importantly, defense counsel did not challenge Officer Beene's testimony as to the intentional nature of the shooting on cross-examination, opting instead to ask only a few unrelated questions about gunshot residue and revolver chamber rotation. 29 RR 205-210. Nor did defense counsel call—or even appear to consult—their own firearms expert to rebut Officer Beene's testimony, or employ an expert to opine on Robinson's capacity to form the required intent for capital murder. During closing arguments, defense counsel then went on to concede that the shooting was not an accident. 30 RR 57 ("I'm not going to stand up here and tell you that there's been an accident in this case."); *see also* 30 RR 59 ("And, like I said, nobody in this courtroom believes it was an accident."); 30 RR 59-60 ("[Y]ou can't say it's an accident. We all know that."); 30 RR 79 ("Was it an accident?  No. I'm not going to stand here, look y'all in the face and tell you it's an accident.").

Both at the time of opening statements and at the time of closing arguments, defense counsel was unaware that, before Robinson's trial, his co-defendant, Bradney Smith, met with prosecutors Rick Hagan and Joe Black at the District Attorney's office. *See* Exhibit 20 ¶ 4 (Affidavit of Bradney Smith). (Smith's defense attorney, Vernard Solomon, had arranged the meeting in the hopes that Smith could assist the State and help himself in his own murder prosecution. *See id.* But Smith did not help the State; instead, he gave information that supported Robinson. Specifically, Smith told the prosecutors that he had been standing right next to Robinson when Mr. Zabokrtsky was shot. *Id.* ¶ 12. He said that Robinson had been surprised when Mr. Zabokrtsky kept trying to grab him. *Id.* ¶ 11. Smith then told the prosecutors that, as an eyewitness to the shooting, he was able to observe that the shooting was an accident, a characterization of the shooting that undercut the State's theory on intentionality. *Id.* ¶ 12.

*Suppression of information favorable to the defense.* There is no evidence in the record to suggest that the State provided these statements to Robinson's defense team, even though *Brady* requires the disclosure of exculpatory information, not just documents. *See Bagley*, 473 U.S. at 676. There was also nothing elicited by the State or the defense at either the guilt-innocence or punishment phases of Robinson's trial that would indicate the defense was aware of Smith's exculpatory statements. Indeed, the State's argument at both guilt-innocence and punishment was predicated on showing that Robinson intended to shoot Mr. Zabokrtsky. 30 RR 54-56.

Further, Smith's statement was clearly favorable to the defense because it directly contradicted the State's theory at both the guilt-innocence and punishment phases that Robinson shot Mr. Zabokrtsky intentionally, and supported defense counsel's theory that the shooting was accidental.

*The suppressed evidence was material.* The suppression of Smith's statements had a reasonably probable effect on the outcome of the proceedings. A reasonable probability of a different result is shown when the failure to disclose evidence "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434.

The key question during the guilt-innocence phase of Robinson's trial was whether the shooting was intentional or accidental, and the suppressed evidence went directly to the heart of that question. In fact, defense counsel placed this question before the jury from the outset, suggesting that evidence would show that Robinson was "surprised" when the gun went off. 26 RR 36-37. Defense counsel then informed the jury:

> [R]ight now we're talking about a capital murder charge, an intentional, intentional killing at that time. And, Ladies and Gentleman, we ask that you listen to the evidence and return your verdict accordingly on that. If you think that there's a lesser included offense charge; in other words, if you don't think it was intentional, if you think it was [not ] intentional or knowing, he can be found guilty of murder, if the Court charges you—so charges you that, and inside the evidence or even accident.

26 RR 43-44.

Like the defense, the State understood Robinson's intent to be the key question at issue. Thus, the State elicited testimony from several witnesses to rebut the defense theory that the shooting was accidental. *See, e.g.*, 27 RR 189-90 (Investigator Ready testifying that Robinson's rap lyrics showed that he intended to shoot Mr. Zabokrtsky); 29 RR 201-02 (testimony from firearms expert Officer Beene in which he agreed that the shooting must have been intentional). And in closing, the State—in perhaps the clearest indication of the materiality of Smith's statements—focused on proving that the shooting had been no accident:

> The split second that he pulled the trigger, if he intended to pull that trigger to shoot Frank Zabokrtsky killing him, he's guilty of capital murder. Because you can take this evidence back in there if you need to. You can pull that trigger if you want to, as a juror in that jury room, and you will see it was no accident. You will see it wasn't a mistake or, "I didn't mean to."

30 RR 54-55. The materiality of evidence is, after all, "best understood by taking the word of the prosecutor." *Kyles*, 514 U.S. at 444.

Because the State failed to disclose Smith's exculpatory statements, defense counsel was unable to present a case in support of its theory, leaving the State's evidence of Robinson's intent largely unchallenged at both the guilt-innocence and punishment phases. But had trial counsel known that Smith would confirm its accidental-shooting theory, the jury would have heard an altogether different case. Defense counsel would have introduced Smith's statements into evidence. They likely would have explored further whether a ballistics expert should be called to counter Officer Beene's testimony regarding intent and used the statements to assist in Officer Beene's cross-examination. *See* Exhibit 21 (Affidavit of Clark) ¶¶ 5-9; Exhibit 22 (Affidavit of Staten) ¶ 3. They would have also used the statements to discredit the testimony of Investigator Ready. Staten Aff. Perhaps most significantly, the statement would have given credence to the original defense theory of an accidental shooting—a theory that the team abandoned in closing argument. *See, e.g.*, 30 RR 59 ("[N]obody in this courtroom believes it was an accident. Black said I'm going to get up here and tell you it's an accident. It's not an

accident, but it's not an intentional killing either."); *see also* 30 RR 79 ("Was it an accident?  No. I'm not going to stand here, look y'all in the face, and tell you it's an accident.").

Had this defense case—born of Smith's corroboration and the investigation that likely would have followed—been before the jury, there is a reasonable probability that the result would have been different. This is especially true given that the jury in Robinson's case—absent evidence presented by the defense in support of its theory—still struggled with the issue of intent. Specifically, during the guilt phase deliberations in Robinson's trial, the jury foreman sent a note to the judge asking, among other questions, "May we have [the] firearm?" 3 CR 644. Approximately two hours later, the foreman sent a second note to the judge asking, "May we remove the zip ties from [the] firearm?" 3 CR 643. The court allowed the jurors to do so. 3 CR 644. The purpose of their experimentation was to determine whether the shooting could have been an accident or unintentional because several of the jurors had doubts as to Robinson's intent. *See* Ex. 21 ¶ 5; Ex. 22 ¶ 3. As juror Clark explained, "We were trying to erase doubt. We wanted to see if maybe the gun went off accidentally."  Ex. 21 ¶ 5. Similarly, juror Staten stated, "During deliberations, I tried to determine whether the shooting was an accident. I was really leaning towards the idea that the shooting was accidental. We wanted to see how much force it would take to pull the trigger."  Ex. 22 ¶ 3. Several jurors conducted the experiment: "I think there were two or three people who tried the trigger pull."  *Id.* Because their experiments indicate uncertainty on the question of whether the shooting was accidental, Smith, who was present at the shooting, likely could have provided testimony sufficient to corroborate the defense's theory and sway at least one juror.

    **2.**    **The prosecution withheld information, favorable to Robinson, tending to undermine Renrick Taylor's credibility.**

As discussed in detail in Claim I, Section A above, and incorporated by reference herein, Taylor was a star witness for the State during the punishment phase of Robinson's trial. Importantly, he offered the only direct testimony as to Robinson's alleged escape attempt and possession of a razor

blade, which proved crucial to the State's theory on future dangerousness. Yet, before his testimony, the State failed to disclose to defense counsel that, in exchange for Taylor's cooperation, Hagan had promised to testify on Taylor's behalf should there be a penalty phase in his trial. *See* Ex. 14 at 17. The State also failed to disclose the pressure Hagan placed on Taylor to cooperate so that he could avoid escape charges of his own. *See* Ex. 10 ¶ 13.

*Suppression of information favorable to the defense.* There is no evidence in the record to suggest that the State ever made defense counsel aware of the promises made to Taylor in exchange for his testimony. In fact, as detailed in Robinson's *Napue* claim, the State took pains to ensure that the jury understood that Taylor had received no benefit in exchange for his cooperation. *See* 32 RR 264.

That impeachment evidence is favorable evidence *Brady* requires the State to disclose. Specifically, *Brady* material includes impeachment evidence, *Bagley*, 473 U.S. at 676, and the duty to disclose reaches "any understanding or agreement as to a future prosecution," not just express "deals." *Giglio*, 405 U.S. at 155; *see also* Ex. 23 (Affidavit of Charles Herring, Jr.) (citing federal, state, and local rules). In fact, the absence of an agreement with precise terms strengthens a witness's incentive to skew his or her testimony, since the reward will presumably correspond with the prosecutor's satisfaction. *Bagley*, 473 U.S. at 683. Thus, here, the State had a duty to disclose that Taylor—who was facing capital murder charges— had been offered (i) a benefit in his existing charge (i.e., the testimony of a State actor on his behalf at sentencing), and (ii) the opportunity to escape a new charge (i.e., attempted escape).

*The suppressed evidence was material.* Had defense counsel known of the promises made by Hagan to Taylor, counsel would have been able to impeach a key witness for the State and, in doing so, shed doubt on the veracity of his claims regarding Robinson's alleged escape and possession of a razor blade. And because Taylor offered the only first-hand account of alleged violent, post-conduct behavior, against an individual otherwise described as "quiet," "reserved," and "calm" by guards and

cellmates alike, *see supra* Claim I, Subsection A.1, it is very likely the suppression of such promises had a reasonably probable effect on the outcome of the proceedings.

3. **The prosecution withheld information, favorable to Robinson, that showed the razor blade belonged to Taylor, not Robinson.**

When Hagan met with his then-client, Taylor, to discuss the incident involving Robinson's alleged escape and possession of a razor blade, Taylor informed him that the razor blade belonged to him, not Robinson. *See* Ex. 10 at 17. The State, however, chose not to disclose this exculpatory information to defense counsel;[18] instead, it opted to elicit false and misleading testimony from Taylor during the punishment phase of Robinson's trial to support its theory that Robinson intended to use the razor blade to assist in his alleged escape. *See supra* Claim I, Section A. As detailed in Subsection I.A.1 above, the State then repeatedly referred to the razor blade in closing to assert that Robinson would be a future danger. Taylor Aff. ¶ 13.

*Suppression of information favorable to the defense.* There is no evidence in the record to suggest that the State disclosed to defense counsel Taylor's statement that the razor blade belonged to him, not Robinson. Rather, at trial, the State elicited false and misleading testimony from Taylor suggesting the opposite. *See, e.g.*, 32 RR 261 (responding to the State's question of whether he had "ever known if Robinson has any kind of object or weapon in his bunk," by stating, "[n]o, sir, not until we got shook down"). And during the state writ hearing, defense counsel made clear that he was not aware that Hagan had acquired exculpatory and impeaching information from Taylor by virtue of Hagan's

---

[18] Hagan found himself in a compromising position, one that he understood quite well. *See, e.g.*, Ex. 14 at 17 ( "I was in a difficult spot. Because I represented [Taylor] as a lawyer on his charges. I didn't feel like that I could adequately advise him on what to do and also represent the State."). As Taylor's then defense attorney, Hagan could not disclose to Robinson's defense counsel that the razor blade belonged to Taylor, not Robinson, without violating attorney-client privilege. But as a representative of the State during Robinson's trial, he had a duty to disclose that same information. Though Hagan withdrew as Taylor's attorney in light of the conflict, that was not enough. He should have withdrawn from Robinson's prosecution as well. *See generally* Exhibit 23. When Hagan chose not to withdraw, he left the State open to the very *Brady* and *Napue* claims outlined in Claim I and this claim.

attorney-client relationship with the star witness. *See* 1 WRR 153 (stating that he [Settle] "would think under *Brady* [Hagan] would have to" disclose any exculpatory information).

Taylor's statement was also clearly favorable to the defense as it would have undercut the State's theory on Robinson's future dangerousness. Specifically, it would have negated the State's ability to paint Robinson as a desperate, violent individual, who stood ready to harm a correctional officer in an attempted escape and whose violence could not be contained in an institutional setting— a crucial consideration for a jury considering the special issues at sentencing.

### B.    The Suppressed Evidence Was Material.

For the reasons detailed at length in Claim I, Subsection B.2, above and incorporated by reference herein, it is likely the suppression of Taylor's statement that the razor blade belonged to him had a reasonably probable effect on the jury's punishment-phase determinations. In short, prior to the razor blade incident, Robinson had a strong punishment case—he was only eighteen years old at the time of the offense, he had no prior convictions, his previous arrests were for conduct that did not suggest an inalterable violent nature, and his jail record showed no indication of any violent misconduct while in custody. Ex. 4; *see also* 32 RR 252. However, by defense counsel's own admission, the introduction of the razor blade incident changed everything. *See, e.g.*, 1 WRR 140. Defense counsel no longer felt comfortable calling their classification expert, out of concern for questions the State might pose related to Robinson's alleged possession of a razor blade. *See* 35 RR 5, 9; 1 WRR 146. Nor did defense counsel feel confident calling their expert on future dangerousness to rebut the State's expert. 1 WRR 199-200.

Thus, when the State aggressively employed the razor blade incident in closing to show that Robinson would be a future danger—a sign, in itself, of the materiality of Taylor's statements, *see Kyles*, 514 U.S. at 444—defense counsel offered nothing to counter the State's narrative. Had defense counsel known that the razor blade belonged to the State's star witness—not Robinson—however,

they would have been able to neutralize the State's future dangerousness theory, call crucial classification and future dangerousness experts to the stand to testify on Robinson's behalf, and focus the jury's attention on Robinson's near-spotless record during incarceration. Ultimately, it is likely that such an altered, bolstered defense case—made possible by Taylor's simple admission that the razor blade did not belong to Robinson—could have led at least one juror to vote for life.

### C.   Alternatively, Prior Counsel Rendered Ineffective Assistance in Failing to Investigate the Razor Blade Incident and Taylor's Testimony.

To the extent this Court finds that prior counsel could have discovered the suppressed evidence with reasonable diligence, counsel was deficient in failing to investigate and obtain it. Counsel had an obligation to investigate and present such evidence in impeachment of Taylor's testimony. Specifically, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

Given the centrality of the razor blade incident and, consequently, Taylor's testimony to the State's case, and trial counsel's own acknowledgement of the devastating impact the incident had on their punishment strategy, 1 WRR 140, any reasonable attorney would have investigated further. *See Miller*, 420 F.3d at 361; *Wiggins*, 539 U.S. at 521. But trial counsel failed to interview any of Robinson's cellmates at the time or the guards at the Harrison County Jail; nor did trial counsel investigate Taylor, the State's star witness, or Benefield, the jailhouse informant. 1 WRR 149-155, 206. And concerns that Hagan might possess impeaching information about Taylor by virtue of their attorney-client relationship never even crossed Settle's mind. 1 WRR 153.

Trial counsel's failures were not premised on any strategic reasoning. Thus, in failing to investigate and uncover key mitigating and impeaching information, trial and state post-conviction counsel's representation fell below that of an attorney representing a capital defendant and Robinson was prejudiced by this error. *Rompilla*, 545 U.S. at 390; *see* Claim I, Subsection B.2 (detailing the

materiality of Taylor's testimony to the State's punishment theory). He is therefore entitled to relief. *See* Claim IV below, setting forth authorities on ineffective assistance of counsel claims; *see also* Ex. 23.

## IV.    Robinson Was Denied His Rights to a Fair Trial, a Fair and Impartial Jury, and Due Process When the Court Failed to Change Venue, and Prior Counsel Was Ineffective in Failing to Request a Change in Venue.

A defendant is entitled to trial by an impartial jury that will decide the case on the evidence presented, free from the influence of publicity and community hostility. When publicity is pervasive, a change of venue is required in order to preserve that right, especially when the publicity has created a hostile atmosphere in the community and the courtroom.[19] These concerns are particularly acute in capital cases, where "the range of discretion entrusted to a jury" creates "a unique opportunity for . . . prejudice to operate." *Turner v. Murray*, 476 U.S. 28, 35 (1986); *see also Irvin v. Dowd,* 366 U.S. 717, 728 (1961).

State post-conviction counsel argued in state court that trial counsel was ineffective for failing to request a change of venue and failing to do so prejudiced Robinson's trial. The trial court denied the claim, and the Texas Court of Criminal Appeals affirmed. *Robinson*, 2016 WL 6610373, at *5-6. These rulings were contrary to and an unreasonable application of federal law. The failure to change venue, and the resulting hostile environment of trial, violated Robinson's Sixth, Eighth, and Fourteenth Amendment rights.

### A.    Relevant Facts.

Robinson was charged with capital murder in a relatively small county. The crime, the investigation, and the trial were highly publicized. Nonetheless, Robinson's trial counsel did not seek a change of venue. They did, however, file the following motions: (1) Defendant's Motion to Excuse

---

[19] *See Irvin v. Dowd*, 366 U.S. 717, 728 (1961) (publicity); *Rideau v. Louisiana*, 373 U.S. 723 (1963) (publicity); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (publicity and courtroom atmosphere); *Estes v. Texas*, 381 U.S. 532 (1965) (same).

for Cause all Prospective Jurors Who Have Heard or Read About This Case and (2) Defendant's Motion to Sequester Jury. *See* Ex. 24 (Motion to Excuse for Cause); Ex. 24 (Motion to Sequester Jury).

After the trial, area residents remembered "a lot of negative publicity about [Robinson's] case in the local news." *See* Ex. 26 (Corey Robinson 2012 Aff.) ¶ 28. "Both the crime and the trial were highly publicized." Ex. 27 (Claude Andrews Aff.) ¶ 2. Corey Robinson and minister Claude Andrews both asked Robinson's trial counsel about a change of venue because of the community prejudice. Robinson 2012 Aff. at ¶ 28; Claude Andrews Aff. ¶ 3.28

Community opinions made their way to Robinson's family. Donnetta Gray, Robinson's mother, reported "Sometimes people refused to wait on us, or started whispering when they saw Coretta and me, saying 'There's the mom and the sister right there.'" Ex. 28 (Gray 2012 Aff.) ¶ 36. Other people would ask her "How could you raise that monster?" *Id.* Coretta Robinson, Robinson's sister, lost friends. *Id.* ¶ 37.  Helen Dawson, a friend of the family, said, "People would come up to [Ms. Gray] and say ugly things about [Robinson]." Ex. 29 (Dawson 2012 Aff.) ¶ 22.

In Harrison County, news reporting of the death of 82-year-old Frank Zabokrtsky and the rape of 82-year-old Arnola Zabokrtsky was extensive. *The Marshall News Messenger*, *The Longview News Journal*, and KLTV, KYTX, KSLA, KTBS, and KETK, the area's major news stations, devoted substantial coverage to the crimes from the time of the offense up through the capital sentencing proceedings.

Front-page headlines and the television news stations were explicit. They characterized the crime as "vicious" and "brutal." *See* Ex. 30 (Newspaper Articles and Local News Coverage). Several stories reported the burglary in detail. Police investigators and the District Attorney outlined for the press their theories of the case, and the press passed those theories along to the public. *Id.* And, article after article, news story after news story reported the sexual assault and, even though Robinson did not commit that assault, connected it to him. For example, one headline stated, "18-year-old Cortné

Mareese Robinson broke into an elderly couple's home leaving one victim dead and the other kidnapped and raped." *Id.* Before Robinson's trial, his case was also referenced in many stories about other home invasion cases. *Id.*

**B.    The trial court erred in holding Robinson's trial in Harrison County, Texas.**

Because of the overwhelming amount of publicity (detailed, only in part, above), social attitudes, and community prejudice, the Sixth Amendment right to a fair and impartial jury entitled Robinson to a change of venue. When determining whether publicity and community prejudice are so heightened as to necessitate a change of venue, the court must consider (i) the size and characteristics of the community, (ii) the area from which the jury is to be drawn, (iii) whether the news stories were blatantly prejudicial, (iv) the severity and notoriety of the offense, (v) other events that might affect the community's view of the defendant, (vi) the amount of time from the offense to the beginning of the trial, and (vii) factors that are likely to affect the candor and veracity of the jurors during voir dire. *Skilling v. United States,* 561 U.S. 358, 386 (2010) . By the time of trial, the trial court had ample evidence that impermissible taint of the venire had occurred. *See* 1 SHCR at 114-123.

First, an analysis of voir dire transcripts confirms that publicity about Robinson's case was pervasive, prejudicial, and fresh in the minds of the prospective jurors in this case. It took 13 days to select the jury. When asked about media coverage, potential jurors said things like the case was "pretty bad," 14 RR 14, and the news media made it seem as though Robinson was guilty, 21 RR 71. Of the 48 jurors who ultimately made Robinson's panel, only a handful said that they had never heard of the case. *See* 1 SHCR at 115, 117-18.

Second, as was detailed by state post-conviction counsel and *infra* Claim V, Robinson's crime occurred in a community that has a long and troubled history regarding race. The crime, involving as it did, the rape of a white woman by a young Black man, was high profile and triggered deep racial

prejudices. That the community was close-knit and insular only exacerbated these concerns. *See* 1 SHCR at 115-17, 120-23.

The barrage of negative treatment Robinson's family received indicated that finding "a panel of impartial, 'indifferent jurors,' who [would] base their decision solely on the evidence produced in court" would be extremely difficult, if not impossible. *Mayola v. Alabama*, 623 F.2d 992, 998 (5th Cir. 1980). Although the law does not require jurors to be wholly ignorant of the case, *Irvin*, 366 U.S. at 722, in Robinson's case, the community did not stop at simply forming impressions or opinions. Community members acted on their opinions in interacting with Robinson's family.

Given these circumstances, the trial court erred by failing to move the trial to a county where a fair and impartial jury could be chosen. Although the trial court issued a gag order, it was insufficient to protect Robinson from the prejudicial impact of the publicity and violated his constitutional rights to an impartial jury, a fair trial, and due process.

### C.   Counsel Were Ineffective for Failing to Move for a Change of Venue.

In addition, trial counsel was ineffective for not investigating the change of venue issue and filing and pursuing a proper motion to change venue. *See supra*, Authorities, Section A. Trial counsel should have developed an adequate record to support a change of venue based on the pervasive pretrial publicity that prevented a fair and impartial trial. Moreover, counsel should have re-urged their motion for change of venue after jury selection when they could have shown actual prejudice, based on the statements by prospective jurors about the effect of media on their views. These failures constituted ineffective assistance. Trial counsel clearly knew that pretrial publicity had tainted the jury pool in Harrison County. *See generally* Exs. 24 and 25. In motions filed in the trial court, they agreed "the publicity given in this case has been extensive and persuasive" and that a "fair trial would be impossible unless all persons who have read or heard about the case are excused for cause." Ex. 24 (Motion to Excuse). They also moved to have the jury sequestered because the news media would

report inadmissible evidence that could prejudice Robinson's right to a fair and impartial trial. Ex. 25 (Motion to Sequester).

Trial counsel had no reasonable basis for failing to research the pretrial publicity and to file an appropriately supported motion to change venue with the court. The court of criminal appeals, in rejecting the venue claim, found reasonable trial counsels' assertions that they thought they could get a fair trial in Marshall because of the size of the black population there. *See* FFCL at 27 ¶ 134. However, despite counsels' representations, the jury pool had only a small percentage of African American, and the newspapers and news stations continued to publish regular updates on the crimes, the victims, and the accused. *See* Ex.30.

### D.    The State Court failed to reasonably apply *Strickland*.

This claim was fairly presented to the state courts and rejected by the CCA on the grounds that trial counsel made a strategic choice not to file a motion for change of venue. Counsel said that because their client was Black and there would be a large percentage of Black citizens in the jury pool, Robinson's chances for a life sentence would be better. *See* FFCL at 27 ¶ 134.

The CCA's decision unreasonably applied clearly established federal law. In rejecting the venue claim, it relied on trial counsel's unrealistic strategic reasons and on the fact that all 12 seated jurors and two alternates told the court they could be fair and impartial when hearing the case. However, the juror's assurances amounted to little more than wishful thinking, in light of the pervasiveness of the pretrial publicity, the nature of the offense, the history of race relations in Harrison County, and the intricate connections the jurors had with the attorneys and witnesses in the trial. As the Supreme Court explained in *Irvin*, a case where the record showed that all jurors claimed impartiality:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but … such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see." With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion.

*Irvin*, 366 U.S. at 728; *see also Sheppard*, 384 U.S. at 351 (jurors' expression of impartiality despite exposure to publicity is not dispositive). The CCA's ruling is contrary to this clearly established law.

AEDPA does not bar relief, when, as here, that court reached its factual findings by applying an incorrect legal standard. "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in 28 U.S.C. § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 933 (2007). Habeas relief is appropriate.

**V.   Robinson Was Denied a Fair and Impartial Jury Because Harrison County's Jury Selection Procedures Systematically Excluded Minorities; Prior Counsel Was Ineffective.**

Robinson was denied a jury pool representing a fair cross-section of the community, in violation of his rights under the Sixth, Fourteenth, and Eighth amendments. The Sixth Amendment guarantees the right to be tried by a fair and impartial jury, *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), and the jury's selection "from a representative cross section of the community is an essential component" of that right, *Taylor v. Louisiana*, 419 U.S. 522, 527-28 (1975). Indeed, the fair cross-section requirement "is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Id.*; *see also Smith v. Texas*, 311 U.S. 128, 130 (1940) (discussing equal protection challenge). Harrison County's jury selection system violated these principles.

**A.   Robinson Was Denied His Sixth Amendment Right to a Fair and Impartial Jury Because Harrison County's Jury Selection System Under-Represented African-Americans.**

Harrison County's jury selection procedures denied Robinson his right to a fair trial. To establish a *prima facie* violation of the cross-section requirement, an individual must show: (1) that the excluded group is a "distinctive" group in the community; (2) that individuals belonging to the "distinctive" group are under-represented in jury venires when compared to their number in the

community; and (3) that the under-representation results from "systematic exclusion" of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 363 (1979).

Robinson easily meets the first two prongs of the *prima facie* test. With regard to prong one, Black community members are a distinctive group for the purpose of a fair cross-section analysis. *See, e.g., Rose v. Mitchell*, 443 U.S. 545, 551 (1979).

To satisfy prong two, the defendant must "demonstrate the percentage of the community made up of the group alleged to be underrepresented" and then compare that percentage with the group's representation in jury venires. *Duren,* 439 U.S. at 364-66. The 2009 Texas Health and Human Services Census Records reveal that the population of Harrison County in 2009 was 64,999.[20] African Americans in Harrison County numbered 14,959, or 23 percent, of the total population. *See* Ex. 31 (2011 American Community Survey, 5-year estimate, Race/Ethnicity Background, Harrison County, Texas).

Despite these figures, jury selection procedures in Robinson's case resulted in almost no representation of African Americans among his venire members. Indeed, in "the panel of 48 potential jurors, including four of which were potential alternates, there were [only] four African-American jurors on the panel." 24 RR 26. Thus, African Americans constituted only 8.3 percent of its members.

This amounts to a significant under-representation of African Americans in the venire as compared to their proportion in the community. Applying an absolute disparity test, the difference is nearly 15 percent.[21] The disparity here is much greater than absolute disparities the Fifth Circuit has tolerated. *United States v. Quiroz,* 137 F. App'x 667, 670 (5th Cir. 2005) (noting 11% disparity was

---

[20] The second prong of the *prima facie* case can be established through statistical data provided by a census. *Duren*, 439 U.S. at 668-69.

[21] Fifteen percent represents the "absolute disparity" on Robinsons's venire. *See Berguis v. Smith*, 559 U.S. 314, 323 (2010) (discussing measures of disparity). Although the Fifth Circuit generally applies the "absolute disparity" test, *see, e.g., Maskeny,* 609 F.3d at 189-90, the Supreme Court has not endorsed either measure of disparity as the definitive measure. *Id.* at 329-30.

insufficient to sustain a claim of racial discrimination); *see Thompson v. Sheppard*, 490 F.2d 830 (5th Cir. 1974). The disparity is sufficient to satisfy the second prong. *See Jones v. Georgia*, 389 U.S. 24, 25 (1967) (disparity of 14.7 percent may be sufficient to support inference of discrimination); *Rideau v. Whitely*, 237 F.3d 472, 486-87 (5th Cir. 2000) (disparity of 13.5 percent may support inference of discrimination).

Robinson also satisfies *Duren*'s third prong, because the underrepresentation of African Americans was the result of "systematic exclusion." To satisfy the third prong, it is not necessary to show discriminatory intent. Rather, Robinson must demonstrate only that the underrepresentation is inherent in the jury selection method used. *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir. 1986) (Sixth Amendment "forbids any substantial underrepresentation of minorities, regardless of whether the State's motive is discriminatory").

The exclusion of African Americans from the jury selection process in this case was systematic. According to Sherry Griffis, the Harrison County District Clerk, the venire master lists in 2011 were generated from a list of licensed drivers and voter registrations in Harrison County. Race is not included on the lists, and the clerk does not take a cross sample of the race of the persons pooled. While this method of jury selection appears to be race-neutral, driver's license and voter registration lists have systematically underrepresented black Texans for decades.

As the Fifth Circuit has found, at the time of Robinson's trial, voter registration rates of African American citizens in Texas lagged "far behind" rates for their white counterparts. *Veasey v. Abbott*, 830 F.3d 216, 259 n.56 (5th Cir. 2016) (en banc) (relying on expert report of Dr. Stephen Ansolabehere, Ph.D., which found "84 to 88% of Anglo citizens of voting age in Texas are registered to vote, compared to . . . 75 to 80% of Black citizens of voting age"); *see also* Ex. 32 (Declaration of Dr. Stephen Ansolabehere, *Veasey v. Abbott*, No. 2:13-cv-193 (S.D. Tex. Sept. 16, 2014), ECF No. 600-1), Table VIII.2b.

Driver's license lists also systematically underrepresented black citizens in the jury pool. The "history of State-sponsored discrimination" in Texas has created "disparities in education, employment, housing, and transportation." *Veasey*, 830 F.3d at 259. As a result, "29% of African Americans . . . live below the poverty line compared to 12% of Anglos." *Id.* at 258.  Because "the poor are less likely to have a driver's license and face greater obstacles in obtaining photo identification," Black Texans—who are disproportionately poorer than white Texans—are disproportionately likely to lack driver's licenses. *Id.* at 250-51; *see also id.* at 250 (noting that Black registered voters were "305% more likely than their Anglo peers to lack" driver's licenses or other identification that satisfied Texas's 2011 voter ID law). This systematic underrepresentation of Black Texans on driver's license lists was exacerbated by two Texas programs—the Driver Responsibility Program and Omnibase—that suspended and placed holds on licenses for drivers who failed to pay fines and surcharges.[22]

Harrison County has failed to implement any procedural changes to ensure that criminal defendants are tried by a fair cross-section of the community. It has not even taken the initial step of keeping records on the race of persons called for jury duty. Nor has it supplemented its lists with school census data, which is historically more representative of African Americans. By failing to act, the County has overlooked efficient and effective means for making jury pools more representative. The persistent and uncorrected nature of the underrepresentation of African Americans in Harrison County jury venires demonstrates that the exclusion is systematic.

Because Robinson has established a *prima facie* violation, the burden shifts to the state to show that attaining a fair cross-section is "incompatible with a significant state interest." *Duren*, 439 U.S. at

---

[22] The Texas Appleseed study found that "Black and Hispanic drivers are much more likely to be impacted by Omnibase holds than White drivers. *See* Texas Fair Defense Project & Texas Appleseed, *Driven by Debt: How Driver's License Suspensions for Unpaid Fines and Fees Hurt Texas Families* (Mar. 2019), http://stories.texasappleseed.org/driven-by-debt. Black individuals make up about 11 percent of licensed drivers in Texas. Yet, they are dramatically overrepresented among people with expired licenses that cannot be renewed due to OmniBase holds, representing 28.6 percent of these drivers." *Id.*; *see also id.* (noting "racial wealth gap" and racial disparities in Texas law enforcement—esp. that DPS issues "higher rates of citations per stop for Black and Hispanic drivers compared to White drivers"—as contributing factors). Texas repealed the programs in September 2019.

368. That significant state interest must be "manifestly and primarily advanced" by the aspects of the jury selection process that prevent a fair cross-section from occurring. *Id.* at 367-68. The State has not, and cannot, meet this burden, and "mere suggestions or assertions" to the contrary are insufficient. *Id.* at 369.

> **B.      Robinson's Trial and Post-Conviction Counsel Provided Ineffective Assistance by Failing to Adequately Raise and Litigate Robinson's Cross-Section Claims.**

Robinson's prior counsel at trial and post-conviction provided deficient performances in violation of his Sixth Amendment right to effective assistance of counsel. *See* Authorities, *supra*.

> **1.      Trial counsel was ineffective, and prejudice is presumed.**

Trial counsel was ineffective for failing to raise Robinson's cross-section claim in the trial court. The venire for his trial was composed almost entirely of white citizens, and counsel's simple skills of observation should have alerted them to the likelihood that African Americans had been systematically excluded. That information on its own reasonably should have led to the appropriate constitutional challenges. In turn, after the venire was empaneled, trial counsel should have noticed that African Americans were almost completely unrepresented and should have recognized that such underrepresentation was not fair or reasonable in relation to the population at large. Despite the clear signs that Robinson's constitutional rights were being violated, counsel failed to make an objection, seek further discovery, retain an expert to help analyze data pertaining to jury selection, or request a hearing to develop the record. Counsel's failure is especially inexcusable given counsel's stated intention not to seek a change of venue because he believed Robinson had a better chance of avoiding the death penalty due to the large Black population in Harrison County. 1 SHCR 739.

Robinson does not need to show prejudice from the violation of the fair cross-section guarantee, because the violation is a structural error.[23]

### 2. Post-conviction counsel was ineffective, and Robinson was prejudiced.

Post-conviction counsel failed to raise a challenge to the jury selection procedures and a related ineffectiveness claim based on trial counsel's failure to object at trial to those procedures. Post-conviction counsel had no reasonable justification for failing to marshal this evidence. Robinson was prejudiced because, if counsel had properly raised these issues, Robinson would likely have been afforded relief at the post-conviction stage of review.

The ineffective assistance of Robinson's post-conviction counsel is the reason juror representation claims were not raised in state court. *See generally* Ex. 17.

## VI. Trial Counsel Were Ineffective for Failing to Address Race or Attempt to Reduce the Likelihood of Bias Among the Jurors.

Cortné Robinson was tried for a racially charged capital crime in a racially divided town using evidence that was bound to inflame racial stereotypes. Against this backdrop, it was ineffective for trial counsel to take no action to examine racial bias with jurors during voir dire.

### A. Relevant background.

Robinson's arguments regarding jury selection and race should be evaluated against the context of the case and the community in which the jury was selected, and the trial took place. *See Ristaino v. Ross*, 424 U.S. 589, 596 (1976) (requiring a court to examine "all of the circumstances presented" to determine whether "there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be" impartial) (internal citation omitted).

---

[23] *See Taylor*, 419 U.S. at 530 (describing the fair cross-section requirement as "fundamental to the jury trial guaranteed by the Sixth Amendment" and reversing without harm analysis); *United States v. Rodriguez-Lara*, 421 F.3d 932, 940-41 (9th Cir. 2005), *overruled on other grounds by United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014); *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1911 (2017) (reserving question whether prejudice is presumed for claims of ineffective assistance for failure to raise strauctural errors that concern "pervasive undermining of the systemic requirements of a fair and open judicial process"); *cf. Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986) (statement for plurality) ("[D]iscrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review.").

1.     **Marshall, Texas.**

Robinson's capital trial was held in Marshall, Texas, a community that is highly segregated and has a long and troubled history with race. In the years leading up to the Civil War, Marshall's economic health and cultural identity were dependent upon slavery, and Harrison County citizens were predominantly slaveholders. In 1850, Marshall was first in the state in both the number of slaves and the number of slaveholders and remained so for the next ten years.[24]

Marshall's economy was supported by and built upon the labor of a large, enslaved African population. The railroad permitted the city to move crops and people across the country, and thousands of slaves ensured that those crops were planted, harvested, and transported. Marshall was an earlier supporter of secession, voting to separate from the United States immediately after Lincoln's election. The city served as the Capitol of the Confederacy west of the Mississippi River after the fall of Vicksburg. Ex. 33 ¶¶ 18-19 (Affidavit of Dr. Celeste Henery). Marshall's complex post-War history included the establishment of a Freedman's Bureau and the presence of Union troops that brought black people seeking economic opportunity and protection into the region. Henery Aff. ¶ 20.[25] Soon after the war ended, Marshall became home to two of the earliest historically black colleges in the United States: Wiley College, established in 1872, and Bishop College (which has since relocated and closed), founded in 1881. Henery Aff. ¶ 20. But progress met resistance.

In partial response to the newly freed Blacks, Marshall's governance was reclaimed by a Confederate-inspired political party in the late 1870s. Retrenchment meant reinforced racial segregation and inequality in the city.[26] *Id.* It also meant racial violence and discrimination in the forms of Jim Crow laws and norms, lynching, and geographic and economic segregation and inequality.

---

[24] Randolph B. Scott, *Population Persistence and Social Change in Nineteenth-Century Texas: Harrison County, 1850-1880*, 48 J. Southern Hist. 185, 187 (1982).
[25] Randolph B. Campbell, "Marshall, TX," *Handbook of Texas Online*, http://www.tshaonline.org/handbook/online/articles/hem01 (last visited Apr. 5, 2021).
[26] *Id.*

Former Marshall resident George Dawson wrote about his experience as a Black man growing up in Marshall in the aftermath of slavery. He recounted witnessing, in 1911, the lynching of his young friend, Pete Spillman, after he was falsely accused of sexually assaulting a white woman.[27] Lynchings in Marshall did not follow the national trend. After the Civil War, lynchings steadily decreased throughout the South. In Marshall, the opposite occurred. Between 1877 and 1950, Harrison County had 14 lynchings, third highest in Texas.[28] Lynchings peaked between 1910 and 1917, some fifty years after the Civil War's end.[29]

Bursts of civil rights organizing beginning in the mid-twentieth century brought national attention to Marshall, and improved conditions for Blacks, but change has been slow and largely inadequate. To put the pace in perspective, when young George Dawson saw his friend killed for allegedly assaulting a white woman, Robinson's great grandmother, the woman who helped raised him, was three years old. In 2003, just six years before Robinson's arrest, the country club in Marshall had no black members.[30] Even today, Marshall is nearly completely segregated, along largely the same geographic boundaries that have divided the black and white populations since the Civil War.

Displays of white supremacist groups occurred in Marshall into the 21st century. Local news articles show the Ku Klux Klan comfortable holding events and even recruiting. On June 12, 2008, for example, a year before Robinson's instant offense, the front-page headline of The Marshall News Messenger read, "Klan activity increasing." *See* Ex. 34 (Marshall News Messenger articles on the KKK). The same day the newspaper also published a story titled, "Klan planning cookout near

---

[27] George Dawson and Richard Glaubman, *Life Is So Good* (2000 Random House) at 7-11; *see also A Walk Through the 20th Century with Bill Moyers: Marshall, Texas* (PBS television broadcast Jan. 11, 1984) (describing separate white and Black worlds in Marshall).

[28] Equal Justice Initiative, *Lynching in America: Confronting the Legacy of Racial Terror* tbl. 6 (3d ed. 2017).

[29] Brandon Jett, *"Let Us Be Law Abiding Citizens" Mob Violence and the Local Response in Harrison County, Texas, 1890-1925*, 54 E. Tex. Hist. J. 22, 45 (2016).

[30] Phil Latham, *Opinion: Asking Questions So a Community Thinks About Race*, Neiman Reports (Fall 2003), https://niemanreports.org/articles/asking-questions-so-a-community-thinks-about-race/.

Jefferson," although it was "actually a lot closer to Marshall." *Id.* The article reported that the invitation to the cookout read, "it was for white Christians only!!" *Id.*

There are other examples:

- On October 1, 2013, a Longview News Journal headline read. "Ku Klux Klan flyers found in 2 East Texas towns." *Id.*

- On October 4, 2013, a Marshall News Messenger, headline read, "Leader claims KKK is Christian, not hate group." *Id.*

- Three years later, a Longview News Journal, headline read, "Klan at 150: Group sees opportunities in U.S. political trends." *Id.*

Marshall at the time of Robinson's trial still bore the marks of historical racism. Race in Marshall is correlated to poverty. In 2009, 33 percent of Marshall's residents were living below the poverty level (as compared to 22 percent statewide).[31] Thirty-three percent of black residents lived below the poverty level, compared to 16 percent of whites and 32 percent of Hispanics/Latinos, the other two predominant racial groups in Marshall.[32]

Importantly, racial inequality persisted in the lived experiences of citizens of Harrison County. Corey Robinson remembers having a run-in, in 2004, with members of the Klan: "I just saw six people with sheets over their heads. They were coming towards me, banging cans and cowbells. They then started running toward me, and I started to try to run, but I realized I couldn't outrun them all." Ex. 35 ¶ 16 (Affidavit of Corey Robinson 2017). Police were not going to protect him. Ralph Hendrix, Robinson's childhood friend, routinely experienced "racially biased policing." As he explained: "[T]here were occasions when police officers would patrol our neighborhood and take pictures of groups of us gathering in our yards. They would eventually come back and arrest some of us for 'disturbing the peace.'" Ex. 36 at ¶ 8 (Affidavit of Ralph Hendrix). On another occasion, when

---

[31] City-Data.com, Marshall, Texas (TX) Poverty Rate Data – Information about poor and low-income residents, *available at* http://www.city-data.com/poverty/poverty-Marshall-Texas.html).
[32] *Id.*

Hendrix's car window had been shot out, police came to the scene. *Id.* ¶ 9. But instead of investigating the incident, they used the shooting as an opportunity to search his car. *Id.* When Hendrix went to a local business to investigate it himself, the police arrested him for disorderly conduct and held him in jail overnight. *Id.*; *see also* Ex. 37 Affidavit of Coretta Robinson 2017 Aff. ¶ 13 (noticing how cops "treat black people differently").

Moreover, schools do not offer children like Cortné protection, as racial disparities plague students from the moment they set foot in elementary school. Specifically, Marshall elementary schools are largely segregated, with those children who live on the West Side—a predominantly Black, socioeconomically disadvantaged community— "more likely to fall through the cracks due to lack of resources and guidance." Ex 38 (Affidavit of Lula Waskom ¶ 21-22); *see also* Coretta Robinson 2017 Aff. ¶ 14 (explaining that she went to a black elementary school based on her neighborhood); Corey Robinson 2012 Aff. ¶ 20 (mentioning most Black students attend "predominantly black, lower performing elementary schools"). The District also appears to view young black students as requiring more discipline. *See* Waskom Aff. ¶ 31 (suggesting that the presence of two assistant principals at Price T. Young Elementary School—a predominantly black school—when the other three elementary schools only have one, conveys the message that black students require more discipline). And, unsurprisingly, "[c]hildren of color [a]re disciplined more severely." Waskom Decl. ¶¶ 20, 30 ("The hammer drops for kids of color, while other kids are given lighter punishments or special treatment").

In middle school, as schools become integrated, such racial disparities are exacerbated. As Corey noted: "In Marshall, you went to school every day with white guys who were growing up learning they're superior to you." Corey Robinson 2017 Aff. ¶ 18; *see also* Coretta Robinson 2017 Aff. ¶ 13 ("As you get older, your white classmates get more stuck up. So do their parents, and they are the ones that fund the schools"). Teachers hold negative stereotypes "that black students ha[ve] to disprove." Corey Robinson 2012 Aff. ¶ 20. Donnetta recalled that when Corey was in middle school,

one teacher even went so far as to "push[ ] him in the head," while saying, "You're nothing but a little n-word." Ex. 39 (Gray 2017 Aff.) ¶ 30. And classes remain largely segregated, with racial disparities "evident in some advanced placement classes and dual credit pre-college classes that are hosted off campus." Waskom Decl. ¶ 30; *see also* Coretta Robinson 2017 Aff. ¶ 15 ("Pretty much all the regular classes had the black kids, and the advanced classes had the white kids.").

Robinson's jury selection played out against this history, the trauma it caused, and the healing and growth it impeded. The jury would be tasked with bringing modern, unbiased sensibilities to an age-old set of triggering facts for the community—a young black man accused of crimes against a white couple, including the crime of raping a white woman.

> 2. **The case.**

Several features of Robinson's case made it especially likely that racial prejudice might affect decision-making absent careful questioning during voir dire. The "fact that the crime charged involved interracial violence"—a murder of a well-admired older white man—was enough to warrant further questioning to guard against the probability of bias. *Turner v. Murray*, 476 U.S. 28, 37 (1986). But several other features heightened the risk of racial prejudice even beyond the crime charged.

Prosecutor Black found something malign in the fact that Robinson took pains to establish that he had not participated in or known about the rape, while he had admitted to the shooting. 30 RR 47. But there is a likely explanation for why this was so. No small part of the inflammatory nature of the evidence stemmed from the fact that Travion Young (and his two co-defendants) were Black, and Arnola Zabokrtsky was White. As one legal scholar has put it, the "potent rape meta-narrative of a stranger who is a Black man violently assaulting a White woman continues to infect prosecutorial decisions."[33] Black-on-white rape carries a pernicious and disproportionate stigma in U.S. society, and

---

[33] Jeffrey J. Pokorak, *Rape as a Badge of Slavery:* The Legal History Of, And Remedies For, Prosecutorial Race-Of-Victim Charging Disparities, 7 Nev. L.J. 1 (2006), https://scholars.law.unlv.edu/cgi/viewcontent.cgi?article=1418&context=nlj.

the specter of it has rallied responses ranging from fear and anger to lynchings. The power of the narrative is amply illustrated in this case. The State spent more time questioning Mrs. Zabokrtsky about the rape than about the burglary and killing of her husband. *Compare* 26 RR 108-12, 116-25 (questioning about the sexual assault spanning fifteen pages), *with id.* at 96-103, 105-08 (questioning about the break-in and shooting spanning twelve pages). Her testimony included a physical demonstration of part of the attack. 26 RR 111 (demonstrating Young dragging Mrs. Zabokrtsky across the floor); twenty-three pictures of her external injuries were shown to the jury. 26 RR 178-80 (Mrs. Zabokrtsky identifying Exhibits 43 through 66). A SANE nurse used a diagram to painstakingly document even her most intimate injuries.

In 1922, Texas Senator James Buchanan fought a proposed anti-lynching bill by arguing that "social equality" excited "the criminal sensualities of the criminal element of the Negro race and directly incite[d] the diabolical crime of rape upon the white women. Lynching follows as swift as lightning, and all the statutes of State and Nation cannot stop it."[34]

Black-on-white rape prompted, in part, the rise of vigilante groups such as the Ku Klux Klan to protect white women from newly freed black slaves. The largely discredited claims of the victim in the Scottsboro trials trafficked in the stereotype, as did the whistle that got young Emmett Till killed. Rapes of white women by black men have been dramatized in films such as *Birth of a Nation* (1915) and *Gone with the Wind* (1939).

The stigma an accusation of raping a white woman carries has not been lost on the courts. In 1975, the Ninth Circuit reversed a rape conviction because the trial attorney invited the jury in closing argument to "[t]hink about the consequences of letting a guilty man . . . go free . . . [b]ecause maybe the next time it won't be a little black girl from the other side of the track" *Kelly v. Stone*, 514 F.2d 18,

---

[34] Barbara Holden-Smith, *Lynching, Federalism, and the Intersection of Race and Gender in the Progressive Era*, 8 YALE J. L & FEM. 54-55 (1995) (citing 62 Cong. Rec. 458-68 (1921)).

19 (9th Cir. 1975); *Miller v. North Carolina,* 583 F.2d 701, 707-08 (4th Cir.1978) (misconduct for prosecutor to make "blatant appeal to racial prejudice in the assertion that no white woman would consent to sexual intercourse with a black man").

The prosecutors appealed to implicit fears about race in other ways, both subtle and explicit. Much of their case trafficked in stereotypes that played on irrational fears and prevented the jury from seeing Robinson for what he was so that they could dispassionately assess culpability and punishment. Most of the tired racial caricatures were on display: the gang member, 36 RR 19 ("While he's been incarcerated, Cortné has tattooed a teardrop on his left cheek, has tattooed a gang symbol on his right cheek); 36 RR 22 ("Cortné Robinson and his gang sought out the house"); the threatening outsider, 36 RR 71 ("The World Trade Centers were brought down by a razor blade");  the predatory animal, 26 RR 22, who does a person who does not feel pain or remorse or regret like others, 36 RR 22 (Dr. Allen testifies Robinson commits crime for enjoyment); 36 RR 23 (prosecutor: "Where are the love songs? Where are the expressions of hope, of joy and wonder? Where are the expressions of tenderness or warmth, of kindness and compassion?"). His rap music—much of which rises from the urban culture of Black youth—was enlisted to make him seem more dangerous. 36 RR 35-36 (Robinson's own attorney decrying "bad" rap rather than engaging in an attempt to educate the jury). He was accused of squandering his advantages, 36 RR 23-24, and blaming others for his shortcomings, 36 RR 23-25. To be properly sentenced, Robinson needed to be seen as more than just a racially stereotypical caricature, but the State's approach—which, in essence, erased all of his humanity—is all too familiar to young Black men. As Dr. Henery wrote:

> An examination of the complex array of forces in Cortné's life gives greater insight into his character and intent than the examination and framing of Cortné's personality as criminal, gangster, thug, leader, or follower. Cortné's blackness and poverty, read through his tattoos and music, were primary points of focus for a racially stereotyped evaluation of his entire character at trial. These biased readings obscured the significant challenges he has faced as a young person, as well as his respectful and loyal nature."

Henery Aff. ¶ 128. In divided communities, with painful pasts and no or incomplete reconciliation, it can be easy to convince jurors to see placeholders rather than people. It was defense counsel's job to prevent that from happing.

**B.   Trial counsel unreasonably failed to address race during voir dire.**

A capital trial presents "a unique opportunity for racial prejudice to operate but remain undetected." *Turner*, 476 U.S. at 35. As the Supreme Court has recognized, jurors are given uniquely broad discretion in capital cases to consider and give weight to a nearly limitless set of facts—any one of which might mean the difference between life and death. It may consider any of the facts in evidence in deciding, for example, whether the defendant poses a future danger. And it is permitted to consider the facts of the offense and the defendant's personal history and circumstances to decide whether culpability is mitigated sufficient to warrant a life sentence.  Given this wide discretion, a juror might impermissibly rely on stereotypes or bias to conclude that a defendant's race makes him more dangerous or less capable of rehabilitation or remorse—and that reliance may never be uncovered. *See id.* A death sentence is final—the error of permitting bias to infect the sentence cannot be corrected once the sentence is carried out.

For these reasons, a black defendant facing a death sentence is entitled by the Sixth and Fourteenth amendments, and by due process, to have potential juries questioned about race when the victims of the offense are white. *Id.* at 36-37; *Ristaino*, 424 U.S. at 595 n.6. But the burden is on trial counsel to request such an inquiry. *Turner*, 476 U.S. at 37. If they do not, the trial court does not err by failing to engage in one. *Id.*

In this case, trial counsel neither made such a request of the court nor embarked on an inquiry of their own.  Although the prospective jurors were asked to identify their race on their questionnaires, not one of the 111 questions addressed race or attempted to ferret out bias. Further, defense counsel did not even mention Robinson's race or the race of the victims during voir dire.

54

Exposing racial bias was critical because of Marshall's history, a history that Marshall does not, for the most part, want to talk about. Phil Latham, the editor of the city's newspaper, *The Marshall News Messenger*, wrote about this fact in 2003. He described his efforts to put together a group of six white and six black ministers to answer 12 questions about race and Marshall for serial publication. Only one white minister turned his request down. But he nearly failed at finding anyone who wanted to be part of the Black cohort. One minister he reached out to told him that talking about race "would be like painting a large target on his back for everyone—police, bankers, insurance agents, employers—to see."[35] The white ministers who participated received threats. The newspaper lost some advertisers.[36]

During trial, defense counsel let the State control the narrative about race. Defense counsel knew race would be subtext in Robinson's trial. At the state habeas hearing, they testified that having fewer Blacks on the jury would minimize chances that jurors would discuss race during deliberations. 1 WRR 63, 78. They appeared to accept that their client was frightening.  36 RR 46-47 ("[A] lot of times, if a person is death or life, just by the lawyer in the courtroom—because . . . he's going to be the most scared person in the court, because he's going to sit next to the guy." But—"that's not in this case."). They deplored rap. 36 RR 35. They played into soft stereotypes, referring to rap stars, for example, as "people all with their gold and stuff like that." *Id.* They blurted out a racially-tinged non sequitur: "[O]ur client's been in jail for a year-and-a-half. Like I said, there's no problems—we have no racial problems." 36 RR 50. Perhaps worst of all, Robinson's counsel conceded the most inflammatory legal argument in the case, that Robinson was responsible for Travion Young's rape. 36 RR 33 ("we say, well all parties [in the home] are just as guilty. That's right. . .).

---

[35] Phil Latham, *Asking Questions About Race So a Community Thinks About Race,* Neiman Reports, *available at* https://niemanreports.org/articles/asking-questions-so-a-community-thinks-about-race/ (Fall 2003).
[36] Marshall ISD counselor Lula Waskom describes a community that "appears to be calm on the surface" but "is anything but." Waskom Aff. ¶ 32. Black turnout for recent political activity has been "very low," and the white response to that activity has been concerted. *Id.*

In these circumstances, the defense team's silence about race was deafening. The circumstances were sufficient to entitle Robinson to a robust inquiry. Defense counsel knew their client was a young black man accused of breaking into to a white couple's home and committing a violent act. They knew that one of the black defendants had raped a white woman in the home. They must have anticipated that extensive evidence regarding that rape would be offered by the State—they testified at the state hearing they believed that evidence was relevant. They told Robinson's jury (erroneously), in closing argument at the penalty phase, that Robinson was guilty of the rape under the law of parties. Counsel knew, too, that Robinson had rapped inculpatory lyrics in the squad car on the day he was arrested. And they knew the community they lived in. It is hard to imagine a case more fraught with racial tension than this one.

## C.   The failure to inquire about race prejudiced Robinson.

It is clearly established that the "ultimate focus" of the prejudice inquiry under *Strickland* is "the fundamental fairness of the proceeding." *Strickland*, 466 U.S. at 696. Defense counsel's deficient performance in failing to interrogate venire members regarding potential racial bias, despite the racially charged nature of Robinson's trial, was an error so egregious that prejudice may be presumed. *See Virgil v. Dretke*, 446 F.3d 598, 613 (5th Cir. 2006) ("Given the fundamental nature of the impartial jury and the consistent line of Supreme Court precedent enforcing it, we must conclude that "the result of [Virgil's trial] is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."); *Miller v. Webb*, 385 F.3d 666, 676 (6th Cir. 2004) (finding that where defense counsel was ineffective for failing to adequately voir dire, and thus failing to ensure an impaneled juror was not biased, prejudice was presumed). When "[n]o effort is made to explore the depth or intensity" of a prospective juror's bias, a court cannot assure itself that all jurors "set aside their preconceived notions and adjudicate[d] [the] matter with an open mind." *Virgil*, 446 F.3d at 613.

Even if Robinson were required to demonstrate prejudice, he has done so, in light of the exceptionally racially charged nature of Robinson's trial. Graphic testimony about the sexual violation of a white woman by a young black man came in through the State's experts, and the State used egregiously graphic language to try to pin the assault on Robinson in its closing statement. 36 RR 72 (Robinson "might as well have been holding [Young] by the hips"). Robinson, of course, was not guilty of the rape, but a court did not decide that until after the State, knowing its inflammatory effect, made him responsible for it. *See Ex Parte Robinson*, No. WR-81,583-01, 2016 WL 6610373, at *4, n.22 (Tex. Crim. App. Nov. 9, 2016) ("the sexual assault was not clearly 'in furtherance of' nor should it necessarily have been anticipated as a result of, the burglary, and there is no evidence that Applicant encouraged it or directly aided and abetted Young's commission of it") (quoting Tex. Penal Code §§7.01, 7.02(b), and 15.02(a)).

It was the State, not defense counsel, that alluded to race in closing argument at both the guilt and punishment phases. Although Robinson, Smith, and Young wore hoodies on the night of the offense, the prosecutor said they were "wearing masks and hoods." 30 RR 41 (emphasis added); *see also* 30 RR 51 (referring to the moment the young men "put those hoods on"). The prosecutor noted the use of the word "cracker"—a slang term for a white person"—and said it showed "No feeling. No caring. No remorse." 30 RR 55. The prosecutor referred again and again to the rap lyrics. *See, e.g.*, 30 RR 56, 83, 84. The prosecutor called the three black men "animals" and "predatory." 30 RR 87; 36 RR 22.

The State introduced race in subtler ways, too—through the pretexts of discussing music and hair-cutting tools in the county jail. Failing to request an inquiry about race left the field for the state to occupy—essentially leaving Robinson without counsel at voir dire.

Rather than stand up and face the trial's racial undertones, Robinson's attorneys either hid from them or leaned into them. Inevitably, that decision, which, given the nature of the case and the community, was neither strategic nor reasonable, produced a biased jury and was therefore prejudicial.

## VII. Trial counsel were ineffective for failing to challenge biased jurors for cause.

Trial counsel failed to minimize the likelihood that Robinson's jury would be affected by racial bias. *See* Claim VI *supra*. But they failed as well, by not advancing legitimate arguments in favor of for-cause strikes against jurors biased (i) by publicity, (ii) by connections with the State and State's witnesses, and (iii) in favor of the death penalty. *See Strickland*, 466 U.S. at 686 (benchmark for assessing performance of counsel is whether his conduct "undermined adversarial process"). Counsel's failures resulted in wasted peremptory challenges and the seating of undesirable jurors while desirable jurors were dismissed. In addition, one juror, Amanda Ferguson, was seated even though she had indicated she would automatically impose the death penalty. 10 RR 196-200. No strategy can justify the constitutionally deficient representation. *See Strickland*, 466 U.S. at 689 (counsel's representation not deficient if it reflects reasonable strategy).

### A. Legal standard.

"[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722; *see also Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) (The Sixth, Eighth, and Fourteenth amendments "guarantee a defendant on trial for his life the right to an impartial jury."). The principal way in which the right to trial by an impartial jury is secured is through voir dire. *See Morgan v. Illinois*, 504 U.S. 719, 729–30 (1992) ("Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.") (internal quotations and citations omitted). In Robinson's case, jurors' improper biases infected their deliberations.

The bias of a juror may be actual or implied; that is, it may be bias in fact or bias presumed as a matter of law. *United States v. Wood*, 299 U.S. 123, 133 (1936). Actual bias is demonstrated when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1983) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Where, however, a juror has a close relationship with a participant or the issues, there exists a "conclusive presumption of implied bias." *Smith v. Phillips*, 455 U.S. 209, 223 (1981) (O'Connor, J., concurring) (internal citation omitted). Neither the trial court, nor the reviewing court, should rely simply on the juror's assessments of his own impartiality. *Patton v. Yount*, 467 U.S. 1025, 1036-37 (1984) (reviewing court must assess whether "the juror's protestation of impartiality [should] have been believed") (internal citation omitted); *Kirk v. Raymark Indus.*, 61 F.3d 147, 153 (3d Cir. 1995) (internal citation omitted). When the record reveals facts that demonstrate that there is a likelihood of prejudice, a court's refusal to grant a challenge for cause should not be upheld simply because the court "ultimately elicits from the prospective juror that he will be fair and impartial, despite earlier statements to the contrary." *Id.* at 156.

**B.     Relevant facts and argument.**

Trial counsel received more than a hundred juror questionnaires on January 7, 2011.  1 WRR 74-75.  They met with the State and eliminated a number of prospective jurors based solely on the answers provided in their questionnaires. *Id.* at 75. In selecting a jury, trial counsel relied "quite a bit" on the answers prospective jurors provided in their questionnaires and discussed each juror after his or her individual voir dire. 1 WRR 73. Trial counsel's goal in jury selection was to pick jurors who would assess a life sentence.  *Id.* at 64, 82, 232. Kevin Settle testified that, even though he filed a pre-trial motion to disclose past and present relationships, associations, and ties between the State and prospective jurors, he truly did not have any concerns regarding the issue at the time. *Id.* at 68. The motion was never ruled on because the State agreed to disclosure. *Id.* at 71.

Settle was interested in removing any jurors who might have a bias against Robinson. *Id.* at 65. He determined bias by observing how potential jurors looked at Robinson. *Id.* One of their concerns was publicity bias, so before voir dire, the team filed a motion to excuse for cause all prospective jurors who had heard or read about the case. *Id.* at 67. As a result of the motion, the State told trial counsel "a lot" of information about prospective jurors, including what the State had heard about certain individuals and whether an individual had a criminal record. *Id.* at 67, 68-69.

Prospective jurors Hubert Staten, George Jones, Cynthia Leleko, Amanda Ferguson, Nila Wall, Clifton Gilliland, Kevin Crutchfield, and Daniel Martin demonstrated an actual bias in their responses during voir dire. Because that bias stemmed from relationships with trial participants, their bias should have been conclusively presumed. *Cf. Smith*, 455 U.S. at 223 (in some cases, such as where juror has a close relation to prosecutor, bias should be presumed). Below are the relationships those jurors disclosed, and trial counsel's reasons, articulated at the State writ hearing, for not moving to strike them:

**Hubert Staten** spent 22 years working in the Marshall Police Department and, as a result, knew about half of the police department. 13 RR 99. He also knew special prosecutor Rick Hagan and Joe Black from his time working at the police department. *Id.* And, he listed Stan Spence as one of the two people he admired the most. *Id.* at 101. Stan Spence was a potential witness for the State in the case. *Id.* Additionally, Staten had knowledge of Robinson's case because one of his co-workers mentioned something about it to him. *Id.* at 102. Trial counsel testified that they did not strike Staten, because Staten did not look away from Robinson, "felt good" to counsel, and, most importantly, was black. 1 WRR 77-78.

**George Jones**'s daughter was friends with prosecutor Joe Black. 11 RR 180. At the writ hearing, Settle did not remember why defense counsel did not ask Jones any questions about the

relationship between Black and his daughter, but he admitted it might have been important information to know. 1 WRR 81.

**Cynthia Leleko** was Joe Black's next-door neighbor, and her husband worked with Rick Hagan's brother. 17 RR 129, 131. She had read about the case on the same day as jury selection, and she knew that Robinson's case was connected to numerous home invasions the year before. 1 SHCR 15; 17 RR 132–33. On her questionnaire, Leleko also said that she was friends with Staten. 1 SHCR 13. Trial counsel were not worried that Leleko might be biased in favor of Black, since "she kind of looked like a hippie." *Id.* at 81. After talking about it, trial counsel decided no one would be able to tell her what to do and she would be "a great candidate" for returning a life sentence; "one of [their] best jurors"; "a great juror." 1 WRR 70, 81.

**Amanda Ferguson** wrote on her juror questionnaire that she was concerned that, once a person had been sentenced to death, it took too long to execute him. *See* 10 RR 186-89. She acknowledged that sometimes people are exonerated while their appeals are playing out, but she maintained that the process takes too long and is too expensive. 10 RR 186-89. She appeared to lean in favor of the death penalty. She said a conviction beyond a reasonable doubt, coupled with a future-dangerousness finding, would cause her to lean toward death. 10 RR 196-200. She also was skeptical about mitigation evidence, acknowledging that some people have difficult histories but pointing out that not everyone with a traumatic past committed capital murder. 10 RR 200. Upon questioning by the trial court, she said she could consider mitigating circumstances. In spite of Ferguson's clear inclinations to impose death, even by violating her instructions to consider the mitigation factor, trial counsel did not move to strike her for cause. They eventually used a peremptory challenge to remove her from the jury. 24 RR 12.

**Nila Wall** was a family friend of Joe Black and taught his children. 1 Supp. RR 117–19. Wall also knew Rick Hagan. *Id.*  Trial counsel did not strike Wall because "she looked really good for life." 1 WRR at 80.

**Clifton Gilliland**'s wife read the newspaper every day and told him about the case. 14 RR 14.. Juror Gilliland also stated that "as far as what's been published [about the crime]… it's pretty—pretty bad." *Id.*

**Kevin Crutchfield** read about the case in the newspaper right before voir dire. 1 Supp. RR 62; 1 SHCR 15.

**Daniel Martin** heard facts about the case from radio news reports and had read about it in the newspaper. 19 RR 153; 1 SHCR 15. Prosecutor Black said he recognized Martin and asked whether Martin had served on a Harrison County jury. 19 RR 151. Settle did not ask any follow-up questions about this because he felt comfortable about how he would make the life-death decision. 1 WRR 82.

Trial counsel's failure to conduct anything more than a cursory questioning during individual voir dire led to their unreasonable failure to challenge any of these jurors for cause or even use peremptory challenges to remove them from the jury box.  As a result of counsel's failure, Robinson was left with a jury stacked with friends and neighbors of the prosecutors, a juror who taught the prosecutor's children, jurors who knew many of the State's witnesses, and jurors who already knew details of the facts of the case. Under these circumstances, Robinson was denied his constitutional rights to a fair and impartial jury and to due process of law.

### C.     The State court unreasonably applied federal law in denying Robinson's bias claim.

This claim was raised and adjudicated in State court. The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions, which adopted *verbatim* the State's proposed findings. *See* FFCL 30-33, 48. The trial court concluded that "trial counsel were careful to inquire into possible biases and make reasonable choices in the selection of the jurors." *Id.* at 48. This did not fully

address Robinson's argument that the jurors could not be impartial because they were emotionally connected to the witnesses and the State. The court's determination of the facts is unreasonable.

A juror's unprobed statement that their relationships with the prosecutors and witnesses would not influence their decisions does not decide the question of bias. Setting aside long-standing relationships to impartially evaluate the credibility of friends' testimony is easier said than done. It is common sense to presume that such relationships would lead jurors to be biased despite their best intentions to the contrary and regardless of their statements that they could be fair and impartial. *Wainwright*, 469 U.S. at 424. Many potential jurors "simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear.'" *Id.* at 424-25. Therefore, it was unreasonable for trial counsel to rely on jurors' unsubstantiated statements that they could be fair and impartial despite their relationships with the prosecution and their prior knowledge of the facts of the case.

As to implied bias, the court's decision was contrary to and an unreasonable application of clearly established Supreme Court precedent because it rejected the claim based on the jurors' express disclaimers of bias, FFCL at 30 ¶ 149, and the State's assessment (adopted verbatim by the trial court) of the credibility and testimony of the jurors in voir dire. "The doctrine of implied bias is 'clearly established Federal law as determined by the Supreme Court.'" *Brooks v. Dretke*, 444 F.3d 328, 329 (5th Cir. 2006). Implied bias does not turn on a juror's self-assessment of his or her own impartiality but is "bias attributable in law to the prospective juror regardless of actual partiality." *Wood*, 299 U.S. at 134; *see also Smith*, 455 U.S. at 222. Indeed, "partly because a juror may have an interest in concealing his own bias and partly because the juror may be unaware of it," a finding of implied bias is justified to avoid a miscarriage of justice. *Id.* at 221-22.

The failure to voir dire and challenge for cause based on explicit or implied bias increased the risk that biased jurors would be seated on Robinson's jury. Inquiry is required when the possibility of

bias is present to ensure just and reliable results. *Virgil*, 446 F.3d at 613 (finding State court's no-prejudice decision unreasonable for counsel's ineffectiveness in failing to challenge juror bias). The individual and cumulative effect of the failure to investigate bias and move to dismiss biased jurors for cause resulted in the denial of Robinson's rights under the Fifth, Sixth, Eighth, and Fourteenth amendments to the United States Constitution.

## VIII.   Counsel was ineffective for failing to object to the State's *Batson* violations.

Only four Black panelists survived the for-cause challenges of voir dire. The prosecution eliminated an additional two of these four—Nancy Moore and Debra Johnson—with peremptory challenges. 24 RR 26–30.  These challenges violated the Equal Protection Clause, yet trial counsel did not object to them. *See Batson v. Kentucky*, 476 U.S. 79, 85 (1986) (Equal Protection Clause prohibits even one race-based challenge); *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994); *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (collecting cases).

A three-step process governs claims under *Batson*. First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. *Batson*, 476 U.S. at 93-94. Second, once the prima facie case is made, the State must offer a race-neutral explanation for the challenged strike. *Id.* at 97. Third, after the State has articulated its explanation for the strike, the court must determine whether the defense has carried its burden of proving purposeful discrimination, often by demonstrating that the State's explanation is a pretext for discrimination, but always by looking at the totality of "all relevant circumstances." *Id.* at 96-97.

Although defense counsel did not object to the peremptory strikes, the State offered a reason for them. It told the trial court that it struck Moore because she was "uncertain as to whether she was in favor of the death penalty" and because she worked at a law firm. 24 RR 27, 31. Johnson "was in favor of the death penalty," but the State said it struck her because the prosecutor recognized a relative, Kyonta Byrd, listed on her questionnaire. *Id.* at 28. Research revealed that Johnson had been a

complainant against Byrd—she reported to the Sheriff's office that he had raped her daughter; Johnson, however, failed to report Byrd's arrest during voir dire. *Id.* at 28-30.

In evaluating the State's asserted reasons for striking 50 percent of the African Americans on Robinson's panel, this Court must consider whether those reasons are pretextual. *See Miller-El v. Dretke*, 545 U.S. 231, 248-49 (2005) (examining asserted reasons for pretext of discriminatory motives). Evidence of pretext may be found if the State declined to strike a white juror who is "similarly situated" to the stricken juror, if the State did not meaningfully question the jurors about the asserted relevant characteristic, if the State questioned black jurors more aggressively than white jurors, or if the circumstances otherwise cast doubt on the claimed reason. *Id.* at 232, 247.[37] Here, the prosecutor's reasons are demonstrably pre-textual.

### A.     Nancy Moore.

The State said it struck Moore because her answers to the question of whether she supported the death penalty were "uncertain." 24 RR 26–31. But Moore's death-qualification testimony was indistinguishable from that of 19 other venire members whom the prosecutor did not strike. *See* Ex. 40 (Special Issues Chart); *Miller-El*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination.") (internal citation omitted).

Moore wrote on her questionnaire, "I can't at this time be sure about my feelings or opinion regarding the death penalty." 10 RR 112. When questioned about that answer during voir dire, she did not equivocate: "If [the crime] warrants it, if the crime warrants that punishment, whatever the judicial system says, that's what I'm for." *Id.* at 113.

---

[37] The Court's comparative analysis will be impeded and perhaps impossible in this case, because the questionnaires of all the jurors who were subjected to peremptory challenges are missing. Though the trial judge said at the state habeas hearing that the questionnaires were made part of the record, undersigned counsel has not been able to locate them. On March 22, 2021, Robinson filed an unopposed motion in the State court requesting copies of the missing questionnaires. Ex. 41 (Motion). Counsel requests an opportunity to supplement the record when the questionnaires are provided.

The State questioned almost every juror about how he or she felt about the death penalty, *see, e.g.,* 10 RR 75 (Burris), 11 RR 143 (Allgood), 12 RR 61–62 (Self), 13 RR 56 (Jernigan), 14 RR 112 (Haught), 15 RR 44 (Merritt), and 15 RR 118 (Anderson), and elicited one or two-word answers to these questions. Moore is not the only one who said her answer would be fact dependent. Jurors Clark, Ferguson, George Jones, Carla Jones, Crutchfield, Staten, Maurer, Hunt, McGough, and Sauer occasionally modified their "yes" or "no" answers with nearly identical sentiments: "it depends on the facts," "I would have to hear everything," or "I would have to hear all the facts." *See, e.g.* 10 RR 39 (Clark) ("I mean, I think anytime you have to decide that on your conscience as far as myself, I mean, it weighs heavy, and you have to really know what you're—you know, how you feel and what the circumstances are.); 11 RR 216 (Jones) (would want to hear all the facts). There is no principled way to distinguish Juror Moore's responses from the other nineteen, who the prosecutor did not strike.

Moreover, the prosecutor did not inquire further to find out more about Moore's views on the death penalty. 10 RR 12-14. "[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller-El*, 545 U.S. at 246 (internal quotations and citations omitted). If the prosecutor was genuinely concerned that Moore was "uncertain" about her feelings and opinions about the death penalty, he would have asked more probing questions.

Pretext also infected the prosecutor's second reason for striking Moore. Moore testified that she worked at the Carlisle Law Firm, which mainly handled civil cases. 10 RR 109, 111. The prosecutor told the court, "We were not comfortable putting anyone that worked in a law firm on the jury." 24 RR 31. That explanation is problematic, because the State failed to strike two other jurors, Dana Nelson and Cynthia Leleko, who also worked with lawyers and who were white.[38] Nelson knew

---

[38] The absence of some questionnaires makes a comparative analysis regarding profession particularly difficult. Every questionnaire asked about profession, but few voir dire inquiries addressed the subject.

Marshall attorney Val Jones "professionally." 18 RR Trial 10. Not only was Leleko prosecutor Black's next-door neighbor, but she also worked directly with the district attorney's office as a CASA (Court Appointed Special Advocate) volunteer. 17 RR 131; *see also* Ex. 42 (Leleko Questionnaire); Exhibit 43 (*The Marshall News Messenger*).

In addition, the State did not ask Moore any questions about her experience with the Carlisle Law Firm or whether that work would affect her as a juror.[39] Indeed, the State did not question any jurors about their experiences with law firms, county-affiliated agencies, or other attorneys. If the State were truly concerned about seating persons who worked with lawyers, it would have asked more meaningful questions of Moore and all the jurors. "[T]he failure to ask undermines the persuasiveness of the claimed concern." *Miller-El*, 545 U.S. at 250 n.8.

### B.      Debra Johnson.

Pretext also infected the prosecutor's reason for striking Debra Johnson. Johnson had been a correctional officer and "favored the death penalty." 18 RR 97-98; 24 RR 28. Johnson listed in her questionnaire the name Kyonta Byrd as either a "sibling" or "son or "stepson."[40] 24 RR 28-30. The prosecutor explained that all potential jurors are required to say whether any family members have been arrested or charged with a criminal offense. Byrd had been charged with raping Johnson's daughter, and Johnson was the outcry witness who reported rape to the Harrison County Sheriff's Office. Johnson had not disclosed the fact—a failure that, the prosecutor said, went "to the heart of Questions 92, 93, 94, and 95, on her questionnaire."[41] *Id.*

---

[39] In fact, because her experience was in civil law, Black observed that she would not be familiar with the "criminal aspect" and terms in the case. 10 RR 111.

[40] It is unclear where the reference to "stepson" or "sibling" came from, since Johnson's questionnaire is missing. A review of the questions on the questionnaire suggests Johnson's reference to Byrd must have been in response to 35 or 92-95. The prosecutor did not question Johnson about Byrd on individual voir dire.

[41] Question 92: Have you, your spouse, any member of your family or any of your close friends ever had occasion to use the office of the Harrison or Harrison County District Attorney?; Question 93: Have you, your spouse, any member of your family or any of your close friends ever been a victim of a crime?; Question 94: Have you, your spouse, any member of your family or any of your close friends ever been accused of or convicted of a criminal offense, either as an adult or as

The State's explanation is inadequate. First, the explanation is inconsistent with the State's treatment of white jurors. Juror Nancy Keohane gave an arguably untrue response but was not challenged. She answered "no" to questions 92-95, which asked about whether she or family members had been victims of crime. Ex. 44 (Keohane Questionnaire) at 14. But, when asked in question 96 if anyone in her family had been accused of doing something criminal, she responded that her "daughter had her identity stolen almost 2 yrs. ago and still is having problems." *Id*. The answer was nonresponsive and, without further explanation, made Keohane's "no" answer to the preceding questions appear at best nonsensical and at worst untrue. *Id*. Keohane, who is white, was neither asked to explain nor stricken from the jury.

Like Johnson's daughter, Juror Martin's parents, who were given hot checks, and Juror Burkhalter's wife, who was a victim of stalking, were victims of crimes. Ex. 45 (Martin Questionnaire) at 14; Ex. 46 (Burkhalter Questionnaire) at 14. Yet, contrary to his explanation regarding Johnson, the State never questioned Martin or Burkhalter about their experiences with or opinions about the sheriff's department or the district attorney's office. *See also* Ex. 47 (Seated Juror Gilliland Questionnaire) at 14 (son involved in felony drug court); Exhibit 48 (Seated Juror Saur Questionnaire) at 14 (family victims of robbery); Ex. 49 (Seated Juror Anderson Questionnaire) at 14 (father imprisoned); Ex. 50 (Seated Juror Clark Questionnaire) at 14 (wife completed probationary sentence); Ex. 51 (Seated Juror Crutchfield Questionnaire) (son broke curfew).

Finally, the prosecutor's explanation regarding Johnson contradicted his trial strategy. *See Miller-El*, 545 U.S. at 247 (soundness of prosecutor's reasons depends, among other things, on "whether the proffered rationale has some basis in accepted trial strategy") (internal quotations and citation omitted). On voir dire, the prosecutor said he struck Johnson because she had failed to

---

a juvenile, other than a traffic offense, including deferred adjudication and/or probation?; Question 95: Have you, your spouse, any member of your family or any of your close friends ever been a prisoner in jail or a penitentiary?

disclose that her daughter had been a victim of rape. 24 RR 28–30. Yet, the State heavily relied on Mrs. Zabokrtsky's sexual assault to convict Robinson of capital murder. Johnson had been a correctional officer and an outcry witness for her daughter's rape. A juror who had those experiences would arguably be inclined to accept the prosecutor's theory. Viewed through the lens of strategy, Johnson "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence, and the prosecutor's explanations for the strike cannot reasonably be accepted." *Miller-El*, 545 U.S. at 247 (internal citation omitted). The prosecution's purported grounds for striking Ms. Moore and Ms. Johnson were pretextual. A new trial must be granted.

C.     **Trial counsel was ineffective in not making a *Batson* challenge.**

"'Racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process and places the fairness of the criminal proceeding in doubt.'" *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (quoting *Rose*, 443 U.S. at 556). Failing to assert and preserve *Batson* claims impedes the administration of justice because, without an objection, the processes in place to weed discrimination are obstructed. An objection triggers the trial court's duty to consider the totality of "all relevant circumstances," including the treatment of similarly situated jurors, and decide whether a prosecutor's reason for the strike was pretextual. *Batson*, 476 U.S. at 96-97.

Counsel in Robinson's case failed to alert the court to those circumstances. They did not question the State's primary basis for challenging Jurors Moore and Johnson. They did not show that Juror Moore was no more unsure about the death penalty than some thirty other jurors who were not struck. They did not show that others, even though not directly working in a civil law firm, had and were currently working with lawyers. Because there were obvious indications that the State's reasons were pretext for discrimination, there was no reasonable strategic basis for not objecting and challenging the peremptory strikes.

But for counsel's failure to object to the *Batson* error, there is a substantial probability that the trial court would have followed the proper procedures and ordered a new panel of jurors not previously associated with the case. *See Batson*, 476 U.S. at 99 n.24 (proper remedy is reinstatement of discharged jurors or selection of jurors from new venire) (internal citation omitted). Since a *Batson* violation is a structural error, no further prejudice is required to be shown. These probabilities are sufficient to undermine confidence in the outcome of the trial. Robinson is entitled to relief from his unconstitutional conviction and sentence, and to a new and fair trial before a lawfully selected jury.

### D. Appellate and post-conviction counsel were ineffective.

This claim was not presented on direct appeal or in State habeas. The failure to present it was due to the ineffectiveness of direct appeal counsel, and initial post-conviction counsel.

## IX. The Trial Court Erroneously Admitted Improper Opinion Testimony, and the State Engaged in Inflammatory Commentary Based on That Testimony, Without Objection by Trial Counsel.

A criminal defendant has a due process right to be tried based solely on admissible evidence, and he has Sixth and Fourteenth Amendment rights not to be convicted except upon a jury determination based upon proof of every element of the offense beyond a reasonable doubt. *Chandler v. Florida*, 449 U.S. 560, 574 (1981); *United States v. Gaudin*, 515 U.S. 506, 514 (1995).

The prosecutor in this case engaged in misconduct throughout both stages of Robinson's trial by resorting to improper and inflammatory argument based on improper opinion testimony. Defense counsel failed to object to the prosecutorial misconduct. The court erred by allowing this evidence to be considered by the jury.

### A. Relevant Facts.

The prosecution relied heavily in opening, at guilt-innocence, closing, punishment, and rebuttal on the statements and lyrics from an in-car video-recorded conversation between Robinson and co-defendant Travion Young and the rap lyrics Robinson freestyled while being recorded.

During its opening statement, the State said "You're going to hear Cortné Robinson say it not once, not twice, but three times that his only regret was he didn't kill that bitch when he had the chance." 26 RR Trial 30. The prosecution further argued that the jury would hear "Cortné Robinson make up a rap song about what went on that night and what he did." *Id.* at 30–31.

In its case in chief, the prosecution offered a transcript of the conversation in the squad car. 27 RR Trial 64-65; *see also* Exhibit 52 (Transcript of Squad Car Video). The prosecution then elicited, without objection, opinion evidence about the meaning of slang terms that Robinson used during that video-recorded conversation. The State showed Investigator Kyle Ready the transcript of the video and asked him to give his opinion on the meaning of Robinson's statement, "I should have dumped on that ho ass." *Id.* at 188. Ready responded that Robinson meant "[t]hat he should have shot Mrs. Zabokrtsky." *Id.*

The prosecutor then elicited, without objection, Investigator Ready's opinion of Robinson's mental state at the time of the crime, based on Ready's interpretation of the transcript of the in-car video. *Id.* at 189-90. The prosecutor read Robinson's words from the transcript: "Damn. Mother fucker. All up under the bushes, up in the trees. That bitch got out of the trunk. I almost shot her there in that room though, but I didn't. Why, I don't know. So I don't know. I wasn't ready for that burglary. I see Homey isn't lying down. I don't know why I didn't shoot the law." *Id.* at 189. According to Ready, these lyrics showed that the crime was not, in his opinion, an accident: Robinson "inten[ded] to do what he needed to do." *Id.* at 189-90.

After this, the prosecution read another statement from the transcript. After Young asked Robinson, "How long, like twenty-five to life?" Robinson responded, "twenty-five to it" and then began to rap the following lines: "twenty-five to it, but I'm hoping for a fifteen. Shit. I've got a lot of shit in my background, nigger; you know what I mean? Be gone for a long time. Think I got life, but, look, I might not . . . . But, look, I might not have. Nigger, just grab it." *Id.* at 190. The prosecutor

71

asked Ready what this meant, and trial counsel objected to speculation. The court sustained the objection. However, this exchange immediately followed:

> **Rick Hagan:** Based upon your experience, based upon your training as an investigator, okay, is it a fair thing to say that Mr. Robinson is formulating a defense?
> **Kevin Settle:** Your Honor, we object. That's speculation.
> **Hagan:** If you can answer without speculating.
> **Settle:** As to whether or not he was formulating a defense?
> **Court:** I'm going to let him ask if he can answer based upon his experience.
> **Hagan:** Can you answer without speculating?
> . . .
> **Officer Ready:** Without speculating, he's trying to set up an excuse for what happened.

*Id.* at 191–92.

Defense counsel themselves elicited improper opinion testimony from Investigator Ready on cross-examination, asking whether Ready who Robinson was referring to when he said "ho." Ready said that Robinson was talking about Mrs. Zabokrtsky.  *Id.*

At the post-conviction hearing, trial counsel explained they did not object to Investigator Ready's opinion testimony because counsel thought it was admissible based on Ready's "years of training." *See* 1 WRR 125.

Later, in rebuttal the prosecution relied on the opinion testimony of Investigator Ready by arguing, "This is from . . . where [Robinson] was . . . in the back seat of the patrol car. And what does he say to Travion Young? 'I should have–I should have dumped, Dog.' Mr. Young says, 'Huh?' 'I should have dumped on that . . .' —I'm going to use the term Lady, because that's what she is." 30 RR 83-84. The defense accepted the opinion testimony as truth by arguing, "[Robinson] said, 'I should have shot Mrs. Zabokrtsky.' Called her a name. 'I don't know why I didn't.' He didn't, Ladies and Gentlemen, because he didn't have the guts." *Id.* at 65.

Additional opinion testimony was elicited. The prosecution asked Sergeant Larry Smith to listen to three recorded songs found on Robinson's cell phone at the time of arrest, but not sung by Robinson in the squad car. 33 RR 14-15. Without objection, the prosecution elicited from Smith that

he recognized Robinson's voice on two of the tracks. *Id.* at 15. Smith gave no basis for his opinion, no suggestion that he was trained in the area of voice recognition, and no suggestion that he had any personal knowledge of or experience hearing Robinson's voice. It is unclear how Smith was able to form the opinion that he recognized Robinson's voice, since the third song found on the cell phone, entitled "whatupnah," was by two Houston-based rappers by the names of Z-Ro and Bombe. *Id.* at 18–19. Then, after Smith recognized the word "thugs" in one song, the prosecution lingered on it, repeating it several times. *Id.* at 17.

At the state writ hearing, defense counsel Settle said he believed that Sergeant Smith was qualified to offer such opinion testimony based on his experience and training. *See* 2, 1 WRR 130–31. Trial counsel did not voir dire Smith before the testimony was offered. *Id.* at 130. Trial counsel was aware that there are actual gang experts who can be called to testify on these subjects. *Id.* Trial counsel recognized that evidence relating to gang membership and tattoos was "terrible" and could think of no strategic reason for letting it into evidence. *See* 1 WRR 129–30.

During the closing arguments at the punishment phase, the prosecution highlighted Robinson's extemporaneous lyrics:

> **Hagan:** Ladies and Gentlemen, I submit to you we learned it through his words to you . . . . [what] his thoughts were and his hopes were and his desires were. Ladies and Gentlemen, search those transcripts, listen to those tapes. Tell me where you hear the words, "I'm sorry." We also learned about his thoughts and hopes and desires through his music. And, you know, art is an expression of how we feel. And I asked myself and you ask yourself, throughout this whole case, through all the evidence presented to you, you've heard Cortné Robinson likes to make songs, that he's an artist. Where are the love songs? Where are the expressions of hope, of joy and wonder? Where are the expressions of tenderness and warmth, of kindness and compassion? Where are they?

36 RR Trial 22–23. The prosecution continued to emphasize the rap lyrics on rebuttal:

> **Black:** Cortné Robinson's thought was, as you remember from the tape, I should have shot her in that room. Ladies and Gentlemen, he wasn't talking about the bedroom; he was talking about the bathroom. He was talking about I should have shot her when she was taped to that chair after she had been raped, sitting in that chair in that bathroom. But the others didn't let him do it. They talked him out of it. We talk about things such as his rap songs. And the one interesting thing you'll find from all artists

just about in rap songs is, they write about personal history and personal ideas. His gang of money-markers and slap you with a nickel plate. I shot her. See, this is not one of those cases where you can go back there and go, well, maybe it happened, or he could have did it, or he was just a party to it.

*Id.* at 70–72.

During sentencing deliberations, the jurors sent a note back to the trial court. Their first request was for the transcript of the squad car recording. Because the transcript was in evidence, the trial court granted their request. *Id.* at 75.

> **B.    The State was permitted to elicit improper opinions, and they made improper arguments based on those opinions.**

The State elicited improper opinion testimony and then repeatedly made improper arguments based on that testimony—arguments that inflamed the passions of the jury and led the jury to believe that Robinson was not remorseful. Robinson's trial counsel failed to challenge the State's use of improper opinion testimony and arguments. Had trial counsel filed a motion to suppress, prepared witnesses to discuss the rap lyrics, and consulted with and presented testimony from an expert qualified to discuss the meaning and significance of Robinson's lyrics, a much different picture would have emerged.

> **1.    The prosecutor elicited improper opinion testimony.**

Investigator Ready and Sergeant Smith offered opinions regarding the meaning of lyrics and statements made by Robinson after he was arrested. If that testimony was intended to be an opinion by a layperson, under Texas Rule of Evidence 701, it was improper because it was not based on the officers' perception. If it was intended as expert opinion testimony, it was improper under Texas Rule of Evidence 702, because no evidence was presented (or asked for) demonstrating the officers' expertise. Moreover, "as a general rule, the opinion of a witness is not admissible to interpret the meaning of the acts, conduct, or language of another." *Rodriguez v. State*, 903 S.W.2d 405, 410 (Tex. App.—Texarkana 1995) (citing *Witty v. State*, 203 S.W.2d 212 (Tex. Crim. App. 1947)). Indeed, in a

particularly absurd moment of plain opinion testimony, Investigator Ready was simply permitted to testify that his opinion was not an opinion, not "speculation." 27 RR 191-92. Rather, Ready suggested, he knew as a matter of fact testimony what Robinson meant. Of course the testimony was speculation, and it was improper speculation, because Ready was not an expert in the subject about which he was opinion—either based on "lay" expertise or based on specialized knowledge. Ready was a police officer. The State elicited no testimony suggesting that, even in that job, he had experience reliably interpreting rap lyrics. Nor did the State elicit testimony that Ready had attended training or written articles about urban vernacular generally, or freestyling specifically. Rather, Ready believed he had figured the case out, the way an amateur sleuth might feel. That is not the lay or specialized expertise.

### 2.  The prosecutors engaged in improper argument.

Throughout the trial, the State used Robinson's lyrics to portray him as someone who would continue to be a future danger and whose character left nothing to mitigate against imposition of death. *See generally* 26 RR 30-31; 41; 36 RR 22–23; 70-72. The State used Robinson's lyrics to portray him as someone who would be a bad influence on others while in prison. 36 RR 22–23; 70–72. The State used his rap song to suggest that Robinson enjoyed the thrill and the drama of committing crimes. 36 RR 70, 72. The State used his songs to suggest that Robinson would kill again if he needed to. 36 RR 72. The State used the rap song to suggest that Robinson glorified violence and the gangster lifestyle. *Id.*

The Constitution places limits on prosecutorial argument. *See Moore v. Morton*, 255 F.3d 95, 105–06 (3d Cir. 2001); *Lesko v. Lehman*, 925 F.2d 1527, 1546 (3d Cir. 1991). A prosecutor is prohibited from using inflammatory language, relying on matters outside the record, or otherwise distracting the jury from its task of deciding the case upon the evidence. *See Caldwell v. Mississippi*, 472 U.S. 320 (1985). In the Fifth Circuit, the standard for evaluating improper argument is whether the prosecutor's remarks "have so infected the trial with unfairness as to make the resulting conviction a denial of due

process." *United States v. Mendoza*, 522 F.3d 482, 493 (5th Cir. 2008). Here, the prosecutor's argument when, reviewed as a whole, was "calculated to incite an unreasonable and retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence." *Lesko*, 925 F.2d at 1545. When the trial court does not correct the prosecutor's improper arguments, the effect is the same as if the trial court had actually instructed the jury that the prosecutor's comments represented a correct statement of the law. *Lesko*, 925 F.2d at 1547.

### C.      Counsel was ineffective.

Trial counsel failed to make timely objections to the improper opinion testimony and arguments of the State. No strategic decision could justify allowing the jury to hear this inadmissible evidence.

Defense counsel was also ineffective for failing to counter the prejudicial use of rap lyrics in this case. Counsel knew the prosecution was going to use the lyrics Robinson sang in the squad car video at the guilt-innocence and at punishment as evidence of extraneous offenses. They knew that the contents of the lyrics were extremely prejudicial. However, trial counsel allowed the prosecution's evidence to go unchallenged and unrebutted. Trial counsel had a duty to challenge the prosecution's use of Robinson's rap lyrics. They could have done so by hiring an expert such as Dr. Charis Kubrin, who could have testified to the following:

- Rap lyrics are frequently misunderstood, misconstrued and taken too literally.

- Rappers commonly use hyperbolic and grandiose language to convey the intensity of emotions felt by frequently marginalized youth.

- While rap lyrics can sometimes be shockingly raw, it is a mistake to always construe them as glorifying, much less encouraging violence. For Robinson, and for many other youth of his age, generation, and demographic, singing lyrics is a form of expressing these intense, complex and often overwhelming feelings.

*See generally* Exhibit 53 (Dr. Charis Kubrin's *Rap on Trial, The Threatening Nature of "Rap" Music.*).[42] An expert such as Kubrin could have helped the jury understand that many rap lyrics are just "hypemusic," or overstated, hyperbolic braggadocio. Still other sections of rap that purport to be violent, blunt, and raw are simply standard rap tropes and clichés, not to be taken literally or too seriously. And, importantly, regardless of whether the lyrics are fictionalized or fact-based, it is not often not true that they represent callousness, lack of remorse, or love of violence or that they say anything about the writer's intent regarding future conduct.[43] Without counter to educate the jury, the prosecution's witnesses—with no real expertise in anything but law enforcement—were able to portray all of the rap lyrics they testified about as literal endorsements of violence. *Id.*

Counsel performed deficiently because they had no reasonable, strategic basis for failing to object and request contemporaneous curative instructions as to each instance of prosecutorial misconduct described above. *See supra* Authorities, Section A.

Robinson was prejudiced by counsel's failure to object to these errors. If the court had instructed the jury regarding the improper arguments of counsel, "there is a reasonable probability that the outcome of the trial would have been different." *See supra* Authorities, Section A. If even one juror had found that testimony from an expert such as Kubrin negated or even cast doubt on the prosecution's portrayal of Robinson as a remorseless gangster, Robinson likely would not have been sentenced to death. *Wiggins*, 539 U.S. at 536.

### D.    The state court opinion unreasonably applied *Strickland* to this claim.

The Texas Court of Criminal Appeals adopted the trial court's order in denying Robinson's claim that counsel was ineffective for failing to object to these instances of prosecutorial misconduct.

---

[42] Dr. Kubrin's curriculum vitae is attached to this exhibit. *See also* Ex. 76 (Report of Charis Kubrin) (discussing impact of race on Robinson's case).

[43] Not only did defense counsel not seek to ameliorate the stereotypes promulgated by the prosecutors, they came close to endorsing them, of rap music, counsel said, "I don't like it maybe. But if you look at TV, you see people all with their gold and stuff like that. They're multimillionaires. . . . That's just – that's a cultural phenomenon right now, and we deal with it. 36 RR 35-36.

The court's brief analysis of Robinson's claim of ineffective assistance of counsel focused only on the underlying merit of the claim. The court found that "trial counsel stated that each witness who testified and gave an opinion was qualified, based upon his training and/or education and/or experience, to render his opinion on the subject in question. *See* Tex. Rules of Evid. 702, 703, 704." *See* FFCL at 45 ¶ 7. The CCA, however, never examined whether the trial court's belief that the evidence was admissible was reasonable, or correct. *See supra* Authorities, Section A.

As addressed at length, Robinson's attorneys' decisions to ignore the opinion testimony and inflammatory arguments and to leave unchallenged the impression that rap lyrics reflect the real world so directly that they can be taken for the truth on life-or-death questions were not the result of reasoned strategy.

## X. Robinson Was Denied His Right to Counsel Because His Counsel Conceded He Was Criminally Responsible for the Sexual Assault and Failed to Move to Exclude Evidence of It.

Robinson's trial counsel conceded, in their closing argument at sentencing, that Robinson was criminally responsible for Travion Young's sexual assault of Arnola Zabokrtsky. This was incorrect. As the evidence showed, and the CCA unequivocally acknowledged, Robinson was not criminally responsible. In saying he was, trial counsel went against their client's direction, misstated the law, and created a significant risk of a biased jury.

Trial counsel's failure to seek to limit the extensive evidence regarding the rape during both the guilt-innocence and punishment phases of trial was also ineffective assistance of counsel. The State introduced the evidence at trial, for context, but the extent of the testimony on the assault nearly exceeded the amount of evidence offered to prove guilt for the charged offense. The extent of the evidence, and its inflammatory nature, was prejudicial. The State offered additional evidence regarding the assault at sentencing, arguing that Robinson was responsible for it under the law of parties. But, as the CCA has recognized, Robinson was not liable under that—or any other—theory. Under state

law, the evidence was inadmissible. Counsel was required to object. This Court should find counsel were ineffective and remand the case to state court.

### A.     Relevant Facts.

#### 1.     The extensive evidence of rape at trial.

The undisputed evidence showed that Robinson played no role in the sexual assault of Mrs. Zabokrtsky, other than being in the home at the time it occurred. *See, e.g.,* 26 RR 121–25 (Mrs. Zabokrtsky testified that only one person sexually assaulted her); 29 RR 130–32 (testing confirmed that Young was the only person present who was a match for DNA recovered from Mrs. Zabokrtsky).[44] When officers initially told Robinson that he was being charged with the sexual assault, he was shocked. 27 RR 169–70. He admitted to taking part in the burglary and assault on Frank Zabokrtsky, but vehemently denied having any role in the sexual assault of Mrs. Zabokrtsky. *Id.* at 170; 1 CR 6. Robinson was not tried on a charge of sexual assault. 1 CR 2.

Nonetheless, the State, with no objection from defense counsel, offered significant evidence of the assault at both stages of the trial. This evidence included testimony by Mrs. Zabokrtsky, various police officers, a sexual assault nurse examiner, and DNA lab technicians, as well as photographs of Mrs. Zabokrtsky's injuries. In effect, the State proved Young's sexual assault of Mrs. Zabokrtsky during Robinson's capital murder trial. From the beginning, the State emphasized its theme, that the jurors could not "take what happened to Frank Zabokrtsky without [us] letting you know what happened to Arnola Zabokrtsky." 26 RR 30. In fact, the State spent more time questioning Mrs. Zabokrtsky about the sexual assault than the burglary and shooting of her husband. *Compare* 26 RR 108–12, 116–25 (questioning about the sexual assault spanning

---

[44] During her testimony, Mrs. Zabokrtsky did not specifically identify who assaulted her. However, the evidence is uncontroverted that it was Travion Young.

fifteen pages) *with id.* at 96–103, 105–08 (questioning about the break-in and shooting spanning twelve pages).

Among the State's direct examination of Mrs. Zabokrtsky were a series of provocative questions to emphasize her suffering at Young's hands:

> Prosecutor: [D]id you feel that he placed his private area . . . his penis inside your private area, your vagina?
> Mrs. Zabokrtsky: Yes.
> Prosecutor: That's not something you wanted to happen?
> Mrs. Zabokrtsky: No.
> Prosecutor: And you didn't ask for him to do that and you didn't want him to do that, did you?
> Mrs. Zabokrtsky: No.

*Id.* at 121, 123. The State also offered photographs depicting her injuries. 28  RR  242–43.

Nanette Parras, a sexual assault nurse examiner, described at length her vaginal examination of Mrs. Zabokrtsky, aided by a diagram. 28 RR 291. She described how the injuries occurred in vivid detail: "the penis [came] in … like an airplane, and it … scrape[d] the bottom of the posterior fourchette and then [went] into the vaginal area. *Id.* at 292-93.

Two scientists testified about DNA testing on items taken from Mrs. Zabokrtsky and from the home. 29 RR 89-145. That testing detected semen on Young's clothing. *Id.* at 104. It also excluded all others present in the home except for Mrs. Zabokrtsky and Young as being DNA contributors. *Id.* at 127-30.

Young's sexual assault of Mrs. Zabokrtsky was a major theme of the State's closing guilt-innocence phase argument. 30 RR 47, 52-53, 55-56, 88-89, 94-95. Young's sexual assault was again described to the jury in graphic detail, focusing on the pain and suffering of Mrs. Zabokrtsky:

> Can you imagine what was going through her mind as she's laying on the floor of her own bathroom tied to a chair, completely naked, with a man climbing on top of her, putting his penis inside of her, having sex with her while she's probably laying there thinking about her husband bleeding to death?

*Id.* at 53. In making these arguments, the State conflated for the jury Robinson's guilt with Young's actions. Even if some evidence regarding the sexual assault was admissible to show context, it should have had no role in the jury's guilt-innocence determination.

At punishment, the State presented evidence of the impact Young's sexual assault had on Mrs. Zabokrtsky and her family. Her son described for the jury his emotions and response to learning that his mother had been sexually assaulted. 33 RR 32-34. He described how he blamed himself for what had happened and wished that he had done things differently. *Id.* at 34. In closing arguments, the State aggressively pressed its theory that, despite the evidence, Robinson was criminally responsible for the assault, asking the jurors to remember it when determining how to answer both special issues. 36 RR 18, 69-70. The prosecutor told the jurors they should find Robinson to be a future danger because "not only was Cortné Robinson responsible for the capital murder of Frank Zabokrtsky … he's also responsible for … the aggravated sexual assault of Mrs. Zabokrtsky." *Id.* at 18; *see also id.* at 72 ("[Trial counsel] say [Robinson] didn't commit the rape. He might as well have been holding [Young] by the hips at the time….").

### 2.      State's Legal Theory Regarding Robinson's Responsibility for the Rape.

Together with this evidence, defense counsel permitted the State to advance a legally incorrect theory throughout Robinson's jury-selection proceedings, trial, and penalty phase—that Robinson was guilty of sexually assaulting Arnola Zabokrtsky, merely because he was participating in a burglary with the perpetrator of that crime, Travion Young.

Robinson had denied involvement in the assault since his first interview with officers after his arrest. He admitted shooting Mr. Zabokrtsky, but he had expressed shock when he heard that Mrs. Zabokrtsky had been raped. 27 RR 170. "You say assault, that's me. Like I said, the only thing I didn't do was the sexual assault." *Id.*

The State did not charge Robinson with that assault. 3 CR 692-700 (jury charge). But it proceeded as though it had. As part of its voir dire presentation, the State introduced nearly every juror who would decide Robinson's sentence to the concepts of party liability and conspiracy. *But see* 1 Supp. RR 117-42 (Nila Wall: neither topic discussed). In most cases, the State told the juror that party liability required that the defendant be criminally responsible for the offense in question, and it correctly defined criminal responsibility: a person is criminally responsible for the acts of another if, "with the intent to promote or assist the commission of the offense" he "solicit[s], encourage[s], direct[s], aid[s], or attempt[s] to aid the other person in the commission of the offense." *See, e.g.,* 11 RR 198 (George Jones); 10 RR 24 (Kenneth Clark); 11 RR 26 (Jennifer Allgood); *see also* Tex. Penal Code §§ 7.01, 7.02. *But see* 14 RR. 26–27 (Clifton Gilliland) (no definition of "criminally responsible").

The State also told the jurors that, to be subject to conspirator liability, the defendant's extraneous conduct must have been foreseeable. *See, e.g.,* 10 RR 24–25 (Clark); 11 RR 27–28 (Allgood). But the example the prosecutor often gave to illustrate the two principles erased their limitations. The example involved a robbery, with a getaway driver and passenger. As the passenger leaves the car to commit the robbery, the driver says—

> "Okay. Well I want you to not hurt anybody. Don't take a gun in there. Just go in and hand the teller a note and come back out, okay?" Well, the driver doesn't know this, but the passenger has got a .44 magnum under his jacket, and he goes in there and the guard starts giving him problems as he was robbing the bank, and he shoots the guard. That's capital murder, okay? Comes back out. Well, now, even though he didn't anticipate it, even though he didn't know that the guy had a gun, [the driver] could still be liable not only as a party, but under the conspiracy theory, because the guy went in to rob a bank. He should have anticipated that a life would be taken."

10 RR 25 (Kenneth Clark); 14 RR 28–29 (Gilliland); *see also* 11 RR. 27–28 (Allgood) (defendant "equally responsible" for robbery if he drives person he knows to be a robber away from the scene as a courtesy); 11 RR 199 (Jones) (same example for law of parties).

The rape remained at the fore of the State's case at sentencing, where it was cited in support of arguments for a future dangerousness finding and against a mitigation finding. Texas law required

that the evidence could not be offered or used at sentencing unless the jury found that the extraneous offense was attributable to the defendant—that is, he was criminally responsible for it either because he committed it or because he was liable as a party. *Haley v. State,* 173 S.W.3d 510, 515 (Tex. Crim. App. 2005). The State argued Robinson was "responsible" for the sexual assault. 36 RR 18.

Defense counsel indicated they understood the importance of the sexual assault in Robinson's trial. In some ways, counsel told the jury, the assault was worse than the killing. *See* 36 RR 33. "Of course" the killing was "bad. But a sexual assault is something that crosses the line, and our client did not do that." 36 RR 33. "A rape is different," he repeated. "it's closer." *Id.* Nonetheless, counsel conceded Robinson was responsible for the rape Young had committed:

> *Our client can be guilty under the law of parties. We all know what.* But he was not the one that committed the sexual atrocity against Mrs. Zabokrtsky. And I think that would have crossed the line. I think we know that. He was not the one. She testified only one person—and we say, well, all parties are just as guilty. *That's right*, but now it comes time for punishment, and we look at that.

36 RR 32-33 (emphasis added). Robinson's jury instructions included the instruction that the jurors could find him guilty as a party and defined party liability. 36 RR 9-10.

Robinson argued in his state habeas petition that the trial court erred by permitting the State to put on such an extensive case of the sexual assault in both stages of the capital proceedings. The CCA rejected the claim. The CCA found the evidence was admissible as it related to the murder allegations. *Robinson*, 2016 WL 6610373, at *4. But the CCA flatly rejected the trial court's conclusion—which it had adopted *verbatim* from the State's proposed findings—that the evidence was admissible to show liability under a theory of party or conspiracy liability: "there is no evidence that Applicant encouraged [the rape] or directly aided and abetted Young's commission of it." *Id.*

## B. Trial Counsel Were Ineffective for Failing to Object to Extensive Evidence of Sexual Assault.

The State offered emotionally charged testimony during both phases of Robinson's capital murder trial, vividly portraying Travion Young's sexual assault of 82-year-old Arnola Zabokrtsky.

Even though it was undisputed that Young acted alone when committing the sexual assault, the State introduced a substantial amount of evidence to repeatedly bring the jury's attention back to Young's act. This evidence had no place in Robinson's capital murder trial, and it would be difficult—if not impossible—for the jury to ignore the bias it invited into the proceedings. [45] Robinson's counsel failed to object to the evidence. This was ineffective.

Deficient performance is frequently assessed when it is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster,* 563 U.S. 170, 196 (2011).

Trial counsel's duties include making proper objections  to preserve the record, which  also prevents the jury from hearing inadmissible and prejudicial  testimony.  ABA  Guidelines, Guideline 10.8, cmt. Trial counsel fell far short of this duty by failing to object to the admissibility of the evidence described above, despite being able to exclude the evidence on three separate grounds: relevancy under Texas Rule of Evidence 401 and 402, unfair prejudice under Texas Rule of Evidence 403, and inadmissible evidence of extraneous crimes under Texas Rule of Evidence 404(b). While strategic decisions of trial counsel are virtually unchallengeable, *Strickland,* 466 U.S. at 689, there is no possible strategy for allowing inflammatory and inadmissible testimony to be admitted.  *See Ex parte Rogers,* 369 S.W.3d  858, 863-64 (Tex. Crim. App. 2012) (no strategic reason exists for failing to challenge inadmissible extraneous offense evidence of sexual assault not committed by defendant).

### C.    The state court decision does not bar relief on this failure-to-exclude claim.

In state court, the CCA held that Robinson was unable to show deficient performance because (1) he reasonably believed the evidence was admissible as "same transaction contextual

---

[45] *See supra* Claim VI (documenting inherent inflammatory nature of evidence about black-on-white rape).

evidence," and (2) Robinson failed to show "the trial court would have abused its discretion by overruling a [Tex. R. Evid.] 404(b) or 403 objection to the sheer volume of the evidence." *Robinson*, 2016 WL 6610373 at *4. (The CCA did not reach the question of prejudice from counsel's errors, which this Court reviews *de novo*).

This decision does not bar merits relief in federal habeas. *See* 28 U.S.C. § 2254(d). The CCA's opinion is contrary to and an unreasonable application of *Strickland*. Moreover, the opinion failed to adjudicate Robinson's claim that counsel was ineffective for failing to exclude the evidence *from the punishment phase*.

First, the CCA decision applies a standard contrary to *Strickland*. "A state court decision is contrary to ... clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams*, 529 U.S. at 405. Review under § 2254(d)(1) is limited to "the specific reasons given by the state court." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The CCA substituted its own state-law test for appellate review of admissibility of evidence for the constitutional test for counsel's performance, *Robinson*, 2016 WL 6610373 at *4, which is contrary to clearly established federal law, *Richardson v. Griffin*, 866 F.3d 836, 844 (7th Cir. 2017). Even if the CCA would not have reversed a decision to *admit* the evidence, the trial court might have still decided to *exclude* the evidence, had counsel raised an objection. Under *Strickland*, counsel had no strategic reason for failing to object to admission of the evidence under Rule 403 or 404(b), even if counsel believed some evidence about the rape was relevant as contextual evidence.

Second, the court erred by overlooking the evidence Robinson presented regarding the significant likelihood that permitting the murder trial to become a trial about a black teenager's rape of a white woman would introduce bias into the jurors' deliberations. *See* 1 SHCR 114-23; *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017) (discrimination in administration of justice is "especially pernicious"). Thus, contrary to the CCA's view, the risk that the jury would use the

evidence to make a character assessment about Robinson as a black man was unacceptable, and the CCA's decision was objectively unreasonable.

The inflammatory nature of the sexual assault evidence is amplified because Mrs. Zabokrtsky was eighty-two years old at the time of Young's attack, and she was a particularly vulnerable and sympathetic figure to jurors. The testimony and images presented to the jury encouraged them to make their decision of Robinson's guilt based on emotions triggered by Mrs. Zabokrtsky's suffering at the hands of Young. When all the evidence is considered, the minimal probative value of the cumulative evidence regarding the sexual assault was outweighed by its prejudicial effect. Evidence of sexual assault is inherently inflammatory. *See United States v. Colombo*, 909 F.2d 711, 715 (2d Cir. 1990) (evidence of sexual assault committed during robbery by someone other than defendant so inflammatory that its erroneous omission required reversal, even though curative instruction was given).

Third, the CCA failed to adjudicate Robinson's claim regarding the introduction and use of the evidence at sentencing. The presumption that the CCA adjudicated this issue on the merits is overcome. It is likely the CCA overlooked the issue. *See Harrington v. Richter*, 562 U.S. 86, 99-100 (2011); *Johnson v. Williams*, 568 U.S. 289, 303 (2013).

Even if the CCA had adjudicated the issue, its denial regarding sentencing was unreasonable. The trial court would have abused its discretion had it not granted an objection to the use of the rape at sentencing. There, the evidence was offered not as context but under a theory of party liability. The jurors were instructed—as the law required—that they could not consider evidence of the rape at punishment unless it found, beyond a reasonable doubt, that the rape was attributable to Robinson. *See* 36 RR 9-10. The CCA has held that a sentencing jury may not consider evidence of prior crimes or bad acts until the factfinder "'is satisfied beyond a reasonable doubt that these prior acts are attributable to the defendant. . . Thus, this evidence serves a purpose

very different from evidence presented at the guilt- innocence phase." *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999). Although the CCA did not say whether the evidence was admissible at Robinson's sentencing, it did say unequivocally that the rape was not attributable to Robinson under a law of parties. *Robinson*, 2016 WL 6610373, at *4. That conclusion should decide the question whether counsel was ineffective for failing to object.

Robinson knew how damning Travion Young's act would be; he asserted his innocence of that act immediately. His attorneys also knew that the rape at issue in this case "crossed [a] line" that even the murder did not. 36 RR 32–33. Valid and likely successful means were available to at least minimize the damage. Not only did counsel fail to avail themselves of those means, they conceded defeat. Their representation was deficient, and Robinson should be given a new trial.

A. **Robinson was denied his right to counsel when counsel ignored his express wishes and conceded that Robinson was criminally responsible for the sexual assault.**

The Sixth Amendment protects a criminal defendant's right to "insist that [his] counsel refrain from admitting guilt." *McCoy v. Louisiana,* 138 S. Ct. 1500, 1505 (2018). In *McCoy*, defense counsel pursued a strategy familiar to criminal defense attorneys—on behalf of his client, he admitted to lesser culpability in a capital case in an attempt to avoid a sentence of death. *Id.* at 1514 n.3. McCoy, however, had directed that counsel make no admissions regarding the killing. *Id.* at 1503. Counsel's refusal to comply with his client's wishes violated McCoy's Sixth Amendment right to direct his defense. *Id.*

Two facts make counsel's decision to override Robinson's wishes unreasonable and even more egregious than that in *McCoy*. First, counsel knew the shame and fear that being found guilty of the rape would cause his client. In fact, counsel—unhelpfully—told the jury that, in some ways, the rape was worse than the killing.[46] Robinson himself had suggested as much. Robinson had ample reason

---

[46] Robinson's statements before trial and his counsel's admission at sentencing that Robinson had opposed admitting guilt for the rape are sufficient to show counsel was acting contrary to his wishes.

to avoid being erroneously found criminally responsible for a black-on-white rape.[47] Second, as the CCA's decision makes clear, counsel's admission was an incorrect application of the facts to the law. Robinson was not criminally responsible. Counsel's performance was deficient for saying otherwise. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (trial counsel's decision not to seek additional funding because of mistaken view that he was not entitled to it was not reasonable strategy; *Strickland* requires that counsel have investigated both facts and law).

The right to effective counsel includes the right to counsel who know the law. The accused must rely on counsel's knowledge of the law and its application to protect them from the power of the State. *See Powell v. Alabama*, 287 U.S. 45, 72-73 (1932); *Walker v. Caldwell*, 476 F.2d 213, 217 (5th Cir. 1973) (citing *Powell*, 287 U.S. at 45); *cf. Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (trial counsel must advise client of legal implications of plea on defendant's immigration status). The right to effective counsel protects the defendant's and society's interest in reliable and just results through the mechanism of adversarial testing. *See Strickland*, 466 U.S. at 685-87.

Because counsel's admission was the product of a mistake about the law, it could not have been strategic. *See Hinton*, 571 U.S. at 274. But even if counsel had not made a mistake about the law, there could be no reasonable strategic reason to admitting culpability for an act that, in the attorney's estimation, was worse than the capital murder itself. *See Eze v. Senkowski*, 321 F.3d 110, 129 (2d Cir. 2003) (tactical decision must be grounded in strategy that advances client's interests). It would not have been an uphill battle to make the legally correct argument: counsel could merely have pointed to the law of parties statute and demonstrated why Robinson did not fall within it. Had they lost the argument, they would have preserved the issue for review in the CCA, where it would have succeeded.

### D.    The Court should presume prejudice. Alternatively, prejudice is clear from the record.

---

[47] Of course, Robinson's concern predicted the State's approach, which was to emphasize—or rather, overemphasize—Young's crime and its connection to Robinson.

Violation of a defendant's right to direct his defense is "structural error," and not subject to a prejudice analysis. McCoy, 138 S. Ct. at 1511. Accordingly, if the Court agrees Robinson's trial attorneys acted contrary to his interest, reversal is required.

If the Court disagrees about the nature of the error, prejudice is readily apparent. A death sentence was far from inevitable in this case. While Robinson had deficits, he was a young man and had had a promising start in life. His problems since turning 16 were explicable, and a course correction was possible. The State invited the jury to permit Travion Young's unilateral decision to rape an elderly white woman to become the focus of Robinson's proceedings. The unopposed, excessive evidence and the legally incorrect concession about both its relevance and its legal implications inevitably stirred old fears and prejudices. See Ristaino, 424 U.S. at 595 n.6 (Sixth Amendment and due process protect defendant's right to impartial jury).

The penalty phase instructions did nothing to minimize the prejudicial impact of counsel's failures. Those instructions told the jurors that if they found Robinson was criminally responsible for the offense, they could consider the rape when deliberating the special issues. The jury was primed for this. The State had told the jury since voir dire that Robinson was criminally responsible, and defense counsel had not pushed back against its party-liability theory. The sheer amount of evidence the jury heard on the subject would have led them to believe they could consider it. Defense counsel's concession was the final nail, permitting the jurors to ignore any "limit" the limiting instruction gave.

## XI.   Trial Counsel Were Ineffective for Failing to Investigate and Present Powerful Mitigating Evidence During Robinson's Punishment Phase.

Counsel's failure to investigate, develop, and present powerful mitigating evidence related to Robinson's childhood trauma violated his constitutional rights. Without that crucial, compelling, and persuasive information, the jury sentenced Robinson to death. Counsel's deficient performance, both standing alone and in combination with counsel's other unreasonable actions during the punishment phase, prejudiced Robinson and thereby violated his rights under the Sixth, Eighth, and Fourteenth

Amendments to the U.S. Constitution. Robinson incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.[48]

### A. Robinson's life history contained highly compelling mitigation that counsel never investigated or presented.

At trial, defense counsel's entire sentencing strategy focused on showing the jury that Robinson deserved mercy, by depicting a "good kid" who just "got off on the wrong track." 1 WRR 132, 180. To support their theory, defense counsel presented the following narrative: Robinson was raised in a largely stable, tight-knit home. His biological father, Moses Robinson, physically abused his mother, Donnetta from the time he was born until he was around three, when Moses was sent to prison. 36 RR 36-45. Shortly after Moses's incarceration, Donnetta began dating Roderick Gray, a man who was a "wonderful influence" and stabilizing figure in Robinson's life from about the age of 5 to age 13. 36 RR 36-45. Robinson was initially a good student, who was, throughout his academic career, described as "quiet" and "non-threatening." 34 RR 10 (Sandra Gerrard), 22 (Sandra Sadler), 38 (Burnette Hamilton), 49 (Keith Gunther), 60 (Bobby Carson), 72 (Tony Thomas). He only started to experience an academic and behavioral decline in high school. Henery Aff. ¶ 75. This decline was largely explained by his mother's inattention, the loss of a father figure following Donnetta and Roderick's divorce, and sleep deprivation caused by the family paper route. 36 RR 40, 55-56; Ex. 54 (Huckabee Report) at 32-34.

But defense counsel's cursory treatment of Moses' abuse, complete omission of Roderick's abuse and parental substance abuse, and resulting failure to present any expert testimony on Robinson's mental health and brain development not only painted a false and grossly misleading

---

[48] Due to the effects of the COVID-19 pandemic, counsel has been unable to perform an adequate investigation of Robinson's life history to determine the extent counsel's unreasonable failure to investigate prejudiced Robinson. Removing "barriers to disclosure" is essential to interviewing witnesses as part of a competent trauma-informed mitigation investigation. *See* Aguirre Decl. ¶ 11.  This usually entails multiple in-person visits with witnesses to build rapport. *Id.* ¶ 11-17. Counsel has been unable to undertake this sensitive investigation given restrictions on travel. Video conferencing fails to ensure confidentiality or allow for assessment of demeanor, and in-person interviewing under social distancing fails, too. *Id.* ¶ 17-22.

picture of Robinson's childhood, but also provided ammunition to the State to counter the defense's mitigation theory. 36 RR 73.

1.  **Donnetta and Moses Robinson: The Early Years**

Cortné MoReese Robinson was born on December 15, 1990, in Conroe, Texas, to parents Donnetta and Moses Robinson. Cortné was the middle child of the family. His brother, Corey Robinson, was 3 years older and his sister, Coretta Robinson, was born 2 years later. The family grew up in Marshall, Texas, a racially-divided community detailed *supra* Claim VI. Though Cortné suffered significant trauma throughout his childhood, crucial events which were to shape his life took place decades prior to his birth.

Donnetta Robinson was born on December 15, 1965, in Los Angeles, California, to Mildred Jones and James Jones. When Donnetta's birth left her mother, Mildred, semi-paralyzed, Donnetta's grandmother, Ruth Warren, flew to California from Marshall, Texas to help her care for her newborn. 33 RR 74 (Donnetta Gray); Gray 2012 Aff. ¶ 5. Approximately six weeks later, when Ruth had to return to her life and husband in Marshall, Texas, she took Donnetta with her. 33 RR 74 (Donnetta Gray). Donnetta's mother, father, and five siblings remained in California. Gray 2012 Aff. ¶ 6. Though her immediate family later moved to Dallas, Texas, Donnetta remained in her grandparents' care throughout her childhood. Gray 2012 Aff ¶ 10; 33 RR 82 (Donnetta Gray).

Donnetta was deeply hurt by her mother's abandonment. As she later explained: "I have always felt disconnected from my family and abandoned by my mother. I often wonder why she was willing to take care of all my siblings but not me." Gray 2012 Aff. ¶ 8; *see also* Ex. 55 Kelley Lane Aff. ¶ 6 ("Donnetta has always had a complex about feeling rejected by her family . . . [S]he never understood why she was separated from her mother. She knew her mother struggled to raise her siblings, but she still did not understand why her mother didn't raise her, too. I think she always wanted love and acceptance from her siblings and mother, but she never got it."); Dawson 2012 Aff. ¶ 7

(noting that Mildred giving Donnetta up had "scarred her really bad"). This, in turn, later contributed to Donnetta's difficulty forming attachments, low self-esteem, and chronic depression, all of which were noticeable to those closest to her. Ex. 54 (Huckabee Report) at 6; Dawson 2012 Aff. ¶ 15 ("Donnetta has always been depressed, and it seems like she doesn't think she matters. She has said things to me like, 'I've not ever been loved, so I don't really know what love is.' She always talks bad about herself."); Coretta Robinson 2012 Aff. ¶ 20 (commenting on her mother's depression).

Donnetta did not get the love she craved from her grandparents, Ruth and William Warren. They lived at 2101 Holland Drive, on the west side of Marshall, in the home where Donnetta would later raise her children. Gray 2012 Aff ¶ 10. Ruth and William were quite poor. *Id.* ¶ 14. Donnetta wore hand-me-downs and clothes that were not in fashion at the time. Lane 2014 Aff. ¶ 4. Though her cousins and other family members had nice clothes, Ms. Dawson explained that "Donnetta was never fixed up." Gray 2012 Aff. ¶ 14; Dawson 2012 Aff. ¶ 8. Donnetta's struggles with poverty would later persist as she tried to raise her own children. Ex. 54 at 31.  Cortné wore Corey's hand-me-downs and Donnetta bought school uniforms and clothes from Goodwill. Corey Robinson 2012 Aff. ¶ 18. The children qualified for the free lunch program at school. *Id.* ¶ 17. Donnetta also applied for food stamps and the electricity was occasionally cut off. *Id.* ¶ 19.

Donnetta's grandparents were also strict, and afforded Donnetta very little freedom. Gray 2012 Aff. ¶ 17. To discipline Donnetta, they spanked her.  *Id.* ¶ 17. While home, Donnetta routinely witnessed abuse, as she saw her grandmother beat her grandfather, who was an alcoholic who drank excessively on a daily basis. *Id.* ¶ 17. In turn, her grandfather verbally abused her grandmother. *Id.*

In school, Donnetta was somewhat of a loner; she was not particularly talkative or social, likely due, in part, to her feelings of insecurity and abandonment, and the lack of affection from her grandparents. Dawson 2012 Aff. ¶ 5; Gray 2012 Aff. ¶ 13; Ex. 54 at 6. Nevertheless, Donnetta worked hard and completed her schoolwork with "no encouragement from anyone." Gray 2012 Aff. ¶ 18.

Throughout middle school and high school, Donnetta excelled as an athlete, where she ran track and played basketball and volleyball. *Id.* Her success was no small feat given that she often had to walk home from practice, as "her family wouldn't go pick her up." Dawson 2012 Aff. ¶ 6. At the time Donnetta graduated from high school in 1984, she had earned a scholarship to play volleyball for East Texas Baptist University. Ex. 56 (Marshall Messenger May 10, 1984).

Moses Robinson was born on September 29, 1963, to parents Jessie B.  Willie and John Robinson. Significantly less is known about Moses Robinson's childhood, due to the limited involvement of Moses and his family in Cortné's upbringing. 33 RR 214 (Corey Robinson); 34 RR 116 (Coretta Robinson); Dawson 2012 Aff. ¶ 11; Lane 2012 Aff. ¶ 17. What little is known from Sanford Robinson, Moses' brother, however, suggests that Moses' father "liked to drink" and his parents engaged in some physical fights. Ex. 57 Sanford Aff. ¶ 5.

Moses and Donnetta met in 1985. At the time, Donnetta was doing well. She had a good job, was taking college classes, and had a new car. Lane Aff. 2012 ¶ 8. Moses had just completed three years of service in the military, and was a welterweight boxer who fought competitively in East and South Texas. Ex. 58 (Marshall News Messenger June 1, 1986). They dated for approximately six or seven months before they married on May 15, 1986. Though the relationship appears to have started off well, it soon turned into a nightmare. Gray 2012 Aff. ¶ 22.

### 2.      A Violent Beginning (1985-2003)

Donnetta and Moses' 11-year marriage consisted of routine drug abuse and unrelenting physical and emotional abuse. According to numerous witnesses, both Moses and Donnetta smoked crack while they were together. Corey Robinson 2012 Aff. ¶ 11; Lane Aff. ¶¶ 12-15. Kelley Lane, Donnetta's cousin, suspects that Moses introduced Donnetta to the drug and that Donnetta smoked crack during the entirety of her pregnancy with Cortné. Lane Aff. ¶ 15. Moses used crack daily, and Corey recalls seeing his father disappear into the bathroom with his mother, carrying a black case of

needles. Gray 2012 Aff. ¶ 24; Corey Robinson 2012 Aff. ¶ 11; Ex. 59 (Moses Robinson TDCJ Presentence Investigation Report).

The drug abuse and resulting child neglect even led Ms. Lane to threaten to call Child Protective Services on Donnetta to request that her children be removed from her care. As she explained: "I had gone over to their house and I could smell crack. It stunk, and the house was filthy. The kids and Donnetta were filthy, too, and they looked like they hadn't bathed in days.  The lights and water were cut off.  That was one of the few times Donnetta and I have ever really fought about something." Lane Aff. ¶ 13.

At the same time, Donnetta struggled with alcohol abuse. One of Donnetta's closest friends, Helen Dawson, explained: "I know Donnetta can be a heavy drinker. I've given her rides to get liquor and I've seen liquor at her house. She drank a lot when the children were younger, when she was having problems with Moses. I also noticed her drinking a lot when she was trying to go to college and having car problems." Dawson 2012 Aff. ¶ 16. Donnetta's children echo Helen's statements. Corey noted: "My mother has drank a lot for as long as I can remember. She has a lot of pain, some of it related to Moses, but I know there's more that I don't know about. When she drinks, she gets very emotional. I believe she is an alcoholic, and has always had a problem drinking, even before my father went to prison." Corey Robinson 2012 Aff. ¶ 12; *see also* Coretta Robinson Aff. ¶ 21 (describing her mother's alcohol use).

Donnetta's substance abuse coincided with, and followed from, a period in which she and her children suffered severe and persistent physical and emotional abuse. Moses first beat Donnetta shortly after their eldest son, Corey, was born on August, 21, 1987. Gray 2012 Aff. ¶ 21. From that point forward, Moses hit Donnetta on a weekly basis. *Id.* ¶ 25; Corey Robinson 2012 Aff. ¶ 7 (noting that as a child, "it seemed . . . like he beat her every day"). As Donnetta explained: "If dinner was not to his liking, he would start a fight. If he did not like what I was watching on TV, he would start a

94

fight. I turned into a coward, but I didn't know what else to do." Gray 2012 Aff. ¶ 25. Friends observed bruises on Donnetta's face, and Corey recalled how his father strategically beat his mother, punching her legs or back, "areas where people wouldn't see her bruises." 34 RR 96 (Helen Dawson); Dawson 2012 Aff. ¶ 10 (remembering a time when she saw Donetta with "her face all messed up"); Corey Robinson 2012 Aff. ¶ 7. Donnetta's cousin described the abuse as so bad, that she believed "Donnetta has nerve damage on her left eye because of [it]." Lane Aff. ¶ 10; *see also* 34 RR 96 (Helen Dawson) (detailing a time when Moses broke Donnetta's jaw and her eyes were swollen).

Moses' abuse did not stop while Donnetta was pregnant with Cortné and Coretta. Gray 2012 Aff. ¶ 22. In fact, shortly before Cortné was born, Moses beat her so severely that he broke her jaw. *Id.* ¶ 26. Moses also did not temper his behavior around his children. When Corey was only six months old, Moses spanked him one night. *Id.* ¶ 22. Moses similarly spanked Cortné and Coretta when they were babies, to get them to stop crying. Corey Robinson 2012 Aff. ¶ 6.

Thus, when Cortné was born in 1990, he entered a house riddled with violence. At trial, Corey informed the jury that Moses used to beat the children with his hands and his fists. 33 RR 204. Corey testified that he lived in "fear of his anger, fear of his tantrums," and that his father hit them hard and would lock them in their rooms. 33 RR 204. Though not explained at trial, the abuse was frequent, and witnessed by both Corey and Cortné alike. Corey Robinson 2012 Aff. ¶¶ 6-9; Gray Aff. 2012 ¶¶ 22, 27.

But the abuse extended far beyond physical attacks at the hands of Moses. On several occasions, Moses used cars and guns to instill fear in his victims. For instance, Moses, a man prone to jealous rage, once tried to run Donnetta over because he thought she was seeing another man. Gray 2012 Aff. ¶ 22. Another time, Moses grabbed a shotgun from the back of his truck and aimed it at Donnetta. Corey Robinson 2012 Aff. ¶ 14. Corey, fearing that Moses planned to kill his mother, ran to her and threw himself on her lap. *Id.* And once more, after Coretta was born, Moses lined Donnetta,

Corey and Cortné up against a wall and threatened to kill them with a gun. Gray 2012 Aff. ¶ 27. As Corey and Cortné held onto their mother, crying, Moses pulled the trigger. *Id.* The only saving grace was that the gun was not loaded. *Id.; see also* Ex. 54 at 8 (describing a statement from Donnetta, in which she relayed that "when Cortné was about two and a half years of age, his father 'lined the family up, put one bullet in his handgun, and played Russian Roulette'").

Unfortunately, escape was not an option.  Each time Donnetta tried to seek refuge for herself and her children by living with her grandmother, Ruth, Moses would show up, wreaking havoc. Gray 2012 Aff. ¶ 26; Ex. 54 at 8. Once, Moses even kicked in all of the windows and broke doors.  Gray 2012 Aff. ¶ 26; Ex. 54 at 8. Though they sought help from police, the officers never arrested him. Gray 2012 Aff. ¶ 26.

On November 17, 1993, however, when Cortné was 3 years old, the family finally got a respite from Moses' abuse. That day, Moses was arrested for 1st degree aggravated robbery, when he beat an elderly, disabled man with a phone. Ex. 60 (Moses Robinson Aggravated Robbery Indictment).  Moses was later convicted and sentenced to 30 years in prison. Ex. 61 (Moses Robinson Judgment Guilty Plea). Donnetta divorced Moses in 1997, while he was still prison. Gray 2012 Aff. ¶ 28. Moses was later released from prison in 2003, after serving 10 years of his sentence. Ex. 62 (Moses Robinson TDCJ Certificate of Parole).

Cortné had limited interaction with Moses after his arrest. During the early years of Moses' incarceration, the family visited him a few times. Henery Aff. 2012 ¶ 34. But because those trips always devolved into Moses yelling at Donnetta and the children, they stopped. *Id.* ¶ 34; *see also* 34 RR 226-227, 235-237 (Corey Robinson). During one such visit, Moses even told Cortné that he was not his biological father. Gray 2012 Aff. ¶ 31. After his release, Moses tried to pick up right where he left off, showing up at their home yelling and threatening to kill the family. 34 RR 117 (Coretta Robinson). But after Moses again denied fathering Cortné and Coretta in court to avoid paying back child support,

the family paid him little attention. Corey Robinson 2012 Aff. ¶ 16; *see also* 34 RR 120-21 (Coretta Robinson) (testifying that she was not able to rely on Moses for any financial assistance). Cortné had been entirely abandoned by his father.

### 3.    Repeating the Cycle: A Violent Step-Father (1995-2003)

In 1995, approximately two years after Moses' arrest, Donnetta began dating Roderick Gray. The two married on Valentine's Day in 1999, at which time Corey was in 2nd grade, Cortné was just about to start Kindergarten, and Coretta was about 2 ½ years old. Ex. 63 (MISD Records for Corey Robinson) at 59; Ex. 64 (MISD Records for Cortné Robinson) at 8.

In relative terms, life with Roderick was better than it had been with Moses. Roderick assumed the role of a father figure, developing a special bond with Coretta. 34 RR 122; Coretta Robinson 2012 Aff. ¶ 15. The family was financially stable, and they never had to worry about putting food on the table or paying electricity bills. *Id.* ¶ 14. Roderick ran the house like an authoritarian, which provided a level of structure Donnetta could not provide on her own. Ex. 54 at 9. But that structure came with significant physical and emotional abuse.

Donnetta and Roderick had frequent physical fights, which Cortné, Corey, and Coretta observed. Coretta Robinson 2012 Aff. ¶ 13; Coretta Robinson 2017 Aff. ¶ 7; Ex. 54 at 9; Ex. 65 (Rath Report) at 1. They often yelled at and hit each other. Coretta Robinson 2017 Aff. ¶ 7; Lane Aff. ¶ 18; Coretta Robinson 2012 Aff. ¶ 13. Coretta recalled seeing "Roderick punch her [mother] once[,] . . . when she tried to leave." Coretta Robinson 2012 Aff. ¶ 13. And Donnetta once called the police to report that Roderick had assaulted her, in front of her children, while he was moving out. Ex. 66 (Marshall PD Family Violence Report 9-26-2003). Roderick's abuse also extended to Cortné, who he daily beat with belts and switches, taking pride in maintaining household discipline. Ex. 54 (Huckabee Report) at 9; 33 RR 164, 166 (Roderick Gray) (asserting that while he was present in the home, Cortné "didn't have a choice" whether to be respectful or not").

At times, the violence escalated. Cortné has recollections of extreme violence, many of which involve guns. For instance, when Cortné was approximately seven years old, he, his brother, and sister were in the car. His mother grabbed a pistol, then entered their house to confront Roderick. Cortné heard yelling and a shot fired, and moments later his mother stumbled out of the house. For a minute, Cortné could not tell if she had been shot or Roderick had been killed. During another fight, Cortné saw Roderick beat his mother so badly that he knocked her out. As Cortné watched her head hit the concrete floor, he thought she was dead. And on yet another occasion, Cortné heard Roderick choking his mother and witnessed him push her through a closed bedroom door, breaking the door in half. When Donnetta grabbed a pistol in self-defense, Cortné tried to step in front of her. But Donnetta brushed him aside and the struggle continued. Eventually, Roderick yelled at Cortné and his siblings to get out of the house, which they did. Shortly after, Cortné heard a gunshot from his house. Once again, Cortné did not know if his mother had been killed. Neither neighbors nor police stepped in to assist them when these fights occurred.

In 2003, when Cortné was 13 years old, Donnetta and Roderick divorced. 33 RR 90. After her divorce, Donnetta started drinking seriously again. Lane Aff. ¶ 19. The family's financial struggles returned, and Donnetta found herself juggling multiple jobs and college courses. Gray 2012 Aff. ¶ 35; Gray 2017 Aff. ¶ 19. Amidst all of that, Cortné began to fall through the cracks.

### 4. Early School: A Promising Beginning (1995-2000)

Despite the turmoil at home, Cortné was a bright, quiet child who excelled in elementary school, qualifying for the Gifted and Talented program in April 1995. Ex. 64 at 7. Through third grade, which ended in Spring 2000, Cortné was mostly an A student, with exemplary attendance. Ex. 64 at 8, 16. His elementary school principal, Tony Thomas, described him as a "sharp young man, very interested in doing well." 34 RR 69.

### 5. Late Elementary School and Junior High: A Gradual Decline (2000-2005)

Cortné transferred to Carver Elementary School in 4th grade, a predominantly black elementary school. During this year, his grades first started to decline and his reports included minor behavioral concerns, such as "messing around" and refusing to work on assignments. Ex. 64 at 16, 18. Though very young, Cortné first tried marijuana during this school year at the age of ten. Ex. 54 at 9.

From 2001-2003, Cortné attended Price T. Young Middle School (PTY) for 5th and 6th grades. Ex. 64 at 16. During this period, his grades continued to decline and disciplinary problems accelerated, with Cortné receiving his first in-school suspension in 6th grade. Ex. 64 at 18, 19, 24. Ms. Lula Waskom, a longtime Marshall ISD School Counselor, describes middle school as the transition from a "hand-holding" model in elementary school, to when kids are left to fend for themselves. She explains: Marshall "schools today, and at the time Cortné attended, seem to lack empathy. After children leave elementary school, the village of caring adults that once surrounded them seems to disappear." Waskom Decl. ¶ 23. The transition seems to be particularly difficult for Black students. Former Assistant Principal Tony Thomas testified that black children fall off academically as they age. 34 RR 81-82. During this transition period, Cortné lost a key support system that he had had outside his home. Waskom Decl. ¶¶ 23, 29. Unfortunately for Cortné, what would have been a turbulent, transformative period for any child coincided with turbulence at home: the separation and divorce of his mother and Roderick, the release of his father, Moses, from prison, and his subsequent rejection by Moses, who denied paternity. Ex. 54 (Huckabee Report) at 11.

In junior high, Cortné's struggles grew in the classroom, even as he found success in extracurricular activities. 33 RR 97, 106-108. Cortné played football, basketball, and track, and played the tuba in the school band. 33 RR 97, 106-108 (Donnetta Gray), 210 (Corey Robinson); 34 RR 55 (Bobby Carson). Cortné also participated in a school program for Marshall Jr. High teenagers, in which he submitted samples of his poetry to be published. But he failed 8th grade English. Ex. 64 at 31. This

year also marked the beginning of disciplinary problems for disruptive behaviors, culminating in his removal to an alternative, in-school disciplinary Student Adjustment Center. *Id.* at 37.

### 6.    Cortné's High School Years: A Child Abandoned (2005-2009)

By the time Cortné entered high school, he had been effectively abandoned by the key adults in his life. His biological father Moses had rejected him. Henery Aff. ¶ 36; Gray 2012 Aff. ¶ 31. The only father (abusive) he had ever known, Roderick, had left. 33 RR 90 (Donnetta Gray). His great-grandmother, Ruth, had passed away. 33 RR 78. Corey had gone to college. 33 RR 210 (Corey Robinson). And his mother was too consumed by, and exhausted from, her three jobs and her own schooling to supervise him. Ex. 54 (Huckabee Report) at 11; Gray 2017 Aff.  ¶ 19. What little energy his mother did have left, she spent worrying about getting Corey off to college and keeping Coretta, who was entering her pre-teen years, from getting pregnant. Gray 2012 Aff. ¶ 35; Henery Aff. ¶ 104. Because Cortné was "always so respectful," she did not "really worry about [him] during those years." Gray 2012 Aff. ¶ 35.

Ties to extended family were practically non-existent. Donnetta had a tenuous relationship, at best, with her family. When she had her children, "there were no baby showers, no balloons – no one in her family paid any attention to them." Dawson 2012 Aff. ¶ 14. To her cousins, she was simply "poor and low class." Gray Aff. 2012 ¶ 39. Corey described them as the "black sheep of [his] mother's side" and noted that neither he nor his siblings were "close with [his] father's family, either." Corey Robinson 2012 Aff. ¶ 15. As Donnetta explained: "Moses's mother Jessie never liked me, and we did not see his family much even before he got locked up. Moses would hit me in front of his mother and she would not do anything.  I never kept the children away from Moses's family, though.  His family just wasn't interested in being with the kids." Gray 2012 Aff. ¶ 29.

And unlike his brother Corey or sister Coretta, Cortné did not have anyone he could turn to outside of his home. Corey Robinson 2012 Aff. ¶¶ 22-23; 34 RR 124; Waskom Decl. ¶ 14. Ms.

Waskom, a Marshall ISD counselor, explained that "[w]ithout a mentorship program in place, it would have been very difficult for a young, black man like Cortné to find a positive role model in school or the community. Most of the teachers at Marshall High School are white, and there were very few male teachers." Waskom Decl. ¶ 30.

As it is for so many black children, boys in particular, school became little more than a place of discipline. As Dr. Celeste Henery explains: "Race plays a significant factor in the subjective reading and disciplining of students' behavior in Texas. The disciplining of black boys is greatest among all secondary school students in Texas for minor infractions, like tardiness or absenteeism. . . . The discipline [Cortné] received in school for largely minor infractions undoubtedly played a role in how he related to school and his decision-making process." Henery Aff. ¶ 95. Unsurprisingly, by high school, Cortné was overwhelmingly of the view that educational institutions "did not sincerely care for the well-being and growth of their students." *Id.* ¶ 94. The teachers who defense counsel paraded before the jury during the punishment phase of Cortné's trial only supported his belief. They offered nothing to suggest that they had invested time in fostering Cortné's well-being; rather, they were present only to testify that Cortné was a quiet child who never threatened them. 34 RR 9-10 (Sandra Gerrard), 22-25 (Sandra Sadler), 41-42 (Lori McCoy). Importantly, "[t]here are no documented attempts on behalf of the school to inquire into Cortné's circumstances or emotional state, or to pursue any support for counseling beyond sparse recommendations." Henery Aff. ¶ 98. And the suggestion by Principal Tony Thomas to Donnetta that she seek outside counseling for Cortné to address his possible depression went unanswered because the family could not afford it. 34 RR 71 (Tony Thomas); 33 RR 199-200 (Karen Nesbitt).

Without adult supervision or mentoring, Cortné's life entered freefall. Though once a promising student, by 9th grade at Marshall High School, Cortné barely eked out C's, if that. Ex. 64 at 60. Over the next two years, as his grades declined further, his unexcused absences and tardies

increased, reaching over 35 tardies in each of his 9th and 10th grade years, respectively. *Id.* at 64, 81. In response to his poor attendance and infractions for sleeping in class and disruptive behavior, school officials repeatedly punished Cortné with corporal punishment, detentions, and in-school suspensions. *Id.* at 66-77. Cortné also faced multiple court appearances and fines for his truancies. *Id.* at 152-56. Though Cortné exhibited numerous signs of distress—such as the high frequency of truancies, tardies, and sleeping in class—that should have caused teachers and staff concern, no one at the school attempted any kind of meaningful intervention or provide behavioral or emotional counseling. Waskom Decl. ¶ 24, 27. Such programs simply did not exist. *Id.* ¶ 17.

Had school officials intervened, they would have learned that many of Cortné's issues stemmed from chronic sleep deprivation related to his late-night paper route. Beginning in 1995, Donnetta worked an early-morning paper route as a fourth job. Gray 2017 Aff. ¶¶ 3-6. The children often accompanied her on this route, which had them out of the home from approximately 2:30 a.m. to 6 or 7 a.m. every day. *Id.* ¶¶ 5-16. The children only got one to two hours of sleep at home each night, having to nap in the car during the route. 33 RR 61; Corey Robinson 2017 Aff. ¶ 12; Gray 2017 Aff. ¶¶ 6-9. In addition, Donnetta had three car accidents while working, all the result of her falling asleep behind the wheel, including one in which she hit a pole. Gray 2017 Aff. ¶ 13; Coretta Robinson 2017 Aff. ¶19. Children were in the car during each accident. Gray 2017 Aff. ¶ 13; Coretta Robinson 2017 Aff. ¶ 19. Cortné suffered a laceration to his head and Corey broke his foot. Gray 2017 Aff. ¶ 13; Coretta Robinson 2017 Aff. ¶ 19. Given the hours, Cortné experienced significant sleep deprivation from the ages of 5 to 18, which "produces immediate, deleterious effects on executive functions (i.e., a range of higher-order cognitive abilities that involve the initiation, planning, and regulation of behavior), which alter attentional capacity, problem-solving, moral judgment, and [impulse] control." Ex. 67 (Alfano Sleep Evaluation) at 5. Importantly, the effects of sleep deprivation are 'most pronounced in adolescents and young adults." *Id.* at 3.

Cortné's academic struggles cost him the ability to play sports. Cortné had spent his childhood playing football and basketball and was an accomplished athlete. As one teacher explained, "Cortné was probably the best athlete in the freshman basketball class." 34 RR 56 (Bobby Carson). But in the 9th and 10th grades, Cortné found himself benched due to his poor academic performance. *Id.* at 58. Frustrated that he could not play, Cortné eventually quit, arguably leaving behind his last support system. *Id.*

Without basketball, Cortné had more free time, some of which he spent creating rap music with friends. Raphael Hendrix 2017 Aff. ¶ 10; Ex 68 ( Jernigan 2012 Aff.) ¶ 4; Corey Robinson 2017 Aff. ¶ 19. For Cortné and his friends, rap music served as an emotional release. As Raphael Hendrix, Cortné's long-time friend, explained: "I like rap music for its rhythms and storytelling. It's not because some of the stories are violent; that's just them telling their stories. But some of those stories make sense to me – like broken homes and missing fathers. Some of that stuff happens to us." Raphael Hendrix Aff. ¶ 11.

During this period, Cortné's home life also remained completely unstructured, as Donnetta lacked the parenting skills needed to raise her children. Focused on her college courses and work schedule, Donnetta often left Cortné and Coretta alone, unsupervised. Gray 2017 Aff. ¶ 19; Dawson 2017 Aff. ¶ 12. Without Donnetta's knowledge, the Robinson home turned into an informal homeless shelter for many of Cortné's friends, including individuals with whom he later became criminally involved. Ex. 54 at 12-13. It was the place children went to do "adult" things. Dawson 2017 Aff. ¶ 14. As Helen Dawson explained, "Things you didn't do with your parents you could go over to Donnetta's house and do." Dawson 2017 Aff. ¶ 12. For instance, Donnetta allowed her children to drink and smoke marijuana at will, and occasionally smoked with them. Lane Aff. ¶ 20; 31 RR 103 (Justin Davis).

By 11th grade, Cortné lacked all interest in academics, as his pattern of excessive unexcused absences, tardies, and sleeping in class persisted; his grades also dropped further. Ex. 64 at 93-95. In

April 2008, Donnetta withdrew Cortné from Marshall High School to homeschool him, though no homeschooling took place. Ex. 54 at 10. Around this time, Cortné was suspected in a number of burglaries, all of which involved other teenage boys. The items stolen included, among other things, electronic equipment, liquor, cigarettes, and, at least once, a crate of cereal. Following each arrest, Donnetta posted Cortné's bail. 33 RR 100. Donnetta did seemingly little to punish Cortné, however, following one 2008 arrest, she "attacked him," grabbing and slamming him. Gray 2017 Aff. ¶ 27. Though the frequency of such attacks is unknown, Donnetta acknowledged that she "spanked" and "punched" Cortné, and once threatened to "stab [him] in the hand" with an icepick before she would ever let him hit her. *Id.*

Though Cortné re-enrolled at Marshall High School for 12th grade, he spent the majority of his time at the Disciplinary Alternative Education Program (DAEP) where he failed every class except one. Ex. 64 at 105-08, 151. As Ms. Waskom explains, given the structure of the DAEP, it is not surprising that Cortné "fell through the cracks":

> The DAEP teachers were not focused on teaching; rather, they served more as facilitators who watched over students while the children worked independently on computers. In addition, staff turnover was high, which made it nearly impossible for students to form any kind of meaningful bond with them. []

> To make matters worse, there was no emotional or behavioral counseling or support at DAEP. The program was strictly a form of disciplinary behavioral control, focused on meting out punishment, as necessary. . . . Generally, DAEP staff do not seek to address the underlying causes of many of the children's behavioral issues. There also were not inquiries into a child's goals or plans for the future. In many respects, the DAEP classroom felt more like a place where students served their time, rather than a learning environment.

Waskom Decl. ¶¶ 16-17.

In January 2009, after Cortné turned 18, he withdrew from Marshall High altogether. Ex. 64 at 167. The months that followed were chaotic and reckless. Cortné continued to work his mother's paper route and spend time with other teenagers and young adults who had prior records. Ex. 54 at 12-13, 31; Henery Aff. ¶¶ 101-103. Donnetta did not intervene. She was overworked, emotionally

104

unavailable, and struggling with her own addictions. Henery Aff. ¶¶ 96, 104, 123. In the weeks leading up to the instant offense, Cortné's depression reached a low point, and he found himself battling suicidal ideations alone. Ultimately, Cortné's tumultuous and abusive childhood and parental neglect and abandonment culminated in the tragic events of September 20, 2009.

If Robinson's background and character, which included significant and persistent childhood physical and emotional abuse, had been presented to the jury with expert and lay witness assistance so jurors could have made an informed, individualized determination, there is a reasonable likelihood at least one juror would have voted for life. That counsel presented none of this renders Robinson's sentence unreliable and merits relief. *Eddings v. Oklahoma*, 455 U.S. 104, 111-12 (1982) (a "reliable adversarial process" requires that counsel present to the sentencing jury evidence of "the character and record of the individual offender" to allow the jury to reach a "reasoned moral response" to punishment) (internal quotation marks and citation omitted).

B.   **Trial Counsel's Failure to Investigate and Present Evidence of the Extreme Physical and Emotional Abuse Robinson Suffered Throughout His Childhood Constitutes Deficient Performance**

Under prevailing professional norms at the time of Robinson's trial, "counsel had an 'obligation to conduct a thorough investigation of [Robinson's] background." *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (internal citation omitted); *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (1875) (internal citation omitted); *see also Walbey v. Quarterman*, 309 F. App'x 795, 801 (5th Cir. 2009) (explaining that counsel is bound by "a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history"). "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524 (internal citations omitted). "In assessing counsel's investigation, [a court] must conduct an objective review of their performance, measured for 'reasonableness under

prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Id.* at 523 (quoting *Strickland,* 466 U.S. at 688); *see also Williams*, 529 U.S. at 396 (concluding that counsel's failure to uncover and present extensive mitigation was not a tactical decision when counsel had not thoroughly investigated defendant's background). Specifically, the analysis must focus on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [a defendant's] background was *itself reasonable.*" *Wiggins*, 539 U.S. at 511.

### 1.    Failure to Investigate Childhood Abuse

Despite these well-established norms, Robinson's trial counsel abandoned their duty to investigate the nature and extent of the abuse he suffered throughout his childhood. *Id.* at 524 (admonishing counsel for abandoning "their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"). As a result, defense counsel offered a stereotype of Robinson's life—in which an impoverished family, headed by a single mother who did her best, struggled to make ends meet. Given defense counsel's focus on detailing Robinson's difficult upbringing for the jury, their failure to pursue evidence of physical and emotional abuse "cannot be characterized as the product of a reasonable strategic decision." *Id.* at 526.

Specifically, far from uncovering evidence that suggested "further investigation would have been fruitless," defense counsel were aware of "many red flags [that] . . . would have prompted a reasonable attorney to conduct additional investigation" into the abuse perpetrated by Moses Robinson and Roderick Gray. *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008); *see also Andrus*, 140 S. Ct. at 1883 (finding deficient performance where "counsel disregarded, rather than explored, the multiple red flags"). For instance, trial counsel elicited testimony, albeit brief and grossly misleading, from Corey Robinson, Helen Dawson and Karen Nesbitt related to Moses' physical abuse during the penalty phase. *See* 33 RR 203-05 (Corey Robinson); 34 RR 95-98, 100-101 (Helen Dawson);

33 RR 192-193 (Karen Nesbitt). Though such testimony dramatically underreported the frequency and severity of the abuse, the line of questioning nevertheless indicates trial counsel were aware it had occurred. Further, Dr. Michael Gottlieb, one of the experts with whom trial counsel consulted, explicitly informed counsel that "[b]ased on [his] review of the records, . . . the defense team . . . should conduct further investigation into Robinson's physical and emotional abuse and its traumatic impact on [him]." Ex. 69 (Gottlieb Decl.) ¶ 11. Finally, another expert, Dr. Barry W. Rath, noted that Robinson had observed "a good deal of violence," including frequent physical fights between his mother and Roderick, before diagnosing Robinson with Post Traumatic Stress Disorder ("PTSD"). Ex. 65 (Rath Report) at 1, 3; *see also id.* at 1 (indicating that Robinson "also experienced drive-by shootings and observed violence when his biological father returned from prison and attempted sexual relationships with his mother").[49] A PTSD diagnosis under the DSM-IV required finding the "person ha[d] been exposed to a traumatic event in which" (i) "[t]he person experienced, witnessed or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others," and (ii) "[t]he person's response involved intense fear, helplessness, or horror."[50] Even on its own, such a diagnosis should have prompted a thorough investigation into Robinson's childhood trauma.

Because evidence of Robinson's childhood abuse was consistent with the sentencing strategy trial counsel ultimately adopted—one focused on Robinson's troubled upbringing—they "had every incentive to develop the strongest mitigation case possible." *See Williams*, 542 F.3d at 1340; *see also Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) ("[W]hen 'tantalizing indications in the record'

---

[49] Dr. Rath visited Robinson twice and wrote trial counsel about his conclusions. *See* Ex. 65 (Rath Report). He administered the Minnesota Multiphasic Personality Inventory (MMPI). In his letter to the defense team, Rath stated that he could not glean valid results on this test, because Robinson had an elevated "faking" score. *Id.* at 2. That score could, Rath said, be the result of a "plea for help" or the result of exaggerated or fabricated symptoms. *Id.* However, Rath said he felt comfortable diagnosing Robinson with Post Traumatic Stress Disorder, based on Robinson's experiences as a child. *Id.* at Letter, 3. He also diagnosed polysubstance dependence and adjustment reaction.[49] *Id.* Rath also stated that Robinson "denied guilt," but stated "'he knew it was wrong.'" *Id.*

[50] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision (4th ed. 2000).

suggest that certain mitigating evidence may be available, those leads must be pursued.") (internal citation omitted); *Wiggins*, 539 U.S. at 532 (same). It thus is apparent that counsel's "failure to expand their investigation 'resulted from inattention, not reasoned strategic judgment.'" *See Williams*, 542 F.3d at 1340-41 (quoting *Wiggins*, 539 U.S. at 526).

Moreover, evidence of childhood physical and emotional abuse is exactly the type of information counsel is obligated to pursue under *Strickland. See Porter*, 558 U.S. at 43 ("It is unreasonable to discount to irrelevance the evidence of Porter's abusive childhood"). Such evidence "is relevant because of the belief, long held by society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotations and citation omitted); *see also Eddings*, 455 U.S. at 112 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1982)) (noting that the consideration of the defendant's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death"); *Boyde v. California*, 494 US. 370, 382 (1990) (same). And such evidence of abuse is particularly salient in cases in which the defendant is young. *See, e.g., Eddings*, 455 U.S. at 115 ("[W]hen the defendant was 16 years old at the time of the offense there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant.").

Because trial counsel did not investigate the extent and severity of Robinson's childhood trauma, neither counsel nor the jury could ever appreciate its severity. The first three years of Robinson's life were traumatic. They were characterized by both extreme violence and his parents' drug and alcohol abuse, neither of which the jury heard much about. *See* Corey Robinson 2012 Aff. ¶ 11; Lane Aff. ¶¶ 12-15 (explaining how Donnetta's abuse of crack cocaine and neglect of her children led her to threaten to call Child Protective Services to have the children removed from her home). The testimony that defense counsel haphazardly put on at trial by Corey Robinson, Helen Dawson,

Karen Nesbitt, and Coretta Robinson was incomplete, at best—a fact conceded by the State in closing when they underscored that Donnetta Gray, whose son was on trial for his life, did not say a word about it. 33 RR 83-88 (Donnetta discussing Moses but not the abuse); *id.* at 192-194 (Nesbitt); *id.* at 203-205, 227-229, 235-235 (Corey Robinson); 34 RR 95-98, 103-106 (Dawson); 36 RR 73.

But had trial counsel pursued this investigation, Donnetta would have told the jury that from the time of Corey's birth until Moses' arrest, Moses beat her on a "weekly basis." Gray 2012 Aff. ¶¶ 22, 25. The tiniest things, like watching the wrong television show, could set him off. *Id.* ¶ 25. Moses even beat her while she was pregnant with Cortné and Coretta, going so far as to break her jaw shortly before Cortné was born. *Id.* ¶ 22, 26.

The abuse was also far more serious than anything portrayed at trial. For instance, Donnetta recounted a time when Moses, in a jealous rage, tried to run her over with his car, simply because he thought she was seeing another man. *Id.* ¶ 22. On another occasion, Moses lined Donnetta, Corey, and Cortné up against a wall and threatened to kill them. *Id.* ¶ 27. Moses then, as the children cried and held onto their mother, pointed a gun at them and pulled the trigger. *Id.* Fortunately, it had not been loaded. *Id.*; *see also* Ex. 54 (Huckabee Report) at 8 (detailing a story from Donnetta in which Moses played Russian Roulette with the family). And Corey remembered an instance when Moses had grabbed a shotgun from the back of his truck and aimed it at Donnetta. Corey Robinson 2012 Aff. ¶ 14. In fear for her life, Corey threw himself on her lap. *Id.* Police refused to help and escape was not an option. Gray 2012 Aff. ¶ 26.

Despite what trial counsel conveyed to the jury during trial, the family did not escape from violence upon Moses' arrest. Instead, from the time Cortné was approximately 5, until he turned 13, he simply suffered under a different abuser. Counsel presented no evidence of abuse by Roderick at trial. Yet if counsel had investigated Robinson's trauma, they would have learned that Donnetta and Roderick had frequent physical fights, during which they yelled at and hit each other. Ex. 54 (Huckabee

Report) at 9; Coretta Robinson 2012 Aff. ¶ 13; Coretta Robinson 2017 Aff. ¶ 7; Lane Aff. ¶ 18. Roderick beat Robinson on a regular basis with belts and switches. Ex. 54 (Huckabee Report) at 9. And Donnetta once called the police to report an assault. Ex. 66 (MPD Assault Family Violence Report on 9/26/2003).

But, as with Moses, Roderick's abuse was also severe. On multiple occasions, the fight escalated to such an extent that Cortné did not know whether his mother would survive. Cortné witnessed Roderick knock his mother out and watched as her head hit the concrete floor. He saw Roderick choke her and push her through a closed bedroom door. On two other occasions, Cortné and his siblings waited outside as their mother and Roderick yelled. During the fights, he heard gunfire and, until his mother stumbled out of the house, feared she was dead.

Trial testimony also dramatically downplayed the effect sleep deprivation from Donnetta's paper route had on Cortné and the family. In particular, later-learned evidence showed that the children often only got one to two hours of sleep at home each night, having to sneak naps during the route. 33 RR 61; Corey Robinson 2017 Aff. ¶ 12; Gray 2017 Aff. ¶¶ 6-9.

Because trial counsel did not conduct even a minimal investigation into Cortné's childhood trauma, they were unable to identify, develop and present expert testimony on how sleep deprivation and childhood abuse affects brain development and mental health. In particular, an expert would have been able to explain to the jury how poverty, sleep deprivation and childhood abuse affect brain development, particularly regions of the brain associated with executive functioning and impulse control. Ex. 54 (Huckabee Report) at 17; Ex. 67 (Alfano Sleep Evaluation) at 5.[51] Further, an expert

---

[51] *See also* Richard L. Gaskill & Bruce D. Perry, *Child Sexual Abuse, Traumatic Experiences, and Their Impact on the Developing Brain*, in *Handbook of Child Sexual Abuse: Identification, Assessment, and Treatment*, at 34 (noting that "excessive or protracted traumatic experiences" can result in "new dysfunctional brain patterns influencing the organization and function of higher brain areas"); Laurie MacKinnon, *The Neurosequential Model of Therapeutics: An Interview with Bruce Perry*, 33 The Australian & New Zealand J. of Family Therapy 210, 215 (2012) (discussing how children with complex trauma develop poorly organized cortexes).

could have discussed how diagnoses of major depressive order and PTSD could affect a child's reasoning. Ex. 54 (Huckabee Report) at 15. Ultimately, such experts could have helped explain to the jury how a quiet child who had once excelled in school and on the athletic field, came to be in the Zabokrtsky house that fateful night.

Without such crucial information, trial counsel were not in a position to make any tactical decision with respect to sentencing strategy, namely what information to put before the jury and how to present it. And because they were ill-informed, the sentencing strategy they ultimately chose was unreasonable. A sentencing strategy is, after all, not justified when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." *Sears v. Upton*, 561 U.S. 945, 954 (2010) (internal quotations and citation omitted); *see also Strickland*, 466 U.S. at 690-91; *Wiggins*, 539 U.S. at 522.

### 2. Failure to Develop and Present Expert Testimony Regarding Brain Development and Mental Health

Trial counsel were similarly ineffective in failing to develop and present expert testimony regarding the role of sleep deprivation and childhood trauma on Robinson's brain development and mental health. At the penalty phase, an attorney's duty to follow up on evidence of mental impairment is much broader than at the guilt-innocence phase. *Bemore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015). This is so because, at the penalty phase, such evidence assists the jury in assessing moral culpability and whether mercy should be granted the defendant. *Id.* at 1176. Here, the failure to conduct a minimally adequate life history investigation prevented counsel, not only from identifying relevant expert witnesses, but also from providing any mental-health expert with adequate information on which to conduct a comprehensive psychological evaluation.

Thus, notwithstanding the fact that counsel retained some mental health experts, trial counsel had a duty to explore and exploit Robinson's chronic sleep loss through expert testimony. Ex. 67 (Alfano Sleep Evaluation) at 4-6. As Dr. Huckabee and Dr. Alfano note, chronic sleep loss in an

adolescent can have more deleterious effects than merely causing someone to fall asleep in class. *See* Ex. 54 (Huckabee Report) at 17; *see generally* Ex. 67 (Alfano Sleep Evaluation). Specifically, it can alter the development of certain regions of the brain of particular interest here: namely those that address impulse control and executive functioning. *See* Ex. 54 (Huckabee Report) at 17; Ex. 67 (Alfano Sleep Evaluation) at 2-3. And evidence of impaired brain functioning is mitigating. *See Porter*, 558 U.S. at 37-39 (finding trial counsel ineffective, in part for failing to discover evidence of brain damage that could result in violent or impulsive behavior).

Trial counsel also had a duty to consult and present an expert on childhood trauma and brain development. Such an expert could have educated the jury on how physical and emotional abuse, especially early in life, can delay development further.[52] Similar to sleep deprivation, trauma can prevent the child from expressing his "full potential for self-regulation, relationships, communication, or thinking" and lead to increased behavioral impulsivity.[53]

Counsel can offer no reasonable strategic reason for why they failed to explore how chronic sleep deprivation and childhood abuse –which they knew Robinson suffered from – would impact the development of an adolescent brain. *See Williams*, 542 F.3d at 1340-41. This is because their failure was, in effect, the direct result of their deficient investigation and borne entirely of their lack of knowledge of Robinson's life history. Moreover, their failure is particularly egregious here where, had Robinson been only a few months younger, he would have been ineligible for the death penalty altogether. *See generally Roper v. Simmons*, 543 U.S. 551 (2005).  Courts have repeatedly held that children are less morally culpable than adults because their brain is still developing, particularly the regions that affect impulse control and reasoning. *Id.* at 569; *see also Graham v. Florida*, 560 U.S. 48, 68 (2011); *Miller*

---

[52] *See* Gaskill & Perry, *supra* at 36 (explaining that "[a]lthough traumatic experience may negatively affect the function of an adult, this same experience literally becomes the neural organization for an infant or child's brain," with children "much more vulnerable to trauma during early development).
[53] *Id.* at 36-37.

*v. Alabama*, 567 U.S. 460, 471 (2012).[54] As discussed above, those are the very same regions affected by chronic sleep and trauma, *see* Ex. 67 (Alfano Sleep Evaluation.) at 3; Ex. 54 (Huckabee Report) at 17, rendering Robinson that much more vulnerable to impulsive, child-like behaviors. *See Bemore*, 788 F.3d at 1174 (even if brain damage manifests in more violent behavior, it is mitigating, as it demonstrates defendant is impaired in ability to conform conduct to the law).

Ultimately, "the responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present the information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community." *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 SANTA CLARA L. REV. 1069, 1085-86 (1996)). This, Robinson's counsel, did not do. Because they failed to investigate Robinson's childhood trauma and, as a result, failed to adequately prepare and engage experts to address how sleep deprivation and child abuse affect brain development and mental health, trial counsel rendered deficient performance.

### C.    Trial Counsel's Failures Prejudiced Robinson

But for trial counsel's failures at sentencing, there is a reasonable probability that Robinson would have been given a life sentence rather than a sentence of death. A defendant is prejudiced where there is a "reasonable probability that [he] would have received a different sentence after a constitutionally sufficient mitigation investigation." *Sears*, 561 U.S. at 956 (internal citation omitted). To assess prejudice, the Court "must consider both the 'newly uncovered evidence' presented to the state habeas court, 'along with mitigating evidence introduced during [the petitioner's] penalty phase trial." The court then inquires as to whether the "evidence is so compelling that there [is] a reasonable

---

[54] For additional information on late adolescent brain development, *see infra* Claim XII.

probability that at least one juror could have determined that because of the defendant's reduced culpability, death [is] not an appropriate sentence." *Escamilla v. Stephens*, 602 F. App'x 939, 941-42 (5th Cir. 2015) (per curiam) (internal quotations and citations omitted). Because of trial counsel's deficient performance, the jury did not hear information that was crucial to rendering an individualized sentencing determination as to Robinson's moral culpability, and, in fact, were presented a false and misleading depiction of Robinson's life. *See Sears*, 561 U.S. at 952 (holding that trial counsel's inadequate investigation, which led to a misleading portrayal of petitioner's upbringing, was deficient and prejudicial). This, in turned, prejudiced Robinson.

1.     **Robinson was Prejudiced by Counsel's Failure to Investigate Childhood Abuse**

As a preliminary matter, the fact that trial counsel put on *a* case in mitigation, does not preclude finding that Robinson was prejudiced by their failure to investigate and present evidence of his childhood abuse. The Court has "never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Id.* at 955. Rather, the Court has "consistently explained that the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below." *Id.* Thus, though trial counsel paraded 19 witnesses in front of the jury on Robinson's behalf, subsequent investigation shows that their testimony was either superficial (the many teachers from Robinson's schooling), misleading, or incomplete to such an extent that Robinson was prejudiced. *Id.* at 954 (noting the Court had "found deficiency *and* prejudice in . . . cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase) (internal citations omitted).

Importantly, as discussed in detail above, had Robinson's trial counsel been effective, the judge and jury would have learned harrowing facts about the abuse Robinson suffered throughout his childhood, as well as how such trauma affected his brain development and mental health. This is

114

exactly the 'kind of troubled history [the Court has] declared relevant to assessing a defendant's moral culpability." *Porter*, 558 U.S. at 41 (internal quotations and citation omitted).

However, because trial counsel failed to investigate Robinson's history of abuse, they focused their sentencing mitigation strategy on showing that Robinson had been a good kid who simply took a wrong turn. As counsel Settle explained, they "[t]ried to present a picture of [Robinson's] early life. Tried to present a picture of a kid that was a good kid that basically got off on the wrong track." 1 WRR 132; *see also id.* at 180 (Larison) (noting that they hoped to convey that Robinson was "basically a good kid, good person, had some years and sometimes . . . when things weren't so well, but that – he was worth saving"). In so structuring Robinson's defense, without the benefit of the above-outlined constitutionally-required investigation, Robinson was prejudiced in two key ways.

First, the defense presented such a watered-down version of Moses' abuse that the resulting depiction of Robinson's childhood was grossly misleading. *See, e.g.*, *Walbey*, 309 F. App'x at 802-03 (finding prejudice where the mitigating evidence presented "was substantially incomplete" and "inaccurate in several . . . respects"). The defense did not mention childhood abuse in its opening statement. 33 RR 58-65. Counsel then chose not to ask Donnetta Gray, Robinson's mother, any questions related to Moses' abuse, 33 RR 81-140, a fact later used to devastating effect by the State in closing to discredit the abuse testimony of Corey Robinson and Helen Dawson.

> And I'm going to ask you to remember this one thing. Donnetta Gray got up there and testified to you. Her son was on trial for his life for capital murder, to determine whether he lives or he dies, and not one time did she tell you how bad Moses was as an abusive father, not once. Now, if my child is up there, I'm going to tell you about it. If your child was, you're going to tell them about it. But she doesn't say a word. We hear it from other people who supposedly see things or what she's told them, but she doesn't tell us that.

36 RR 73.

In fact, the first mention of Moses' child abuse was elicited by the State, during Roderick Gray's testimony, an individual who neither witnessed any abuse nor confirmed his suspicions with

Donnetta or any of the children. 33 RR 176, 180-88. Only after Roderick Gray's admission did the defense elicit testimony regarding Moses' abuse from four subsequent witnesses, Corey Robinson, Helen Dawson, Karen Nesbitt, and Coretta Robinson. *See* 33 RR 192-93 (Nesbitt); *id.* at 203-06, 225-28, 235-37 (Corey Robinson); 34 RR 95-98, 100-05 (Dawson); 33 RR 116-19 (Coretta Robinson). Their testimony, however, was mainly "general and conclusional," *see Walbey*, 309 Fed. App'x at 803, and, in the case of Ms. Nesbitt, devoid of a first-hand account of physical abuse. 33 RR 192-93 (describing how she "knew something was going on" but "didn't actually see it").[55] Moreover, both Ms. Dawson and Coretta, in their brief testimony, downplayed the severity of the abuse and/or its effects. For instance, Coretta, after describing an incident with Moses following his release from prison in which he went to their house, "screaming and yelling, banging on the door, . . . [and] making threats towards Corté," suggested that no one called the police because she "honestly didn't think it was that serious." 34 RR 116-19.  Ms. Dawson, likewise, when asked why she never reported Moses' abuse to the police, responded that she was "trying to be a good friend," but that, in any event, the abuse did not last long and the children were young. 34 RR 98. In closing, the defense then referenced the abuse only briefly, during which defense counsel himself voiced aloud the uninformed notion that an argument could be made that the children were too young to have been affected. *See* 36 RR 36-45 ("And even if we could say, well, the kids were young, they didn't see this or that, Ladies and Gentleman, I'm telling you, I grew up in that kind of environment.").

The information uncovered during the post-conviction investigation of the frequency and severity of Moses' abuse, as outlined above, is dramatically different in kind from that presented during Robinson's trial. Thus, Ms. Dawson's and Corey's testimony failed to communicate to the jury the "bloodcurdling" facts of Moses' abuse. *See Walbey*, 309 F. App'x at 803 (noting that the testimony

---

[55] Of further concern, neither witness was prepped in advance of their testimony, and thus did not know what questions they would be asked or what to expect. Dawson 2012 Aff. ¶ 2; Corey Robinson 2012 Aff. ¶ 2. Corey also indicated that because of this, he felt "extremely nervous" on the witness stand. *Id.*

about the Child Protective Services' rating could not "be expected to have communicated to a jury the bloodcurdling facts of his upbringing"). Had the jury received an accurate portrayal of the trauma Robinson suffered from an early age, there is a reasonable probability that at least one juror would have voted for life.

Second, to make matters worse, the version of Robinson's life history the jury did hear omitted any discussion of abuse by Roderick, a fact that the State quite successfully used against Robinson to bolster their case in aggravation. Specifically, throughout the punishment phase, Roderick was portrayed as a "wonderful influence," with whom "life was good." 36 RR 39. Consequently, when defense counsel later tried to make the argument in closing that lack of structure and lack of a father figure was to blame for Robinson's downfall, 36 RR 36-45, 49-50, they provided the State an easy counter. And the State jumped on it, arguing: "We talk about no structure, no father figure. From the time he was 5 until the time he was 15 [sic], he had structure and a father in his family, the time when he's developing and learning and knowing right from wrong." 36 RR 73.

But this portrayal of Roderick could not have been farther from the truth. During post-conviction investigation, and discussions with individuals who were all available at the time of Robinson's trial, we have learned that the family escaped one abuser only to fall into the hands of another. *See* Coretta Robinson 2012 Aff. ¶ 13; Coretta Robinson 2017 Aff. ¶ 7; Lane Aff. ¶ 18; Ex. 54 (Huckabee Report) at 9. And as previously outlined, the abuse was frequent and, at times, severe. Coretta Robinson 2012 Aff. ¶ 13; Coretta Robinson 2017 Aff. ¶ 7; Ex. 54 (Huckabee Report) at 9.

This misleading portrait of the years Robinson spent with Roderick was made even worse by counsel's decision to portray school as a source of normalcy in Robinson's life. This is so because the schools consistently failed to intervene as his life careened towards disaster. *See*, *e.g.*, Waskom Decl. ¶¶ 24, 27 (noting that the frequency of Cortné's truancies and tardies, and his sleeping in class, should have caused teachers concern). At the end of the day, Marshall schools were places of punitive

discipline for Cortné, not educational institutions. *See* Waskom Decl. ¶¶ 20, 30; Henery Aff. ¶¶ 94-95, 98 (finding "no documented attempts on behalf of the school to inquire into Cortné's circumstances or emotional state, or to pursue any support").

Though counsel were aware, at the time of trial, of allegations of abuse by Roderick, they did nothing to correct this false impression, instead choosing to present a false narrative that portrayed Roderick as a savior-figure through subsequent testimony. *See* 33 RR 89-90, 97, 116, 195-96, 206-07; 34 RR 110-111; *see also Walbey*, 309 Fed. App'x at 803 (finding prejudice where counsel failed to correct inaccurate testimony that presented a "seriously distorted view of his [client's] childhood"). Thus, Robinson was prejudiced not only by trial counsel's failure to present such compelling mitigation, but also by their choice to present a mitigation narrative not based in fact that did little more than strengthen the State's aggravation case. *See Andrus*, 140 S. Ct. at 1881 ("Due to counsel's failure to investigate compelling mitigating evidence, what little evidence counsel did present backfired by bolstering the State's aggravation case."). Had counsel conducted the constitutionally-required investigation, and uncovered and presented such strong evidence of childhood trauma, it is likely at least one juror would have concluded that Robinson deserved mercy. Jurors, after all, deliberated at length on the appropriate sentence in this case.

### 2. Robinson was Prejudiced by Counsel's Failure to Develop and Present Expert Testimony Regarding Brain Development and Mental Health

Because of trial counsel's deficient investigation, Robinson was further prejudiced by their failure to develop and present expert evidence regarding the powerful effect chronic sleep deprivation and his childhood trauma had on his brain development and mental health. To be sure, counsel consulted with two experts who reviewed trial counsel's files, Dr. Rath and Dr. Gottlieb, in order to consult on psychological issues. However, neither psychologist was provided with the full factual picture of Robinson's traumatic upbringing. Indeed, Dr. Gottlieb—despite being retained to answer a "narrow" consultation question—insisted that counsel conduct further investigation of Robinson's

life history and then retain a qualified psychologist. Ex. 69 (Gottlieb Decl.) ¶¶ 11, 16. What is more, notwithstanding the incomplete picture of Robinson's upbringing that counsel provided him, Dr. Rath identified that Robinson "is a young man who comes from a home environment marked by violence and conflict which provides the "background for post-traumatic stress disorder." *See* Ex. 65 (Rath Report) at 6. Dr. Rath's report was an "abbreviated summary," however, and did little to explain the nature of Robinson's post-traumatic stress disorder or how such a trauma would have affected his functioning at the time of the offense. Ex. 65 (Rath Report) at 6.

Fortified with the additional evidence that a competent life-history investigation would have yielded, reasonable counsel would have identified and engaged experts to help develop and present powerful evidence on the impact of sleep deprivation and trauma on mental health.[56] Importantly, such experts could have helped jurors understand how Robinson's difficult upbringing factored into his decision to break into the Zabokrtsky home that tragic night. For instance, Dr. Huckabee could have informed the jury that long-term childhood poverty "has been associated with internalizing problems such as anxiety and depression," as well as with "smaller brain volume in the amaygdala and hippocampus, regions that are critical to successful emotional development." Ex. 54 (Huckabee Report) at 17. In addition, an expert could have detailed how poor sleep and trauma affect adolescent brain development, particularly in those regions responsible for executive functioning and impulse control. *See* Ex. 54 (Huckabee Report) at 17.[57] Such information would have been of particular import here given Robinson's youth at the time of the offense. Specifically, the regions adversely affected by childhood trauma and sleep deprivation are the same regions of the brain that the *Roper* court found

---

[56] Robinson has retained the services of a psychologist specializing in the study of childhood trauma, Dr. John Blackshear, Ph.D., of Duke University. Dr. Blackshear has reviewed Robinson's records but has been unable to complete an evaluation of Robinson due to ongoing restrictions on visitation to the COVID-19 pandemic. As of filing, the Polunsky Unit, where Robinson is housed, continues to impose restrictions on visitation and does not permit experts to conduct evaluations in the room ordinarily reserved for psychological visits. Robinson intends to supplement his petition with the results of Dr. Blackshear's visit as soon as feasible after Dr. Blackshear is able to render an assessment.

[57] *See also* Gaskill & Perry, *supra* at 36-37.

rendered children under 18 less morally culpable than adults. *See Roper*, 543 U.S. at 570. In sum, in addition to the harrowing first-person accounts of abuse, the jury would have heard powerful evidence of the negative impact sleep deprivation and trauma have on the developing brain; instead, no expert took the stand for the defense.

### 3.   Trial Counsel's Failures Individually and Cumulatively Prejudiced Robinson

Each of counsel's failures individually prejudiced Robinson. However, when they are considered cumulatively, the prejudice is clear. Where, like here, counsel's deficient performance so riddled the trial with misstatements and uninformed strategic choices, the court should apply a cumulative *Strickland* prejudice analysis. *See, e.g., White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010) (holding that "[t]he combined prejudicial effect of [multiple deficiencies] has shown that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable"); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("considering whether [petitioner] was cumulatively prejudiced" by counsel's errors and finding prejudice).

The State's case for death was not strong. Robinson was very young. He had been in trouble, but that trouble was concentrated in a relatively short time period and was an aberration from the rest of his life. His behavior, while incarcerated, suggested he would not pose a danger in an institutional setting, *see supra* Claims I, II, III, save for the razor blade incident, which is of questionable evidentiary value as the product of prosecutorial misconduct, as discussed *supra* Claims I, II, and III. Thus, when Robinson's youth, *see infra* Claim XIII, is coupled with the lay and expert testimony regarding his extensive and severe childhood trauma and its enduring effects that would have resulted from a constitutionally-required investigation, his case in mitigation is comparatively strong. *See Wiggins*, 539 U.S. at 534 ("In assessing prejudice, [the court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence.").

The prevailing professional norms in 2011 required, at minimum, that defense counsel attempt through mitigation investigation and evidence to provide the jury with a complete picture of Robinson's life and circumstances so that they could render the constitutionally-mandated individualized sentencing determination. Trial counsel's performance here did not meet this burden, and the cumulative consideration of trial counsel's deficiencies prejudiced Robinson by undermining confidence in his death sentence. Relief should be granted.

> ### D.      Any procedural default of this claim is excused.

Robinson did not present this claim regarding counsel's failure to conduct a reasonable mitigation investigation in his state habeas application. In state habeas, Robinson presented a factually and legally distinct claim that trial counsel had failed to present lay witnesses and call a social historian. *See* 1 SHCR 103-31 (Claim Five). *See Ward v. Stephens*, 777 F.3d 250, 258-59 (5th Cir. 2015). The failure to present this claim was the result of ineffectiveness on the part of state post-conviction counsel. *See supra* Authorities.

## XII.   Trial Counsel Was Ineffective for Failing to Investigate the State's Expert Evidence of Future Dangerousness and Exclude, Impeach, or Rebut that Expert's Testimony.

In Texas capital sentencing, the first special issue the jury must unanimously answer is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). Texas is unique among active death-penalty states in requiring jurors to answer this "speculative" future dangerousness question. *Buck v. Davis*, 137 S. Ct. 759, 776 (2017).

To meet its burden on this question, the State called forensic psychologist Dr. Thomas G. Allen to opine on the likelihood Robinson would commit violent acts in the future. Dr. Allen was permitted to offer highly prejudicial opinions that Robinson was a "psychopath," exhibited "anti-social personality disorder," and posed a "high risk" of committing an act of violence even in a secure prison, based on a haphazard, unreliable method.

Counsel failed in every regard to challenge both the admissibility and weight of Dr. Allen's unreliable testimony.

- Counsel did not obtain Dr. Allen's underlying testing and data in preparation for the sentencing proceeding, and failed to move to conduct a voir dire examination of Dr. Allen under Tex. R. Evid. 705(b) to learn the underlying facts or data before Dr. Allen gave his opinion.

- Counsel did not investigate Dr. Allen's training or methodology, including by reviewing Dr. Allen's readily available prior testimony to mine inconsistencies in his method.

- Counsel failed to insist on a hearing to test whether the State could meet its burden to show by clear and convincing evidence that Dr. Allen's opinion regarding Robinson's long-term future dangerousness properly relied on principles of the field of forensic psychology and was scientifically reliable, under Texas Rules of Evidence 702 and 703, and failed to object to the admission of his testimony.

- For the hearing or cross-examination, counsel failed to develop and present expert testimony from a psychologist actually familiar with the science of risk assessment, who could have testified that Dr. Allen's methods were not supported by the science or consulted with counsel on effective cross-examination.

- Counsel failed to subject Dr. Allen's testimony to powerful cross-examination that would have negated the impact of his opinion.

- Counsel failed to develop and present expert testimony from a mental-health specialist, who would have rebutted Dr. Allen's diagnosis of anti-social personality disorder.

- Alternatively, since counsel did not present a mental-health expert who had evaluated Robinson, counsel should have objected to the State's improper effort to have Dr. Allen testify in rebuttal, since there was no defense expert testimony to rebut.

### A.      Relevant Facts.

Defense counsel filed a motion requesting all reports and data from all State witnesses. *See* 1 CR 13. Neither Dr. Allen's report, nor any data, is among defense counsel's file materials.

In addition, defense counsel filed a motion for a *Daubert*[58] hearing regarding Allen's testimony. *See* 1 CR 134-38. The trial court granted the motion. 5 RR 45. No hearing was conducted. Defense

---

[58] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

counsel Settle testified at the state writ hearing that no hearing was needed, because counsel knew Dr. Tom Allen, and knew he was qualified. *Id.*; *see* 1 WRR 161.

At sentencing, the State promised that Dr. Allen would testify as to "whether or not [Robinson is] going to hurt someone else." 31 RR 20. Yet Dr. Allen did not testify in the State's case-in-chief. After the defense rested its case without presenting any expert testimony, the State called Dr. Allen in rebuttal. 34 RR 137.

Dr. Allen said that risk assessment techniques are "in general" accepted but acknowledged "controversy" about "what is" and "what isn't relevant." 34 RR 140. He suggested that he testified for both defense and prosecution teams from "time to time," 34 RR 139, and said he couldn't recall how many times he had testified about future violence risk assessments in general, 34 RR 142.

In describing his method, Dr. Allen was remarkably informal. First, he said "some of the things" he looks at are "static" factors like age, and "dynamic" factors like "attitudes," and "kinds of violence." 34 RR 142. "Attitudes"—Dr. Allen admitted—were "a little softer in a sense." *Id.* Then, he clarified: his "methodology" consisted of "look[ing] at the violent conduct in the case" to judge "the nature, the quality of the violence at that time, and what it entailed" and then reviewing conduct before and after the offense in question, "looking for both static and dynamic risk factors." 34 RR 143. To make this assessment, Dr. Allen relied upon case history provided to him by the prosecution and his observation of the defense's presentation at sentencing. 34 RR 144-45. Dr. Allen did not interview Robinson.

Next, Dr. Allen said he actually did something different: he scored an instrument called the Historical Clinical Risk Management-20 (HCR-20) and produced a risk assessment. 34 RR 145-46. The HCR-20 looks at 20 factors in determining whether a person poses a risk. *See* Ex. 70 (Affidavit of Stephen Hart, Ph.D.) at 6-7 (describing test); Ex. 71 (Dr. David Self's HCR-20 and PCL-R Scoring

Sheets). After completing the assessment, Allen concluded that Robinson presented a "high" risk for continuing acts of violence "in whatever society he's in." 34 RR 159.

In his testimony, Dr. Allen addressed some of the instrument's factors, but not others. He said he found no evidence of mental illness in Robinson's history. Specifically, he said there was no indication in the records of "mental retardation" or "neurological or fetal alcohol syndrome." 34 RR 147. In addition, Allen testified that "there's no psychiatric disorder in terms of, you know, schizophrenia, mood disorders, bipolar disorders." *Id.* at 148.

Dr. Allen did find evidence of a personality disorder—another factor included on the instrument. *See* 34 RR 150; Ex. 71 (Scoring Sheets). Specifically, Allen believed that Robinson has Antisocial Personality Disorder (ASPD). 34 RR 150. Allen said there was "pretty obviously evidence of antisociality and antisocial personality" that is "probably pretty severe, probably a level of psychopathy, which is a more severe form of the disorder." *Id.* When asked whether a personal interview was required to make an ASPD assessment, Allen said "the nature of the evidence I got, there was a lot of pretty good clinical observation, especially the video in the police car." *Id.* Robinson's behavior in the squad car was especially important, Allen said, because "when someone tends to be without conscience … there are going to be issues." *Id.* at 152. When Allen viewed the videotape from the squad car, he observed "clinically" that Robinson was callous and without remorse. *Id.* at 153.

In Dr. Allen's view, Robinson posed a risk of future danger for another reason, because the kind of violence Robinson employed in committing his offense was qualitatively different from other kinds of violence. Allen compared what Robinson had allegedly done—killed for money—with violent acts such as killing an enemy at war or defending one's children. *Id.* at 154-55. That a defendant used "instrumental" violence, Allen said, is significant because it's "willful." *Id.*

On redirect examination, Dr. Allen went further and added yet another instrument to his methodology. He testified that he had scored an instrument called the Hare Psychopathy Checklist-

Revised (PCL-R) to determine whether Robinson could be characterized as a psychopath. *Id.* at 170-71; *see* Ex. 70 (Hart Report) at 4-5 (describing test). Allen concluded that Robinson scored a 33 on the psychopathy instrument, which he testified was high. 34 RR 174. A score of 33 made it more likely Robinson was not only a psychopath, but a "severe" psychopath, who had a greater likelihood of reoffending and being violent. *Id.* at 173-74.

On recross, Dr. Allen said he was unaware of tests suggesting that results on the Hare test were heavily influenced by which party hired the expert. *Id.* at 176. However, he said, he would not be surprised by such a bias, which he called "subtle." *Id.*

Robinson's counsel did not call a mental health expert or an expert on future dangerousness. The team hired Dr. Barry Rath to perform a neuropsychological evaluation. Dr. Michael Gottlieb was hired to consult on the issue of adolescent brain development. Gottlieb Decl. ¶ 4. Only Dr. David Self advised counsel on the issue of future dangerousness. *See* 1 CR 257; *see also* 1 WRR 184.

Dr. Self did not visit Robinson. *See* 1 WRR 198. He, however, scored both an HCR-20 and a PCL-R for him.[59] *See* Ex. 71 (Scoring Sheets). Self scored Robinson as a 21 on the psychopathy instrument, 12 points lower than did Dr. Allen. *Id.* He totaled 15 points on the HCR-20, but did not provide a final score, likely because he was unable to answer one of the questions—how Robinson had done on supervision.[60] *Id.*

In its closing argument at sentencing, the State relied heavily on Dr. Allen's conclusions about Robinson. It reminded the jury that Allen had testified that Robinson's behavior was "consistent with antisocial personality disorder, juvenile onset, that Cortné Robinson's behavior [was] consistent with psychopathy," and that Robinson used "violence as a means to obtain a goal without guilt or remorse

---

[59] The instruments were found in trial counsel's discovery, provided by attorneys who represented Robinson in his state habeas proceedings. They were not introduced at the state writ proceedings.

[60] Although Self was not called to testify at sentencing, he was apparently in the courtroom during Allen's testimony. *See* 1 WRR 199.

or empathy for those that he injures." 36 RR 19. During its deliberations, the jury requested to see the "evidential report submitted on Dr. Allen's findings," but, because it was not in evidence, the judge did not provide any report. 36 RR 76.

### B.    Counsel failed to investigate Dr. Allen's methodology and training.

Robinson's defense counsel were ineffective in their handling of future dangerousness. *See supra* Authorities. Counsel's conduct violated their duty to conduct a thorough investigation of the evidence that the State intended to use to prove future dangerousness.

Counsel failed to take the most preliminary steps to investigate Dr. Allen, his methodology, or his training. Counsel's files reveal no sign that they reviewed Dr. Allen's curriculum vitae, list of prior testimony, or trainings, all of which were available to them. *See* Ex. 72 (Curriculum Vitae of Dr. Thomas G. Allen); Ex. 73 (List of Forensic Psychological Experience for Dr. Thomas Allen). Moreover, counsel failed to ensure disclosure of Dr. Allen's testing and underlying data. "Effective cross-examination of an expert witness," the Advisory Committee on the Federal Rules of Civil Procedure recognized, "requires advance preparation." Notes of Advisory Committee on Fed. R. Civ. P. 26(b)(4), 1970 Amendment. "The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand." *Id.* Counsel requested—and were granted—access to these materials. Yet counsel inexplicably failed to pursue these essential disclosures before trial. As a result, counsel were operating on a mere hunch about Dr. Allen's opinion, testing, and methods.[61]

### C.    Counsel failed to insist upon a hearing to test the reliability of Dr. Allen's testimony on the subject of long-term future dangerousness.

---

[61] Undersigned counsel has requested that counsel for Respondent—in his capacity as Attorney *Pro Tem*—search the State's file for materials from Dr. Allen. However, due to the pandemic, counsel for Respondent has been unable to travel to Marshall to take possession of and examine the file for this information. Robinson intends to supplement with any responsive information that the State's search produces.

Defense counsel neither pressed its request for a hearing regarding the reliability of Dr. Allen's expert opinion nor objected to the testimony, although there were ample bases for doing so. Trial counsel's failures amounted to ineffective assistance of counsel.

Texas law provided clear rules for excluding expert testimony on future dangerousness. Texas adopted the standards enunciated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), in interpreting its evidentiary rules for the admission of expert opinions. *See* Tex. R. Evid. 702, 703, 705. *Daubert* requires a judge to "act as a true 'gatekeeper' when addressing the reliability and relevance of expert testimony." *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010) (citing *Daubert*, 509 U.S. at 589-92). Texas Rule of Evidence 702 requires the proponent of testimony—here, the State—to show by clear and convincing evidence that the testimony has scientific reliability and is "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 590).

Texas courts use four "general observations" to "guide the inquiry into scientific reliability: (1) falsifiability; (2) peer review and publication; (3) the existence of methodological standards, including the error rate; and (4) general acceptance within the relevant scientific field." *Id.* at 273 (citing *Daubert*, 509 U.S. at 593-94). "To be considered reliable, evidence from a scientific theory must satisfy three criteria: '(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question.'" *Id.* (quoting *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)).

The relevant question for Dr. Allen's testimony was not whether Allen was minimally qualified to offer an expert opinion, whether the field of forensic psychology was itself legitimate, or even whether risk assessment techniques *generally* are valid within forensic psychology. The critical question that counsel unreasonably failed to raise was whether Dr. Allen properly applied the accepted

principles of forensic psychology, "as far as those principles apply to the prediction of long-term future dangerousness" in prison. *Id.* at 274.

The opinions of leading experts in Dr. Allen's field show that Dr. Allen's risk assessment method was error-prone and lacked scientific rigor as applied to this subject. Dr. Allen's method placed significant weight on his subjective assessment of a range of features such as "attitude" and "personality" that he assessed without clinical rigor. Dr. Allen then applied psychological instruments to a context—predictions of the likelihood of future violence in capital sentencing—in which those instruments were known to be unreliable. His explanation of his method in a prior capital sentencing captures his idiosyncratic method:

> I try to line up the factors that are most relevant to assessing risk. And of course, history is a biggy. Sort of picture in your mind if you got A + B + C = 6. And let's say you find out that A is the history and its value is 3. Well then you've still got three points to account for. Well, the Hare might be in there, too. I can't give you an absolute number, but let's say the Hare is weighted as a 2 for its predictive power then you've got 3 +2 and then C would be 1 for some other factor. Well there's more factors than that, but basically that's what I do.

Ex. 80 (Testimony of Dr. Thomas Allen, *State of Texas v. Robert Roberson*, Feb. 13, 2003) at 129.

Dr. Daniel Murrie has provided an affidavit setting forth what would have been widely available information at the time of Robinson's sentencing. *See* Exhibit 74 (Affidavit of Daniel Murrie, Ph.D.). Murrie is a licensed psychologist and the Director of Psychology at the University of Virginia's Institute of Law, Psychiatry & Public Policy. *Id.* at 1-2. Murrie trains psychologists and psychiatrists in administering forensic evaluations. *Id.* He conducts them himself. *Id.*[62]

According to Dr. Murrie, a risk assessment must "always identify the relevant context and convey clearly the context considered." *Id.* at 2. For a capital defendant, the obvious context is prison. *Id.* at 3. By 2010, "[m]any courts h[ad] explicitly recognized that violent risk assessments in capital cases are specific to the prison context when parole is not an option." *Id.* But, even when the courts

---

[62] Dr. Murrie's extensive qualifications are set out in his report. *See* Murrie Aff. at 1-2.

will not acknowledge that fact, Murrie states, "evaluators must." *Id.* "The vast majority of violence risk assessments at capital sentencing must consider only the prison context. Thus, there is never a scenario in which a violence risk assessment for capital sentencing would address risk of violence in the community in the *near* future." *Id.* (emphasis in the original).

Dr. Murrie notes that, in this context, risk assessment has little value. This is so because "the base rates of serious violence are far different in prison than in the community." *Id.* at 4. And, the risk factors for violence are different in prison than they are in the community." *Id.* Thus, assessment of risk for capital sentencing "must consider different data than assessments of violence risk for offenders returning to the community." *Id.*

In light of these facts, well known to the academic and legal community at the time of Dr. Allen's testimony, Allen's testimony was unscientific and unreliable. *See United States v. Taylor*, 320 F. Supp. 2d 790, 794 (N.D. Ind. 2004) ("[D]ue to the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings, the Government and any of its experts is prohibited from utilizing this test in evaluating [the defendant]."); *Daubert*, 509 U.S. at 594 (holding theories that have not been widely accepted may be viewed with skepticism) (citations omitted). Indeed, Dr. Murrie emphasizes, "*the relevant scientific and professional literature specifically warns evaluators and attorneys against considering the exact data sources that Dr. Allen emphasized.*" *Id.* at 8 (emphasis in the original). Specifically, regarding the reliability (or relevance) of risk assessors in capital cases, Murrie points to the following improper testimony.

- Linking ASPD to a risk of violence in a capital sentencing was "widely recognized as misleading and professionally inappropriate."

- Using the PCL-R in a risk of violence assessment at a capital sentencing was "widely recognized as misleading and professionally inappropriate, and potentially unethical."[63]

---

[63] Dr. Murrie notes that "relevant literature often and explicitly warned evaluators against using the PCL-R in capital proceedings." *Id.* at 11. This opinion is supported by that of another expert, Dr. John Edens, a professor of psychology at

- Using the HCR-20 in a risk assessment at capital sentencing "was widely recognized as lacking scientific basis and therefore professionally inappropriate."

*Id.*; *see generally* Ex. 70 (Hart Report).[64]

Dr. Allen's testimony about psychopathy was objectionable for an additional reason: it was well-established by the time of Robinson's trial that different trained experts gave very inconsistent scores using the instrument in adversarial settings like death-penalty trials, depending on which side retained the expert. According to Dr. Allen, by his reckoning, Robinson had a score of "33" on the psychopathy scale, which indicated "severe" psychopathy. An instrument in defense counsel's possession at the time could have challenged this evidence. Their own expert, Dr. David Self, put Robinson at a 21 on the PCL-R, far below Allen's estimated 33.[65] The difference between the two scores is concerning. *See* Ex. 75 ¶ 21. Studies of the PCL-R have revealed that scores on the instrument are unreliable because they vary depending on who is giving them: prosecutorial witnesses tend to give higher scores; defense witnesses tend to give lower ones. *Id.*[66]

The problem, Edens continues, gets worse: some studies show that "even examiners who are employed by the same 'side' of a case (and examiners who are independently appointed) may give markedly different scores" on the tests. *Id.* at 6. These results suggest subjective considerations are being brought to bear: "the scores themselves are to some extent a function of the expert conducting

---

Texas A & M, who has studied forensic assessment and written on the subject, and who is the co-author of a common instrument used to identify mental health problems in prison inmates. *See* Ex. 75 ¶ 5.

[64] Recently, a group of psychologists, including Drs. Murrie, Hart, and Edens, issued a "Statement of Concerned Experts," in a leading journal of forensic psychology, stating that "one cannot use the PCL–R in the context of capital sentencing evaluations to make predictions that an individual will engage in serious violence in high-security institutional settings with adequate precision or accuracy to justify reliance on the PCL–R scores." David DeMatteo, et al., *Statement of Concerned Experts on the Use of the Hare Psychopathy Checklist—Revised in Capital Sentencing to Assess Risk for Institutional Violence*, 26 Psychol., Pub. Pol'y, & L. 133 (2020).

[65] It is true that Self did not score one question (whether Robinson was a juvenile delinquent), but even if he had scored that as a 2 (the highest score possible on an individual item), he would have ended up scoring Robinson with a total score of 23—ten points below that given by Allen. This test, administered in this way to this individual, was not an effective measuring tool.

[66] Although Dr. Allen testified he was unaware of these bias studies, he said the difference in results is "subtle." Dr. Edens noted that "subtle" "fails to reflect the very large magnitude of differences across examiners seen in the published research at that time—and in this specific case." Edens Aff. at 8.

the assessment rather than simply being an objective assessment of the 'true' level of psychopathy exhibited by the defendant." *Id.* Studies suggest that more than 30 percent of the variability in PCL-R scores can be explained by the identity of the examiner. *Id.*

Dr. Allen's testimony was objectionable for other reasons. First, Allen did not interview Robinson personally. *See* Hart Aff. at 9.[67] Dr. Stephen Hart's doctoral thesis dissertation supervisor was Robert Hare, the author of the PCL-R. Hart stated in his attached affidavit that Allen did not have sufficient information from the records to score the instrument without a personal interview. *See id.* In addition, likely because Allen did not visit or talk to Robinson, many of the items appeared to be scored based primarily on Robinson's offense, rather than his overall lifestyle and history, which Dr. Murrie calls a "common error in PCL-R scoring." *See Ex 76* Murrie Aff. at 14 n.14. And, as Dr. Hart noted, use of the PCL-R is problematic with young people, because (i) that instrument "expects that the person being evaluated" has had sufficient experiences to produce reliable scores on individual questions such as whether remediation has been successful and (ii) the adolescent personality is "in a state of flux." *See id.* at 10 n.22.

Further, given the record that he had to review, it is difficult to see how Dr. Allen could have arrived at any score with any reliability. For example, one of the questions asked on the HCR-20 is whether the defendant has a major mental illness. Robinson, who was 18 at the time of his arrest and had an impoverished childhood, had never been seen by mental health professionals at the time of his sentencing. The HCR-20 also asks whether the defendant suffers from lack of insight, has been unresponsive to treatment, or makes plans that lack feasibility. Robinson had not been asked to display insight or explain any plans he may have had. And, of course, Robinson had never received meaningful "treatment" for his problems, so Dr. Allen could not assess how responsive he had been to treatment.

---

[67] While Dr. Allen told the jurors they should know he had not seen Robinson personally, he did not tell them why or what effect that fact may have had on his results.

As with the HCR-20, the PCL-R included questions that Robinson's case history and record simply could not answer. For example, whether Robinson was glib or exhibited superficial charm could not be gleaned from this record. *See* Ex. 70 (Robinson's Test Scores). The recordings of Robinson were wholly inadequate for that purpose: they displayed Robinson under once-in-a-lifetime, stressful, circumstances, not in a situation in which he might be called upon to use a personality trait for nefarious purposes. In addition, there was no evidence regarding Robinson's sexual behavior. *Id.* And, as explained above, there was no evidence regarding Robinson's future plans, or whether any plans he had were realistic. *Id.*

The professional opinions of Drs. Edens, Murrie, and Hart represent the widely accepted view of psychologists in their field. Counsel could have easily consulted with and presented testimony from one of these psychologists at a *Daubert* hearing or in cross-examination. *See* Ex. 77 (Hart Suppl. Aff.); Ex. 78 (Murrie Suppl. Aff.); Ex. 79 (Edens Suppl. Aff.).

What is more, counsel should have been aware that many of the exact features of Dr. Allen's self-professed method had already been rejected as unreliable by the Texas Court of Criminal Appeals. In its 2010 decision in *Coble*, the Court of Criminal Appeals held that the expert future dangerousness testimony of forensic psychiatrist Dr. Richard Coons should have been excluded as unreliable. *Coble*, 330 S.W.3d at 279-81. The CCA criticized Dr. Coons's use of "subjective" criteria to assess future dangerousness, including the defendant's "attitude toward violence," the undefined role past conduct played in predicting future conduct, the role of "personality and behavior," and his emphasis on "conscience." *Id.* at 271-72, 278-79. The Court also disapproved of the fact that Dr. Coons relied "entirely upon the documentary materials given to him by the prosecution," not "any psychiatric assessment of appellant" or "any psychological testing" generated since a previous evaluation nearly two decades earlier. *Id.* at 279.

In strikingly similar testimony, Dr. Allen emphasized Robinson's "attitude" toward violence which he characterized as "instrumental," 34 RR 142, 154,[68] his anti-social personality, *id.* at 150-53, and his lack of conscience, *id.* at 152. Like Dr. Coons, Dr. Allen drew his testimony from documentary evidence alone, not from a clinical evaluation. Like Dr. Coons, Dr. Allen's discussion of the different factors "blend and overlap." *Coble*, 330 S.W.3d at 272. Dr. Allen haphazardly unveiled his method, failing even to address his use of the PCL-R in his direct examination. Like Dr. Coons, Dr. Allen cited no literature to validate his methods or other experts who use his methodology. *Id.* at 277-78.

Further, although Dr. Allen relied on Dr. Robert Hare himself to support his view that the PCL-R was "very reliable" and "validated" in prisons, Dr. Hare has repeatedly acknowledged misuses of the instrument and cause for concern in criminal sentencing.[69] Dr. Hare has also recognized that a larger number of trained evaluators in simulated field settings perform unreliably—that is, more often than not give scores outside the standard error of measurement (+/-3).[70]

Counsel had an obligation to investigate the methods Dr. Allen planned to use. Because counsel failed to take even preliminary steps to gather information on Dr. Allen's method and training, his opinions, or the underlying data and facts on which he formed those opinions, counsel were not

---

[68] One of the factors he identified as rendering Robinson a future danger was the nature of his criminal acts. Robinson's violence was instrumental, which is "more problematic in assessing criminal behavior." 34 RR 154. It was "the use of violence or the threat of violence to obtain a criminal goal." *Id.* "Reactive violence"—or, in Dr. Allen's view, violence that is less problematic "in assessing criminal behavior"—is violence "where, you know, say I'm at war and you're the enemy and you're coming at me, and I know you're there to kill me because I'm your enemy, and so my capacity to kill you is there. . . . Or, if I think you're a threat to my children, I have the capacity for violence in that situation." *Id.* Neither type of violence Allen compared "instrumental violence" to is unlawful. Citizens not only have the right to kill in war; they can be compelled by their government to do so. And, killing in defense of others is legally defensible. Allen's testimony essentially told the jury that Robinson was a future danger—and thus more eligible for the death penalty than others—because he broke the law in killing someone. If this were the case, of course, the need for a sentencing hearing in a capital case would vanish. Anyone who killed without legal justification could be executed. This is not the law. Defense counsel did not cross-examine Allen on this testimony or attempt to clarify his incorrect assumptions.

[69] *See* Robert Hare, *Psychopathy, the PCL-R, and Criminal Justice: Some New Findings and Current Issues*, 57 Can. Psychol 21, 30 (2016) ("In many cases, the problem is related to limited forensic training and experience, improper use of the PCL-R, failure to keep abreast of the research literature, and the inability or unwillingness of some forensic experts to adhere to established professional and ethical standards of practice.").

[70] *See* Julie Blais, Adelle Forth & Robert Hare, *Examining the Interrater Reliability of the Hare Psychopathy Checklist—Revised Across a Large Sample of Trained Raters*, 29 Psychol. Assessment 762, 771 (2017) (expressing concern that 30% of trained raters scored more than half of study samples outside SEM and noting that, in real-world applications, adversarial bias in criminal sentencing "exacerbates this problem").

able to make even an informed decision about whether to move to exclude Dr. Allen's testimony. *See Strickland*, 466 U.S. at 690-91 ("Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

Counsel's obligation to test the reliability of Dr. Allen's method for assessing Robinson's long-term risk of future dangerousness was not diminished just because Dr. Allen had been previously admitted as a future dangerousness expert in Texas capital cases. "[C]ourts do not 'grandfather in' expert testimony in a particular field or by a particular witness simply because the court has admitted expert testimony in that field or by that witness in the past." *Coble*, 330 S.W.3d at 276 n.56. Indeed, until 2010, the CCA had repeatedly *upheld* the admission of Dr. Coons's testimony in other cases. *See id.* (collecting examples).

### D.    Counsel failed to adequately counter Dr. Allen's testimony.

Even if counsel had failed to *exclude* Dr. Allen's testimony as scientifically unreliable, counsel had a duty to counter Allen's unscientific and unsupported claims about their client.

Counsel's cross-examination did not touch on vast troves of information that could have been used to undercut Dr. Allen's highly prejudicial testimony.

The information that counsel could have used at a hearing to exclude Dr. Allen's testimony altogether, *see supra* Section C, would have been equally powerful as cross-examination. In addition to that, counsel had readily available rebuttal and impeachment information from Dr. Allen's CV and past testimony. For example, counsel could have elicited testimony:

- that, despite his high score on the PCL-R, Robinson was at a far lower risk of committing an act of violence in prison because of the prison environment. *See* Ex. 80 (Roberson Tr.) at .

- that Dr. Allen had consulted and testified for the State far more often than for defendants in capital cases. *See id.* at 118.

134

- that Dr. Allen had not received official training in administering the Hare Psychopathy Checklist from authorized trainers working with the test's founder, Dr. Robert Hare. *See id.* at 124-25; *see also* Ex. 80 (no training after 2003 with Dr. Hare's "Darkstone Group").

- that Dr. Allen had previously used a higher cut-off score for rating psychopathy (30, not 28). *See* Roberson Tr. at 112 ("In capital cases, I use a cutoff of 30."). This is especially significant as Dr. Allen suggested that Robinson's score of 33 indicated a "severe" form of psychopathy. 34 RR 173-74.

- Whether Dr. Allen had ever examined the accuracy of his predictions in his two decades testifying in capital cases.

### E. Counsel failed to develop and present mental health evidence that would rebut or mitigate Dr. Allen's future dangerousness testimony.

Finally, counsel unreasonably failed to develop and present expert mental-health testimony that would have contextualized and rebutted the most prejudicial aspects of Dr. Allen's testimony.

At the center of the State's argument that Robinson presented a future danger were Dr. Allen's unquantified opinions that Robinson had ASPD and that he was a psychopath predisposed to commit acts of violence. Information was available to trial counsel that would have provided a strong counter to these opinions. Dr. Allen testified that his review of the case indicated that Robinson had "severe" ASPD—an assertion trial counsel did nothing to challenge. But that drive-by diagnosis was incorrect at the most elemental level.

In 2017, psychologist Dr. Helena Huckabee reviewed Robinson's records and performed a psychological evaluation.[71] Huckabee interviewed Robinson. *See* Ex. 54 (Huckabee Report) at 20. She also interviewed Robinson's mother, Donnetta Gray, and took a full family history. *Id.* At the conclusion of her review of the records in this case, and her interviews with Robinson and his mother, Huckabee diagnosed Robinson with 1) Complex Trauma; 2) Severe Sleep Deprivation; and 3) Depression. *Id.* at 17, 28-30. Huckabee explicitly ruled out ASPD and, after meeting with Robinson, explicitly concluded that he was remorseful for his conduct. *Id.* at 27.

---

[71] Dr. Huckabee's curriculum vitae is attached to her report. *See* Ex. 54 (Huckabee Report).

**Antisocial Personality Disorder.** Dr. Huckabee rejected Dr. Allen's assertion that Robinson has ASPD. *Id.* at 26–27. She noted that, to meet the diagnostic criteria for ASPD, Robinson must have been capable of being diagnosed with a conduct disorder before he was 15 years old. *Id.* at 27.[72] Huckabee noted that, before he was 15, Robinson's difficulties included sleepiness, tardiness, truancy, and neglecting to wear his school uniform—all school infractions. *See* Ex. 54 (Huckabee Report) at 27. These difficulties "fall far short of the criteria for Conduct Disorder, which is defined by flagrant disregard for the rights of others." *Id.*

In addition, Huckabee found Robinson to be "highly remorseful and full of guilt and self-criticism." *Id.* at 14. Huckabee stated that "[h]owever callous or indifferent Mr. Robinson may have appeared at the time of the crime, he clearly exhibits guilt and remorse now and such a conscience is consistent" with the results on the assessments she made of him. *Id.*[73]

**Major Depression.** Dr. Huckabee's testing revealed that Robinson suffers from major depressive disorder, moderate and recurrent, with anxious distress. *Id.* at 28. Based on Huckabee's interviews, and her review of the records, she opined that his depression has "persisted for many years." *Id.* His loss of interest in sports, sleepiness, marked academic decline, drug use, and interpersonal difficulties may all have indicated teenage depression. *Id.*

Depression is consistent with the Robinson family's history. Robinson's mother, Donnetta Gray, reported that one of her sisters suffers from depression and bipolar disorder. *See* Gray 2017 Aff. ¶ 25. Another sister has tried to kill herself. *Id.* Corey Robinson, Robinson's brother, reported that Donnetta suffered from depression after Cortné's arrest. *See* Corey Robinson 2017 Aff. ¶ 9. Corey

---

[72] *See also* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 645–50 (4th ed. 1994) (Antisocial Personality Disorder) (DSM-IV). Dr. Huckabee referred to the definition found in the DSM-V, which was published after Robinson was convicted and sentenced to death. However, the same criteria are found in the DSM-IV.

[73] Dr. Huckabee also found that Robinson had "surprising insight and reflect about events and his experiences." Ex. 54 (Huckabee Report) at 21. She was "often surprised by the degree of contemplation Cortné exhibited." *Id.* He was, she reported, "polite, cooperative, and [ ] motivated to do well." *Id.*

himself reported symptoms of anxiety and a fear of bad things happening, and received therapy, before his brother's offense, for those symptoms. *Id.* Coretta Robinson, Cortné's sister, suffered depression after her brother's arrest, and tried to kill herself. *See* Coretta Robinson 2017 Aff. ¶ 9-10. And Megan Robinson, Corey's wife and Cortné's sister-in-law, said that there is "a lot of depression in this family…. I think every single one of them has depression and has been suicidal at one time or another." *See Ex 81* Megan Robinson Aff. ¶ 5. Such familial history of depression and bipolar disorder stands in stark contrast to Dr. Allen's testimony at trial that he found no evidence of mental illness in Robinson's history. 34 RR 147.

**Post-Traumatic Stress Disorder (PTSD) and Complex Stress Disorder.** In Dr. Huckabee's view, Robinson also suffers from PTSD and complex trauma, conditions that provide a better explanation for his behavior than ASPD. *See* Ex. 54 (Huckabee Report) at 28. Specifically, her testing revealed anxious arousal and hyperarousal, defense avoidance, dissociation, insecure attachment (relational avoidance and rejection sensitivity), and impaired or reduced self-awareness— all symptoms of PTSD. *Id.*

Trial counsel did not introduce their own expert assessment results—either to counter Dr. Allen's score or to undermine the reliability of the test as it was administered by both experts in this case. Nor did they hire an expert such as Dr. Murrie or Dr. Edens to counter the highly prejudicial "assessments" performed by Dr. Allen—even though ample professional advice and expertise was available to do so at the time of Robinson's trial.

Counsel did not make a strategic decision not to develop this evidence, because counsel had failed to conduct a reasonably adequate investigation into Robinson's background.

### F. Counsel failed to object to the State's improper introduction of expert future dangerousness evidence on rebuttal.

Finally, if counsel did not present an expert of their own, there was simply no excuse for failing to object to Dr. Allen's testimony coming in as rebuttal testimony. A State future dangerousness

expert's "rebuttal testimony is limited to the issues raised by [a] defense expert." *Soria v. State*, 933 S.W.2d 46, 58 (Tex. Crim. App. 1996). The State promised the jury it would hear from Dr. Allen, but if it wanted to keep that promise, it should have offered his testimony in its case-in-chief. When defense counsel failed to offer medical evidence, there was nothing to rebut, and the defense was entitled to keep the door shut on Dr. Allen's testimony. By failing to reject, defense counsel let the sentencing hearing end with evidence that their client was a psychopath. Even without a *Daubert* challenge under Tex. R. Evid. 702, 703, and 705, counsel had ready grounds under state law for preventing that from happening.

### G.    Counsel's ineffectiveness was prejudicial.

There is a reasonable probability that the outcome in Robinson's case would have been different had it not been for trial counsel's ineffective performance. The State's expert testimony on future dangerousness was especially powerful because, due to counsel's other errors, there was no defense expert to provide a counterweight.

There are several indications that Dr. Allen's testimony carried great weight with jurors. The prosecution opened the punishment phase by suggesting that Dr. Allen's opinion would tell the jurors "whether or not [Robinson is] going to hurt someone else." 31 RR 20. Dr. Allen opined Robinson was a "high risk" for committing an act of violence "in any setting." He suggested Robinson was a psychopath—a term that has "the strong likelihood to unduly prejudice jurors against a defendant." Edens Aff. ¶ 13.[74] This stark opinion increased the likelihood the jury would credit it. *See Coble*, 330 S.W.3d at 286 (weighing whether testimony was "particularly powerful, certain, or strong"). The jurors

---

[74] Research suggests that jurors associate the term with fictionalized villains such as Hannibal Lecter, or real-world serial killers. *Id.* And, significantly, the presence of psychopathy in studies involving mock juries increases the support for execution. *Id.* Numerous courts have warned of the unfairly prejudicial effect that psychopathy evidence can have on a capital jury's deliberations. *See, e.g.*, *United States v. Barnette*, 211 F.3d 803, 825 (4th Cir. 2000) (testimony of psychopathy was "damning as it could be" and likely contributed to death sentence); *Stitt v. United States*, 369 F. Supp. 2d 679, 698–700 (E.D. Va. 2005) (psychopathy testimony prejudicial); *United States v. Sampson*, 335 F. Supp. 2d 217, 222 n.27 (D. Mass. 2004) (prohibiting government's expert from using word "psychopath").

appeared to be concerned by it—they specifically requested more information about the support for

Dr. Allen's opinion during deliberations. 36 RR 76.

Moreover, "scientific" expert testimony can have an extraordinarily persuasive effect on

jurors.[75] *Coble*, 330 S.W.3d at 281. The jury heard someone labeled an "expert" with a lengthy list of

credentials and experience state that he had formed an opinion—expressed without doubt—that

Robinson was highly likely to commit criminal acts of violence in the future. Defense counsel offered

no counterweight—let alone expert counterweight—to that testimony. *Cf. id.* at 282, 286 (finding

harmless error because defense expert "effectively rebutted and refuted" State's unreliable expert).

It is especially significant that Dr. Allen's future dangerousness testimony activated

unconscious racial stereotypes that jurors had about Robinson as a dangerous Black man. Specifically,

Dr. Allen testified that someone who behaves like Robinson is "a predator . . . looking for prey." 34

RR 155. He also described Robinson as "hunting for" a victim. *Id.* Dr. Allen's use of dehumanizing

language comparing Robinson to an animal not only suggested that he could not be controlled, but

also drew on invidious racial stereotypes.[76] Thus, without invoking race directly, Dr. Allen's testimony

most certainly "appealed to a powerful racial stereotype—that of Black men as 'violence prone.'" *Buck*,

137 S. Ct. at 776 (quoting *Turner*, 476 U.S. at 35 (plurality op.)). "Research consistently finds that

perceptions of African American men are influenced significantly, and sometimes unconsciously, by

the widespread stereotype that they are intrinsically violent—and that this phenomenon can affect

judgments about their likelihood of future crime and the appropriateness of particular punishments."

Brief of Amicus Curiae Constitutional Accountability Center in Support of Petitioner at 23, *Buck*, 137

---

[75] Citing Joel Cooper et al., *Complex Scientific Testimony: How Do Jurors Make Decisions?,* 20 Law & Hum. Behav. 379, 379 (1996); Jeff Greenberg & April Wursten, *The Psychologist and the Psychiatrist as Expert Witnesses: Perceived Credibility and Influence,* 19 Prof. Psych. Res. & Prac. 373, 378 (1988); *see* C. Robert Showalter & Richard J. Bonnie, *Psychiatrists and Capital Sentencing: Risks and Responsibilities in a Unique Legal Setting,* 12 Bull. Am. Acad. Psych. & L. 159, 165 (1984) (noting that jurors tend to overvalue predictions that confirm their pre-existing beliefs).
[76] *See* Sheri Lynn Johnson, *Racial Imagery in Criminal Cases,* 67 Tul. L. Rev. 1739 (1993) (discussing "portrayals of persons of color as animal-like or subhuman in some other way" in criminal cases).

S. Ct. 759 (discussing social science findings) https://www.scotusblog.com/wp-content/uploads/2016/08/15-8049-CAC-amicus.pdf. Indeed, because of the State's improper argument about rap lyrics, the invocation of the historically Black "west side," Robinson's trumped-up gang affiliation, and defense counsel's prejudicial concession that he was responsible for the rape of an elderly white woman, Robinson's jury was already primed to consider the issue through the lens of Black male dangerousness.

Under these circumstances, the failure to challenge Allen was inexcusable and prejudicial.

### H.   These Claims May Be Reviewed on the Merits, Because Post-Conviction Counsel's Ineffectiveness Excuses Any Failure to Raise Them.

These claims were not raised in Robinson's initial state writ application. They were raised in Robinson's subsequent writ application. The CCA dismissed Robinson's application. Any default of these meritorious claims was the result of ineffective assistance by state post-conviction counsel. *See* Ex. 6 (Post-Conviction Counsel Aff.) ¶¶ 13-18.

### XIII.   Because he was 18 at the time of the offense, Robinson's execution would violate the Eighth Amendment prohibition on cruel and unusual punishment.

Robinson incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Robinson raised this claim in state court.

The Eighth Amendment prohibits "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." *Atkins v. Virginia*, 536 U.S. 304, 311 n.7 (2002); *see also Enmund v. Florida*, 458 U.S. 782, 788 (1982). A punishment's proportionality is determined by the evolving standards of decency, since "the standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (citing *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, J., dissenting)). The Eighth Amendment "must

draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

The concern over cruel and unusual punishment is even more significant when a person's life is at stake. In capital cases, "the Court has been particularly sensitive to insure that every safeguard is observed," because "[t]here is no question that death as a punishment is unique in its severity and irrevocability." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (citing *Furman*, 408 U.S. at 286-91 (Brennan, J., concurring). Under the Eighth Amendment, a death sentence "is excessive when it is grossly out of proportion to the crime" or it does not fulfill the two distinct social purposes served by the death penalty: "retribution and deterrence of capital crimes." *Id.* at 173, 183; *see also Kennedy*, 554 U.S. at 441 (citing *Coker v. Georgia*, 433 U.S. 584, 592 (1977)).

When assessing the proportionality of a death sentence under the Eighth Amendment, "the Court [also] insists upon confining the instances in which the punishment can be imposed." *Id.* at 420. The result has been that the death penalty is only proportionate when used for "'a narrow category of the most serious crimes' and on those whose extreme culpability makes them 'the most deserving of execution.'" *Id.* (quoting *Roper*, 543 U.S. at 568); *see also id.* (recognizing that the death penalty should be reserved for "the worst offenders").

The U.S. Supreme Court has made clear that the Eighth Amendment limits the sentences that may be imposed on children. Recognizing their diminished capacity and culpability, in 2005 the U.S. Supreme Court prohibited the death sentence for juveniles under eighteen at the time of the crime in *Roper*, 543 U.S. at 574-75. Later, in *Graham v. Florida*, it held that children convicted of non-homicide offenses cannot be sentenced to life without parole and must have a "realistic" and "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 74-75. And in *Miller v. Alabama* and *Montgomery v. Louisiana*, the Court established that children must have this meaningful opportunity for release even in homicide cases—except in the rarest of cases where the

141

sentencer determines that the particular. . . child "exhibits such irretrievable depravity that rehabilitation is impossible[.]" *Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016); *Miller v. Alabama*, 567 U.S. 460, 473 (2012). *Roper*, *Graham*, *Miller*, and *Montgomery* are grounded in the belief that youths have reduced culpability and greater capacity for reform, an understanding gleaned in large part from "developments in psychology and brain science [showing] fundamental differences between juvenile and adult minds." *Graham*, 560 U.S. at 68; *see also Miller*, 567 U.S. at 471–72, 472 n.5 (internal quotations and citation omitted).

In its *Roper* decision, the Court recognized that the "qualities that distinguish juveniles from adults do not disappear when an individual turns 18," but it stated nonetheless that "a line must be drawn." *Roper*, 543 U.S. at 574. That line, however, was not drawn in *Roper*, but re-drawn. In *Thompson v. Oklahoma*, 487 U.S. 815 (1988), the Supreme Court held that the death penalty was unconstitutional for offenders under the age of 16. Thus, evolving standards of decency, which must move apace with emerging scientific consensus, compel courts to continue to reevaluate arbitrary rules to ensure that only those who are most culpable and therefore "most deserving of execution" are sentenced to death. *Roper*, 543 U.S. at 568.

Moreover, since "the imposition of death by public authority is so profoundly different from all other penalties . . . an individualized decision is essential in capital cases." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). In general, the effects of brain development in youth twenty-one and under has reached the point of scientific consensus. The medical community has now overwhelmingly determined that adolescents in their late teens and early twenties are more comparable to their younger peers than they are to adults in their late-twenties or older with developed brains. For the same reasons *Roper* extended the categorical bar to all adolescents under eighteen, conformity with Eighth Amendment standards now counsels this Court to apply the constitutional protection to youths twenty-one and under. But this is especially true for those who, like Robinson, have other factors

further delaying their development. Therefore, while an 18-year old should be categorically exempt from execution, under an individualized determination Robinson's execution in particular would violate the Eighth Amendment's prohibition on cruel and unusual punishment.

### A. Evolving standards of decency no longer allow for the imposition of death sentences on people 18 years of age.

The Eighth Amendment's prohibition of cruel and unusual punishment requires that "punishment for crime should be graduated and proportioned to [the] offense." *Roper*, 543 U.S. at 560 (internal quotations and citations omitted). This proportionality principle requires the court to "determine which punishments are so disproportionate as to be cruel and unusual" and limits the death penalty to those who commit "the most serious crimes" and who are "most deserving of execution." *Id.* at 568 (quoting *Atkins*, 536 U.S. at 319). The death penalty is categorically barred for certain groups of offenders if a national consensus develops against executing the particular group, scientific consensus supports a finding of lesser culpability for certain classes of offenders, and if capital punishment fails to serve the purposes of punishment, namely retribution or deterrence. *See, e.g.*, *Roper*, 543 U.S. at 571; *Atkins*, 536 U.S. at 319; *Kennedy*, 554 U.S. at 441; *see also Gregg*, 428 U.S. at 155 (the death penalty is said to serve two purposes, retribution and deterrence).

### 1. National consensus

A national consensus has developed against executing offenders who were under 21 years of age at the time they committed their offense. A review of the laws and practices of the various states demonstrate this. The "'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.'" *Graham*, 560 U.S. at 62 (internal citation omitted). But "[a]ctual sentencing practices are [also] an important part of the Court's inquiry into consensus." *Id.* (internal citations omitted). Upon information and belief, at the time of this writing, twenty-three states, plus the District of Columbia and four United States territories, effectively ban the death penalty. Three additional States have imposed moratoria on executions, and during the last fifteen

years, seven states have demonstrated an actual practice of neither executing nor sentencing to death offenders who were under 21 years of age at the time they committed a capital offense. Added together, there are thirty states plus five additional jurisdictions that bar execution of offenders under 21 years by law or in practice.

Even in those remaining States that authorize the death penalty as a punishment for offenders under 21, executions occur in a minority of the States. For instance, between 2005 and 2017, "only 140 of the 1133 death sentences" handed down "were imposed on youthful offenders and the number of youthful offenders sentenced to death each year has been declining."[77] Further, these youthful offender death sentences were concentrated in just a few jurisdictions, with California (34), Florida (19), Texas (15), Alabama (14) and the Federal government (8) accounting for "64% of all death sentences of youthful offenders since *Roper*."[78] During this same time period, death sentences of youthful offenders were also concentrated in only a few counties. Specifically, of the over three thousand counties in the United States, only seventy-five counties had sentenced a youthful offender to death, with Los Angeles and Riverside, California (a state under a current moratorium on carrying out executions) comprising 15% of all youthful offender death sentences.[79]

In addition, courts in some states have extended the Eighth Amendment protections of *Roper*, *Graham, Miller*, and *Montgomery* to young adults, at least in some circumstances. For example, a Circuit Court in Kentucky declared the death penalty unconstitutional for offenders under 21. *See Commonwealth v. Bredhold*, No. 14-CR-161, Order Declaring Kentucky's Death Penalty Statute as Unconstitutional (Fayette Circuit Court, 7th Div. Aug. 1, 2017) (Scorsone, J.). (The Kentucky Supreme Court later vacated the opinion on justiciability grounds. *Commonwealth v. Bredhold*, 599 S.W.3d 409,

---

[77] John H. Blume, et al., *Death By Numbers: Why Evolving Standards Compel Extending Roper's Categorical Ban Against Executing Juveniles from Eighteen to Twenty-One*, 98 Tex. L. Rev. 2, 20 (2020).
[78] *Id.* at 21-22.
[79] *Id.* at 22-23.

412 (Ky. 2020), *cert. denied sub nom. Diaz v. Kentucky*, 19-8873, 2021 WL 161019 (U.S. Jan. 19, 2021).)
The court reasoned that "given the national trend toward restricting the use of the death penalty for
young offenders, and given the recent studies by the scientific community, the death penalty would
be an unconstitutionally disproportionate punishment for crimes committed by individuals under
twenty-one (21) at the time of their offense." *Id.* (relying heavily on brain science-related testimony to
conclude that the death penalty is a disproportionate punishment for offenders younger than 21
because such individuals are categorically less culpable and have a better chance at rehabilitation); *State
v. Norris*, No. A-3008-15T4, 2017 WL 2062145, at *5 (N.J. Super. Ct. App. Div. May 15, 2017) (internal
quotation omitted) (relying on *Miller* to remand for resentencing a 75-year aggregate sentence imposed
for murder committed by a 21-year-old defendant, reasoning that where the sentence is the practical
equivalent of life without parole, courts must "consider at sentencing a youthful offender's failure to
appreciate risks and consequences as well as other factors often peculiar to young offenders").

Finally, it is not just courts and state legislatures that have recognized that brain development
continues into one's early twenties, particularly in those regions that affect executive functioning and
impulse control. For instance, numerous organizations have released resolutions or statements urging
courts to extend *Roper* exemptions to anyone under 21, including the American Academy of Pediatric
Neuropsychology and the American Bar Association's House of Delegates. *See, e.g.*, Ex. 82 (Am. Acad.
Of Pediatric Neuropsychology Decl., filed in *Guzek v. Kelly*, No. 17CV08248, Circuit Court for the
State of Oregon, Marion County) ¶ 2 (stating there is no "neuroscience to indicate the brains of 18-
year-olds differ in any significant way from those of 17-year olds," as "ongoing maturation of the brain
[continues] through at least age 20").[80] In addition, just this year, the American Association on
Intellectual and Developmental Disabilities (AAIDD) increased the age of onset for intellectual

---

[80] *See also* Lee Rawles, *Ban Death Penalty for Those 21 or Younger, ABA House Says*, ABA Journal (Feb. 5, 2018), *available at*
http://www.abajournal.com/news/article/Ban_death_penalty_for_those_21_or_younger_aba_house_says (last visited
Apr. 5, 2021).

disability from 18 to 22, in recognition of "research that has shown that important brain development continues into our 20s."[81] And numerous state and federal laws have, for years, recognized that adolescents continue to develop in meaningful ways into their early twenties. Specifically, there are over 3,000 laws that restrict what individuals under 21 are allowed to do.[82] Among such restrictions include prohibiting an individual from serving as a Federal Marshal or FBI agent until they are 21 or 23 years old, respectively, and restricting—in almost all cases—the role of officer in any branch of the military to those aged 22 or older.[83] Ex. 83 ("On Neuroscience and the Teen-aged Death Penalty") at 7.

National consensus is clear that, under evolving standards of decency, the execution of any 18 year old is no longer permissible under the Eighth Amendment.

## 2. Scientific Evidence

Based on findings from the medical and scientific community, the Supreme Court held in *Roper* that it is cruel and unusual punishment to impose death sentences on juveniles under eighteen. Given the knowledge about the human brain maturation process then available, the Court's cutoff at age eighteen made sense at the time. As leading researchers in the field have explained, at the time of the Court's decision in *Roper*, available research in 2005 failed to focus on the brain development of late adolescents, and "[y]oung adults between the ages of eighteen and twenty-one constitute[d] a less well-defined category."[84]

---

[81] R.L. Schalock, R. Luckassan, & M.J. Tassse, *Twenty Questions and Answers Regarding the 12th Edition of the AAIDD Manual: Intellectual Disability: Definitions, Diagnosis, Classification, and Systems of Supports*, Am. Ass'n intellectual and developmental disabilities 1, 3 (2018).

[82] *Death Penalty Due Process Review Project: Section of the Civil Rights and Social Justice*, A.B.A. Res. 111 (2018), *available at* https://www.americanbar.org/content/dam/aba/administrative/crsj/policy/2018_mm_111.pdf.

[83] This is particularly important here, where the State in closing argued that the case was about greed and hate, "not about whether [Robinson's] frontal lobe had developed." 36 RR 66-67. As the State explained: "If that's so true, why do we give 18-year-old men semi-automatic and fully automatic weapons and tell them to protect us every day." *Id.*

[84] *See* Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Authority: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 644 (2016).

But scientific research and advances in neuroscience and neuropsychology since *Roper* have led to the finding that many of the same traits possessed by juveniles under eighteen—traits that make them ineligible for the death penalty—also apply to older adolescents in their late teens and early twenties.[85] Ex. 84 (Steinberg Decl., filed in *Guzek v. Kelly*, No. 17CV08248, Circuit Court for the State of Oregon, Marion County) ¶ 17 (explaining that "several aspects of brain development affecting judgment and decision-making are not only ongoing during early and middle adolescence, but continue at least until age 21"); *see also id.* ¶ 33 ("Certainly, there is no scientific evidence to suggest that a meaningful psychological distinction can be drawn between individuals who are nearly 18 years old and those who are between 18 and 21"); Ex. 85 (Robert J. McCaffrey and Cecil R. Reynolds, O*n Neuroscience and the Teen-aged Death Penalty*) at 5 ("There is no clear way to differentiate in clinically or practically meaningful ways the functioning of the brains of 17-year-olds from those aged 18, 19, and 20 in terms of risk taking behaviors [and] the ability to anticipate the consequences of their actions."). In the fifteen years since *Roper*, three major changes have altered the justification for a strict age-eighteen cutoff: (1) scientific research has developed to explain the effects of brain maturation, or the lack thereof, on the behavioral and decision-making abilities of late adolescents in their late teens and early twenties; (2) recent changes in the treatment of older adolescents in the criminal justice system reflect a more informed understanding of late adolescents and the differences between late adolescents and adults with fully-matured brains; and (3) the Court decided *Hall v. Florida*, 572 U.S. 701 (2014), and *Moore v. Texas*, 137 S. Ct. 1039 (2017), which illuminated the interaction between law and science and sought to reduce the "unacceptable risk" that death sentences are imposed on those who lack the requisite culpability. *See Hall*, 572 U.S. at 704.

In particular, the scientific community has since confirmed that individuals who are 18 years old do not have fully developed brains and continue to be vulnerable to risk-taking behavior and peer

---

[85] *See* Blume, et al., *supra*, at 12.

pressure just like their peers who are younger than 18. *See* Ex. 84 (Steinberg Decl.) ¶¶ 9, 17, 18-20; *see also id.* ¶ 30 (noting that "[m]any of the same immaturities that characterize the brains of individuals younger than 18, and that have been found to mitigate their criminal culpability, are characteristic of the brains of individuals between 18 and 21").[86] First, like juveniles, late adolescents demonstrate a lack of maturity," "underdeveloped sense of responsibility," and recklessness that render them less morally culpable than their adult counterparts. *See Roper*, 543 at 569 (internal citation omitted). For instance, as compared to adults, late adolescents are more likely to "underestimate the number, seriousness, and likelihood of risks involved in a given situation," "have more difficulty identifying possible costs and benefits" of given alternatives, and "underestimate the chances of various negative consequences occurring," and the "degree to which they could be harmed if the negative consequences" do occur. Ex. 84 (Steinberg Decl.) ¶ 19. Late adolescents are also more likely to engage in "sensation-seeking" behavior and the pursuit of potential rewards, while simultaneously possessing less ability to control their impulses and consider future consequences of their actions. Ex. 84 (Steinberg Decl.) ¶¶ 20-21.[87] Their deficiencies in judgment and self-control, relative to adults, are even greater in "situations that are emotionally arousing, including those that generate negative emotions, such as fear, threat, anger, or anxiety." Ex. 84 (Steinberg Decl.) ¶ 23; *see also* Ex. 86 (Brief of Amici Curiae In The Fields Of Neuroscience, Neuropsychology, and Related Fields, *Wardlow v. Texas*, No. 19-8712 (June 19, 2020) at 15 ("[T]he effect of being in a charged emotional context is to make the adolescent and emerging adult brain 'look younger' than it actually is.") (internal citation omitted).

---

[86] Blume, et. al., *supra*, at 13 ("[T]he prefrontal cortex—an area of the brain associated with reasoning and higher function—remains developmentally immature and underregulated until the mid-20s, while the brain's dopamine-producing reward centers are relatively overexpressed, making young adults more vulnerable to impulsivity, less capable of emotional reasoning, and more likely to make errors in self-regulation") (internal quotations and citation omitted).

[87] *See also* Rhiana Kohl, *The Influence of Brain Development Research on the Response to Young Adult Males 18-24 Years of Age in the Criminal Justice System*, Mass. Dep't of Correction at 10 (Nov. 2018) (noting that the "desire to seek risk actually *increases* between the ages of eighteen and twenty-one before starting to taper off later") (emphasis added) (internal citation and quotations omitted).

Late adolescents' vulnerability to such impulsive and risk-taking behaviors is best explained by a "maturation gap" in key regions of their brains. As Dr. Laurence Steinberg explains, the

> system that is responsible for the increase in sensation-seeking and reward-seeking that takes place in adolescence, which is localized mainly in the brain's limbic system, undergoes dramatic changes very early in adolescence, around the time of puberty. . . . But the system that is responsible for self-control, regulating impulses, thinking ahead, evaluating the rewards and costs of a risky act, and resisting peer pressure, which is localized mainly in the prefrontal cortex, is still undergoing significant maturation well into the mid-20s. Thus, during middle and late adolescence there is an imbalance between the reward system and the self-control system that inclines adolescents toward sensation-seeking and impulsivity."

Ex. 84 (Steinberg Decl.) ¶ 27.[88]

Moreover, like juveniles, late adolescents "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *See Roper*, 543 U.S. at 569 (internal citations omitted). In fact, the "mere presence of a peer" increases their risky decision making relative to adults.[89] *See* Ex. 86 (*Wardlow* Amicus Brief) at 15-16 (same). Scientists believe that this phenomenon occurs because young people in the presence of peers "pay relatively more attention to the potential rewards of a risky decision than they do when they are alone, and that they are especially drawn to immediate rewards," both material and social. Ex. 84 (Steinberg Decl.) ¶ 24. It is thus not surprising that all of the offenses for which Robinson was charged involved more than one individual.

Finally, late adolescents, like juveniles, do grow out of their impulsive or reckless behaviors, as their "personality traits . . . are more transitory, less fixed," suggesting that "even a heinous crime committed by a juvenile is [not necessarily] evidence of irretrievably depraved character." *Roper*, 543 U.S. at 570; *see also Graham*, 560 U.S. at 68 ("[F]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character

---

[88] *See also* Jay N. Giedd, *The Amazing Teen Brain*, 312 Scientific American 33, 34 (June 2015) ("The most recent studies indicate that the riskiest behaviors arise from a mismatch between the maturation of networks in the limbic system, which drives emotions and becomes turbo-boosted in puberty, and the maturation of networks in the prefrontal cortex, which occurs later and promotes sound judgment and the control of impulses.").
[89] B.J. Casey, *Beyond Simple Models of Self-Control to Circuit-Based Accounts of Adolescent Behavior*, 66 Ann. Rev. Pscyhol. 295-319 (2015).

deficiencies will be reformed.") (internal quotations and citation omitted). The tendency for late adolescents to mature cannot be overstated: researchers estimate that only 5 or 6% of children who engage in criminality turn out to be "life-course persistent offenders," with 85% to 90% of those individuals desisting from crime by their mid-twenties. Ex. 86 (*Wardlow* Amicus Brief) at 18-19. This "pattern . . . holds regardless of offense type, including cases of violent crime." *Id.*

This finding is particularly important in Texas where jurors are required to assess "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). Because assessing whether a late adolescent is likely to reoffend is nearly impossible, requiring a jury to render such a determination is simply too unreliable to meet the requirements of the Eighth Amendment. *See Graham*, 560 U.S. at 68 (noting that "it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the  rare juvenile offender whose crime reflects irreparable corruption"); *see also Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) ("The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment.") (internal quotations and citation omitted).

Because young adults (ages 18, 19, or 20) as a class are not fully mature, they should not be considered among "the worst offenders" for purposes of the death penalty. *Roper*, 543 U.S. at 569. Therefore, "the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity" without violating constitutional principles. *Id.* at 554. Because Robinson was merely 18 and well under 21 at the time of the offense, he should not be subjected to the death penalty.

### 3.    Other judicial considerations

*First*, executions of 18 year olds serve no penological purpose. "(C)apital punishment is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social

purposes served by the death penalty: retribution and deterrence of capital crimes. *Kennedy*, 554 U.S. at 441; *accord Gregg*, 428 U.S. at 183 (1976) (noting that the death penalty should serve these "two principal social purposes").

Executing a young offender under 21 years of age serves no retributive purpose. The culpability and blameworthiness of 18 year olds are diminished to a substantial degree by their youth and immaturity. Just as with juveniles under 18 years of age, research suggests that this group can mature and "age out" of the recklessness and impulsiveness that characterize it. The fact that this group can mature necessarily means that they cannot be the "worst of the worst" so as to justify the ultimate sanction. *Roper*, 543 U.S. at 569. "Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.*. at 571.

As for the rationale of deterrence, *Roper* stated, "the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence. "In particular[,] . . . [t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually non-existent." *Id.* at 572 (internal quotations and citation omitted). The reasoning about the lack of deterrence applies equally to individuals under 21 years of age. Deterrence as a rationale for punishment necessarily requires a group to reflect upon the consequences of its actions. Late adolescents suffer from the same impulsivity as younger teenagers: They act rashly, without reflection and full consideration of the consequences of their actions.

*Second*, the concerns raised in *Roper* about the increased vulnerability of juvenile offenders are especially heightened in Texas, where future dangerousness is at issue. The Supreme Court's determination that certain groups of people must be categorically barred from capital punishment is based in part on the unacceptable risk that jurors would not give adequate weight to the offenders'

diminished culpability in the face of the brutality of their crimes. "An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death." *Id.* at 572-73.

This was true in the instant case, where the State's closing argument emphasized Robinson's youth as evidence of his future dangerousness. Initially, the State focused the jury's attention on the notion that Robinson was not a child: "Cortné Robinson had a gifted and talented mind. He still does. I submit to you, for someone his age, he is very mentally developed. He showed he had that ability in school, and he also showed that he frittered it away. He used his gifted and talented mind, and he chose the adult lifestyle that he enjoys to this very day." 36 RR 23-24; *see also* 36 RR 66 ("[D]o you think at the same time [Robinson was] standing over Frank Zabokrtsky, do you think 18 mattered? Do you think his age was a factor; that Mr. Frank was going, how old are you? I bet he wasn't."). But then the State went farther, using Robinson's youth against him. After discussing Robinson's decision to tattoo his face, the State argued:

> And that ought to be an indicator to you, as they say, he's aging out. And he's still developing from 18 to 25 till he's mature. How many people can he hurt from that 18 to 25? Do we get to say that's his grace period? Do we get to say it's okay, because he's still maturing in prison, so let him harm people, join a gang, get into fights, hurt somebody else, and at that point in time, it's okay?

36 RR 71-72; *cf.* Henery Aff. ¶¶ 120-121 (noting that the "pre-conviction phase of Cortné's incarceration revealed his emotional immaturity, deficient coping skills, and errors in judgment" and interpreting his decision to get facial tattoos as "a desperate, scared, and naïve act of a younger person"). Rather than accurately portraying Robinson as a child in crisis and in desperate need of

support, the State painted Robinson as a future danger *because of his young age*, rather than despite it.[90]

Use of young age as a factor to support capital punishment when it is actually, according to scientific

consensus, evidence of diminished culpability, renders the death sentences of young adults unreliable.

The State's argument was particularly concerning here, in a case that involved a young black

male defendant and a white victim. Young people of color are disproportionately sentenced to death

compared to white defendants, and the impact of race on sentencing is amplified when the victim is

white.[91] Moreover, prosecutors, like those in Robinson's case, are more likely to argue youth in

aggravation when the defendant is a young person of color.[92] Such arguments play directly to

decisionmakers' subconscious stereotypes, in which black youth are perceived as "more prone to

criminal behavior" and thus more deserving of harsh punishment.[93] This, too, leads to arbitrary and

unreliable death sentences against young persons of color in violation of the Eighth Amendment.

Given the complete lack of penological justification, the heightened risk of the unreliability of

the sentence, and vulnerability of the defendant, executing an offender who was 18 years of age at the

time of the crime violates the Eighth Amendment's prohibition on cruel and unusual punishment.

> **B.      Because of the trauma he suffered in childhood, the concerns raised in *Roper*
>           apply especially to Robinson and executing him would violate the Eighth
>           Amendment.**

---

[90] This line of argument is also at odds with *Roper* and its progeny, which emphasize a child's diminished moral culpability, while also acknowledging the very real possibility of reform. *See, e.g., Miller*, 567 U.S. at 472 (citations and internal quotation marks omitted) ("We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neuropsychological development occurs, his deficiencies will be reformed).

[91] *See* Blume, et al., *supra,* at 24 (finding that 74% of the youthful offenders sentenced to death since *Roper* were black or Latinx.); *id.* at 24-26 (finding that in youthful offender cases with a single victim, two-thirds of death sentences involved a white victim, 12% a Latinx victim, and 2% an Asian victim, a disparity not as pronounced in homicide arrests).

[92] *Id.* at 24.

[93] *Id.* at 25; *see also* Darrell Steffensmeier, Jeffery Ulmer, and John Kramer, *The Interaction of Race, Gender, and Age in Criminal Sentencing: The Punishment Cost of Being Young, Black, and Male*, 36 Criminology 763, 787 (1998) (highlighting that young black men are "more likely to be perceived as dangerous, committed to street life, and less reformable than women and older offenders"); Peter S. Lehmann, Ted Chiricos, and William D. Bales, *Sentencing Transferred Juveniles in the Adult Criminal Court: The Direct and Interactive Effects of Race and Ethnicity*, 15 Youth Violence and Juvenile Justice 172, 185 (2017) (finding that "Black and Hispanic [juvenile transfers to adult court] are sentenced especially harshly for violent, sex, and drug offenses," which lends support to the belief that "perceptions of dangerousness associated with race and ethnicity are informed by attributions connecting Black and Hispanic youth to violent crime").

The concerns that *Roper* enumerated in establishing a categorical ban on the execution of those under 18 years old apply equally to Robinson, an 18-year-old who suffered severe trauma and sleep deprivation as a child. Specifically, Robinson's adverse childhood experiences likely delayed his functional development, suggesting that at the time of the offense, despite his chronological age, he was developmentally functioning more like a younger child. Ex. 54 (Huckabee Report) at 17; Ex. 85 (Alfano 2017 Letter) at 2. Because an individualized determination as to the appropriateness of capital punishment should be made for a defendant who was only 18 years of age at the time of the crime, *Lockett*, 438 U.S. at 605, a *Roper* exception should apply.

As detailed *supra* Claim XI, Robinson suffered chronic sleep deprivation and severe and persistent child abuse from birth, later resulting in a PTSD diagnosis. *See* Ex. 54 at 28-30. He also grew up poor and was exposed to drugs and alcohol from a young age. Ex. 54 (Huckabee Report) at 7, 10. These factors are all crucial in assessing an individual's functional age. Specifically, as Dr. Huckabee and Dr. Alfano underscore, chronic sleep deprivation can delay development of the regions of the brain that affect executive functioning and impulse control. *See* Ex. 54 at 17; Ex. 67 (Alfano Report) at 5-6. The deleterious effects of chronic sleep deprivation are "most pronounced in adolescents and young adults," rendering them even more "vulnerable to risk" than they already are. Ex. 86 at 2. Similarly, trauma affects brain development in the limbic system and pre-frontal cortex, regions critical to impulse control and reasoning.[94] And poverty and early drug use, likewise, affect brain development in areas that control emotional development and judgment. *See* Ex. 54 (Huckabee Report) at 17 (noting that childhood poverty "has been associated with . . . smaller brain volume in the amygdala and hippocampus, regions that are critical to successful emotional development").[95] Ultimately, the

---

[94] *See* Gaskill & Perry, *supra*, 34.

[95] *See also* Center for Brain Health, *Starting Age of Marijuana Use May Have Long-Term Effects on Brain Development*, Science Daily (Feb. 10, 2016) (adolescents "who began using marijuana at the age of 16 or younger demonstrated brain variations that indicate arrested brain development in the prefrontal cortex, the part of the brain responsible for judgment, reasoning, and complex thinking") (citing to Francesca M. Filbey, *et al.*, *Preliminary Findings Demonstrating Latent Effects of Early Adolescent*

obvious fact that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18," *Roper*, 543 U.S. at 574, is all the more pronounced for young adults who are sleep deprived, suffer from depression, and have PTSD.

### C.      The state court's ruling does not bar relief.

The Texas Court of Criminal Appeals adopted the trial court's finding that Texas and Supreme Court law precludes this claim on the merits. It did not address whether Robinson was harmed by the error. Should this court determine error occurred, review must be *de novo*.

### D.      Conclusion

For all of the foregoing reasons, executing Robinson, an 18 year old who had suffered significant trauma at the time of the crime, would violate the principles articulated in *Roper, Graham, Miller,* and *Montgomery* as well as the Eighth Amendment's prohibition against cruel and unusual punishment. Based upon evolving standards of decency, this court must grant Robinson relief.

## REQUEST FOR RELIEF

WHEREFORE, based upon the foregoing, Petitioner respectfully requests that the Court grant him the following relief and any other relief as appropriate:

(1) Such discovery, including depositions and interrogatories, as is necessary for full and fair resolution of the claims set forth in this Petition;

(2) An evidentiary hearing on all claims involving disputed issues of fact;

(3) Leave to amend the Petition in light of any evidentiary hearing and fact development procedures;

(4) Leave to file a Memorandum of Law in support of the Petition;

(5) Should it assist the Court, a status conference to discuss timing of the above; and

(6) The issuance of a Writ of Habeas Corpus to provide Petitioner with relief from his unlawful conviction and sentence.

---

*Marijuana Use Onset on Cortical Architecture*, 16 Dev. Cognitive Neuroscience 16-22 (2015)), *available at* https://www.sciencedaily.com/releases/2016/02/160210135334.htm (last visited Apr. 2, 2021).

Respectfully submitted,

MAUREEN FRANCO
Federal Public Defender
Western District of Texas

*/s/ Joshua Freiman*
JOSHUA FREIMAN
Assistant Federal Public Defender
Capital Habeas Unit
NY Bar No. 5353545
919 Congress, Suite 950
Austin, Texas 78701
737-207-3007 (tel.)
512-499-1584 (fax)

Counsel for Petitioner

DATED:  April 5, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of April, 2021, I electronically filed the foregoing Amended

Petition for Writ of Habeas Corpus with the Clerk of Court using the CM/ECF system which will

send notification of such filing to the following:

**Garrett Greene**
Texas Attorney General - Austin
300 West 15th Street
Austin, TX 78701-1220

/s/ Joshua Freiman

157